UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

**PLANNED PARENTHOOD**                          **CASE NO.: 1:15-cv-568**
**SOUTHWEST OHIO REGION, et al.,**

        **Plaintiffs,**                          Judge Michael R. Barrett

    v.

**RICHARD HODGES, et al.**

        **Defendants.**

### OPINION AND ORDER

This matter is before the Court on the Motion for Preliminary Injunction of Plaintiff Planned Parenthood of Southwest Ohio ("PPSWO"). (Doc. 24).[1] Defendant Director of the Ohio Department of Health, Richard Hodges, ("Defendant" or "Director") has filed a response in opposition (Doc. 26),[2] and PPSWO has filed a reply (Doc. 27).[3] The parties have agreed that no oral hearing is necessary to render a decision.

**I.    BACKGROUND**

    **A.    PPSWO**

PPSWO operates an ambulatory surgical facility ("ASF")[4] providing women's health services, including abortions, in Cincinnati, Ohio. PPSWO and its predecessor have provided

---

[1] This motion incorporates arguments made in the first motion for a preliminary injunction (Doc. 3).

[2] The response in opposition incorporates arguments made in the response in opposition to the first motion for a preliminary injunction (Doc. 19).

[3] The reply incorporates arguments made in the reply in support of the first motion for a preliminary injunction (Doc. 21).

[4] ASFs are free-standing facilities in which outpatient surgery is performed routinely. Ohio Rev. Code § 3702.30(A)(1). "ASFs include facilities providing medical care and services in areas including, but not limited to, cosmetic and laser surgery, plastic surgery, abortion, dermatology, digestive endoscopy, gastroenterology, lithotripsy, urology, and orthopedics." *Women's Medical Professional Corp. v. Baird*, 438 F.3d 595, 599 n.1 (6th Cir. 2006).

care in Ohio since 1929.  PPSWO provides approximately 3,000 abortions per year, including surgical abortions through 19 weeks 6 days of pregnancy dated from the first day of the woman's last menstrual period ("LMP") and medication abortions through 49 days from the LMP.

### B. The WTA Requirement under Ohio Admin. Code § 3701-83-19(E)

Under Ohio law, ASFs must be licensed.  Ohio Rev. Code § 3702.30(E)(1).  The director of the Ohio Department of Health is authorized to establish quality standards for regulation of the ASFs.  Ohio Rev. Code § 3702.30(B).  Pursuant to that authority, the director promulgated a requirement in Ohio Administrative Code § 3701-83-19 requiring an ASF to have a written transfer agreement ("WTA") with a hospital for transfer of patients in the event of medical complications, emergency situations, and for other needs that may arise.  Ohio Admin. Code § 3701-83-19(E).  If any ASF was unable to obtain a WTA, then it could apply to the director of health for a variance or waiver from the WTA requirement by demonstrating that "the requirement has been met in an alternative manner" or that "the strict application of the license requirement would cause undue hardship" and "granting the waiver would not jeopardize the health and safety of any patient."  Ohio Admin. Code § 3701-83-14(A), (C)(1)-(2).  The director, however, was given authority to establish conditions for the variance or waiver to be operative and to rescind the waiver or variance at any time upon determining that the conditions were not being met.  Ohio Admin. Code § 3701-83-14(E).  All variance and waiver requests were to be considered on a case-by-case basis and the granting of one variance or waiver was not to be precedent setting for other variances or waivers.  Ohio Admin. Code § 3701-83-14(G).

In 2006, the Sixth Circuit addressed the constitutionality of the WTA requirement as applied to a Dayton, Ohio abortion clinic in *Women's Medical Professional Corp. v. Baird*, 438 F.3d 595 (6th Cir. 2006).  In the context of a permanent injunction, the Sixth Circuit upheld the constitutionality of the WTA requirement but found that the director did not afford the clinic

procedural due process when he ordered the clinic closed before a hearing could be held on the proposed denial of the license application. *Id.* at 602-11.

  C. <u>**H.B. 59**</u>

In 2013, the General Assembly, through H.B. 59, changed Ohio statutory law in regards to the WTA requirement. First, it codified the regulatory requirement that an ASF must have a WTA with a local hospital. Ohio Rev. Code § 3702.303.

