**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **PLANNED PARENTHOOD** | : | **Case No. 1:15-cv-568** |
| **SOUTHWEST OHIO REGION** | : | |
| C/O Gerhardstein & Branch, LPA | : | |
| 432 Walnut Street, Suite 400 | : | **Judge Michael R. Barrett** |
| Cincinnati, Ohio 45202 | : | |
| | : | |
| **WOMEN'S MED GROUP** | : | |
| **PROFESSIONAL CORPORATION** | : | |
| C/O Gerhardstein & Branch, LPA | : | |
| 432 Walnut Street, Suite 400 | : | **PLAINTIFFS' FIRST AMENDED** |
| Cincinnati, Ohio 45202 | : | **COMPLAINT FOR DECLARATORY** |
| | : | **AND INJUNCTIVE RELIEF** |
| Plaintiffs, | : | |
| vs. | : | |
| | : | |
| **RICHARD HODGES** | : | |
| 246 N. High Street | : | |
| Columbus, Oh 43215 | : | |
| In his official capacity as the Director of the | : | |
| Ohio Department of Health | : | |
| | : | |
| and | : | |
| | : | |
| **UNIVERSITY OF CINCINNATI** | : | |
| **MEDICAL CENTER, LLC** | : | |
| 3200 Burnet Avenue | : | |
| Cincinnati, OH  45229 | : | |
| | : | |
| and | : | |
| | : | |
| **UC HEALTH** | : | |
| **C/O AGENT: GH&R Business** | : | |
| **Services, Inc.** | : | |
| 511 Walnut Street 1900 5/3 Center | : | |
| Cincinnati, OH  45202 | : | |
| | : | |
| Defendants. | : | |

## I.    PRELIMINARY STATEMENT

1.    This civil rights case pursuant to 42 U.S.C. § 1983 challenges Ohio's continuing assault on the right of women to exercise reproductive freedom and its efforts to shutter the last two ambulatory surgery facilities that perform abortions in Southwest Ohio. If both facilities must shut their doors, abortion services in Southwest Ohio will be virtually eliminated overnight.

2.    Such efforts are part of a deliberate strategy to severely reduce access to abortion by imposing and enforcing laws and regulations that do not promote women's health or any other valid state interest.  At the beginning of 2013, there were 14 clinics in Ohio providing surgical abortion.  Today there are only nine clinics providing surgical abortion, and at least three of the remaining clinics, including Plaintiffs' two clinics, are in jeopardy of closing.

3.    Even though surgical abortion is one of the safest medical procedures in modern medicine and such a requirement is medically unjustified, Ohio requires that abortions performed by Plaintiffs be provided only in ambulatory surgical facilities ("ASFs") that maintain a written transfer agreement ("WTA") with a local hospital (the "WTA Requirement"). Despite the fact that WTAs have proven exceedingly difficult, if not impossible, for ASFs that provide abortions to obtain and/or retain, the WTA Requirement was upheld in 2006 because the Department of Health ("ODH") has the "ability to grant a waiver of this requirement." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 610 (6th Cir. 2006).A "waiver" under Ohio administrative rules would make the WTA Requirement inapplicable for a given clinic—but, in fact, ODH has not granted any "waivers" of this requirement—instead, ODH has, on limited occasions, granted a "variance" from the WTA Requirement for clinics that satisfy the WTA Requirement in an alternative manner.  A "variance," if granted by ODH, is valid for only one year—thus, an ASF that cannot obtain a WTA must reapply for a variance every single year.

2

4.      The WTA Requirement, however, apparently did not go far enough for Plaintiffs'
opponents. In 2013, as a part of the biennial budget bill Substitute Amended House Bill 59 of the
130th General Assembly ("HB 59"), Ohio banned abortion clinics – and only abortion clinics –
from obtaining the necessary WTA from a "public hospital," Ohio Rev. Code Ann. § 3727.60
("Public Hospital Ban"), making the already difficult task of securing a WTA even more
challenging.  At the same time, HB 59 prescribed onerous and detailed requirements for an ASF
seeking a variance of the WTA Requirement (leaving intact the regulatory variance process for
all other types of variances that might be sought). While the latter requirement is facially neutral,
it too singled out ASFs providing abortions, as they were the only ASFs that had sought a WTA
variance.  Additionally, HB 59 codified the WTA Requirement, thus eliminating the Director's
discretion to grant a "waiver" of the prior administrative rule.

5.      But HB 59 was also apparently not enough. The most recent assault on women's
reproductive freedom, enacted as part of biennial omnibus budget measure House Bill 64 of the
131st General Assembly ("HB 64") in 2015, immediately and automatically suspends an ASF's
license (1) if ODH fails to act on a variance application within 60 days, or (2) if ODH denies the
ASF's request for a variance pursuant to Ohio Rev. Code 3702.304 (A). Ohio Rev. Code
3702.309 (A) ("Automatic Suspension Provision").  The Automatic Suspension Provision takes
effect on September 29, 2015,leaving all ASFs with variance applications pending subject to
immediate licensure suspension at any time.

6.      Because of the WTA Requirement, the Public Hospital Ban, and the Automatic
Suspension Provision, Plaintiffs Planned Parenthood Southwest Ohio Region ("PPSWO") and
Women's Med Group Professional Corporation ("WMGPC") are at risk of being forced to
immediately shut down operations at their ASFs and to turn away their patients, without any

3

prior notice and without any opportunity for a hearing. Indeed, both have variance applications pending with ODH, and if those applications are denied they will be forced to close immediately. Lawson Declaration ¶¶ 20, 22, 23, 26; Haskell Declaration ¶¶ 26, 28, 32, 33.[1] PPSWO has been forced to seek a variance of the WTA Requirement because Defendant University of Cincinnati Medical Center ("UCMC") terminated its WTA with PPSWO as required by the Public Hospital Ban, and PPSWO has been unable to obtain a replacement from any hospital in Cincinnati. Plaintiff WMGPC is in a similar situation, having been unable to obtain a WTA from any hospital in Dayton for the ASF it operates, Women's Med Center of Dayton ("WMCD").[2]

7.      If, in the absence of an injunction being issued in this case, ODH automatically suspends both PPSWO's and WMCD's ASF licenses under HB 64, which could happen at any time after September 29, surgical abortion would become wholly unavailable in Southwest Ohio. The women of Southwest Ohio would be forced to travel hundreds of miles round trip to the next closest abortion providers in Columbus or Cleveland,[3] and, due to a statutory waiting period, make that trip twice, or stay overnight, in order to access surgical abortion. And neither PPSWO nor WMGPC would have any right to seek review of ODH's actions in violation of Plaintiffs' due process rights.

