UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

**PLANNED PARENTHOOD**  **CASE NO.: 1:15-cv-568**
**SOUTHWEST OHIO REGION, et al.,**

        Plaintiffs,         Judge Michael R. Barrett

    v.

**RICHARD HODGES, et al.**

        Defendants.

### OPINION AND ORDER

This matter is before the Court on Defendants University of Cincinnati Medical Center, LLC and UC Health's ("UC Defendants") Rule (12)(b)(1) Motion to Dismiss for Lack of Standing (Doc. 44). Planned Parenthood of Southwest Ohio ("PPSWO") and Women's Medical Group Professional Corporation ("WMGPC") (hereinafter collectively referred to as "Plaintiffs") have filed a response in opposition (Doc. 50), and the UC Defendants have filed a reply (Doc. 51). This matter is now ripe for review. For the reasons discussed below, the UC Defendants' Motion is **GRANTED**.

**I.**  **BACKGROUND**

The facts of this case were recited at length in the Court's previous order granting Plaintiffs' preliminary injunctive relief and will not be repeated here except as necessary for this Motion. Plaintiffs' initial Complaint was filed on September 1, 2015. (Doc. 1). On January 15, 2016, Plaintiffs filed their Amended Complaint. (Doc. 42).

1

The facts relevant to this Motion are largely undisputed. PPSWO operates an ambulatory surgical facility ("ASF")[1] providing women's health services, including abortions, in Cincinnati, Ohio. All ASFs must be licensed. To obtain a license, ASFs must maintain a written transfer agreement ("WTA") with a hospital for transfer of patients in the event of medical complications, emergency situations, and for other needs that may arise. Ohio Admin. Code § 3701-83-19(E). If any ASF was unable to obtain a WTA, then it could apply to the director of health for a variance or waiver from the WTA requirement by demonstrating that "the requirement has been met in an alternative manner" or that "the strict application of the license requirement would cause undue hardship" and "granting the waiver would not jeopardize the health and safety of any patient." Ohio Admin. Code §§ 3701-83-14(A), (C)(1)-(2).

In 2013, the General Assembly, through H.B. 59 changed Ohio statutory law in regards to the WTA requirement. Relevant to this Motion is Ohio Rev. Code § 3727.60 under which a "public hospital" is prohibited from "[e]nter[ing] into a written transfer agreement with an ambulatory surgical facility in which nontherapeutic abortions are performed or induced[.]" Ohio Rev. Code § 3727.60(B)(1). That section further prohibits physicians with staff membership or professional privileges at a public hospital from using "that membership or those privileges as a substitution for, or alternative to, a written transfer agreement for purposes of a variance application" submitted by an ASF that performs such abortions. Ohio Rev. Code § 3727.60(B)(2). Collectively, these portions of H.B. 59 are referred to as the "Public Hospital Ban."

---

[1] ASFs are free-standing facilities in which outpatient surgery is performed routinely. Ohio Rev. Code § 3702.30(A)(1). "ASFs include facilities providing medical care and services in areas including, but not limited to, cosmetic and laser surgery, plastic surgery, abortion, dermatology, digestive endoscopy, gastroenterology, lithotripsy, urology, and orthopedics." *Women's Medical Professional Corp. v. Baird*, 438 F.3d 595, 599 n.1 (6th Cir. 2006).

At the time the Public Hospital Ban was signed, PPSWO had a WTA with the University of Cincinnati Medical Center ("UCMC"), dated May 29, 2013, which was effective for one year, with an automatic one-year renewal period. (Doc. 42, ¶ 51). After the Public Hospital Ban was signed, UCMC acknowledged that it was a "public hospital" as defined under the statute. (*Id.* at ¶ 53). Accordingly, UCMC provided notice to PPSWO that it would terminate the WTA with PPSWO as of September 28, 2013, the day before the effective date of the Public Hospital Ban. (*Id.*). Moreover, in its denial of a request for a WTA from an ASF facility operated by WMGPC, Lebanon Road Surgery Center ("LRSC"), UCMC referenced "recent changes in Ohio law" as one the reasons for the denial. (*Id.* at ¶ 76). Other reasons cited for the denial included recent changes in the ownership and leasehold interests of the City of Cincinnati and the University in [UCMC]. (*Id.*).

