**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **PLANNED PARENTHOOD OF OHIO SOUTHWEST REGION, et al.,** | : | **Case No. 1:15-cv-568** |
| **Plaintiffs,** | : | **Judge Michael R. Barrett** |
| **vs.** | : | |
| **LANCE HIMES,** | : | |
| **Defendant.** | : | |

**PLAINTIFFS' MOTION TO COMPEL ODH DIRECTOR HIMES AND FORMER ODH DIRECTOR HODGES TO RESPOND TO DEPOSITION QUESTIONS**

Plaintiffs move to compel Ohio Department of Health ("ODH") Director Lance Himes and former ODH Director Richard Hodges (together, the "Directors") to answer certain questions from their depositions, which they have refused to do, by improperly invoking the deliberative process privilege. In fact, the deliberative process privilege does not apply to the vast majority of the questions to which the Defendant objected.

In the limited instances where it arguably does apply, Plaintiffs overcome the deliberative process privilege because of the centrality of the Defendant's conduct to the underlying issues in the case—namely, the Defendant's determinations regarding Plaintiffs' applications for a variance from Ohio's written transfer agreement requirements, and the reasons animating those decisions. Therefore, for the reasons set forth in the attached memorandum, this Court should compel the Directors to respond.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **PLANNED PARENTHOOD OF OHIO SOUTHWEST REGION, et al.,** | : | **Case No. 1:15-cv-568** |
| **Plaintiffs,** | : | **Judge Michael R. Barrett** |
| **vs.** | : | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO COMPEL** |
| **LANCE HIMES,** | : | |
| **Defendant.** | : | |

## I. INTRODUCTION

Plaintiffs seek highly relevant information from two witnesses: Defendant Lance Himes, the current director of the Ohio Department of Health ("ODH"), and Richard Hodges, who formerly occupied that same role. When Plaintiffs deposed Mr. Himes, he refused to answer approximately twenty questions because he wrongly claimed that the answers were protected by the deliberative process privilege. Mr. Hodges did the same for approximately twenty-seven questions. (*See* Deps. of Directors Himes and Hodges, attached hereto as **Exhibits A** and **B**, respectively).

This Court should compel the Directors to answer the questions because (1) the privilege is not nearly as broad or sweeping as the Defendant contends, and is inapplicable to most of the questions; and (2) even for those questions where it arguably could apply, it is overcome under the prevailing legal standards.

## II. BACKGROUND

In this case, Plaintiffs contend that a series of recent Ohio laws, and ODH's implementation thereof, place an undue burden on a woman's constitutional right to abortion.

As the U.S. Supreme Court recently affirmed, a law is unconstitutional if its "purpose or effect" is to "place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2300 (2016) (quotations omitted). States cannot burden abortion clinics and the patients they serve with stringent regulatory requirements designed to cure entirely fabricated problems, but that is exactly what Ohio has done here. *Id.* at 2311. Defendant has also violated Plaintiffs' rights to equal protection under the laws by treating them differently from other similarly situated parties without a sufficient state interest.

In Ohio, doctors perform surgical abortions at "ambulatory surgical facilities" ("ASFs"). Ohio law requires every ASF to have a "written transfer agreement" ("WTA") with a local hospital whereby the hospital agrees to accept patients from the ASF in the event of an emergency, R.C. 3702.303; O.A.C. 3701-83-19(E)—notwithstanding that federal law already prohibits hospitals from turning away patients who need emergency care. 42 U.S.C. § 1395dd(b) (commonly referred to as EMTALA). All hospitals in Ohio must comply with EMTALA, and ODH inspects hospitals for compliance with EMTALA. (Defendant's Rule 30(b)(6) Dep. 148: 10-17, attached hereto as **Exhibit C**.)

