# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| Planned Parenthood Southwest Ohio Region, et al., | : <br> : <br> : Case No. 1:15-cv-00568 <br> : <br> : Judge Michael R. Barrett <br> : <br> : <br> : <br> : <br> : <br> : |
| Plaintiffs, | |
| vs. | |
| Richard Hodges, in his official capacity as the Director of the Ohio Department of Health, | |
| Defendant. | |

## ORDER

This matter is before the Court on Defendant's Motion to Compel Document Production. (Doc. 92). Plaintiffs filed a Response, (Doc. 107), the Court held oral argument, (Doc. 113), and Plaintiffs later provided non-party patient medical files for *in camera* review.

## I. BACKGROUND

Defendant moves the Court to compel Plaintiffs—Planned Parenthood Southwest Ohio Region ("PPSWO") and Women's Med Group Professional Corporation ("WMGPC")—and interested parties—Planned Parenthood of Greater Ohio ("PPGOH") and T&S Management of Columbus, LLC ("T&S")—to produce documents responding to discovery requests. (Doc. 92). Specially, Defendant requested all documents, including individual patient medical files with identifying information redacted, relating to patients who received abortion services at Plaintiffs' or the interested parties' facilities and (1) had

medical complications that occurred at or near the time of those services which did not result in a direct transfer from the facilities to a hospital or (2) went to a hospital after discharge from their facilities. (*Id.*, Attachments 1 and 2, Requests 4 and 9), (*id.*, Attachments 10 and 11, Requests 1 and 5). The timeframe for the requests "is January 1, 2011 through the present." (*Id.*, Attachments 1, 2, 10, and 11).

Regarding the first group of requested documents, Plaintiffs initially responded that, for patients who had complications *at the time of* abortion services and were treated at their facilities, Defendant already has their Confidential Abortion Reporting ("CAR") forms. (Doc. 92, Attachment 7). Regarding patients who had complications *after* the abortion services and were treated at their facilities, Plaintiffs stated that Defendant already has their Post Abortion Care Reports for Complications ("PCR"). (*Id.*). With respect to patients who had complications either *at or after* the time of abortion services and were treated at Plaintiffs' facilities, Plaintiffs asserted that they provided Defendant with a summary of "the number and types of abortion-related complications from 2011 through 2017" in a document titled "Annual Complication of Summary." (*Id.*). In a supplemental letter to Defendant, PPSWO proposed that it could "provide a summary of the complications for these surgical patients by providing a Form 51, ('Post-Abortion Complication Log')", for all complications treated at PPSWO since mid-2014 onward in lieu of producing the actual patients' charts.[1] (Doc. 92, Attachment 8). WMGPC proposed creating a similar "summary that includes the patient chart number and the type and date of each complication" in lieu of producing the actual patients' charts. (*Id.*). WMGPC did not provide a time-frame for this offer. (*Id.*). With respect to patients who

---

[1] PPSWO notes that "[t]his form was implemented in early 2014." (Doc. 92, Attachment 8).

had medical complications *at or after* the time of abortion services and were treated at PPGOH's and T&S' facilities, both initially responded that Defendant "*already collects and possesses complication data*" from those clinics pursuant to Ohio Rev. Code § 3701.79(H). (Doc. 92, Attachment 12) (emphasis in original).

Regarding the second group of requested documents, PPSWO identified 20 patient charts and agreed to produce the PCR forms for Defendant, if available in the charts.[2] (Doc. 92, Attachment 7). WMGPC identified 34 patient charts and agreed to produce the PCR forms for Defendant, if available. (*Id.*). PPGOH informed Defendant that his "request would require PPGOH's staff to spend hundreds of hours reviewing thousands of individual patient records, and . . . it would require [] staff to spend time and resources identifying and retrieving archived hard copy medical records that are located in an off-side storage facility." (Doc. 92, Attachment 12). T&S responded that it "has no system for identifying patients who were hospitalized after discharge prior to the fall of 2017 . . . so identifying all abortion patients who were hospitalized after discharge would require staff to spend hundreds of hours reviewing thousands of individual patient records to see if there is any record of a post-discharge hospitalization." (*Id.*).