Second, it preserved the ASFs ability to request a variance and set forth the specific procedures for submitting a request for a variance. Ohio Rev. Code § 3702.304(A)-(B). Under that provision, "[t]he director's decision to grant, refuse, or rescind a variance is final." Ohio Rev. Code § 3702.304(C).

Third, it added Ohio Rev. Code § 3727.60 under which a "public hospital" is prohibited from "[e]nter[ing] into a written transfer agreement with an ambulatory surgical facility in which nontherapeutic abortions are performed or induced[.]" Ohio Rev. Code § 3727.60(B)(1). That section further prohibits physicians with staff membership or professional privileges at a public hospital from using "that membership or those privileges as a substitution for, or alternative to, a written transfer agreement for purposes of a variance application" submitted by an ASF that performs such abortions. Ohio Rev. Code § 3727.60(B)(2).

PPSWO has been unable to obtain a WTA and has had to apply for variances from the WTA requirement. The Ohio Department of Health granted PPSWO's variance request on November 20, 2014. (Doc. 3-1, PageId 67). On May 18, 2015, PPSWO applied to renew its license and submitted its 2015 variance application with the Ohio Department of Health, which was pending as of the date this lawsuit was filed. (Id.).

  C. <u>**Action of Defendant on September 25, 2015**</u>

3

On September 25, 2015, the Director denied the variance application of PPSWO on the basis that the "provision of only three named back-up physicians does not meet the expectation that a variance provide the same level of patient health and safety that a written transfer agreement with a local hospital assures for 24/7 back-up coverage." (Doc. 24-1, PageId 291). The Director contemporaneously issued a notice to PPSWO proposing to revoke and refusing to renew the facility's ASF license. (Id., PageId 293-95). Consistent with *Baird*, PPSWO has been notified that it has an opportunity to request a hearing on the proposed license revocation and that, pursuant to Ohio Rev. Code § 119.07, it may remain in operation while the administrative proceedings are taking place. (Id.). The preliminary relief for the denial of that variance was resolved by the Agreed Order dated September 28, 2015 wherein the parties agreed that since the Director's denial of the variance occurred prior to the effective date of Ohio Rev. Code § 3702.309, the provisions of Ohio Rev. Code § 3702.309, including the Automatic Suspension Provision, would not apply to that denial. (Doc. 22).

D. **PPSWO's September 28, 2015 Variance Application**

After PPSWO's variance application was denied on September 25, 2015, PPSWO obtained a fourth doctor who would agree to treat, using his privileges at a local hospital, any patients from PPSWO needing emergency care. (Doc. 24-1, PageId 297-303). PPSWO then submitted a new variance request on September 28, 2015. (Id., PageId 296-97). That variance request remains pending before the Director.

E. **H.B. 64 Takes Effect**

H.B. 64, a bill containing revisions and additions to the statutory scheme for ASF variance applications and licensure, took effect on September 29, 2015. The new statutory scheme includes an amendment to Ohio Rev. Code § 3702.304, which added the following

4

language: "Not later than sixty days after receiving a variance application from an ambulatory surgical facility, the director shall grant or deny the variance. A variance application that has not been approved within sixty days is considered denied." When a variance application is denied, an ASF is not in compliance with the requirements necessary to possess a valid license under the licensing scheme. *See* Ohio Rev. Code § 3702.30(D).

The new statutory scheme also includes the addition of Ohio Rev. Code § 3702.309, which provides, in pertinent part: "If a variance application is denied under section 3702.304 of the Revised Code, the license of such an ambulatory surgical facility is automatically suspended" ("Automatic Suspension Provision"). At the time of suspension, the ASF must cease operations. Ohio Rev. Code § 3702.30(E)(1); Ohio Admin. Code § 3701-83-03(A). An ASF operating without a license is subject to action against it by the Ohio Department of Health, including civil penalties. Ohio Rev. Code § 3702.32. "If a facility's license remains under suspension pursuant to [§ 3702.309] after the expiration date of the license, in order to operate as an ambulatory surgical facility it must apply for a new license under [§ 3702.30]." Ohio Rev. Code § 3702.309(B).