8.      To protect the constitutional rights of Plaintiffs and their patients, this Court must act to declare the WTA Requirement and the Automatic Suspension Provision unconstitutional,

---

[1] The Declarations of Jerry Lawson and Martin Haskell, along with the exhibits, are incorporated herein by reference.

[2] WMGPC also operates the Lebanon Road Surgery Center in Sharonville, Ohio, which is a suburb of Cincinnati. LRSC stopped performing surgical abortions in 2014 after ODH denied its variance application and revoked its ASF license for not having a WTA.

[3] The remaining clinic in Toledo is in litigation to keep its license since it lost its WTA with the public hospital after the Public Hospital Ban went into effect. *In the Matter of Capital Care Network of Toledo v. State of Ohio Department of Health*, Case No. CL-201501186, Sixth District, Lucas County. And as discussed *infra* §4(G), patients who are past 16 weeks 6 days LMP would be forced to travel to Cleveland if Plaintiffs were forced to shut down their ASFs.

and enjoin their enforcement.  This Court must further act to declare the Public Hospital Ban unconstitutional, enjoin its enforcement, and reinstate PPSWO's agreement with UCMC. Plaintiff Women's Medical Group Professional Corporation owns and operates the ASF known as Women's Med Center of Dayton ("WMCD") at 1401 E. Stroop Rd. in Kettering, OH. WMGPC and its predecessors have been providing abortions to women in the Dayton area since 1975, soon after *Roe v. Wade*, 410 U.S. 113 (1973), was decided.  WMCD provides surgical abortions, pregnancy testing, and birth control healthcare services to women. WMCD provides approximately 2,800 abortions per year. WMCD provides abortions to women to 22 weeks 6 days of pregnancy LMP or to 450 grams estimated fetal weight, whichever is less. The only other ASF in Ohio that performs abortions to that gestational age is located in Cleveland.  WMGPC also operates a clinic in Sharonville, Ohio called Lebanon Road Surgery Center ("LRSC") that no longer provides surgical abortions because it has no WTA.  WMGPC sues on its own behalf of its current and future medical staff, servants, officers, and agents, and on behalf of its patients.

9.     Defendant Richard Hodges is the Director of the Ohio Department of Healthand is responsible for enforcing the ASF laws and rules, issuing ASF licenses, and granting or denying variances of the ASF requirements. Defendant Hodges also has the authority to impose civil penalties and take actions to close an ASF that is operating without a license or that is operating with a suspended license.  He is not a physician.  Defendant Hodges is a "person" under 42 U.S.C. § 1983, and all of the actions alleged in this case have been taken under color of law.  He is sued in his official capacity.

10.     Defendant University of Cincinnati Medical Center, LLC ("UCMC") and Defendant UC Health are Ohio businesses properly registered through the Ohio Secretary of State.  Defendant UCMC is a hospital that is part of UC Health.  Although UCMC is a nonprofit

private entity, it qualifies as a "public hospital" as broadly defined in Ohio Rev. Code Ann. §

3727.60 (A)(4).  Consequently, UCMC is compelled by the State to arbitrarily deny Plaintiffs'

request for a WTA without due process of law.  UCMC has thereby been dragooned into the

State's overarching scheme to restrict the licensing of abortion clinics.  Defendants UCMC and

UC Health are "persons" under 42 U.S.C. § 1983 and at all times relevant to this case acted

under color of law.

## II.    FACTS

### A.  Abortion Practice and Safety

11.    Women seek abortion for a variety of deeply personal reasons, including familial,

medical, financial, and personal. Some women have abortions because they conclude that it is

not the right time in their lives to have a child or to add to their families; some to preserve their

life or health; some because they receive a diagnosis of a severe fetal medical condition or

anomaly; some because they have become pregnant as a result of rape; and others because they

choose not to have children.

12.    Approximately one in three women in this country will have an abortion by age

forty-five. A majority of women having abortions (61%) already have at least one child, while

most (66%) also plan to have a child or additional children in the future.

13.    Women in Ohio may obtain two types of abortion: medication abortion and

surgical abortion. Medication abortion is a method of ending an early pregnancy by taking

medications that cause the woman to undergo a procedure similar to an early miscarriage.

Medication abortion is available in Ohio only through 49 days LMP.

14.    Surgical abortion, despite its name, does not involve any incision.  It is legal in

Ohio until viability.

15.     Most abortions are performed during the first trimester of pregnancy, when the gestational age of the fetus is at or less than fourteen weeks LMP.

16.     Because abortion is so safe, the vast majority of abortions can be and are safely provided in an outpatient setting.  In 2013, 99.6% of Ohio abortions were performed in an outpatient center.

17.     Even though abortion rarely results in complications, Plaintiffs provide high quality care in the rare event that it does. Most of the rare complications related to abortion are safely and appropriately handled in the outpatient setting.

18.     In the exceedingly rare case that a patient requires hospital-based care, Plaintiffs' protocols and practices ensure that the patient receives the necessary, quality care.

19.     Regardless of whether an ASF has a WTA with a local hospital, appropriate care is also ensured because hospitals provide necessary care to patients who need it. Indeed, hospitals must comply with the federal Emergency Medical Treatment & Labor Act, which requires hospitals to treat and stabilize all emergency patients. 42 U.S.C. § 1395dd(b) (commonly referred to as EMTALA).In fact, Miami Valley Hospital in Dayton assures it will treat WMCD patients in an emergency.  Haskell Declaration ¶ 14 and Exhibit B page 000038.