Plaintiffs bring claims against the Director of the Ohio Department of Health, Richard Hodges ("Director") and the UC Defendants challenging, in part, the constitutionality of the Public Hospital Ban.

## II.  STANDARD

The UC Defendants raise an attack on Plaintiffs' standing as it relates to Plaintiffs' claims against them. Article III standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Plaintiffs bear the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119, L.Ed.2d 531 (1992). Moreover, the party invoking federal jurisdiction must have standing at the commencement of the litigation. *Davis v. Federal Election Com'n*, 554 U.S. 724, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) (citing *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)).

Therefore, Plaintiffs must establish "standing for each claim asserted and for each form of relief sought in his original complaint." *Smith v. Robbins & Meyers, Inc.*, No. 3:12-cv-281, 2014 WL 4705905, at *4 (S.D. Ohio Sept. 22, 2014).

"To demonstrate standing, a plaintiff must have alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Salazar v. Buono,* 559 U.S. 700, 711, 130 S.Ct. 1803, 176 L.Ed.2d 634 (2010). To satisfy the requirements of Article III standing, a plaintiff must establish: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 524 (6th Cir. 2001) (quoting *Friends of the Earth, Inc.v. Laidlaw Envtl. Servs.*, 528 U.S.167, 180-181 (2000)).

Both parties cite to Plaintiffs' Amended Complaint (Doc. 42) in their memoranda. Therefore, the Court cites to portions of Plaintiffs' Amended Complaint in order to effectively address the parties' arguments. The Court is mindful, however, that the question here is whether Plaintiffs had Article III standing to bring their claims against the UC Defendants when they filed their original complaint on September 1, 2015. Regardless of whether the Court looks to Plaintiffs' original complaint or their Amended Complaint, Plaintiffs fail to establish Article III standing to bring their claims against the UC Defendants.

### III. <u>ANALYSIS</u>

Plaintiffs identify their injury as the threatened loss of their ASF licenses without due process of law. (Doc. 50, PageID 497). More specifically, Plaintiffs allege that they suffered an injury when "UCMC was compelled by the State to end its WTA with PPSWO. The decision to

4

terminate the WTA was dictated by the State and was not based on any medical or professional discretion or judgment." (Doc. 42, ¶ 53).

Plaintiffs' original Complaint does not actually reference the UC Defendants in any of their claims. (Doc. 1, ¶¶ 86-97). Nevertheless, to redress the alleged injury suffered by Plaintiffs as a result of the UC Defendants alleged actions, they asked that the Court "[i]ssue a permanent injunction against Defendants UCMC and UC Health, ordering UCMC to reinstate the WTA with PPSWO dated May 29, 2013 and not to deny any request for a WTA from Plaintiffs or prohibit any of its doctors from entering into back-up physician agreements with Plaintiffs[2] based upon the Public Hospital Ban." (*Id*. at ¶ E). This language, however, was removed from the Amended Complaint. Instead, Plaintiffs now ask the Court to "[i]ssue a declaratory judgment that the Public Hospital Ban is unconstitutional and as such does not prevent UCMC or UC Health from entering into a WTA with Plaintiffs or prohibit any of UCMC or UC Health's doctors from entering back-up physician agreements with Plaintiffs." (*Id.*, PageID 454, ¶ E). This is the only requested remedy that relates to the UC Defendants.

The UC Defendants argue that Plaintiffs have not suffered an injury as it relates to them because Plaintiffs do not have a legally protected interest in obtaining or maintaining a WTA with the UC Defendants specifically. (Doc. 44, PageID 481). The UC Defendants argue that regardless of whether the Public Hospital Ban goes into effect, the UC Defendants are under no legal obligation to enter into a WTA with Plaintiffs. (Doc. 51, PageID 507). Accordingly, while the UC Defendants do not dispute Plaintiffs have alleged an "injury in fact," they argue that the

---

[2] Plaintiffs also assert, however, that they have now signed contracts with a sufficient number of backup doctors (Doc. 42, PageID 446, ¶ 66). As such, the majority of Plaintiffs' arguments appear to focus on the WTA issue. Plaintiffs do, however, argue that even if the UC Defendants decline to enter into a WTA with Plaintiffs, their doctors would still be eligible to enter into backup agreements with Plaintiffs, thereby enlarging the pool of eligible providers. (*See* Doc. 50, PageID 503). For the same reasons discussed herein with respect to the WTA, Plaintiffs do not have Article III standing to bring claims as they relate to the UC Defendants' individual physicians.

alleged injury is an issue between Plaintiffs and the Director – not between Plaintiffs and the UC Defendants.