But Ohio law bars publicly funded hospitals from signing WTAs with abortion clinics, and many other hospitals choose not to do so for religious or political reasons. (Am. Cmplt. ¶ 27). Thus, as a practical matter, many abortion clinics cannot comply with the statutory requirement—particularly those clinics serving vulnerable populations in Ohio's rural areas. *Id.* ¶ 87. Alternatively, an ASF can keep its license even without a WTA if it can secure a variance from the requirement by convincing the ODH Director that it "is capable of achieving the purpose of a written transfer agreement" by other means. R.C. 3702.303; 3702.304. Variance

applications must comply with a detailed list of mandatory and onerous requirements—if a clinic cannot meet these requirements, its application will necessarily be denied. Ohio law otherwise invests the Director with virtually unfettered discretion in deciding whether to ultimately grant or deny a variance; the Director need not even explain or justify his decision to the clinic. R.C. 3702.304. The Director's decision is final and not appealable. *Id.* As the Defendant's Rule 30(b)(6) designee testified, only abortion clinics face this predicament: no other ASF in Ohio has ever been unable to comply with the WTA requirement.[1]

At the core of this case are two questions: (1) whether the WTA requirement and ODH's implementation thereof are *designed* to advance patient health, or rather to hinder abortion access; and (2) whether the WTA requirement and ODH's implementation thereof in *practice* advance patient health, or merely hinder abortion access. If the purpose behind the WTA requirement or ODH's implementation thereof is to impose a substantial obstacle in the path of a woman seeking an abortion, the law is unconstitutional. If the State is treating abortion providers differently from similarly situated parties because of anti-abortion animus, the law is unconstitutional. And if the WTA requirement, or ODH's implementation thereof, has the *effect* of creating burdens on patient access that outweigh any health and safety benefits, so too must the law fall. *Hellerstedt*, 136 S. Ct. 2992, 2309. Thus, ODH's decisions regarding the WTA requirement, and the reasons for its decisions, are integral to each of these claims.

That brings us to the depositions underlying this motion to compel.[2] At their depositions, Plaintiffs asked Director Himes and former Director Hodges to explain their decisions to grant or

---

[1] Q: Are there any ASFs that were unable to obtain a Written Transfer Agreement other than the abortion ASFs? A: I am not aware of any, no. (Defendant's Rule 30(b)(6) Dep., 268:2-6.) (**Exhibit C**.)

[2] Plaintiffs' Rule 30(b)(6) Notice of ODH included several topics relating to ODH decisions to approve or deny a variance application, including, *inter alia*, "the minimum number of backup physicians with admitting privileges that are necessary for an ASF to obtain a variance of the WTA requirement," "[a]ll changes in the minimum number of backup physicians required, and reason(s) for each minimum number and change," and "ODH's evaluation of and decisions with respect to applications for a variance of the WTA requirement." Defendant objected on several

deny certain variance applications, the policy rationale behind those decisions, and whether they would or would not have granted a variance in hypothetical situations. In response, the Directors objected, arguing that the answers are shielded by the deliberative process privilege and the quasi-judicial privilege.[3] Plaintiffs now move to compel answers to those questions.

## III. ARGUMENT

### A. The deliberative process privilege does not apply to most of the questions at issue.

The policy rationale behind the deliberative process privilege is to encourage candid discussion among public officials about agency decisions by shielding those communications from discovery. *Proctor & Gamble Co. v. U.S.*, 2009 WL 5219726 at *1 (S.D. Ohio, Dec. 31, 2009) ("[T]he purpose of the privilege is to promote frank discussion of issues relating to the adoption of policies for and the making of specific adjudicative decisions within a government agency"); *Dawson v. Sullivan*, 136 F.D.R. 621, 624 (S.D. Ohio, 1991) (same).

To be deliberative, the communication must reflect "the give-and-take of the consultative process." *Proctor & Gamble Co.,* 2009 WL 5219726 at *1. The determinative question is whether disclosure would harm "the consultative functions of government that the privilege of non-disclosure protects." *Dawson,* 136 F.R.D. at 625 (quotations omitted). Like other privileges,

---

grounds, including that Plaintiffs seek "information that is more appropriately discoverable by other means such as the depositions of former and current ODH directors and medical directors." *See Def's Objections to 30(b)(6) Notice*, 5-6, 11. (**Exhibit D**). Accordingly, the Parties agreed that Plaintiffs would reserve questions regarding specific decisions for the depositions of the Directors, rather than ODH's 30(b)(6) witness.