## II. PARTIES' ARGUMENTS BEFORE THE COURT

Defendant asserts that the information in the requested documents, namely individual patient files, is relevant to his defense of Ohio's safety interests in regulating ambulatory surgical facilities ("ASFs") which includes facilities that provide abortions. (Doc. 92). He argues that the patient files are the most detailed and direct information

---

[2] PPSWO explains that, "[i]n some cases, a copy of the PCR form is placed in the patient file. In other cases, a copy is not kept in the patient file." (Doc. 92, Attachment 7).

3

describing what happened during a specific abortion complication. (*Id.*). He contends that production of the documents is not unreasonable, as confidentiality interests are adequately safeguarded through the case's protective orders and his request that Plaintiffs redact patient-identifying information, Plaintiffs have already identified relevant patient files with respect to the second group of requested documents, and Ohio laws require documentation of complications that occur at the facilities. (*Id.*) (citing Ohio Rev. Code § 3701.79(C) and Ohio Admin. Code § 3701-83-12(C)(6)).

Plaintiffs, PPGOH, and T&S respond that the requested documents are not relevant as this case concerns the constitutionality of Ohio's Written Transfer Agreement requirement,[3] Public Hospital Ban,[4] and Automatic Suspension Provision[5] under the Fourteenth Amendment as those Ohio laws relate to ASFs that provide abortions. (Doc. 107, PageID 1646) (emphasis omitted). Thus, according to Plaintiffs and the interested parties, the only relevant medical records are those that include information about when a "patient experienced an emergency abortion complication resulting in a direct transfer from the abortion facility to the hospital." (*Id.*) (emphasis omitted). They also argue that compelling the production of the requested interested-party patient files would violate their patients' Fourteenth Amendment informational privacy rights. (*Id.*; PageID 1652-58). They conclude by arguing that, even assuming the information contained in the patient files was relevant, Defendant's request violates discovery proportionality principles. (*Id.*, PageID 1651) (citing *id.*, Attachments 7-11).

---

[3] Ohio Rev. Code. § 3702.303(A).
[4] Ohio Rev. Code. § 3727.60(B).
[5] Ohio Rev. Code. § 3702.309(A).

4

## III. ANALYSIS

### a. Federal Rules of Civil Procedure

The Federal Rules of Civil Procedure provide that, unless the court orders otherwise, "the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. Pro. 26(b)(1). However, "the court must limit the frequency or extent of discovery otherwise allowed. . . if it determines that" "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C). A party may file a motion to compel discovery when another party fails to provide a proper response to the request for the production of documents. Fed. R. Civ. P. 37(a)(3)(B).

### b. Motion Denied

On consideration of the parties' briefing, their arguments presented at the hearing, and the Court's *in camera* review of four sample patient medical files, the Court denies Defendant's Motion to Compel, (Doc. 92), for two principal reasons: concern surrounding both the burden of production and the informational privacy rights of Plaintiffs' and the interested parties' patients.

#### i. Burden of Production

Assuming without deciding that the requested documents are relevant, the Court finds that most of the information that Defendant seeks can be obtained from other sources. *See* Fed. R. Civ. P. 26(b). Defendant already has Plaintiffs' CAR forms which "document complications at the time of the abortion, and [] provide information on the

5

specific type of abortion complication." (Doc. 92, Attachment 7), (Doc. 107, Attachment 12). Defendant also has Plaintiffs' PCR forms which detail the particular types of complications and the treatment provided after an abortion. (Doc. 92, Attachment 7), (Doc. 107, Attachment 13). Indeed, as Defendant noted, Plaintiffs and the interested parties are required by Ohio laws to report any abortion complications that occur *at or after* abortions provided at their facilities and, so, Defendant already has these reports. (Doc. 92, PageID 903). In particular, Ohio Revised Code § 3701.79(C) states that, "[t]he attending physician shall complete an individual abortion report for each abortion the physician performs upon a woman . . . The report shall include, but is not limited to, all of the following: . . . (6) Complications by type." Ohio Revised Code § 3701.79(H) provides that "[e]ach case in which a physician treats a post abortion complication shall be reported on a post abortion complication form. The report shall be made upon a form prescribed by the department, shall be signed by the attending physician, and shall be confidential."