Under § 3702.309, a license subject to the Automatic Suspension Provision may be reinstated by the Director if: (1) the ASF files a complying WTA with the Director; (2) the Director grants a variance; or (3) the license is required to be reinstated pursuant to an order issued in accordance with Ohio Rev. Code §§ 119.01 to 119.13. Sections 119.01 to 119.13 concern administrative procedures. Of particular relevance here are §§ 119.06, 119.07, 119.09, and 119.12. An adjudication order may be effective with or without a hearing. Ohio Rev. Code § 119.06. A hearing is not required for orders "suspending a license where a statute specifically permits the suspension of a license without a hearing." Ohio Rev. Code § 119.06(B). When a

statute permits suspension of a license without a prior hearing, an agency issuing an order must provide post-suspension notice and a hearing upon request from that person. Ohio Rev. Code §§ 119.06, 119.07. But when an agency is required to afford an opportunity for a hearing prior to the issuance of an order, the agency must give notice to the party that includes the reasons for the proposed action, the law or rule directly involved, and a statement informing the party of the right to a hearing if requested within 30 days of the time of mailing the notice. Ohio Rev. Code § 119.07. The hearing, if requested, is governed by Ohio Rev. Code § 119.09. The decision made after the hearing may be appealed to the appropriate court of common pleas, and the decision of that court also may be appealed. Ohio Rev. Code § 119.12. An agency's failure to hold an adjudication hearing before the expiration of the license does not terminate the request for a hearing or invalidate any order issued thereafter. Ohio Rev. Code § 119.091.

### F. Temporary Restraining Order

On September 30, 2015, this Court issued a Temporary Restraining Order that maintains the status quo up through October 13, 2015 at 5:00 p.m. (Doc. 25).

## II. PRELIMINARY INJUNCTIVE RELIEF

PPSWO seeks a preliminary injunction to enjoin the Director from enforcing or complying with Ohio Rev. Code § 3702.309, including the Automatic Suspension Provision, on the basis that it violates PPSWO's procedural due process rights.[5]

Under Federal Rule of Civil Procedure 65, injunctive relief is an extraordinary remedy, the purpose of which is to preserve the status quo. *Certified Restoration Dry Cleaning Network,*

---

[5] Plaintiffs also originally moved for a preliminary injunction on the basis that the two provisions violate the One-Subject Rule of the Ohio Constitution. (Doc. 3, PageId 51-57). In the opposition brief, Defendant invoked the Eleventh Amendment with respect to the One-Subject Rule in addition to raising other arguments. (Doc. 19, PageId 230-34). In their reply, Plaintiffs indicated that they "agree that, since Defendant has invoked the Eleventh Amendment, a preliminary injunction is not warranted on the single-subject claim." (Doc. 21, PageId 249). Additionally, PPSWO did not raise the One-Subject Rule as a basis for relief in the motion for a preliminary injunction that is presently before this Court. (*See* Doc. 24). Accordingly, the Court will not address that issue.

*L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). In determining whether to grant or deny a preliminary injunction, the Court must consider four factors: (1) whether the movant has shown a likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015) (citing *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012)0. The foregoing factors are not prerequisites, but are factors that the Court should balance. *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004). A preliminary injunction should be granted "only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

  A. <u>**Likelihood of Success on the Merits**</u>

To establish a procedural due process claim, PPSWO must show that (1) it has a life, liberty, or property interest protected by the Due Process Clause; (2) it was deprived of that protected interest; and (3) the State did not afford it adequate procedural rights prior to depriving it of the property interest. *Women's Medical Professional Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) (citing *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999)).

For the purposes of the preliminary injunctive relief, the Director does not dispute that PPSWO has a protected property interest. (*See* Doc. 19, PageId 234; Doc. 26, PageId 312). That property interest plainly exists in the continued operation of its ASF. *Baird*, 438 F.3d at 612 (holding that the physician and the clinic had "a protected property interest in the continued operation of the Dayton clinic"). Further, as PPSWO points out, and the Director does not dispute, PPSWO also has a protected property interest in its ASF license because PPSWO

7

previously has obtained and currently has a valid license for operation pursuant to Ohio Rev. Code § 3702.304 and will be unable to operate its business without it under the new Ohio statutory scheme. *See Bell v. Burson*, 402 U.S. 535, 539 (1971) ("Once licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment."); *Brookpark Entm't, Inc. v. Taft*, 951 F.2d 710, 716 (6th Cir. 1991) (recognizing that an Ohio liquor licensee has a property interest protected under the Due Process Clause); *State v. Hochhausler*, 76 Ohio St. 3d 455, 460 (1996) (holding that a driver has a protected property interest in his or her driver's license); *C.f. Baird*, 438 F.3d at 611 (recognizing that a *first-time* applicant for a license does not have a protected property interest in the obtainment of a license).