20.     Even if a clinic were to have a WTA at a particular hospital, the clinic's patients may not go to that hospital.  Some paramedics decide which hospital is closest or best suited for the patient's needs and do not care which hospital has a WTA with the clinic.  Others may follow the patient's preference based on insurance or other issues.

21.     As a result, WTAs do nothing to increase patient safety or health and are not medically necessary.

22. What does clearly decrease patient safety and threaten patients' health is the lack of access to abortion services.

23. Continuing a pregnancy can pose a risk to the lives and to the physical, mental, and emotional health of some women, such as those seeking abortions because of their age, because they are pregnant as a result of rape or incest, or because there are or may be anomalies in the fetus, some of which are fatal to the fetus and are discovered later in the pregnancy.

**B. History of the ASF Licensing Framework and WTA Requirement**

24. In 1995, Ohio passed a law requiring ASFs to obtain a license from ODH. In 1999, ODH notified the abortion facilities in Ohio that they needed to apply for such a license.

25. ODH regulations required all ASFs to have a WTA "for transfer of patients in the event of medical complications, emergency situations, and for other needs as they arise." Ohio Admin. Code § 3701-83-19(E). An ASF could apply for a variance from the WTA Requirement, as it could from any other ASF requirement, by demonstrating that "the requirement has been met in an alternative manner," or that the ASF would suffer "undue hardship" from the requirement and that granting the waiver would not "jeopardize the health and safety of any patient." *Id.* § 3701-83-14 (C).

26. The WTA Requirement has been difficult, if not impossible in some cases, for the ASFs that provide abortions to comply with. Over the years, Women's Med Center Dayton, Lebanon Road Surgery Center in Sharonville, Capital Care in Toledo, and PPSWO in Cincinnati have all been unable to obtain a WTA.

27. Abortion clinics have had difficulty meeting the WTA Requirement because of hospitals' religious and political opposition to abortion, and/or because of hospitals' fear of the harassment and intimidation they and their doctors would face if they were to enter into a WTA with an abortion clinic. For example, there is a national campaign to shame the Dayton doctors

who provide back-up services to patients of WMCD. An anti-abortion group plastered the doctors' faces on trucks next to a photograph of an alleged aborted fetus, drove the truck through each doctor's neighborhood, and parked the trucks at the hospital and their respective homes and work sites.[4] This and other harassment takes place solely to intimidate the doctors from agreeing to admit WMGPC's patients to a hospital.

28.     As a result, the only ASFs seeking variances from ODH from the WTA Requirement are ASFs that provide abortions. Not a single ASF in Ohio has applied for a variance from the WTA Requirement, except for abortion providers.

29.     In 2006, the Sixth Circuit upheld the WTA Requirement as applied to Plaintiff WMCD because it recognized that ODH could grant a waiver or variance of the requirement. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595 (6th Cir. 2006).

**C.     HB 59**

30.     In 2013, as part of the omnibus budget bill HB 59, the legislature altered the ASF licensing scheme with respect to the WTA provisions.

31.     The purpose of the changes to the ASF requirements in HB 59 was to reduce access to abortion. For example, upon its introduction in committee, State Senator Joe Ueker, stated that, "Someone has to stand up for the rights of the unborn."[5] Similarly, when Governor Kasich refused to use his line-item veto, his spokesperson stated that "[t]he governor is pro-life and we believe these are reasonable policies to help protect human life."[6] Mike Gonidakis, a member of the Ohio State Medical Board and president of Ohio Right to Life, stated regarding

---

[4]*Killers Among Us: Dr. Martin Haskell and His Abortion Enablers*, CREATED EQUAL http://www.createdequal.org/wright-state.

[5] Ann Sanner, *Abortion-Related Issues Remain Part of Ohio Budget*, THE ASSOCIATED PRESS (June 6, 2013), http://www.crescent-news.com/editors%20pick/2013/06/06/abortion-related-issues-remain-part-of-budget.

[6]Juliet Eilperin, *Abortion Limits at State Level Return Issue to National Stage*, THE WASHINGTON POST (July 5, 2013), http://www.washingtonpost.com/politics/abortion-limits-at-state-level-return-issue-to-the-national-stage/2013/07/05/f86dd76c-e3f1-11e2-aef3-339619eab080_story.html.

the section: "Ohio has a history of advancing common-sense pro-life initiatives. We are very conscious not to overreach. . . . We believe in the incremental approach: one step at a time, advancing legislation that will withstand court scrutiny."[7]  In addition, Governor Kasich touted HB 59 as including a number of "pro-life provisions" in a letter to Ohio Right to Life.  Haskell Declaration Exhibit B page 000039.

32.    HB 59 altered the WTA Requirement in three critical respects. First, the WTA Requirement, which was originally required only by regulation, was incorporated into statute. Ohio Rev. Code Ann. §3702.303(A) now provides:

> Except as provided in division (C) of this section, an ambulatory surgical facility shall have a written transfer agreement with a local hospital that specifies an effective procedure for the safe and immediate transfer of patients from the facility to the hospital when medical care beyond the care that can be provided at the ambulatory surgical facility is necessary, including when emergency situations occur or medical complications arise. A copy of the agreement shall be filed with the director of health.

33.    Second, HB 59 amended the ASF licensing provisions to prohibit any "public hospital" from "enter[ing] into a written transfer agreement with an ambulatory surgical facility in which nontherapeutic abortions are performed or induced."  Ohio Rev. Code Ann. § 3727.60(B)(1) ("Public Hospital Ban"). The ban applies only to clinics that provide abortions and does not apply to any other ASF in the state.

34.    WTAs do nothing to increase patient safety or health and are not medically necessary.  And there is certainly no legitimate reason, even if a WTA is required, to exclude public hospitals from the list of eligible hospitals.  To the contrary, if the purpose of a WTA is to improve patient safety, it is irrational to exclude the hospitals in a community, such as teaching hospitals, that might provide the highest level of patient care.

---

[7] Rachel Weiner, *What makes Ohio's New Abortion Law Unique*, THE WASHINGTON POST(July 1, 2013), http://www.washingtonpost.com/blogs/the-fix/wp/2013/07/01/what-makes-ohios-new-abortion-law-unique/.