Plaintiffs cite this Court's prior order granting preliminary injunctive relief, arguing that "this Court has already held, PPSWO has a constitutionally protected property interest in the operation of its business and in its ASF license," and that its ASF license is threatened without due process of law.  (Doc. 50, PageID 497).  Plaintiffs' request for preliminary injunctive relief, however, was made exclusively in reference to the actions of Defendant Director; the UC Defendants were not named or otherwise involved in the injunction[3].  The Director has not contested Article III standing as to Plaintiffs' claims against it.  Therefore, Plaintiffs' reliance on the Court's prior order is misplaced in that regard.

Next, Plaintiffs argue they have properly alleged a Fourteenth Amendment Equal Protection challenge because as a result of the Public Hospital Ban, the UC Defendants may not *consider* entering into a WTA with Plaintiffs. (Doc. 50, PageID 498).  Plaintiffs argue consideration is enough to establish standing.  (*Id.*).  Plaintiffs cite *Ne. Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla*., 508 U.S. 656 (1993) in support of their argument that the right to be considered constitutes standing.  However, the facts in that case are inapposite.  The United States Supreme Court found that an association of contractors had standing to challenge a city ordinance, which provided preferential treatment to certain minority-owned businesses with respect to the award of city contracts.  (*Id.* at 658).  The Court held that it was not necessary for the plaintiff to show that one of its members would have received a contract but for the ordinance in order to bring a lawsuit against the city.  (*Id.*).  The

---

[3] Plaintiffs' Motion for Preliminary Injunction asked the Court to "enjoin Defendant Director of the Ohio Department of Health, Richard Hodges, from enforcing or complying with that provision." (Doc. 3, PageID 31). Accordingly, the UC Defendants did not file a response to Plaintiffs' motion, and the preliminary relief provided by the Court was directed at Defendant Richard Hodges, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with Defendant.  (*See* Doc. 28, PageID 343).

United States Supreme Court explained:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. See, *e.g., Turner v. Fouche, supra,* 396 U.S., at 362, 90 S.Ct., at 541 ("We may assume that the [plaintiffs] have no right to be appointed to the ... board of education. But [they] do have a federal constitutional right to be *considered* for public service without the burden of invidiously discriminatory disqualifications") (footnote omitted) (emphasis added). And in the context of a challenge to a set-aside program, the "injury in fact" is the inability to compete on an equal footing in the bidding process, not the loss of a contract. See *Croson,* 488 U.S., at 493, 109 S.Ct., at 721 (principal opinion of O'CONNOR, J.) ("The [set-aside program] denies certain citizens the *opportunity to compete* for a fixed percentage of public contracts based solely upon their race") (emphasis added). To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis.

(*Id.* at 666).

Here, however, the UC Defendants do not dispute Plaintiffs' standing to challenge the Public Hospital Ban generally. Rather, the question is whether Plaintiffs have standing to challenge the Public Hospital Ban as it relates to the UC Defendants, a hospital that was merely complying with the Public Hospital Ban—which effectively formed the alleged injury—when it ended its WTA with PPSWO and denied LRSC's request. The Court finds that it does not.

In this case, the undersigned finds that Plaintiffs have no constitutional right to be considered for a WTA specifically with the UC Defendants. Rather, the constitutional right in this context, as explained by *Ne. Florida Chapter of Associated General Contractors of America*, is the right to have the ability to compete on equal footing for a WTA with *any* hospital. Consequently, in this case, the Director is more akin to that of the city in *Ne. Florida Chapter of Associated General Contractors of America.*