[3] The quasi-judicial privilege, sometimes called the "judicial mental process privilege," is wholly inapplicable. This narrow privilege shields the deliberative process of a neutral decision-maker presiding over an adversarial process outside of a courtroom. There must be a quasi-judicial proceeding before there can be quasi-judicial privilege, and there was no such proceeding here. *See Libertarian Party of Ohio v. Husted*, 33 F.Supp.3d 914, 923 (S.D. Ohio 2014); *TBC Westlake v. Hamilton Cty. Bd. of Revision*, 1998-Ohio-445, 81 Ohio St. 3d 58, 64, 689 N.E.2d 32, 37 (administrative agency could not claim quasi-judicial privilege when it did not adjudicate a dispute but exercised executive function). Here, the Directors acted solely in an executive function.

the deliberative process privilege impedes the truth-seeking function of the courts, and, as a result, courts construe it narrowly. *F.D.I.C. v. Hatziyannis*, 180 F.R.D. 292, 293 (D. Md. 1998).

The party invoking the privilege bears the burden of establishing two requirements: the document or testimony must be (1) "predecisional," and (2) "deliberative." *NetJets Large Aircraft Inc., v. U.S.*, 2015 WL 1526346, at *3 (S.D. Ohio, April 3, 2010). "Predecisional" means a document was received or a discussion occurred *before* the decision was made. *Id.* "Deliberative" means "the result of a consultative process." *Id.* In other words, a "deliberative" document "reflect[s] the opinions of the writer rather than the policy of an agency." *Id.* The privilege potentially covers "recommendations, draft documents, proposals, suggestions, and other subjective documents." *Id.*

Importantly, the privilege does not exempt from disclosure communications that "simply state or explain a decision the government has already made" or are "purely factual." *Id.*, at *4. The key inquiry in determining whether particular information is "deliberative" is whether "disclosure of the information would expose the decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Thomas v. Cate*, 2010 WL 797019 at *1 (E.D. Calif., March 5, 2010).

Here, Defendant has fundamentally misconstrued the nature of the privilege, taking an unduly broad view of its scope. Defendant invoked the privilege not to protect predecisional, deliberative communications between and among individuals at ODH, but to protect *all* information that in any way relates to the Directors' decisions to grant or deny a variance. The privilege does not extend so far, and this Court should require the witnesses to answer questions that are not covered by this narrow, qualified privilege.

### 1. The Court should compel the Directors to answer factual questions.

Defendant invoked the privilege to avoid answering simple factual questions. But the deliberative process privilege does not "protect material that is purely factual." *NetJets*, 2015 WL 1526346, at *4 (citing *In re Sealed Case*, 121 F.3d 729, 737 (D.C.Cir. 1997)); *United States ex rel. Williams v. Renal Care Group, Inc*., 696 F.3d 518, 527 (6th Cir. 2012) (purely factual matters "do not enjoy the privilege.") (internal citations omitted).

Seven separate times during the Directors' depositions, defense counsel instructed them not to answer straightforward, factual questions:[4]

*Figure 1: Fact Questions*

| Director | Page; Line | Question |
|---|---|---|
| Hodges | (100; 10-12) | For the 14 hours Planned Parenthood would not be transferring a patient, did you require a backup doctor to be available to admit? |
| Hodges | (122; 10-12) | And that's the situation that you found existed at Founder's when you granted their variance? |
| Himes | (82; 7-11) | Would you agree that the Planned Parenthood Southwest Ohio hospital transfer policy provides for continuity of care, communication, delivery of medical regards, and transportation of the patient to the hospital? |
| Himes | (86; 24-25); (87; 1-3) | Would you agree that [in Women's Med's 2017 variance request] these emergency medical protocols and hospital transfer protocols provide for continuity of care, communication, delivery of medical records, and transportation? |
| Himes | (90; 12-15) | Were you aware that Miami Valley had agreed from 2002 through '15 to accept hospital transfers from Women's Med Center in Dayton even though there's no transfer agreement? |
| Himes | (91; 11) | So when you reviewed Women's Med Center's 2014 and 2017 variance requests, were you aware at either time that Miami Valley would |