In addition to the above requirements, Ohio Administrative Code 3701-83-12(A) mandates that each health care facility must "establish a quality assessment and performance improvement program designed to systematically monitor and evaluate the quality of patient care, pursue opportunities to improve patient care, and resolve identified problems." And, "[t]he quality assessment and performance improvement program shall" "[d]ocument and review all unexpected complications and adverse events, whether serious injury or death, that arise during an operation or procedure." Ohio Admin. Code 3701-83-12(C)(6). As Defendant has not asserted otherwise, the Court assumes that he has these assessment reports for Plaintiffs and the interested parties.

Plaintiffs also provided the Court with supplementary information regarding the

6

documents they have given to Defendant in addition to their initial responses discussed above, *see supra* Section I, and under Ohio's reporting requirements. (Doc. 107, PageID 1649-50). PPSWO and WMGPC, in response to written interrogatories, provided Defendant with charts listing, among other things, conditions or situations that are not considered to be abortion complications, conditions or situations that are considered to be abortion complications, whether a specific complication has occurred at their facilities, and whether a patient sought hospital care after discharge from their facilities. (Doc. 108, SEALED, Attachments 1, 2, and 3). Plaintiffs have also provided "documents summarizing the number and types of abortion-related complications" at their facilities. (Doc. 108, SEALED, Attachments 4 and 5).

In addition to the documents and information Defendant already has, PPSWO's Rule 30(b)(6) designee explained that, to produce the two groups of requested documents, the facility would have "to expend 528 hours locating, retrieving, scanning and sending" the requested patient medical records to their attorneys to be redacted. (Doc. 107, Attachment 7, PageID 1676). WMGPC's designee stated that it would have "to expend 185 additional hours locating, retrieving, reviewing, scanning, cataloging, and delivering" the requested medical records to their attorneys. (Doc. 107, Attachment 8, PageID 1681-82). PPGOH's designee contends that it would be "required to expend approximately 121 hours of staff time . . . locating, retrieving, and scanning" 153 medical records before sending to counsel. (Doc. 107, Attachment 9, PageID 1687). T&S's designee explained that one of its two facilities did not formally track abortion complications in a log until January 2017 and estimated that staff would need to review 6,000 patient charts and that review would take 3,000 hours before they could give them

to their lawyers. (Doc. 107, Attachment 10, PageID 1690). T&S's designee also stated that, for its other facility, if it "had to pull, review, and identify complications from the log since 2011, it would take 7,800 hours of staff time." (*Id.* at PageID 1691). The trial attorney for Plaintiffs, who also represents the interested parties, declared that, based on the approximations of the Rule 30(b)(6) designees, "[t]he estimate total time for [her] staff and [her]self to organize, review, and redact these records . . . would be approximately 831 hours." (Doc. 107, Attachment 11, PageID 1695).

To the extent that Defendant asserts that he wants the patient files because "this case directly involves Ohio's safety interests in regulating outpatient surgical facilities, making medical complications a natural part of the discussion," (Doc. 92, PageID 901), he fails to explain, on more than a general level, why the CAR, PCR, and Annual Summary reports—all of which describe medical complications—fail to reveal "the types of problems that could result in future emergencies or transfers" and "may also provide insight into why having regulations in place for emergency transfers is necessary." (Doc. 92, PageID 899). Rather, his arguments appear to be based on his conclusion that Plaintiffs waited too long to respond to his reasonable discovery request and general theories of relevancy in discovery. *See* (Doc. 92).

Given the combination of the information Defendant already has and the time Plaintiffs and the interested parties would have to spend to find and redact the medical files, the Court finds that the information that Defendant seeks can be found in the CAR, PCR, other required reporting documents found under Ohio's laws and regulations, or summaries already provided and will not require Plaintiffs spend nearly 12,500 hours producing the redacted files. The Court further finds that information not found in those