With respect to the likelihood that the Automatic Suspension Provision will deprive PPSWO of the protected interest, the Director does not contest that the Automatic Suspension Provision would result in a deprivation of a protected property interest to those ASFs in operation that are denied a variance on or after September 29, 2015. Nor does the Director dispute that PPSWO had a variance application pending before him at the time the present motion was filed, which was denied thereafter on September 25, 2015 or that PPSWO has a variance application currently pending before the Director that is subject to the Automatic Suspension Provision in Ohio Rev. Code § 3702.309 following a denial or 60 days of inaction on its variance application by the Director. PPSWO therefore has met its burden on this element at this time.

8

The next issue to address is whether PPSWO is afforded adequate procedural rights under Ohio Rev. Code § 3702.309, including the Automatic Suspension Provision.[6] It is PPSWO's position that, pursuant to *Baird*, the Automatic Suspension Provision provides it with no procedural protections and that such procedural protections are required here. The Director contends, however, that PPSWO has adequate pre- and post-deprivation review. Specifically, the Director argues that PPSWO's submissions of variance applications to him under Ohio Rev. Code §§ 3702.30 and 3702.304 constitute an adequate pre-deprivation procedure and that the provisions in Ohio Rev. Code § 3702.309 for reinstatement of a license and the administrative proceeding procedures in Ohio Rev. Code § 119.06 constitute adequate post-deprivation remedies such that no other procedural protections are required. For the reasons discussed below, the Court finds that PPSWO has met its burden of showing a likelihood of success in proving that the Automatic Suspension Provision will deprive PPSWO of its protected property interests without providing either adequate pre- or post-deprivation review in violation of PPSWO's constitutional right to procedural due process.

Contrary to the Director's argument, PPSWO's submission of applications for variances from the Director under Ohio Rev. Code §§ 3702.30 and 3702.304 does not constitute an adequate pre-deprivation procedure. The discretionary decision or the inaction of the Director that results in the automatic suspension of the ASF licenses occurs only *after* the submission of the application. As explained in *Baird*, pre-deprivation procedures must provide an opportunity to respond to the basis for the proposed action that will result in the denial of the party's property rights. Specifically, *Baird* explained:

---

[6] "This determination is one of federal law and thus is not limited by the procedures that the state may have deemed to be adequate when it created the property right." *Leary v. Daeschner*, 228 F.3d 729, 742 (6th Cir. 2000) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)).

9

> *Nor can [the abortion clinic's] request for a waiver be appropriately characterized as an opportunity to be heard and respond.* To be sure, its letter to ODH describes the arrangements made by Dr. Haskell for emergency treatment of his patients, concedes the impossibility of obtaining a transfer agreement for the Dayton facility, makes a legal argument that denying the license under the circumstances would violate the clinic's substantive due process rights, and refers to a waiver granted to another clinic that could not obtain a transfer agreement. It does not address, however, the basis for Director Baird's decision to deny the waiver—that the arrangement with the practice group was not a sufficient protection for patients. *Indeed, since it preceded the decision, it can hardly be characterized as a "pretermination opportunity to respond." The case law contemplates at a minimum some chance to react to proposed governmental action before deprivation occurs.*

*Baird*, 438 F.3d at 614 (emphasis added). Accordingly, under *Baird*, PPSWO's opportunity to present its variance applications to the Director cannot constitute a pre-termination opportunity to respond to a subsequent denial of the variance application before its license is suspended and it is forced to cease operations.