35.     At the same time, the Public Hospital Ban also prohibits physicians with staff membership or professional privileges at a public hospital "to use that membership or those privileges as a substation for, or alternative to, a written transfer agreement for purposes of a variance application" for an ASF that performs abortions. Ohio Rev. Code Ann. § 3727.60(B)(2).

36.     Third, HB 59 also provided a new variance process, which applies only to a variance of the WTA Requirement. The contents of an application for a variance from the WTA Requirement are now set out in Ohio Rev. Code Ann. §3702.304, which provides:

(A) The director of health may grant a variance from the written transfer agreement requirement of section 3702.303 of the Revised Code if the ambulatory surgical facility submits to the director a complete variance application, prescribed by the director, and the director determines after reviewing the application that the facility is capable of achieving the purpose of a written transfer agreement in the absence of one. The director's determination is final.

(B) A variance application is complete for purposes of division (A) of this section if it contains or includes as attachments all of the following:

(1) A statement explaining why application of the requirement would cause the facility undue hardship and why the variance will not jeopardize the health and safety of any patient;

(2) A letter, contract, or memorandum of understanding signed by the facility and one or more consulting physicians who have admitting privileges at a minimum of one local hospital, memorializing the physician or physicians' agreement to provide back-up coverage when medical care beyond the level the facility can provide is necessary;

(3) For each consulting physician described in division (B)(2) of this section:

(a) A signed statement in which the physician attests that the physician is familiar with the facility and its operations, and agrees to provide notice to the facility of any changes in the physician's ability to provide back-up coverage;

(b) The estimated travel time from the physician's main residence or office to each local hospital where the physician has admitting privileges;

(c) Written verification that the facility has a record of the name, telephone numbers, and practice specialties of the physician;

11

(d) Written verification from the state medical board that the physician possesses a valid certificate to practice medicine and surgery or osteopathic medicine and surgery issued under Chapter 4731 of the Revised Code;

(e) Documented verification that each hospital at which the physician has admitting privileges has been informed in writing by the physician that the physician is a consulting physician for the ambulatory surgical facility and has agreed to provide back-up coverage for the facility when medical care beyond the care the facility can provide is necessary.

(4) A copy of the facility's operating procedures or protocols that, at a minimum, do all of the following:

(a) Address how back-up coverage by consulting physicians is to occur, including how back-up coverage is to occur when consulting physicians are temporarily unavailable;

(b) Specify that each consulting physician is required to notify the facility, without delay, when the physician is unable to expeditiously admit patients to a local hospital and provide for continuity of patient care;

(c) Specify that a patient's medical record maintained by the facility must be transferred contemporaneously with the patient when the patient is transferred from the facility to a hospital.

(5) Any other information the director considers necessary.

(C) The director's decision to grant, refuse, or rescind a variance is final.

(D) The director shall consider each application for a variance independently without regard to any decision the director may have made on a prior occasion to grant or deny a variance to that ambulatory surgical facility or any other facility.

37.     Prior to HB 59, and at the time that *Baird* was decided, an abortion clinic seeking a variance from ODH was required to demonstrate that it would meet the intent of the requirement in an alternative manner, and it was solely within the ODH Director's discretion whether to grant the variance request.

38.     Now, because of HB 59, the ODH Director can grant a variance only if an applicant submits a "complete variance application" that contains agreements with consulting physicians possessing admitting privileges at a minimum of one local hospital, and that contains verification that this hospital has been informed of the physician's agreement with the abortion

12

clinic and the doctor has committed to providing back-up coverage for the abortion clinic when necessary.

39.     Thus, because of HB 59, an abortion clinic that cannot obtain an agreement with enough consulting physicians with admitting privileges at a local hospital will not be able to obtain a variance.  The ODH Director no longer has discretion to grant variances to such clinics.

40.     There is no valid state interest that is served by the restrictions on abortion clinics, and abortion clinics alone, imposed by HB 59.

**D.  HB 64**

41.     At the end of June 2015, the Legislature yet again altered the ASF variance process as part of another biennial omnibus budget bill ("HB 64"), making it harder still for abortion providers.

42.     HB 64 amends Ohio Rev. Code § 3702.304 to require Defendant Hodges, the director of ODH, to grant or deny an application for a variance of the written transfer agreement requirement within 60 days. Any variance application "that has not been approved within 60 days is considered denied." Ohio Rev. Code § 3702.304 (A)(2) ("60-Day Deadline").  For those variance applications that are pending with ODH on the effective date of HB 64, HB 64 gives the director an additional 60 days after the effective date to grant or deny the application prior to the automatic denial. HB 64 § 737.13.

43.     HB 64 also adds a new section, § 3702.309, that requires an ASF's license to be automatically suspended in the event of a WTA variance denial: "If a variance application is denied under section 3702.304 of the Revised Code, the license of such an ambulatory surgical facility is automatically suspended." ("Automatic Suspension Provision").  Thus, if a WTA variance application is either explicitly denied by the director of ODH, or if the variance application is considered denied because of the 60-Day Deadline, ODH must automatically

13

suspend the ASF's license.  Immediately upon the suspension of its license, an ASF must cease

operations. Ohio Rev. Code § 3702.30(E)(1); Ohio Admin. Code 3701-83-03.