7

Moreover, Plaintiffs concede that hospitals have complete discretion to refuse or ignore their requests for a WTA. (Doc. 42, ¶ 55). For example, Plaintiffs specifically assert that "[m]any of the local hospitals are Catholic institutions with a stated opposition to cooperating in the provision of abortion services. Thus, PPSWO was unable to secure a WTA with a non-"public" hospital because of the complete discretion exercised by those hospitals to refuse or ignore PPSWO's requests." (*Id.*). The Sixth Circuit has explained that hospitals have the "unfettered power to decide whether or not to enter into an agreement." *Women's Med. Prof'l Corp.v. Baird*, 438 F.3d 595,609 (6th Cir. 2006). Further, "Ohio has no power over hospitals to direct them as to how to respond to requests for written transfer agreements and that hospitals could deny such a request for business, religious, personal or political reasons." (*Id.*). Therefore, the UC Defendants have the discretion to refuse or ignore Plaintiffs' requests just like any other hospital. Indeed, the UC Defendants cited recent changes in ownership and leasehold interests as additional reasons for the denial of LRSC's request for a WTA. Therefore, Plaintiffs cannot show an injury with respect to their claims against the UC Defendants.

Likewise, because Plaintiffs have not established an "injury in fact" as to the UC Defendants, Plaintiffs cannot establish that any injury is fairly traceable to the challenged action of the UC Defendants. Under Plaintiffs' theory, they would have standing to bring suit against any hospital who denied Plaintiffs' WTA requests because each denial would threaten their ASF licenses and thus, such action would be fairly traceable. This reasoning directly contradicts Sixth Circuit precedent establishing a hospital's power to decide whether to enter into a WTA. (*Id.*). Accordingly, Plaintiffs' argument is unpersuasive.

Finally, Plaintiffs fail to establish that a favorable decision would adequately redress their alleged injury with respect to the UC Defendants. The issue of redressability with regard to

8

standing ultimately "turns on whether a plaintiff gets something (other than moral satisfaction) if the plaintiff wins." *Hague v. City of Mansfield, Ohio*, 257 Fed. App'x 887, 892 (6th Cir. 2007) (internal quotation marks omitted).

If the Public Hospital Ban is ultimately found to be unconstitutional, a concise declaration declaring the statute unconstitutional will adequately redress Plaintiffs' alleged injury – the threatened loss of their ASF licenses. The Court, however, need not go a step further to declare that the UC Defendants may enter into WTAs with Plaintiffs or that the UC Defendants' doctors may enter into back-up physician agreements with Plaintiffs. In fact, such a declaration would not guarantee that Plaintiffs would be redressed by the decision. Plaintiffs concede this point when they assert that: "[a]lthough this relief does not guarantee that the UC Defendants would provide Plaintiffs with a WTA or that UC doctors would enter into back-up agreements with Plaintiffs, it is a necessary step in addressing the constitutional issues described above." (Doc. 50, PageID 502). Contrary to Plaintiffs' argument, declaring the Public Hospital Ban unconstitutional would simply give back to all public hospitals the same discretion they had before the Public Hospital Ban was signed. Then, the UC Defendants, as well as other public hospitals, would have the power to decide whether to enter into WTAs with Plaintiffs. Therefore, Plaintiffs' assertion that their alleged injury would be redressed by a declaratory judgment that the Public Hospital Ban does not prevent UCMC or UC Health from entering into WTAs with Plaintiffs or prohibit any of UCMC or UC Health's doctors from entering back-up physician agreements with Plaintiffs is potentially speculative[4]. Accordingly, Plaintiffs have

---

[4] The undersigned acknowledges that because the UC Defendants have entered into WTAs with PPSWO in the past, it is possible that the UC Defendants would choose to do so again. However, as discussed herein, they are not required to do so. And because Plaintiffs fail to establish an "injury in fact" as it relates to the UC Defendants, they do not have Article III standing to bring suit against the UC Defendants, regardless of redressability.

failed to meet their burden of establishing that their request for relief against the UC Defendants would provide anything more than moral satisfaction; this is not sufficient.

### III.     CONCLUSION

Consistent with the foregoing, the UC Defendants' Motion to Dismiss for Lack of Standing (Doc. 44) is **GRANTED**.  The claims against University of Cincinnati Medical Center, LLC and UC Health are dismissed.  The Clerk shall enter judgment accordingly.  Plaintiffs' claims against Defendant Director of the Ohio Department of Health, Richard Hodges remain.

**IT IS SO ORDERED.**

                                              s/*Michael R. Barrett*
                                              Michael R. Barrett, Judge
                                              United States District Court