[4] When compiling this brief, Plaintiffs endeavored to include all questions to which Defendants objected on the basis of the deliberative process privilege. However, the deposition transcripts are hundreds of pages, and it is possible that some questions were inadvertently omitted. Plaintiffs do not intend waiver of any argument with respect to questions not included in this brief, and reserves their right to make similar arguments about those questions at a later date.

| | | |
|---|---|---|
| | | accept emergencies even without a written transfer agreement? |
| Himes | (92; 11) | Were you aware that Kettering would agree to accept hospital transfers from Women's Med when you reviewed Women's Med's variance requests? |

None of these questions involve pre-decisional communications or the deliberations of ODH. Instead, they are purely factual questions. To respond, the Directors need not disclose internal deliberations, or the "give-and-take of the consultative process" or debates among ODH staff. No communications at the ODH would be chilled by the Directors answering factual questions. Accordingly, the Court should compel to the Directors to respond.

**2. The Court should compel the Directors to answer post-decisional questions.**

Defendant wrongly objected to questions that are post-decisional. The deliberative process privilege applies only to "predecisional" deliberative content. *See NetJets*, No. 2:11-CV-1023 at *3 (citing *Rugiero v. U.S. Dep't of Justice*, 257 F.3d 534, 550 (6th Cir. 2001)). According to the U.S. Supreme Court, reasons "actually adopted" and which provide "the basis for an agency policy" are post-decisional and therefore fall outside the privilege's protection—as opposed to the pre-decisional reasons considered or debated internally before the adoption of the policy. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 152 (1975); *see also DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001) (citing *Sears, Roebuck*, 421 U.S. at 150).

Once an agency makes a decision, the agency is obligated to disclose both "the decision and reasons that support it." *Proctor & Gamble Co.*, 2009 WL 5219726 at *2. In other words, asking *why* the government decided on its ultimate policy is different from asking (1) *how* the government decided on its policy, or (2) how and why it *rejected* other possible policies. The former does not "reveal the government's decision-making processes." *Confidential Informant 59–05071 v. U.S.*, 108 Fed.Cl. 121, 131 (2012).

A number of deposition questions challenged by the Directors address policy decisions that were actually adopted. For example, Plaintiffs asked, "why did you grant [Planned Parenthood's] variance on November 20th, 2014?" (Hodges Dep., 85:4-5). This question, and others like it, do not interrogate the protected deliberative process by which the Director arrived at his conclusion. Rather, it asks him to provide only the final, post-decisional reasons why he arrived at his conclusion. The deliberative process privilege does not apply to such questions.

*Figure 2: Post-Decisional Questions*

| Director | Page; Line | Question |
|---|---|---|
| Hodges | (77; 25) | Why did you grant this request? |
| Hodges | (85; 4) | So why did you grant [Planned Parenthood's] variance on November 20th, 2014? |
| Hodges | (74; 14) | Did that raise any red flags for you? [referring to the fact that Planned Parenthood's approved variance application contained three backup doctors as opposed to four] |
| Hodges | (75; 18-20) | Did those three doctors meet your expectations for the backup physicians? |
| Hodges | (85; 14-15) | Did the fact that litigation was filed have anything to do with your decision? |
| Hodges | (88; 3-5) | When they [Planned Parenthood] reduced their number to three [backup] doctors, that did not cause a problem for you at that time? |
| Hodges | (98; 11-14) | Why do you require 24/7 backup coverage for Planned Parenthood for hospital transfers when it's only open for a shorter period of time? |
| Hodges | (111; 13-15) | When you wrote this denial in September of '15, was it your expectation if they [Planned Parenthood] added one more [backup doctor] that would be sufficient?" |
| Hodges | (113; 1-3) | Was there any other reason you denied the request in September of 2015 other than the fact that they had three doctors and not four? |
| Hodges | (113; 15-20) | Is it safe to say that when Planned Parenthood added the fourth doctor and you granted that variance request at that point in November [2015], that the only reason that they were denied was they had three instead of four doctors as backups? |
| Hodges | (117; 8-9) | Why did you invite them [Founders] to add a third [backup doctor]? |
| Himes | (242; 2-3) | Why was four [backup physicians] satisfactory for Planned Parenthood? |