8

mandatory reports may be found in the summaries that Plaintiffs offered and Defendant has, to date, declined to accept as an adequate substitute. (Doc. 107, PageID 1650). With respect to the first group of requested documents, Plaintiffs offered to produce a Form 51, Post-Abortion Complication Log, for all complications treated at PPSWO since mid-2014 and a similar summary from WMGPC. (Doc. 92, Attachments 7, 8). The Court will order Plaintiffs to produce those documents to Defendant within thirty (30) days of this order. WMGPC did not provide a time frame for its offer, thus the Court will utilize the time frame found in Defendant's initial request *i.e.*, January 2011 to the present. With respect to the second group of requested documents, PPSWO identified 20 patient charts and agreed to produce the PCR forms for Defendant, if available, and WMGPC identified 34 patient charts and agreed to produce the PCR forms for Defendant, if available. (Doc. 92, Attachment 7). The Court will order Plaintiffs to produce those documents, if available, to Defendant within 30 days of this order.

The Court also notes Plaintiffs and the interested parties argument that, "expert testimony on abortion safety would be far more probative on this topic that [(sic)] combing through hundreds of sensitive patient records." (Doc. 107, PageID 1655). Although the Court did not ask Plaintiff if their experts would review patient files at the hearing, Plaintiffs must inform the Court, within a reasonable time-frame, if they plan to provide their experts with patient files. *Cf. June Med. Servs., LLC v. Gee*, No. CV 16-444-BAJ-RLB, 2018 WL 4956108, at *2 (M.D. La. Oct. 12, 2018) (discussing defendants' concern that plaintiffs would provide patient medical files to their experts, which defendants argued would prejudice them if they were unable to obtain the same patient files).

9

ii. Right to Informational Privacy

The Court finds that Plaintiffs' and the interested parties' patients have a greater interest in keeping their medical records private than Defendant's interest in obtaining those files for use in this matter. *See Bloch v. Ribar*, 156 F.3d 673, 684 (6th Cir. 1998) (citing *J. P. v. DeSanti*, 653 F.2d 1080, 1090-91 (6th Cir. 1981)).

In *Whalen v. Roe*, 429 U.S. 589 (1977), the U.S. Supreme Court acknowledged two privacy principles that stem from the Fourteenth Amendment. *Bloch*, 156 F.3d 673 at 683. The first privacy principle protects one's right to make certain personal choices, *see e.g.*, *Roe v. Wade*, 410 U.S. 113 (1973), whereas the second privacy principle protects one's "right to control the nature and extent of information released about that individual," *Bloch*, 156 F.3d at 683 (citing *Whalen*, 429 U.S. at 599-600). The second principle is also known as one's informational right to privacy and is at issue in this case.

The U.S. Court of Appeals for the Sixth Circuit ("Sixth Circuit") construes the informational right to privacy to extend "only to interests that implicate a fundamental liberty interest." *Bloch*, 156 F.3d at 684 (citing *DeSanti*, 653 F.2d at 1090 and *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1061 (6th Cir. 1998) ("This circuit . . . will only balance an individual's interest in nondisclosure of informational privacy against the public's interest in and need for the invasion of privacy where the individual privacy interest is of constitutional dimension.")). Consequently, in the Sixth Circuit, "a constitutional right to nondisclosure of certain types of private information exists, but not all disclosures of private information will trigger constitutional protection." *Bloch*, 156 F.3d at 684. The Sixth Circuit uses a "two-step process for analyzing informational right-to-privacy claims: (1) the interest at stake must implicate either a fundamental right or one

implicit in the concept of ordered liberty; and (2) the government's interest in disseminating the information must be balanced against the individual's interest in keeping the information private." *Id.* (citing *DeSanti*, 653 F.2d at 1090-91). And, "[o]nly after a fundamental right is identified should the court proceed to the next step of the analysis—the balancing of the government's interest in disseminating the information against the individual's interest in keeping the information private." *Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008).