The cases upon which the Director relies do not support his position that the variance application provides sufficient pre-termination due process. For example, in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542-46 (1985), the Supreme Court held that a public employee was entitled under the Due Process Clause to an opportunity to *respond* to the employer's proposed termination of him to present reasons why the action should not be taken. The Court elaborated:

> The point is that where there is an entitlement, a prior hearing facilitates the consideration of whether a permissible course of action is an appropriate one. This is one way in which providing "effective notice and informal hearing permitting the [employee] to give his version of the events will provide a meaningful hedge against erroneous action. At least the [employer] will be alerted to the existence of disputes about facts and arguments about cause and effect . . . [His] discretion will be more informed and we think the risk of error substantially reduced.

*Id.* at 543 n. 8. Similarly, in *Leary v. Daeschner*, 228 F.3d 729, 742-44 (6th Cir. 2000), the circuit court determined that the plaintiffs received procedural due process when they were

provided notice and an opportunity to respond *after* a decision made by their employer and *before* they actually were deprived of their property interest.[7]

PPSWO's position that the variance application is not a pre-deprivation opportunity to respond is consistent with *Loudermill* and *Leary*. The pre-deprivation opportunity to respond must come *after*, not *before*, the discretionary decision.

In the absence of a pre-deprivation remedy, the Court must consider whether the post-deprivation remedy standing alone provides PPSWO with adequate procedural protections to satisfy due process. "Not every deprivation of liberty or property requires a predeprivation hearing or a federal remedy" and, in some instances, due process may be satisfied by adequate post-deprivation remedies alone. *Ramsey v. Board of Educ.*, 844 F.2d 1268, 1272 (6th Cir 1988); *see also Baird*, 438 F.3d at 614 (citing *Leary*, 228 F.3d at 743) ("In some cases, postdeprivation review may possibly be sufficient, and no predeprivation process is required."). "Determining what process is due in a given case requires consideration of a number of factors: the nature of the property interest involved (particularly its importance to the individual possessing it); the risk of an erroneous deprivation caused by inadequate procedures designed to safeguard the interest; the value, if any, that additional procedures might provide; and the state's burden in having to provide additional procedures." *Ramsey*, 844 F.2d at 1272 (citing *Mathews*

---

[7] The other decisions relied upon by the Director are not binding on this Court but nonetheless still do not support his position that the variance application itself provides sufficient pre-termination due process because each one required an opportunity to respond to the proposed action. *Am. Towers, Inc. v. Williams*, 50 F. App'x 448 (D.C. Cir. 2002) (recognizing that the district court dismissed plaintiff's procedural due process claim related to the rescission of a permit where the defendant's "pre-deprivation procedure . . . consisted of notice of the proposed rescission and an opportunity to respond in writing"); *Raditch v. United States*, 929 F.2d 478, 480-81 (9th Cir. 1991) (stating that the government agency had adequate procedures in place to provide due process but that "someone in the OWCP decided to terminate [the plaintiff's] benefits *without giving him notice and an opportunity to respond*, and without following the OWCP's procedures for gathering the requisite medical evidence" such that he did not receive adequate pre-deprivation remedies, but finding post-deprivation remedies alone were sufficient in that instance due to the unanticipated and unauthorized act of that OWCP employee) (emphasis added); *Sauceda v. Dep't of Labor & Indus.*, 917 F.2d 1216, 1219 (9th Cir. 1990) (holding that plaintiff was not entitled to an evidentiary hearing prior to the suspension of his disability benefits where the evidentiary hearing would not aid in avoiding erroneous decisions and the defendant was required to inform a claimant of its decision to suspend benefits with its reasons and give the claimant an opportunity to request reconsideration of the decision).

*v. Eldridge*, 424 U.S. 319, 334-35 (1976)). "When making this determination, the most important consideration to bear in mind is that the fundamental requirement of the Due Process Clause 'is the opportunity to be heard and it is an opportunity which must be granted at a meaningful time and in a meaningful manner.'" *Ramsey*, 844 F.2d at 1272 (quoting *Parratt v. Taylor*, 451 U.S. 527, 540 (1981)) (additional internal quotations omitted).

Here, the Court finds PPSWO has demonstrated a likelihood of success in showing that an opportunity to be heard before the automatic suspension of its license would provide it an opportunity to be heard at a meaningful time and in a meaningful manner. *Ramsey*, 844 F.2d at 1272 (quoting *Parratt v. Taylor*, 451 U.S. 527, 540 (1981)) (additional internal quotations omitted).