44.     Like HB 59, the purpose of HB 64 is to target abortion clinics and to restrict

abortion access in the state.  The 60-Day Deadline and the Automatic Suspension Provision only

apply to an ASF seeking a variance of the WTA Requirement. No other ASFs requesting

variances of other rule requirements are subject to these harsh penalties. During the Senate floor

debate over HB 64, a State Senator who is a former President of Ohio Right to Life,[8] made clear

that these amendments were targeted at abortion clinics, describing the variance process as

applying "in those situations where you cannot find a hospital who is willing to serve as a

backup to an abortion clinic, and you can seek a variance by having some physicians who are

willing to take ownership of the complications that occur in that clinic."[9] She stated that HB 64's

new 60-Day Deadline for responding to variance requests was designed to make sure that ODH

will rule swiftly on variance requests from abortion clinics.[10]  On HB 64's signing by Governor

Kasich, Ohio Right to Life issued a press release celebrating the bill's "pro-life measures" that

"will hold abortion facilities accountable."  Ohio Right to Life's Press release admits that the

Automatic Suspension Provision will shut down abortion clinics, and specifically references

WMCD as a clinic that could be shut down.[11]

45.     If an ASF were to provide surgical services without a license, ODH could take

action against it, including imposing civil penalties between one thousand and two hundred and

---

[8] Catherine Candisky, *Group Pushes for More Abortion Restrictions, Defunding of Planned Parenthood*, COLUMBUS DISPATCH (Feb. 11, 2015, 12:36 AM), http://www.dispatch.com/content/stories/local/2015/02/10/ohio-right-to-life-legislative-agenda.html; *Peggy Lehner*, LINKEDIN https://www.linkedin.com/pub/peggy-lehner/8/943/461 (listing her role as President of Ohio Right to Life from 1984-1988).
[9] *Senate Session*, THE OHIO CHANNEL (June 18, 2015)
http://www.ohiochannel.org/MediaLibrary/Media.aspx?fileId=146746&startTime=9777
[10] *Id.*
[11] Katherine Franklin, *Governor Kasich Signs Pro-Life Budget*, OHIO RIGHT TO LIFE (June 30, 2015),
http://www.ohiolife.org/governor_kasich_signs_pro_life_budget

fifty thousand dollars and/or imposing daily civil penalties between one thousand and ten thousand dollars for each day that the ASF operates. Ohio Admin. Code § 3701-83-05.1(A); Ohio Rev. Code Ann. § 3702.32 (A).

46.     Thus, abortion providers whose licenses are suspended will be forced to shut down and cease providing abortion services immediately, even to patients with already scheduled appointments, without giving these providers (or their staff members) any notice, and without even affording them an opportunity for a pre-deprivation hearing.

47.     Providers are not only denied a pre-deprivation hearing—they are also denied any post-deprivation hearing rights. While HB 64 indicates that a provider's license could be reinstated pursuant to an order issued in accordance with Chapter 119 of the Revised Code, Ohio Rev. Code § 3702.309(A)(3), an abortion provider will in fact have no right of appeal under Chapter 119. That is because Ohio law explicitly states that "the refusal of the director to grant a variance or waiver, in whole or in part, shall be final and shall not be construed as creating any rights to a hearing under Chapter 119 of the Revised Code." Ohio Admin. Code § 3701-83-14(F); Ohio Rev. Code § 3702.304(A) and (C). Moreover, the automatic suspension of a license does not trigger any right to appeal under Chapter 119 because the automatic suspension does not qualify as an agency "adjudication" under Ohio Rev. Code§ 119.06. An "adjudication" does not include "acts of a ministerial nature," Ohio Rev. Code §119.01(D), such as the automatic suspension of an abortion provider's license following a variance denial. As a consequence, an abortion provider also cannot appeal the suspension of its ASF license either pre or post deprivation.

48.     The Legislature enacted the Automatic Suspension Provision knowing that abortion providers are the only ASFs in Ohio to seek variances from the WTA Requirement, and

15

that the Automatic Suspension Provision would mean that abortion providers, and only abortion providers, would be subject to deprivation of their licenses without procedural protections. In fact, the Automatic Suspension Provision's effect on abortion clinics was the motivation behind the Legislature's actions.

49. There is no valid state interest that is served by the restrictions on abortion clinics, and abortion clinics alone, imposed by HB 64.

**E. PPSWO's ASF Licensing History**

50. Since 2000, PPSWO has operated with an ASF license.

51. The most recent UCMC WTA, dated May 29, 2013, was effective for one year, with an automatic one-year renewal period.

52. UCMC, the nation's first teaching hospital, is an internationally recognized hospital with state-of-the-art medical facilities. UCMC is the only hospital in the region that is designated as a Level 1 trauma center by the American College of Surgeons because of its highly specialized emergency medicine team and its ability to treat the most complex emergency situations the fastest.

53. After HB 59 was signed, UCMC acknowledged that it was a "public hospital" within the meaning of the new prohibition. As a public hospital, UCMC was compelled by HB 59 to arbitrarily and discriminatorily terminate any WTAs with abortion providers without due process of law. UCMC provided notice to PPSWO that it would terminate the WTA with PPSWO as of September 28, 2013, the day before the effective date of the Public Hospital Ban. Thus, UCMC was compelled by the State to end its WTA with PPSWO. The decision to terminate the WTA was dictated by the State and was not based on any medical or professional discretion or judgment.

54.     UCMC is a non-profit institution that is privately operated.  On information and belief, the Legislature drafted the definition of "public hospital" broadly in part with the intent to include UCMC so that the WTA between UCMC and PPSWO would be terminated.

55.     After receiving notice of the termination of its WTA with UCMC, PPSWO approached all the local hospitals in Hamilton County and surrounding counties seeking a WTA, but those hospitals either rejected or ignored PPSWO's requests.  Many of the local hospitals are Catholic institutions with a stated opposition to cooperating in the provision of abortion services.  Thus, PPSWO was unable to secure a WTA with a non-"public" hospital because of the complete discretion exercised by those hospitals to refuse or ignore PPSWO's requests.

56.     Prior to the expiration of the WTA with UCMC and pursuant to HB 59, PPSWO applied for a variance from the WTA Requirement. The application included contracts with several back-up physicians with privileges at a local hospital who agreed to provide care to PPSWO's patients, as well as a patient hospital transfer policy in order to assure ODH that PPSWO provides continuous care to any patient who requires transfer to a hospital.

57.     Though PPSWO's variance application had been pending with ODH, on October 14, 2014, ODH informed PPSWO that it did not comply with the ASF licensing requirements because it lacked a WTA.  The letter threatened to revoke PPSWO's license.