| | | |
|---|---|---|
| Hodges | (116; 23-25) | Why were two doctors insufficient as backups for Founder's in 2016? |
| Hodges | (150; 9-11) | Why wasn't the third doctor being added in July of '15 sufficient for you to grant the variance request then? |
| Hodges | (150; 16-19) | Was there any other reason that you denied the variance request in June of '15 other than the fact that they only had two backup doctors? |
| Himes | (249; 17-18) | Any other reason why you granted the Founder's request in 2017 and 2018? |
| Hodges | (152; 16-18) | What more did Women's Med Center need to provide to ODH in order to get a variance in July of 2015? |
| Himes | (232; 15-16) | Any other reason you denied the variance? [referring to Women's Med Center's 2017 variance request] |
| Himes | (248; 6) | Can you tell me why that is? [referring to why two backup doctors was sufficient for a variance at a prior time] |

These questions are not designed to undercover internal, deliberations among ODH employees. Instead, they seek an explanation for the Defendant's final decisions—decisions that have already been made and are known to the public. Accordingly, the Court should compel the Directors to respond to the foregoing post-decisional questions.

**3. The Court should compel the Directors to answer hypothetical questions.**

Likewise, the Directors refused to answer hypothetical questions, to which the deliberative process privilege does not apply. Hypothetical questions aim to determine what the state's policy is, not how that policy came to be. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980) (holding that documents applying agency policies to "a specific, and often hypothetical, fact pattern" are not protected by the privilege because "[n]o 'decision' is being made or 'policy' being considered"). For example, the question, "[i]f Planned Parenthood had submitted their May 2015 request with four doctors, would you have granted that?" (Hodges Dep., 111-112:23-25), was an attempt to determine how many doctors are required for a variance pursuant to ODH's adopted policies. By its very nature, a hypothetical

question cannot require the disclosure of sensitive internal deliberations that actually took place. Therefore, requiring a response does nothing to chill candid discussions among policy officials.

*Figure 3: Hypothetical Questions*

| Director | Page; Line | Question |
|---|---|---|
| Hodges | (72; 24-25) | If [a variance] was granted, would that mean there were no red flags? |
| Hodges | (111; 23-25) | If Planned Parenthood had submitted their May 2015 [variance] request with four doctors, would you have granted that? |
| Hodges | (150; 3-4) | If they had added a third backup, would that have satisfied you on June 25? |
| Hodges | (152; 5-8) | Is there anything Women's Med Center of Dayton could have done after getting your June 25, 2015 letter to obtain a variance? |
| Himes | (233; 20-22) | And if there were another reason for denying the 2017 variance, would you put that in your letter? |
| Himes | (235; 10-12) | If Women's Med Center had provided a fourth backup doctor agreement in the variance request, would you have granted the variance? |
| Himes | (242; 17-18) | If Planned Parenthood had only three doctors, would you have granted that request? |

The Court should compel the Directors to answer these questions because they do not require the Directors to reveal "the government's decision-making process." *Confidential Informant*, 108 Fed.Cl. at 131. Rather, they require the Directors to simply explain the criteria the State applies in ruling on variance requests. They do not expose internal communications or deliberations, only the State's adopted policy.

**B. For those few questions regarding pre-decisional, deliberative reasoning, Plaintiffs can overcome this privilege under prevailing law.**

A handful of questions from the Directors' depositions arguably do fall within the scope of the deliberative process privilege because the questions seek predecisional information. But even if a question concerns predecisional, deliberative reasoning, that does not end the Court's inquiry.

Courts have permitted a party to overcome the deliberative process privilege under two separate (and often alternative) theories. First, some courts have held that the privilege does not apply to predecisional questions when the government's conduct is at issue. Second, other courts have applied a balancing test to determine whether a party should be permitted access to the material protected by the privilege. Under either theory, this Court should compel the Directors to respond to predecisional questions.