Beginning with the step one, the Sixth Circuit has found, at least, two instances in which the interest at stake implicates a fundamental right: where the release of information could lead to bodily harm or where the information is of a sexual, personal, and humiliating nature. *See e.g.*, *Kallstrom*, 136 F.3d at 1062 (holding that undercover police officers possessed a privacy interest "in preserving their lives and the lives of . . . their family members, as well as preserving their personal security and bodily integrity"); *Bloch*, 156 F.3d at 685 (holding that "sexuality and choices about sex . . . are interests of an intimate nature which define significant portions of our personhood."); *see also Lambert*, 517 F.3d at 441(stating that "[t]he clear principle emerging from *Bloch* is that the sheriff's publication of the details of Bloch's rape implicated her right to be free from governmental intrusion into matters touching on sexuality and family life, and that to permit such an intrusion would be to strip away the very essence of her personhood."). Here, the Court finds that the interest at stake implicates a fundamental right, as the information Defendant seeks about Plaintiffs' and the interested parties' patients is of a sexual, personal, and humiliating nature in that their medical records surrounding their abortion procedures necessarily include details regarding the patients' sexuality and

11

sexual choices. *See Bloch*, 156 F.3d at 685.

Turning to the step two, "[w]here state action infringes upon a fundamental right, such action will be upheld . . . only where the governmental action furthers a compelling state interest." *Id.* at 686 (quoting *Kallstrom*, 136 F.3d at 1064)). Defendant asserts that obtaining the requested information in patients' medical files furthers Ohio's safety "interest in ensuring that clinics are preparing in advance for when problems happen" and "interest in regulating outpatient surgical facilities." (Doc. 92, PageID 891-92).

Although Defendant articulates why he wants the individual medical records, he provides no argument as to why his stated interests outweigh the patients' interest in preventing the dissemination of the details of their medical files from their abortion services, including their complete medical histories, to the state. Rather, he appears to accept that there are confidentially interests at play and contends that those interests are adequately safeguarded, as there are protective orders in place and Plaintiffs and the interested parties can redact any identifying information from the medical files such that the Court need not engage in balancing his interests with those of the patients. (Doc. 92, PageID 900-901). However, the Court agrees that Defendant's reliance on the protective orders and redaction fails to address Plaintiffs' and the interested parties' reasonable apprehension that redacting certain information "does not alter the fundamentally sensitive and private nature of these records, nor does it ensure that a particular patient's identity will not ultimately be disclosed to or discovered by the government or otherwise." (Doc. 107, PageID 1657). Indeed, "[a]lthough the government has agreed to the redaction of names, addresses, birthdates, and other objectively identifying information, the [requested medical records] records nevertheless contain other potentially identifying

information of an extremely personal and intimate nature, including, among others, types of contraception, sexual abuse or rape, marital status, and the presence or absence of sexually transmitted diseases." *Planned Parenthood Fed'n of Am., Inc. v. Ashcroft*, No. C03-4872 PJH, 2004 WL 432222, at *2 (N.D. Cal. Mar. 5, 2004). Defendant does not address this concern or the concern that "it is unlikely that the individual patients whose records are being produced would have notice or an opportunity to contest disclosure." *Id.* The Court will not produce arguments that Defendant failed to make.

Finally, Defendant asserts that the patient files "can show" "the types of problems that could result in future emergencies or transfers" and "may also provide insight into why having regulations in place for emergency transfers is necessary." (Doc. 92, PageID 899). However, the Court is not convinced that Defendant's interest in the *possibility* that he may find something in the requested patient medical records outweighs the patients' potential loss of privacy resulting from the disclosure of their medical records to the government. Rather, the Court finds that, based the facts of this case, the potential harm resulting from disclosure exceeds Defendant's interest, particularly in light of all of the information regarding abortion complications that he already has. In sum, Defendant fails to establish that producing Plaintiffs' and the interested parties' individual patients' medical records, even if redacted, "are routine discovery obligations," (Doc. 92. PageID 893), such that the Court should compel their production.

## IV. CONCLUSION

Based on the foregoing, the Court **ORDERS** that Defendant's Motion to Compel, (Doc. 92), is **DENIED**. However, the Court **ORDERS** that **Plaintiffs provide Defendant**,

within 30 days of the date of this order, (1) a Form 51, Post-Abortion Complication Log, for all complications treated at PPSWO since mid-2014 and a similar summary from WMGPC since January 2011 and (2) the PCR forms, if available, from the 20 patient charts PPSWO identified and from the 34 patient charts WMGPC identified with respect to Defendant's second group of requested documents.

**IT IS SO ORDERED.**

          _s/ Michal R. Barrett_____
          Michael R. Barrett, Judge
          United States District Court