In *Baird*, the Sixth Circuit recognized that Ohio law provided several procedural protections to the abortion clinic after the initial denial of a license application, including administrative hearings under Ohio Rev. Code § 119.06 and an opportunity to apply for a waiver under Ohio Admin. Code § 3701-83-14. *Baird*, 438 F.3d at 612-13. Nevertheless, it determined that a post-deprivation remedy alone would not suffice to meet the requirements of due process in that case. *Baird*, 438 F.3d at 614. In reaching that conclusion, the Sixth Circuit recognized that the proposed denial by the ODH (which offered a hearing under Ohio laws) was sent on the same day as a cease-and-desist order requiring the abortion clinic to close or face civil penalties, which operated to prevent the abortion clinic from obtaining a hearing prior to the deprivation of its property interest in its ongoing business. *Id.* at 613. It further determined that the property interest at stake—the continued operation of the business—outweighed any undefined undue burden, and that that the ODH was not truly unable to anticipate and prevent the deprivation because it served the letter to close the clinic. *Id.* The ODH also did not demonstrate any public

policy reason for shutting down the operations simultaneously with the denial of the license application whereas the interest in continuing to operate the business was strong. *Id.* at 614. Finally, the circuit court held that there were material facts for resolution at a hearing. *Id.*

The facts here are striking similar to those in *Baird*. The challenged provisions of the Ohio statutory scheme have virtually the same effect as the denial and cease-and-desist letter in *Baird*. Specifically, the suspension of the ASF's license occurs simultaneously with the denial of the variance. PPSWO thus will be required to cease operating its clinic immediately or face penalties. Just as in *Baird*, PPSWO has a strong interest in the continued operation of its business. Although the Director has argued, and may be correct, that the automatic suspension would be more administratively efficient under Ohio Rev. Code § 119.06, 119.07, 119.09, he has not provided a compelling argument at this stage to show why pre-termination notice and an opportunity to respond to the denial of a variance application would be an undue burden when that appears to have been the practice until September 29, 2015. At this stage of the litigation, PPSWO has demonstrated a likelihood of success in showing that its strong interest in the continued operation of its business outweighs any undue burden.

Further, as in *Baird*, the Director has not shown that the ODH is "truly unable to anticipate and prevent a random deprivation" of the protected interest. Under Ohio Rev. Code § 3702.304, the Director has 60 days to act on a variance application, and he is able to control the timing of and the ultimate decision on the pending variance application that triggers the automatic suspension.

Also consistent with *Baird* is that there are material facts for resolution at a hearing. *See Baird*, 438 F.3d at 614. In *Baird*, the dissent took the position that there was no material fact for resolution at a hearing. *Id.* The majority responded:

13

> In my judgment, there is a fact issue for hearing, that is, whether Dr. Haskell's alternative arrangements for emergency treatment for his patients will adequately protect them. [The Director's] ability to exercise discretion in acting on a waiver means that he can deny the waiver after hearing, but it also means that he could grant the waiver--without departing from any regulation or any legal requirements. The decision is properly his, not ours.

438 F.3d at 614. The same is true here. Given that PPSWO's variance application is subject to the complete discretion of the Director, a hearing would permit PPSWO an opportunity to respond to the reasons for the denial, including an opportunity to address whether the alternative arrangements for emergency treatment for the patients are adequate. This is particularly true under the newly effective Ohio Rev. Code § 3702.04 because a variance application can be denied by inaction such that a hearing would resolve whether the variance application actually demonstrated an inability to protect patients through alternative arrangements or whether it was denied due to, for example, administrative oversight. Therefore, the hearing would serve a greater purpose than for PPSWO to request the Director to show leniency or depart from his own regulations. *See Loudermill*, 470 U.S. at 543 n. 8 (citing *Dixon v. Love*, 431 U.S. 105, 114 (1977)).

On its face, the Director's strongest argument against a pre-deprivation hearing concerns the health and safety of the patients. But that argument does not deprive PPSWO of a likelihood of success on the merits for two primary reasons.

First, *Baird* held that a pre-deprivation opportunity to respond is required under analogous circumstances. *Baird*, 438 F.3d at 613-14.