58.     Because of ODH's threatened revocation of PPSWO's ASF license and PPSWO's exposure to substantial civil penalties, PPSWO was forced to file litigation in this Court seeking to enjoin ODH from taking actions to revoke its ASF license.  *See* Complaint, *Planned Parenthood Southwest Ohio Region v. Hodges*, No. 1:14-cv-867 (S.D. Ohio Nov. 10, 2014) (*Hodges I*).

17

59.     In response to this litigation, ODH granted PPSWO's variance request on November 20, 2014, and the litigation was dismissed without prejudice.

60.     PPSWO's variance was approved through May 31, 2015, the date that coincides with PPSWO's license renewal application deadline.  The ASF license renewal request and a new variance request were submitted in May 2015. Under the law in place at the time, which the Automatic Suspension Provision changed, ASFs with pending license renewal applications could continue operating as long as the renewal application was timely filed. Ohio Admin. Code §3701-83-05.

61.     On September 25, 2015, Defendant Hodges denied PPSWO's request for a variance.  This denial is attached to Lawson Second Declaration as Exhibit B (Doc. 24-1 PageID# 291).

62.     On September 25, 2015, Defendant Hodges proposed to revoke and not renew PPSWO's ASF license and offered PPSWO to request a hearing on the proposed revocation within 30 days.  This proposed revocation is attached to Lawson Second Declaration as Exhibit C (Doc. 24-1 PageID# 293).

63.     The variance denial states that "PPSWO's provision of only three named back-up physicians does not meet [the ODH Director's] expectation that a variance provide the same level of patient health and safety that a written transfer agreement with a local hospital assures for 24/7 back-up coverage."  Lawson Declaration Exhibit B. The denial also notes that the prior variance that ODH granted to PPSWO was based on "backup agreements with four named physicians." *Id.*

64.     As a result, Defendant Hodges' denial of the variance appeared to require PPSWO to add a fourth backup doctor to its variance request.  The Ohio Department of Health ("ODH") had never before informed PPSWO that four backup doctors were required.

65.     Previously, PPSWO had a variance from ODH with only three backup doctors. The first time ODH notified PPSWO that three backup doctors were insufficient was when it denied the 2015 variance request on September 25, 2015.  After the Public Hospital Ban in HB 59 caused UCMC to rescind its WTA with PPSWO, PPSWO requested a variance in 2013, 2014 and 2015.  All of PPSWO's variance requests named three backup doctors, except for a short time from August 2014 through January 2015 when the variance request included a fourth doctor.  Although ODH granted PPSWO's 2014 variance while it had four backup doctors, one of those doctors resigned in January 2015, leaving PPSWO with three backup doctors.  PPSWO immediately notified ODH of the resignation.  ODH never objected to the change back to three doctors.  Lawson Second Declaration. Exhibit B.

66.     As soon as ODH informed PPSWO of the need for a fourth backup doctor, PPSWO diligently searched for a fourth doctor.  On Monday September 28, 2015, PPSWO signed a contract with a fourth backup doctor.

67.     On September 28, 2015, PPSWO submitted a new variance request to ODH adding the fourth backup doctor.  Lawson Second Declaration Exhibit D.  (Doc. 24-1 PageID# 296). This variance request was granted on November 27, 2015.

68.     At the same time, Director Hodges notified PPSWO that it would be required to submit a new variance request by April 1, 2016, sixty days in advance of the expiration of PPSWO's license, due to Ohio Rev. Code § 3702.304 (A)(2) ("60-Day Deadline").

69.     On September 29, 2015, HB 64 became effective.

19

70.     Because of the Public Hospital Ban, PPSWO is unable to obtain a WTA and will instead be forced to go through the annual process of applying for a variance from ODH.

**F.  WMCD's Licensing History**

71.     WMGPC and its predecessors have been providing reproductive health services to women in the Dayton, Ohio area since 1975.  In October 2002, WMCD applied for an ASF license.  The application met the requirement for a license in all respects.  WMCD had entered into a WTA with Miami Valley Hospital in October 2002.  However, the following month, Miami Valley Hospital rescinded the WTA after pressure from a Board member who did not want the hospital to be associated with an abortion clinic.  While the application was pending, WMCD requested a waiver of the WTA Requirement since it had all medically necessary protocols in place for admitting patients to a hospital in an emergency and non-emergency situation.  WMCD met all the other requirements for an ASF license.  Nonetheless, in January 2003, ODH denied WMCD's waiver request and ASF license application and issued a cease and desist order requiring the clinic to close immediately.  Litigation over ODH's actions ensued. *See Women's Med. Prof'l Corp v. Baird*, 438 F.3d 595, 603 (6th Cir. 2006); *Women's Med. Prof'l Corp v. Baird*, SDOH Case No. 2:03-cv-162.

72.     In 2008, WMCD applied for a variance of the WTA Requirement.  ODH granted WMCD's variance request based on WMCD's hospital transfer protocol and relationship with backup physicians who could admit a WMCD patient to a local hospital.

73.     In December 2011, ODH changed its internal rules for processing variance requests and required ASFs to apply for a variance annually at the time that the ASF applied for its license renewal.  At the time of this rule change, WMCD and its affiliated clinic LRSC were the only ASFs in the state with a WTA variance.

74.     WMCD filed its annual license renewal application and variance application for 2015 on July 24, 2015,.  On September 25, 2015, ODH denied WMCD's variance application. WMCD submitted three backup doctors, but ODH required four.  WMCD has not been able to reapply for a variance because it does not have a fourth backup doctor.

75.     WMCD's affiliated clinic in Sharonville, LRSC, however, has already been forced to cease providing surgical abortion services because of the WTA Requirement and ODH's refusal to grant LRSC's variance application.  After the rule change requiring ASFs to apply for a variance annually, ODH refused to approve LRSC's application for a renewal of its variance and instead took actions to revoke LRSC's ASF license.

76.     Moreover, because of the Public Hospital Ban, LRSC was unable to obtain a WTA with any public hospital in Cincinnati.  As a public hospital, UCMC was compelled by law to arbitrarily and discriminatorily deny a WTA to LRSC because LRSC is an abortion provider. The decision to deny a WTA was dictated by the State and was not based on any medical or professional discretion or judgment.  UCMC specifically referenced the Public Hospital Ban as the reason for its inability to enter into a WTA with LRSC. In a letter dated August 5, 2013, UCMC denied LRSC's request for a WTA stating that HB 59 prohibits it from entering into a WTA with LRSC.  "Due to recent changes in Ohio law and the ownership and leasehold interests of the City of Cincinnati and the University in [UCMC], we are not able to execute and provide the transfer agreement you requested."