**1. Defendant's Conduct is central to the litigation.**

Many courts have found that this privilege protects the government's internal deliberations only if those deliberations are collateral to the litigation; when the Government's motives and reasoning are directly at issue in the case, the privilege falls away. *Bd. of Educ. of Shelby Cty., Tenn. v. Memphis City Bd. of Educ.*, No. 2:11-CV-02101-SHM, 2012 WL 6003540, at *4-5 (W.D. Tenn. Nov. 30, 2012), *supplemented*, No. 2:11-CV-02101-SHM, 2012 WL 6607288 (W.D. Tenn. Dec. 18, 2012) (deliberative process privilege does not apply at all in case alleging racial discrimination by government actors); *Children First Found., Inc. v. Martinez*, 2007 WL 4344915, at *7 (N.D.N.Y. Dec. 10, 2007); *Tri-State Hosp. Supply Corp. v. United States*, 2005 WL 3447890, at *8 (D.D.C. Dec. 16, 2005) (if "the government's intent is squarely at issue, there is no need for the court to engage in the tests applied in deliberative process privilege cases because 'the privilege does not come into the picture.'"); *In re Sealed Case*, 121 F.3d 729, 746 (D.C.C. 1997) ("The privilege disappears altogether when there is any reason to believe government misconduct occurred."); *Anilao v. Spota*, 2015 WL 5793667, at *19 (E.D.N.Y. Sept. 30, 2015) (collecting cases).

Here, the government's rationale for granting or denying variance requests is central to Plaintiffs' undue burden and equal protection claims. Indeed, the government itself has placed

its deliberative process squarely at issue by arguing that its decisions to deny Plaintiffs' variance requests serve legitimate, health-related objectives, and that the laws (and the Directors' implementation thereof) are not, as Plaintiffs' contend, roadblocks intended to shutter abortion clinics.

As the evidence demonstrates, the requirements for a variance are strikingly inconsistent both across clinics and across different years for the same clinic. For example, the law requires only one "backup" physician who has admitting privileges at a local hospital, R.C. 3702.304(B)(2), but the Director sometimes required as many as four such physicians on a variance application.[5] Other times, three physicians were deemed sufficient.[6] But sometimes, two were fine.[7] Sometimes it mattered whether those doctors were in a group practice; sometimes it didn't.[8] Sometimes the Director deemed it significant whether the physicians providing care at the clinic had admitting privileges themselves; other times that did not matter. As Director Hodges himself put it: "There was no rule. It was on a case-by-case basis, and it depended entirely on the circumstances."[9]

The process used to approve or deny variance requests implicates the undue burden balancing test, which requires that any benefits of the law be weighed against the burdens it imposes on patients. *Whole Women's Health v. Hellerstedt,* 136 S. Ct. 2992, 2309 (2016). Plaintiffs contend that the basis for a decision to grant or deny a variance is unpredictable, untethered to any principled, identifiable health objectives, and instead motivated by an improper anti-abortion purpose. *Id.* at 2316 (Texas could not impose "arbitrary" rules on abortion

---

[5] Deposition of Richard Hodges, at 77 (June 12, 2018)
[6] *Id.* at 87-88.
[7] Deposition of Lance Himes, at 247.
[8] *Id.* at 130-32.
[9] *Id.* at 117.

providers.). Additionally, clinics faced with confusing, contradictory and ever-changing variance requirements will struggle to keep their doors open, particularly since the Directors generally do not explain their decisions to deny variance applications or suggest how a clinic might cure any perceived deficiencies.[10]

A party cannot argue that the law accomplishes health and safety objectives while simultaneously refusing to provide the other side with discovery that would show that assertion to be untrue. *Bank of Dearborn v. Saxon*, 244 F.Supp. 394, 401 (E.D. Mich. 1965) (if exercise of director's discretion is not subject to judicial review, then his decisions are "unassailable in any court by any process"). The deliberations of the Directors are necessary to show what health objectives, if any, informed their decisions to grant or deny variance requests, and are necessary to allow the Court to fully resolve Plaintiffs' claims that the Directors' denials of Plaintiffs' variance applications were in fact motivated by anti-abortion animus, in violation of both the undue burden test and the Equal Protection Clause. Thus, given that the government's misconduct and intent is directly at issue in this case, this Court should find the deliberative process privilege inapplicable and compel the Directors to respond to the following questions:

*Figure 4: Pre-Decisional Questions*

| Director | Page; Line | Question |
|---|---|---|
| Himes | (83; 17-19) | When you approved the variance request, you approved based, in part, on the policy. Is that correct? |
| Himes | (94; 10-12) | Did you consider when you granted the request for a variance [from Planned Parenthood in 2018] that TriHealth [Bethesda North Hospital] would accept emergency patients? |
| Himes | (150; 18-20) | Did you consider that Miami Valley would accept Women's Med Center emergency patients when you denied the request? |

[10] Deposition of Richard Hodges, at 152-154. Plaintiff WMGPC has appealed to state court Director Himes' order to revoke its license for WMCD because it only has three back-up physicians.

| | | |
|---|---|---|
| Himes | (225; 8) | Did you act on that input? [referring to input from medical director on whether or not to grant a variance] |
| Himes | (226; 13-15) | And what types of questions have you asked? [referring to questions posed to medical directors about a variance that Director Himes was considering] |
| Himes | (227; 5-6) | What medical research or studies have you used, if any, to grant or deny a variance? |
| Himes | (239; 10-13) | And before you made your decision, did you go online and see how many doctors were part of the Wright State Physicians Group and what their names were? |
| Himes | (240; 22-25) | Other than the doctors' names not being listed, the entire practice of doctors' names being listed, is there any other concern you have with the Wright State Physicians' contract? |
| Hodges | (64; 4-5) | If you did send them back, do you recall why? [referring to draft letters sent back to legal counsel for changes or editing] |
| Hodges | (78; 21-22) | Did Dr. DiOrio recommend that you sign them? [referring to conversation with medical director regarding decision to grant variance in November 2014] |
| Hodges | (79; 6-8) | In your discussions with Dr. DiOrio about these two requests, did you raise any red flags? |
| Hodges | (90; 16-22) | Between February 1st, 2015 when they [Planned Parenthood] were down to three, and September 25, 2015 when you denied their 2015 variance request, what information did you have about their variance requests that changed your mind about three being sufficient in February but not sufficient in September? |
| Hodges | (95; 6-8) | Was there any new recommendations from Dr. DiOrio with regard to the 2015 variance request? |
| Hodges | (149; 18-20) | So that was your expectation when you wrote the letter in June that they would add a third doctor? |

**2. The Need for the Information Outweighs the Defendant's Interests.**

Alternatively, other courts have applied a balancing test to determine whether the plaintiffs' need for the information outweighs the state's interest in protecting its deliberative processes from discovery. *L.H. v. Schwarzenegger*, 2007 WL 2009807, at *4-*8 (E.D. Cal. July 6, 2007). This balancing test must be applied to the Plaintiffs' predecisional questions:[11]

[11] If the Court determines that any questions from part A of this brief do fall within the scope of the deliberative process privilege, that privilege is overcome for the same reasons set forth in this section.

If this Court decides to apply a balancing test, the deliberative process privilege is still inapplicable in this case. Courts weigh four factors when determining whether the plaintiff's need for information outweighs the governmental interest in protecting its deliberative processes from discovery: "(1) the relevance of the evidence sought, (2) the availability of other evidence, (3) the role of the government in the litigation, and (4) the potential consequences of disclosure of the information." *Libertarian Party of Ohio v. Husted*, 33 F. Supp. 3d 914, 919 (S.D. Ohio 2014) (citing *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984)).

The first and second factors weigh in Plaintiffs' favor. As detailed above, the evidence here is highly relevant. The Defendant argues that the WTA requirement and its application by ODH accomplishes legitimate health objectives; Plaintiffs argue that it does not and instead serves only anti-abortion animus. The Director of ODH is charged with determining whether a facility "is capable of achieving the purpose of a written transfer agreement," R.C. 3702.304, through its variance, and his deliberations on whether to grant a variance bear on the all-important question: "what is the purpose of a written transfer agreement?" Additionally, ODH is the only entity possessing information about the objectives of the Directors' review of these applications and the process undertaken, so no other evidence is available.