Second, the cases upon which the Director relies to demonstrate the necessity of the Automatic Suspension Provision pursuant to a health and safety justification are plainly distinguishable. The Director views the health and safety concern in *State v. Hochhausler*, 76 Ohio St. 3d 455 (1996), in isolation from the totality of the Ohio Supreme Court's decision.

14

*Hochhausler* involved the immediate suspension of a driver's license pursuant to Ohio Rev. Code § 4511.191 after a driver failed or refused to take a breath-alcohol test. The Ohio Supreme Court found procedural due process satisfied only after considering the various factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Hochhausler*, 76 Ohio St. 3d at 460-62. The Court first found that the private interest in the license was weakened due to the limited duration of the suspension, the fact that the driver received a prompt post-suspension review within five days, and there was hardship relief available under the statute. *Id.* at 460-61. It next determined that the risk of erroneous deprivation was small because the statute permitting the suspension under this specifically identified circumstance required affirmative objective findings and a sworn statement of the officer before the deprivation could occur. *Id.* at 462. As for the health and safety interest, the Court held that the State had an obvious and compelling interest in removing from the road those individuals who may be violating the State's criminal laws prohibiting intoxicated driving. *Id.* Of importance to the Court was that the specific health and safety interest was "unequivocally" reflected in the criminal laws and the courts' sentencing practices. *Id.*

Similarly, in *Temponeras v. Ohio State Medical Board*, 36 N.E.3d 20, 211 (Ohio Ct. App. 2015), the Ohio Appellate Court held—without engaging in a procedural due process analysis—that the Medical Board had authority to take immediate action against an individual's medical license pursuant to Ohio Rev. Code § 4731.22(B)(24) when it received evidence that the Drug Enforcement Administration ("DEA") of the United States Department of Justice terminated or suspended the license holder's DEA certificate of registration for overprescribing certain controlled substances and where several patients had died from drug overdoses. Notably, § 4731.22(B)(24) specifically identifies the DEA's suspension on a certificate of registration as a

circumstance where a license could be immediately suspended and requires affirmative action from the board before such a suspension may occur. Ohio Rev. Code § 4731.22(B).[8]

Here, the connection to health and safety is tenuous at this time. The health and safety risk identified by the Director stems from the denial of a variance from a statutory WTA requirement. Under Ohio Rev. Code § 3702.304, the Director has discretion as to whether to deny the variance. Ohio Rev. Code § 3702.304 does not require the Director to make any affirmative finding as to a risk to health and safety or the commission of a crime before denying the variance and triggering the automatic suspension. While he may deny a variance on the basis that he believes the alternative arrangements are inadequate to protect the health and safety of others, he also could deny the variance for other technical or arbitrary reasons. Moreover, he could deny a variance for no reason at all by failing to act for 60 days. The decision is entirely within his discretion. The denial of a variance, standing alone, thus does not plainly implicate the same obvious, direct, and compelling health and safety concerns as are present with respect to drugs, guns, and crimes. PPSWO has offered strong evidence that the continued operation of its clinic after a denial of a variance in a manner consistent with its multiple years of operation and pursuant to similar alternative procedures that previously have been approved for emergency transfers, will not pose the unduly high immediate risks to patient health and safety that have been identified by the Director. Also of importance is the evidence presented by PPSWO that it

---

[8] The out-of-circuit cases cited by the Director are similarly distinguishable due to the obvious connection between the action of the individual (based on affirmative findings) and the government's concern for health and safety. *Hightower v. City of Boston*, 693 F.3d 61, 66-67, 85 (1st Cir. 2012) (holding that revocation of a "license to carry a concealed, large capacity weapon" upon a determination that the license holder is not qualified to hold or renew the license due to providing false information on the application—which is a crime under Massachusetts law—is justified where the statute specifically sets forth the reasons a license may be suspended or revoked and where there are obvious and immediate concerns of health and safety); *Spinelli v. City of New York*, 579 F.3d 160, 164, 170-71 (2d Cir. 2009) (holding that pre-deprivation process was not required to suspend a gun dealer's license under the applicable state statute that permitted suspension for "good cause" where an affirmative review of the premises demonstrated "grossly inadequate" security at the gun store, given the interest in public safety; suspension was not, however, a default rule in that case).

has obtained a fourth physician to satisfy the previously expressed concern of the Director as well as the evidence that local hospitals will treat the patients of an abortion clinic who present in the emergency department even in the absence of a WTA.