77.     ODH formally denied LRSC's variance request, and LRSC was forced to cease providing surgical abortions, making PPSWO the only remaining surgical abortion provider in Cincinnati. If WMGPC could obtain a WTA from UCMC, it would be able to reapply for LRSC's ASF license.

**G.  The Threatened Elimination of Abortion Access in Southwest Ohio**

78.      Because of the Automatic Suspension Provision and the Public Hospital Ban, once HB 64 goes into effect, the last two remaining surgical abortion providers in Southwest Ohio will be at risk of immediate shutdown, causing Plaintiffs, their staff, and their patients irreparable injury from exposure to penalties, denial of abortion services, closure of the ASFs, suspension of their ASF licenses, loss of income, and inability to provide or receive comprehensive reproductive health care.

79.      But for the Public Hospital Ban, PPSWO and LRSC would have a WTA with UCMC, and would neither be required to apply for a yearly variance nor be subjected to the Automatic Suspension Provision.

80.      If PPSWO and WMCD were forced to shut down their ASFs, the women of Southwest Ohio, including patients with already scheduled procedures at PPSWO and WMCD, would be forced to seek surgical abortions elsewhere, and to travel hundreds of miles in order to access care.

81.      In fact, given the significant restrictions on medication abortion approved by the legislature in 2004, and in effect since 2011, medication abortion is rarely provided in Southwest Ohio and even when provided must be accessed in the first seven weeks of pregnancy LMP. Therefore, if Plaintiffs were forced to close their ASF's, all methods of abortion would be virtually unavailable in Southwest Ohio.

82.      If the PPSWO ASF is closed, Cincinnati will be the largest metropolitan area in the entire United States without a surgical abortion provider. As of the 2010 census, the Cincinnati metropolitan area had a population of over 2.1 million residents, making it the largest metropolitan area in all of Ohio.

22

83.     WMCD is the only surgical abortion provider in the Dayton area.  As of the 2010 Census, the Dayton metropolitan area had a population of over 840,000 residents.

84.     If Plaintiffs are forced to shut down their ASFs, any woman who would have sought a surgical abortion at these clinics will have to travel to another city outside of Southwest Ohio to obtain an abortion – and will need to make that trip at least twice because of a state law that requires two trips to the clinic (the first for counseling and an ultrasound and the second visit, at least 24 hours later, for the abortion). The next closest clinics in Ohio outside of Southwest Ohio are located in Columbus, approximately 220 miles round trip from Cincinnati, and 150 miles round trip from Dayton.

85.     Moreover, Planned Parenthood of Greater Ohio's clinic in Columbus currently has a two to three week wait for abortion appointments, and cannot accommodate any additional patients.  Lawson Declaration ¶ 28. Thus, the only provider in Columbus that has the ability to possibly accept more patients is Founder's Women's Health Center. Founders would have to accommodate over 5,500 patients from PPSWO and WMCD.  However, Founders performs surgical abortions only to 16 weeks 6 days LMP.

86.     Due to significant delays in scheduling an abortion because of the reduced availability of abortion providers, women who are earlier in their pregnancies will face significant and possibly dangerous delays.  For other women, the additional travel required to obtain an abortion will increase the costs and delay the abortion.  Although abortion is one of the safest surgical procedures, the risk of complications (as well as the cost of the procedure) increases as the pregnancy advances.

23

87.     Given that the vast majority of Plaintiffs' patients are low-income, the increased costs, travel, and delays will make it impossible for a large fraction of women to obtain an abortion.

88.     Those patients Plaintiffs treat who are over 16 weeks 6 days LMP would have to travel to Cleveland, Ohio to obtain an abortion. Cleveland is approximately 502 miles round trip from Cincinnati and 438 miles round trip from Dayton. These women must make a minimum of three trips to the facility.  The final two visits must be on back to back days, thus requiring out of town patients to stay overnight in a hotel.  Given the number of Plaintiffs' patients who seek abortions after 16 weeks 6 days, the increased costs, travel and delays will make it extremely difficult, if not impossible for a significant number of women to obtain an abortion past 16 weeks 6 days LMP.

89.     Once the Automatic Suspension Provision goes into effect on September 29, 2015, (1) if ODH denies PPSWO and WMCD's variance applications at any point in the following 60 days, or (2) if ODH fails to act on the variance applications by November 28, 2015, both clinics will be forced to shut their doors immediately, without any opportunity for a hearing either pre or post license suspension.

90.     Shutting down Plaintiffs' ASFs will jeopardize women's health and deprive women of their constitutionally protected right to obtain a pre-viability abortion.

### III.     CLAIMS FOR RELIEF – 42 U.S.C. § 1983

### COUNT I
### (Substantive Due Process – Plaintiffs' Patients – WTA Requirement, Public Hospital Ban, and Automatic Suspension Provision)

91.     The allegations of paragraphs 1 through 90 are incorporated as though fully set forth herein.

92.     The WTA Requirement, Public Hospital Ban and the Automatic Suspension Provision, individually and taken together, violate rights to liberty and privacy secured to Plaintiffs' patients by the due process clause of the Fourteenth Amendment to the United States Constitution. The WTA Requirement, Public Hospital Ban and the Automatic Suspension Provision have the purpose and/or effect of imposing a substantial obstacle in the path of women seeking abortions without furthering a valid state interest.

### COUNT II
### (Due Process Nondelegation – Plaintiffs – WTA Requirement)

93.     The allegations of paragraphs 1 through 92 are incorporated as though fully set forth herein.

94.     The WTA Requirement violates Plaintiffs' due process rights under the Fourteenth Amendment to the United States Constitution by delegating standardless and unreviewable authority to private parties (hospitals and potential back-up doctors) and by employing a constitutionally insufficient variance process.