The third and fourth factors also weigh in favor of disclosure. The ODH Director is the defendant in this case, and is charged with violating Ohio citizens' constitutional rights by administering a scheme to shutter abortion clinics. Its role is thus "significant," as opposed to tangential or immaterial. *L.H. v. Schwarzenegger*, 2007 WL 2009807, at *7; *Harding v. Cty. Of Dallas, Texas,* No. 3:15-CV-0131-D, 2016 WL 7426127, at *11–13 (N.D. Tex. Dec. 23, 2016) (holding that this factor weighed in favor of overcoming the privilege where "the decisionmaking process . . . [itself] is the case") (alteration in original). Courts also find that the

potential consequences of disclosure are limited where the parties have a protective order in place, as the Parties do here. *Schwarzenegger*, 2007 WL 2009807, at *7 (citing *Prince v. County of San Diego*, 165 F.R.D. 614, 620 (S.D.Cal. 1996)).

In short, this Court has every reason to require the Directors to answer Plaintiffs' reasonable, limited questions regarding the health and safety factors they considered, if any, in evaluating Plaintiffs' variance. Whichever theory the Court applies to analyze predecisional questions—either examining the Defendant's conduct or applying a balancing test—Plaintiffs overcome the privilege asserted by the Defendant based on the facts of this case.

## IV. CONCLUSION

For the foregoing reasons, this Court should compel the Directors to answer all of the questions, including factual, post-decisional, hypothetical, and predecisional ones for which Defendant wrongly claimed the deliberative process privilege.

Respectfully submitted,

/s/ Ruth E. Hartman
Ruth E. Hartman #0078860
Michael E. Mumford #0073931
BAKER HOSTETLER LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200
(216) 696-0740 (fax)
mmumford@bakerlaw.com
rhartman@bakerlaw.com

*Attorneys for Plaintiff Women's Med Group Professional Corporation*

Jennifer L. Branch # 0038893
Trial Attorney for Plaintiffs
Alphonse A. Gerhardstein # 0032053
Gerhardstein & Branch Co. LPA
441 Vine Street, Suite 3400

Cincinnati, OH 45202
(513) 621-9100
(513) 345-5543 (fax)
agerhardstein@gbfirm.com
jbranch@gbfirm.com

*Counsel for Women's Med Group and for Planned Parenthood Southwest Ohio Region*

Carrie Y. Flaxman
Planned Parenthood Federation of America
1110 Vermont Avenue, NW, Suite 300
Washington, DC 20005
(202) 973-4800
(202) 296-3480 (fax)
carrie.flaxman@ppfa.org
Admitted Pro Hac Vice

Jennifer Keighley
Planned Parenthood Federation of America
123 William St., 9th Floor
New York, NY 10038
(212) 261-4749
(212) 247-6811 (fax)
Email: jennifer.keighley@ppfa.org
Admitted Pro Hac Vice

*Co-counsel for Plaintiff Planned Parenthood Southwest Ohio Region*

Julia Kaye
Brigitte Amiri
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 284-7358
(212) 549-2651 (fax)
jkaye@aclu.org
bamiri@aclu.org
Admitted Pro Hac Vice
*Of Counsel for Plaintiff Women's Med Group Professional Corporation*

Freda J. Levenson #0045916
ACLU of Ohio Foundation, Inc.
4506 Chester Avenue
Cleveland, OH 44103
(216) 472-2220
(216) 472-2210 (fax)
flevenson@acluohio.org
*Of Counsel for Plaintiff Women's Med Group Professional Corporation*

B. Jessie Hill #0074770
Cooperating Counsel for the ACLU of Ohio
Case Western Reserve Univ., School of Law
11075 East Boulevard
Cleveland, Ohio 44106
(216) 368-0553
(216) 368-2086 (fax)
bjh11@cwru.edu
*Co-Counsel for Women's Med Group Professional Corporation*

## Certificate of Service

I hereby certify that on July 13, 2018 a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail and email upon all parties for whom counsel has not yet entered an appearance electronically.

/s/ Ruth E. Hartman
One of the Attorneys for Plaintiffs