Accordingly, the Court finds PPSWO has shown a likelihood of success on the merits of its procedural due process claim.

### B. Irreparable Harm

To obtain a preliminary injunction, the harm that would result in the absence of the injunction must be irreparable, not merely substantial. *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Irreparable harm is harm that is "actual and imminent" rather than "harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). As PPSWO points out, when a constitutional right is being threatened or impaired, a finding of irreparable harm is mandated. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Here, PPSWO has demonstrated that its constitutional right to procedural due process is imminently threatened because its September 28, 2015 variance application falls under the newly effective provisions of Ohio Rev. Code §§ 3702.304 and 3702.309. The threatened constitutional violation is a sufficient ground upon which to find irreparable harm if the injunction does not issue. Moreover, the inability to operate an ongoing business for an unknown period of time constitutes irreparable harm that cannot be fully compensated by monetary damages. *See Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1382 (6th Cir. 1995). This factor therefore weighs in favor of PPSWO.

### C. Substantial Harm to Others

This third factor weighs in favor of PPSWO.  The denial of an injunction may subject PPSWO to the Automatic Suspension Provision upon the denial of or 60 days of inaction on its variance application, which means its business could be shut down immediately.  The immediate shutdown of its operations would mean that women with previously scheduled appointments and new patients could face a delay or be precluded from obtaining abortion services at those clinics, which may result in irreparable harm.  *See Planned Parenthood Southeast, Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013).  While *Baird*, 438 F.3d at 604-09, held that women would be able to obtain those services at another clinic, even though doing so may require additional travel, that conclusion was made in terms of undue burden on a woman's right to have an abortion in the context of an as-applied constitutional challenge to a regulation imposing restrictions on abortion clinics.  While it bears consideration here, the standard for irreparable harm here is not identical.  The temporary nature of the provided relief therefore justifies a finding of irreparable harm to others.

At the same time, the Court recognizes the Director's position that the issuance of an injunction would present health and safety risks to the patients where it is not clear that the clinics have satisfied the State-identified standards for emergency care or where a specific determination has been made as to a severe risk to a women's health and safety at a clinic.  But at this time, the connection between the denial of the variance and the health and safety concerns is tenuous, as explained previously.  Given the temporary nature of the relief, the Court finds that the harm to women seeking abortion services outweighs the more theoretical harm to the patients' health and safety at this time.

    **D.**    **Public Interest**

The public interest in preserving the status quo and in ensuring access to the constitutionally protected health care services while this case proceeds is strong.  *See Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir. 2012) (stating that "[t]he public interest is promoted by the robust enforcement of constitutional rights"); *Doe v. Barron*, 92 F. Supp. 2d 694, 697 (S.D. Ohio 1999) ("A woman's right to choose to terminate her pregnancy was decided more than twenty-five years ago in *Roe v. Wade*.  It is in the public's interest to uphold that right when it is being arbitrarily [or unconstitutionally] denied.").  Given that the Automatic Suspension Provision potentially could apply to the denial of PPSWO's variance request so as to close its business, the Court finds it is in the public interest to ensure that those interests are preserved through an injunction until a final hearing on the merits.  This factor therefore weighs in favor of PPSWO.

### III.   CONCLUSION

Having balanced the four factors for preliminary injunctive relief, the Court hereby **GRANTS** PPSWO's Motion for Preliminary Injunction (Doc. 24).  Defendant Richard Hodges, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with Defendant who receive actual notice of this Order, are **PRELIMINARY ENJOINED** from enforcing Ohio Rev. Code § 3702.309 and from suspending PPSWO's license pursuant to the Automatic Suspension Provision of Ohio Rev. Code § 3702.309 while this Preliminary Injunction Order is in place.

PPSWO shall not be required to post bond.  *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995).

**IT IS SO ORDERED.**

                                                                        s/Michael R. Barrett                
                                                                        JUDGE MICHAEL R. BARRETT
                                                                        UNITED STATES DISTRICT COURT