### COUNT III
### (Equal Protection – Plaintiffs – Public Hospital Ban and Automatic Suspension Provision)

95.     The allegations of paragraphs 1 through 94 are incorporated as though fully set forth herein.

96.     The Public Hospital Ban and the Automatic Suspension Provision, both individually and taken together, violate Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution by treating Plaintiffs differently from other similarly situated parties without a sufficient state interest.

### COUNT IV
### (Substantive Due Process – Plaintiffs – Public Hospital Ban and Automatic Suspension Provision)

97.     The allegations of paragraphs 1 through 96 are incorporated as though fully set forth herein.

98.     The Public Hospital Ban and the Automatic Suspension Provision, both individually and taken together, violate Plaintiffs' due process rights under the Fourteenth Amendment to the United States Constitution as they lack any rational basis.

**COUNT V**
**(Procedural Due Process –Plaintiffs– Automatic Suspension Provision)**

99.     The allegations of paragraphs 1 through 98 are incorporated as though fully set forth herein.

100.    The Automatic Suspension Provision violates the right to procedural due process secured to Plaintiffs by the due process clause of the Fourteenth Amendment to the United States Constitution.  The Automatic Suspension Provision deprives Plaintiffs of their protected property interests without affording them any procedural protections.

**COUNT VI**
**(Single Subject Rule—Plaintiffs—HB 59 and HB 64)**

101.    The allegations of paragraphs 1 through 100 are incorporated as though fully set forth herein.

102.    Those portions of HB 59 and HB 64 that affect Plaintiffs' ASF licenses violate the single-subject rule of the Ohio Constitution, Ohio Constitution Art. II, Section 15(D), as they do not share a common purpose or relationship with the respective biennial omnibus budget bills into which these provisions were inserted.

**IV.     PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court:

A.      Issue a declaratory judgment that Ohio Rev. Code Ann. §3702.303(A) ("WTA Requirement") is unconstitutional facially and as applied to PPSWO and WMGPC;

B.      Issue a permanent injunction against Defendant Hodges and all those acting in concert with him from enforcing the WTA Requirement;

C.      Issue a declaratory judgment that Ohio Rev. Code Ann. § 3727.60 ("Public Hospital Ban") is unconstitutional facially and as applied to PPSWO and WMGPC;

D.      Issue a permanent injunction against Defendant Hodges and all those acting in concert with him from enforcing the Public Hospital Ban;

E.      Issue a declaratory judgment that the Public Hospital Ban is unconstitutional and as such does not prevent UCMC or UC Health from entering into a WTA with Plaintiffs or prohibit any of UCMC or UC Health's doctors from entering back-up physician agreements with Plaintiffs;

F.      Issue a declaratory judgment that Ohio Rev. Code Ann. § 3702.309 ("the Automatic Suspension Provision") is unconstitutional facially and as applied to PPSWO and WMGPC.

G.      Issue a preliminary and permanent injunction against Defendant Hodges and all those acting in concert with him from enforcing the Automatic Suspension Provision;

H.      Issue a declaratory judgment that Ohio Rev. Code Ann. § 3727.60 ("Public Hospital Ban"), Ohio Rev. Code § 3702.304 (A)(2) ("60-Day Deadline"), and Ohio Rev. Code Ann. § 3702.309 ("the Automatic Suspension Provision") are facially unconstitutional under the Ohio Constitution;

27

I.      Issue a permanent injunction against Defendant Hodges and all those acting in concert with him from enforcing the Public Hospital Ban, the 60-Day Deadline, and the Automatic Suspension Provision.

J.      Award to Plaintiffs reasonable costs, expenses, and attorney fees;

K.      Award such other and further relief as this Court shall deem just and reasonable.

Respectfully submitted,

Carrie Y. Flaxman
Planned Parenthood Federation of America
1110 Vermont Avenue, NW, Suite 300
Washington, D.C. 20005
(202) 973-4800
(202) 296-3480 (fax)
carrie.flaxman@ppfa.org
jennifer.keighley@ppfa.org
*Admitted Pro Hac Vice*

Jennifer Keighley
Planned Parenthood Federation of America
434 W. 33rd Street
New York, N.Y. 10001
Telephone: 212-261-4749
Facsimile: 212-247-6811
Email: jennifer.keighley@ppfa.org
*Admitted Pro Hac Vice*
 *Co-counsel for Plaintiff Planned*
 *Parenthood Southwest Ohio Region*

B. Jessie Hill #0074770
Cooperating Counsel for the ACLU of Ohio
Case Western Reserve Univ., School of Law
11075 East Boulevard
Cleveland, Ohio 44106
(216) 368-0553
(216) 368-2086 (fax)
bjh11@cwru.edu
*Co-Counsel for Women's Medical Group*
*Professional Corporation*

/s/Jennifer L. Branch
Jennifer L. Branch # 0038893
*Trial Attorney for Plaintiffs*
Alphonse A. Gerhardstein  # 0032053
GERHARDSTEIN & BRANCH CO. LPA
432 Walnut Street, Suite 400
Cincinnati, Ohio 45202
 (513) 621-9100
 (513) 345-5543 fax
agerhardstein@gbfirm.com
jbranch@gbfirm.com
*Counsel for Plaintiffs Planned*
*Parenthood Southwest Ohio Region*
*and Women's Medical Group*
*Professional Corporation*

Jennifer Lee
Brigitte Amiri
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212)549-2633
jlee@aclu.org
bamiri@aclu.org
*Admitted Pro Hac Vice*
*Of-Counsel for Plaintiff Women's*
*Medical Group Professional*
*Corporation*

Freda J. Levenson #0045916
ACLU of Ohio Foundation, Inc.
4506 Chester Avenue

28

Cleveland, Ohio 44103
Tel: (216) 472-2220
Fax: (216) 472-2210
flevenson@acluohio.org

*Of-Counsel for Plaintiff Women's
Medical Group Professional
Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2016 a copy of the foregoing pleading was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail and email upon all parties for whom counsel has not yet entered an appearance electronically.

/s/ Jennifer L. Branch
Trial Attorney for Plaintiff