UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD SOUTHWEST OHIO REGION, et al., | : | Case No. 1:15-cv-568 |
| | : | |
| | : | |
| | : | Judge Michael R. Barrett |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| RICHARD HODGES, et al., | : | |
| | : | |
| | : | |
| Defendants. | | |

## PLAINTIFF WOMEN'S MED GROUP PROFESSIONAL CORPORATION'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 2

II. CURRENT LICENSE STATUS ........................................................................... 3

The moment the Ohio Supreme Court issues a final a ruling in Plaintiff's administrative state court case, Women's Med Center Dayton's ("WMCD") ASF license will be revoked.

III. STATEMENT OF FACTS ...................................................................................... 4

    A.  Abortion Care and Safety....................................................................................... 4

Abortion is a common and very safe procedure. Complications from abortion are rare nationally and at WMCD. Complications that would require a transfer directly from a clinic to a hospital are especially rare. In the event that a WMCD patient needs to be transferred to the hospital, WMCD has comprehensive protocols and procedures to ensure patients get the care they need.

    B.  Transfer of Patients from Outpatient Facilities to Hospitals ............................................... 7

Neither emergency nor inpatient hospital care is dependent on an outpatient facility having a Written Transfer Agreement ("WTA") with a hospital or an agreement with one or more backup physicians with admitting privileges at a local hospital.

    C.  Regulatory Framework and WMCD Compliance ............................................................ 9

For decades the State of Ohio and the Ohio Department of Health ("ODH") has sought to reduce access to abortion through implementation of the challenged requirements. All hospitals in the Dayton area are either legally prohibited or unwilling to enter into a WTA with WMCD. While WMCD was able to meet the unnecessary statutory requirement that it have agreements with at least one backup physician and even the arbitrary ODH rule that it have four such backup physician agreements, ODH has still not granted WMCD's request for a variance from the WTA requirement.

    D.  The Effects on Women in Ohio if WMCD Is Forced to Close........................................ 14

Allowing the State to enforce the challenged restrictions would close the only abortion clinic in Dayton—one of only two clinics left in southern Ohio that provide abortion past 19 weeks LMP, and one of only three clinics in the region that provide abortion past 10 weeks LMP. Without WMCD, patients will face increased financial and logistical barriers to obtaining this time-sensitive medical care and, if they are able to obtain care at all, that care might be delayed.

VI. ARGUMENT ............................................................................................................ 17

    A. Standard for Granting Relief ............................................................................ 17

Plaintiff readily meets the test for temporary and preliminary relief. *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 460 (6th Cir. 1999).

    B. Plaintiff Has Demonstrated a Substantial Likelihood of Success on the Merits ............. 18

        *1.* The Burdens Resulting from the Effect of the Challenged Restrictions on Plaintiff Outweigh Any Medical Benefit, in Violation of WMCD's Patients' Substantive Due Process Rights. ................................................................................................ 18

*Whole Woman's Heath* "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." 136 S. Ct. at 2309. Because the benefits of the justifications of the challenged restrictions outweigh the burdens these restrictions impose, the restrictions should not be upheld. *Id.* at 2309.

        a. The Challenged Restrictions Serve No Medical Benefit. ..................................... 19

The challenged restrictions "do not benefit patients and are not necessary." *Whole Woman's Health*, 136 S. Ct. at 2315.

        b. Forcing WMCD to Close Will Burden Ohio Patients. ......................................... 21

The closure of clinics and the resulting reduction in access to abortion impose burdens by increasing the travel, financial, and logistical barriers to obtaining time sensitive medical care, which will delay the care of some patients and entirely prevent others from obtaining care. *Whole Woman's Health*, 136 S. Ct. at 2313.

        c. The Burdens Outweigh the Benefits. ................................................................. 26

The increased distances that patients in Ohio will be forced to travel "when taken together with the other[] [burdens] the closing[] [of clinics] brought about and when viewed in the light of the virtual absence of any health benefit" should lead this court to conclude that Plaintiff is likely to prevail on the merits of its claim that the challenged restrictions impose an undue burden on the right of women in Ohio to obtain abortion. *Whole Woman's Health*, 136 S. Ct. at 2313.

        *2.* The Challenged Restrictions Violate Plaintiff's Due Process Rights by Delegating Unreviewable Authority Over Plaintiff's License and Livelihood to Private Actors. 28

Ohio law provides no standards to guide or restrict the exercise of discretion by hospitals or physicians who are considering whether to enter into agreements with WMCD, and thus fails to provide both the necessary procedural and substantive due process protections to WMGPC. *See, e.g.*, *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936).

C.   Plaintiff Will Suffer Irreparable Harm................................................................... 29

The loss of WMCD's ASF license will cause irreparable constitutional, medical, emotional, and psychological harm to WMCD's patients and to the clinic itself. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001); *W. Ala. Women's Ctr.*, 2016 WL 6395904, at *13; *Performance Unlimited, Inc. v. Questar Publishers,* Inc., 52 F.3d 1373, 1382 (6th Cir. 1995).

D.   Neither Defendants Nor Anyone Else Will Suffer Harm If Preliminary Relief Is Granted.................................................................................................................... 30

WMCD has been providing safe, legal abortion care in Ohio for decades without the enforcement of this regulatory scheme.

E.   Granting Preliminary Relief Serves the Public Interest .................................................. 31

The public interest is always served by preventing the violation of constitutional rights, including the constitutional right to abortion.  *See Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati*, 822 F.2d 1390 (6th Cir. 1987).

V. CONCLUSION ....................................................................................................................... 31

# TABLE OF AUTHORITIES

## Cases

*Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*,
  698 F.3d 885 (6th Cir. 2012) ................................................................. 31

*Birth Control Ctrs., Inc. v. Reizen*,
  508 F. Supp. 1366 (E.D. Mich. 1981) ..................................................... 28

*Bonnell v. Lorenzo*,
  241 F.3d 800 (6th Cir. 2001) ................................................................. 29

*Carter v. Carter Coal Co.*,
  298 U.S. 238 (1936) ................................................................................ 28

*Comprehensive Health of Planned Parenthood Great Plains v. Williams*,
  263 F. Supp. 3d 729 (W.D. Mo. 2017) ................................................... 27

*Doe v. Barron*,
  92 F. Supp. 2d 694 (S.D. Ohio 1999) .................................................... 31

*Elrod v. Burns*,
  427 U.S. 347 (1976) ................................................................................ 29

*EMW Women's Surgical Ctr., P.S.C. v. Glisson*,
  No. 3:17-CV-00189-GNS, 2018 WL 6444391 (W.D. Ky. Sept. 28, 2018) ..................... passim

*Hallmark Clinic v. N.C. Dep't of Human Res.*,
  380 F. Supp. 1153 (E.D.N.C. 1974) ....................................................... 28

*June Medical Servs. v. Kliebert*,
  250 F. Supp. 3d 27 (M.D. La. 2017) ...................................................... 27

*Memphis Planned Parenthood, Inc. v. Sundquist*,
  175 F.3d 456 (6th Cir. 1999) ........................................................... 17, 26

*NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*,
  246 F. App'x 929 (6th Cir. 2007) .......................................................... 30

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*,
  52 F.3d 1373 (6th Cir. 1995) ................................................................. 30

*Planned Parenthood Ariz., Inc. v. Humble*,
  753 F.3d 905 (9th Cir. 2014) ........................................................... 23, 26

*Planned Parenthood Ark. & E. Okla. v. Jegley*,
  No. 4:15-CV-00784-KGB, 2018 WL 3029104 (E.D. Ark. June 18, 2018) ..................... passim

*Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati*,
  822 F.2d 1390 (6th Cir. 1987) ............................................................... 31

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health* ,
  896 F.3d 809 (7th Cir. 2018) ................................................................. 23

*Planned Parenthood of Ind. and Ky., Inc., v. Comm'r of Ind. State Dep't of Health*,
  273 F. Supp. 3d 1013 (S.D. Ind. 2017) .................................................. 27

*Planned Parenthood of Kan. v. Drummond*,
  No. 07-4164-CV, 2007 WL 2811407 (W.D. Mo. Sept. 24, 2007) ........................ 22

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992) ................................................................................ 18

*Planned Parenthood of Wis, Inc. v. Schimel*,
  806 F.3d 908 (7th Cir. 2015) ........................................................... passim

*Planned Parenthood of Wis., Inc. v. Van Hollen*,
   738 F.3d 786 (7th Cir. 2013) ............................................................... 24, 26
*Planned Parenthood of Wis., Inc. v. Van Hollen*,
   94 F. Supp. 3d 949 (W.D. Wis. 2015) ................................................. 21, 28
*Planned Parenthood of Wis., Inc. v. Van Hollen*,
   No. 13-CV-465-WMC, 2013 WL 3989238 (W.D. Wis. Aug. 2, 2013) .................. 22
*Planned Parenthood of Wisc., Inc. v. Van Hollen*,
   963 F. Supp. 2d 858 (W.D. Wisc. 2013)...................................................... 30
*Planned Parenthood Se., Inc. v. Bentley*,
   951 F. Supp. 2d 1280 (M.D. Ala. 2013) .................................................... 22
*Planned Parenthood Southeast, Inc. v. Strange*,
   33 F. Supp. 3d 1330 (M.D. Ala. 2014) ................................................. 21, 24
*Roe v. Wade*,
   410 U.S. 113 (1973)......................................................................... 18
*Tucson Woman's Clinic v. Eden*,
   379 F.3d 531 (9th Cir. 2004) .............................................................. 26
*W. Ala. Women's Ctr. v. Miller*,
   217 F. Supp. 3d 1313 (M.D. Ala. 2016) ................................................... 30
*W. Ala. Women's Ctr. v. Miller*,
   299 F. Supp. 3d 1244 (M.D. Ala. 2017) ............................................... 25, 27
*W. Ala. Women's Ctr. v. Williamson*,
   900 F.3d 1310 (11th Cir. 2018) ........................................................... 24
*Whole Woman's Health v. Hellerstedt*,
   136 S. Ct. 2292 (2016) ................................................................. passim
*Women's Medical Professional Corporation v. Baird*,
   438 F.3d 595 (6th Cir. 2006) ....................................................... 27, 28, 29

## Statutes & Regulations

42 U.S.C. § 1395dd.......................................................................... 7
Ohio Admin. Code § 3701-83-05 ........................................................... 12
Ohio Admin. Code § 3701-83-14 ........................................................... 10
Ohio Rev. Code § 2919.201................................................................. 5, 15
Ohio Rev. Code § 3702.303.................................................................. 9
Ohio Rev. Code § 3702.304................................................................. 11
Ohio Rev. Code § 3727.60.................................................................. 11

## Other Authorities

Nathan S. Richards, Note, *Judicial Resolutions of EMTALA Screen Claims at Summary
   Judgment*,
   87 N.Y.U. L. Rev. 591 (2012) ............................................................. 8

**<u>PLAINTIFF WOMEN'S MED GROUP PROFESSIONAL CORPORATION'S MOTION
FOR TEMPORARY RESTRAING ORDER AND/OR PRELIMINARY INJUNCTION</u>**

        Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Women's Med

Group Professional Corporation ("WMGPC"), moves to preliminarily enjoin enforcement of

Ohio Rev. Code section 3702.303 ("the Written Transfer Agreement ("WTA") Statute")  and

3702.304 ("the Variance Statute") as it applies to WMGPC's clinic, Women's Med Center

Dayton ("WMCD"). Absent an order from this court, the Ohio Department of Health's ("ODH")

biased and arbitrary enforcement of these statutes will result in the immediate revocation of the

ambulatory surgical facility license of WMCD the moment the Ohio Supreme Court issues a

final ruling on WMPGC's state administrative case. Without this license, WMCD will be forced

to immediately stop providing surgical abortion care and will be forced to close entirely shortly

thereafter. Because the revocation of the license is immediately effective upon the ruling of the

Ohio Supreme Court, Plaintiff respectfully requests the Court enter a temporary restraining

order.

        Additionally, Plaintiff's 2019 variance application is currently pending with ODH.

Pursuant to the Variance Statute, this application will be denied by default if ODH fails to rule

on it by September 23, 2019. To avoid a default denial of Plaintiff's 2019 variance application,

Plaintiff respectfully request that Defendants be enjoined from enforcing or acting in compliance

with the Variance Statute. Should this court be unable to enter the requested preliminary

injunction by September 23, 2019, Plaintiff respectfully requests that the Court enter a temporary

restraining order.

        Plaintiff will provide notice to all Defendants upon the filing of this motion.

        Plaintiff requests that the injunction be granted without bond. If bond is required,

Plaintiff requests it be set a $1.00.

1

## I.    INTRODUCTION

The State of Ohio has undertaken a deliberate campaign to eliminate access to abortion care. This campaign has taken many forms,[1] including the creation and enforcement of regulations that use patient safety as a pretext for targeting abortion providers. Evidence shows that abortion is very safe and complications requiring transfer from a clinic to a hospital are extremely rare. Moreover, when transfers do occur, federal law requires that hospitals accept patients in need of emergency care. Nevertheless, Ohio has required clinics performing surgical abortions either to secure a written transfer agreement ("WTA") with a local hospital pursuant to Ohio law ("WTA Statute") or enter into agreements with four backup physicians with admitting privileges at local hospitals pursuant to an arbitrary and unwritten Ohio Department of Health ("ODH") rule ("Four Backup Physician Rule"). These restrictions do not increase patient safety, but, because the political climate in Ohio makes it so difficult for abortion provider Women's Med Center Dayton ("WMCD") to comply with these restrictions, ODH is poised, in the absence of an injunction, to revoke WMCD's ambulatory surgical facility ("ASF") license. Without this license, WMCD will be forced to close.

The enforcement of the WTA Statute, the Four Backup Physician Rule, and the statute that ODH has interpreted to create the Four Backup Physician Rule (the "Variance Statute") impose burdens without providing any benefits to patients in clear violation of *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2302, 2313 (2016). WMCD is the only clinic in the

---

[1] In just the past year, the Ohio Legislature has passed three separate bans on abortion, including a ban on abortion after just six weeks of pregnancy. *See* Senate Bill 23, 133rd Gen. Assemb. (banning abortion after only six weeks of pregnancy); Senate Bill 145, 132nd Gen Assemb. (banning the safest and most common second-trimester abortion procedure); House Bill 214, 132nd Gen. Assemb. (banning abortions based on the patient's reason for seeking care).

Dayton metropolitan area and one of only two Ohio clinics outside of Cleveland that provide abortion services up to 22 weeks after a patient's last menstrual period ("LMP"). Unless this Court grants temporary relief, WMCD's patients will be forced to delay time-sensitive medical care—or forgo it altogether—resulting in irreparable constitutional, medical, emotional, and psychological harm. Additionally, these restrictions unconstitutionally delegate unreviewable authority to private entities. For these reasons, and because the balance of interests weighs strongly in Plaintiff's favor, this Court should grant temporary and/or preliminary injunctive relief.

## II.   CURRENT LICENSE STATUS

As described in detail below, on September 25, 2015, ODH denied WMCD's 2015 application for a variance from the WTA requirement because it listed three individual backup physicians instead of four. Second Declaration of W.M. Martin Haskell, M.D. ("Second Haskell Decl."), ¶ 37. That same day, ODH proposed to issue an order revoking and refusing to renew WMCD's ASF license for failure to comply with the WTA Statute. *Id.* ¶ 38 & Ex. E. That order was issued November 30, 2016. *Id.* Ex. G. Since that time, WMCD has only been able to provide surgical abortion care pursuant to a state court ruling on WMCD's administrative claim that stayed the revocation of WMCD's ASF license and has remained in place during subsequent state appeals. *Id.* ¶ 15 & Ex. H. Thus, unless this Court grants temporary or preliminary relief, ODH's order revoking WMCD's ASF license will be effective once the Supreme Court of Ohio enters its decision and WMCD will be forced to close shortly thereafter. *Id.* ¶ 40.

### III.    STATEMENT OF FACTS

#### A.  <u>Abortion Care and Safety</u>

Approximately one in four women in this country will have an abortion in her lifetime.[2] Declaration of Paula Hillard, M.D. ("Hillard Decl."), ¶ 30. Women seek abortions for a variety of medical, psychological, familial, economic, and personal reasons. *Id.*; Second Haskell Decl. ¶ 10. Women may not feel it is the right time in their lives to have a child or add to their families. Hillard Decl ¶ 30; Second Haskell Decl. ¶ 10. Most women having abortions (nearly 60%) already have at least one child, and 66% plan to have children later. Hillard Decl. ¶ 30. Some women seek abortions because they suffer from medical conditions, such as diabetes or hypertension, which can be exacerbated by pregnancy or childbirth. *Id.*; Second Haskell Decl. ¶ 10. Others do so because they are pregnant as a result of rape or incest. Hillard Decl. ¶ 30; Second Haskell Decl. ¶ 10. Some patients seek abortion care because they have received a diagnosis of a severe, and sometimes lethal, fetal condition. Hillard Decl. ¶ 30; Second Haskell Decl. ¶ 11. For all of these reasons, being forced to continue an unwanted pregnancy can pose a risk to a woman's physical, mental, and emotional health, and even to her life. Hillard Decl. ¶¶ 15, 34; Second Haskell Decl. ¶ 10.

Patients in Ohio can obtain two types of abortion in the clinical setting: medication abortion and surgical abortion. Second Haskell Decl. ¶ 8. Medication abortion is a method of ending an early pregnancy by taking medications that cause the patient to undergo a process similar to an early miscarriage. Hillard Decl. ¶ 11; Second Haskell Decl. ¶ 8. Medication

---

[2] Plaintiffs use "women" here as shorthand for patients seeking abortion care, but note that people of all gender identities, including transgender men and people who are non-binary, may also need and utilize abortion care and other reproductive health care.

4

abortion is currently available through 70 days LMP. Hillard Decl. ¶ 11; Second Haskell Decl. ¶ 8. Surgical abortion, despite its name, does not involve any incision. Hillard Decl. ¶ 12; Second Haskell Decl. ¶ 9. A surgical abortion procedure can occur over one or two days, depending on the stage of the pregnancy. Second Haskell Decl. ¶ 9. From June 2018 to June 2019, WMCD provided 2,129 surgical abortions and 865 medication abortions. *Id.* ¶ 6. Approximately 20% were performed after the first trimester. *Id.*

Abortion is currently legal in Ohio up to 20 weeks from fertilization, which is equivalent to 22 weeks LMP. Ohio Rev. Code § 2919.201. However, only three clinics in Ohio currently provide abortions after 19 weeks LMP: WMCD in Dayton, Planned Parenthood Southwest Ohio ("PPSWO") in Cincinnati, and Preterm in Cleveland, each of which performs abortions through 21 weeks, 6 days LMP.  Second Haskell Decl. ¶ 49; Declaration of Sharon Liner, M.D. ("Liner Decl."), ¶ 5. As with all patients seeking abortion care, those who seek care after 19 weeks LMP do so for a variety of reasons, including because of a severe fetal anomaly, which often may not be diagnosed until 20 weeks LMP. Second Haskell Decl. ¶¶ 11, 49.

Abortion is a very safe procedure. Hillard Decl. ¶ 14; Second Haskell Decl. ¶ 12; *accord Whole Woman's Health*, 136 S. Ct. at 2320 (Ginsburg, J., concurring) ("[A]bortion is one of the safest medical procedures performed in the United States.") (quoting Brief for Am. Coll. of Obstetricians & Gynecologists et al. as Amici Curiae 6-10)). Because abortions are so safe, the vast majority can be and are safely provided in an outpatient setting. Hillard Decl. ¶ 17. In 2017, 99.5% of Ohio abortions were performed in an outpatient center. *Id.*; Second Haskell Decl. ¶ 12. Abortion has a lower mortality rate than many common outpatient procedures and medications, including colonoscopy, tonsillectomy, plastic surgery, and penicillin. Hillard Decl. ¶ 16. It is also vastly safer than continuing a pregnancy to term: the risk of death associated with childbirth

is approximately 12 to 14 times higher than that of abortion, and the risk of death associated with legal induced abortion is a tiny fraction of the overall pregnancy-related mortality rate in the U.S. (0.6–0.7 per 100,000 compared to 17.2 per 100,000). *Id.* ¶ 15.

Any complications associated with abortion are likely to occur after the patient has already left the abortion clinic. Hillard Decl. ¶¶ 11, 13, 22; *accord EMW Women's Surgical Ctr., P.S.C. v. Glisson*, No. 3:17-CV-00189-GNS, 2018 WL 6444391, at *15 (W.D. Ky. Sept. 28, 2018), *appeal pending*, No. 18-6161 (6th Cir. Nov. 5, 2018). When complications at the clinic do occur, the overwhelming majority are minor and can be successfully treated in an outpatient setting. Hillard Decl. ¶¶ 13–17; Second Haskell Decl. ¶¶ 12–13; *see also Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 912 (7th Cir. 2015) ("[C]omplications from an abortion are both rare and rarely dangerous."). For instance, a recent study of 54,911 California Medicaid-funded abortions found an overall major complication rate (including emergency department visits) of 0.23%, with only 0.03% involving ambulance transfers to an emergency department. Hillard Decl. ¶ 14. In a 2018 study of 50,311 induced abortions, only 0.32% of patients experienced a major adverse event, such as hospital admission or additional surgery. *Id*. Based on these and other data, the nonpartisan National Academy of Sciences, Engineering, and Medicine concluded in 2018 in a comprehensive report on the safety of abortion that "[t]he clinical evidence clearly shows that legal abortions in the United States . . . are safe and effective." *Id.*; *see also Glisson*, 2018 WL 6444391, at *16 n.13 (citing this study).

It is very rare that a patient needs to be transferred from WMCD to a hospital. Second Haskell Decl. ¶ 13. Indeed, from October 2015 to June 30, 2019, WMCD performed over 8,164 surgical abortions and only one of those patients needed to be transferred to the hospital due to a surgical complication. *Id.* ¶ 15. In this rare event, WMCD has comprehensive procedures and

6

policies that ensure patients receive the care they need. *Id.* ¶ 13 & Ex. B 000041–47. These

protocols detail, among other things, that the charge nurse is responsible for calling 911 and

ensuring the patient's medical record accompanies the patient to the hospital; the physician is

responsible for providing urgent care, communicating with the receiving physician and

emergency room physician at the hospital, completing and printing detailed patient medical

records describing the reason for transfer and the care delivered, and providing care instructions

to the ambulance crew; and the reception charge person is responsible for directing someone to

greet the ambulance and directing the ambulance crew to the patient. Second Haskell Decl. Ex.

B 000041–47.

### B. <u>Transfer of Patients from Outpatient Facilities to Hospitals</u>

Neither emergency nor inpatient care is dependent on an outpatient facility having a

WTA with a hospital or an agreement with one or more backup physicians with admitting

privileges at a local hospital.

As an initial matter, pursuant to the federal Emergency Medical Treatment and Active

Labor Act ("EMTALA"), hospitals that receive Medicare funds and operate emergency

departments are required to provide stabilizing treatment to patients experiencing emergency

medical conditions. 42 U.S.C. § 1395dd(b); *see also* Declaration of Norman Schneiderman,

M.D. ("Schneiderman Decl."), at ¶¶ 18–21, 23, 46–47; Second Haskell Decl. Ex. B at 000038

(letter from CEO of Miami Valley Hospital to ODH stating that it will treat "any and all patients

presenting to" its emergency department "[a]s required by Ohio and federal law"). All Dayton-

area hospitals that operate emergency departments are required by law to treat any WMCD

patients in need of emergency medical care. *See* Schneiderman Decl. ¶¶ 18-23; *Glisson*, 2018

WL 6444391, at *28 n.17 ("EMTALA. . .encompasses virtually all acute care hospitals.") (citing

Nathan S. Richards, Note, *Judicial Resolutions of EMTALA Screen Claims at Summary Judgment*, 87 N.Y.U. L. Rev. 591, 592 n.3 (2012)).

The former Chief of the Bureau of Community Health Care Facilities and Services at ODH, Roy Croy, agreed that a WTA requirement "serves no medical benefit" in light of the safety of abortion and the requirements of EMTALA. Declaration of Roy Croy ("Croy Decl."), ¶ 26. Moreover, in his experience: "Ohio hospitals do not turn away patients in need of care, even when a medical complication arises outside of the emergency context. Thus, there is no medical benefit to requiring an abortion facility to have either a WTA or a variance from the WTA requirement." *Id.*

Moreover, as Dr. Norman Schneiderman has explained based on his four decades of experience at Miami Valley Hospital in Dayton, including as Chief of Staff and Chairman of the Department of Emergency Medicine, emergency department staff are virtually never aware if a patient arrives pursuant to a WTA, because the existence of such an agreement has no clinical relevance. Schneiderman Decl. ¶¶ 22–23.

Nor is a backup physician with admitting privileges necessary to ensure that a patient experiencing an abortion complication will receive appropriate emergency care in the event of a hospital transfer. The referring physician at the abortion clinic can communicate directly with emergency department staff, with no need for a backup physician to serve as intermediary; this is standard medical practice for serious complications occurring in an outpatient setting. Schneiderman Decl. ¶¶ 35–43; Hillard Decl. ¶ 19; *see also* Second Haskell Decl. Ex. B at 000041–47 (reflecting that WMCD physicians are to communicate with the emergency physician or receiving physician in the case of a hospital transfer). Emergency department physicians are well-equipped to deal with any of the (rare) complications associated with abortion, which are

comparable to common obstetrics and gynecology ("OB-GYN") problems, and to seek support as needed from OB-GYN specialists on staff. Schneiderman Decl. ¶¶ 32–34; Hillard Decl. ¶ 21.

A backup physician agreement is also unnecessary to ensure a patient receives appropriate inpatient care. In large hospitals, like the ones in the Dayton area, inpatient care is managed by hospitalists (physicians whose only job is to manage inpatient care) working with hospital physicians in the appropriate specialty. Schneiderman Decl. ¶ 28. Relying on hospitalists to provide such care is a matter of course in modern medical practice: patients presenting at a hospital typically do not have a preexisting relationship with a doctor on staff in the emergency department or in the specialty area in which they need care, and this in no way affects the quality of services the patient receives. Schneiderman Decl. ¶¶ 26–28; Hillard Decl. ¶ 20; *see also Schimel*, 806 F.3d at 912.

### C. <u>Regulatory Framework and WMCD Compliance</u>

Despite the overwhelming evidence proving the safety of abortion and the rarity with which a patient is transferred from an abortion clinic to a hospital, Ohio has, for decades, sought to reduce access to abortion through the implementation of the challenged requirements. The complicated history of Defendants' campaign to revoke Plaintiff's abortion license is set out in detail in the Second Declaration of Dr. Haskell, but Plaintiff highlights the most relevant details for the present motion herein.

Since 2002, after Plaintiff's court challenge to the medically unnecessary requirement that it obtain an ASF license ended unsuccessfully, providers of surgical abortion in Ohio have been required to obtain an ASF license. Second Haskell Decl. ¶ 19. To obtain this license, providers must "have a written transfer agreement with a local hospital." Ohio Rev. Code § 3702.303. However, while every other ASF in the state is permitted to comply with the WTA

Statute with a WTA from a public hospital, Ohio law prohibits any public hospital from "enter[ing] into a [WTA] with an [ASF] in which nontherapeutic abortions are performed or induced," *id.* at § 3727.60, and private hospitals have no obligation to enter into a WTA with any ASF.

It has been impossible for Plaintiff to comply with this requirement. For years, the owner of WMCD has written every hospital in the Dayton area to request a WTA, and all hospitals have turned him down. Second Haskell Decl. ¶ 23. Notably, the CEO of Miami Valley Hospital—a hospital in the Dayton area—wrote a letter to ODH declining to establish any formal affiliation with the clinic, but assuring ODH that the hospital would treat WMCD's patients in the extremely rare event of an emergency. Second Haskell Decl. Ex. B at 000038. However, this commitment was not sufficient to satisfy the State. *See* Second Haskell Decl. ¶¶ 36–37.

Plaintiff therefore has relentlessly pursued an ASF license by attempting to comply with the regulatory alternatives to the WTA Statute, even as the State repeatedly changed the regulatory framework in order to prevent WMCD from complying. Prior to 2013, an ASF that could not obtain a WTA could either request a waiver of the WTA requirement if it demonstrated that the requirement caused it "undue hardship" and that granting the waiver would not "jeopardize the health and safety of any patient," or obtain a variance from the WTA requirement if it could show that the WTA requirement "ha[d] been met in an alternative manner." Ohio Admin. Code § 3701-83-14(C). Under this framework, Plaintiff was able to obtain a variance from the WTA requirement based on its transfer protocols and arrangements with two backup providers with admitting privileges. Second Haskell Decl. ¶ 24.

In 2013, however, the Ohio legislature eliminated the possibility of a waiver from the WTA requirement and changed and codified the requirements for a variance, thus requiring any

10

ASF unable to obtain a WTA to meet stringent variance requirements, described below, to continue to operate. *See* Ohio Rev. Code § 3702.304 ("Variance Statute"). Since only abortion clinics had sought variances from the WTA requirement, Roy Croy Deposition Transcript ("Croy. Dep. Tr.") 49:3-6, the clear purpose of this law was to make it more difficult for abortion clinics to continue to operate.

Under the Variance Statute, an application for a variance must include, among other things, "[a] letter, contract, or memorandum of understanding signed by the facility and one or more consulting physicians who have admitting privileges at a minimum of one local hospital, memorializing the physician or physicians' agreement to provide back-up coverage when medical care beyond the level the facility can provide is necessary[.]" Ohio Rev. Code § 3702.304(B)(2). Each backup agreement must include "[d]ocumented verification that each hospital at which the physician has admitting privileges has been informed in writing by the physician that the physician is a consulting physician for the [ASF] and has agreed to provide back-up coverage for the facility when medical care beyond the care the facility can provide is necessary." *Id.* at § 3702.304(B)(3)(e). Additionally, Ohio law prohibits physicians with admitting privileges at public hospitals from entering into backup agreements with abortion clinics. *See* Ohio Rev. Code § 3727.60.

Just as it has been impossible for WMCD to comply with the WTA Statute, it has been extremely difficult for it to meet the requirements of the Variance Statute because of the prohibition on public hospitals signing WTA agreements or allowing their physicians to sign backup agreements; the prevalence of Catholic hospitals in the area, which refuse to either enter into WTAs with abortion clinics or allow physicians with privileges in their hospital to enter into backup agreements; and the stigma around abortion that leads even physicians who are

11

supportive of WMCD's work to fear professional repercussions for associating with the clinic. *See* Second Haskell Decl. ¶¶ 23, 32, 35.

WMCD has diligently submitted a complete variance application, including statutorily compliant agreements with backup physicians, every year since 2013.[3] *Id.* ¶¶ 28, 35–37, 41. Although ODH did not initially rule on WMCD's 2012, 2013, or 2014 license renewal and variance applications, under Ohio law, the clinic was able to continue operating as long as it timely filed its annual applications. *Id.* ¶ 28; *see also* Ohio Admin. Code § 3701-83-05.

On June 24, 2015, ODH retroactively denied WMCD's variance applications for the past three years. Second Haskell Decl. ¶ 34. Despite the fact that ODH had approved a variance application with two backup physicians as recently as 2008 and that, under Ohio law, it had the discretion to approve a variance application with only one backup physician, ODH arbitrarily denied the variance applications on the grounds that WMCD's two backup physicians with admitting privileges were insufficient to ensure patient safety. Croy Decl. ¶¶ 20–21; Second Haskell Decl. ¶¶ 24, 34 & Ex. C at 1–2.

Despite the serious challenges of finding local physicians willing to tolerate the severe anti-abortion harassment that WMCD's backup physicians face, *see infra* pp. 12-13, WMCD was ultimately able to add a third backup physician. Second Haskell Decl. ¶ 35. Accordingly, on July 24, 2015, WMCD filed its 2015 license renewal and variance application, which identified three backup physicians with admitting privileges at Miami Valley Hospital, and described in detail how WMCD's emergency protocols, its backup physicians, *their* backup group coverage, and WMCD's separate backup arrangement with Wright State Physicians Women's Health Care, the

---

[3] While the statute would allow ODH to require variance applications every two years, ODH has required annual applications. Second Haskell Decl. ¶ 27.

OB-GYN practice group at Miami Valley Hospital, would ensure 24/7 backup coverage. *See* Second Haskell Decl. ¶¶ 35–36 & Ex. B; *see also* Declaration of Dr. Doe ("Doe Decl.") ¶¶ 11–14 (filed separately under seal).

Nevertheless, in September 2015—after this litigation was filed—ODH denied WMCD's 2015 variance application that met ODH's previous demand for three backup doctors. Second Haskell Decl. ¶ 37. ODH provided no real medical justification; instead, it stated summarily that the "provision of only three named backup physicians does not meet [the Director's] expectation that a variance provide the same level of patient health and safety that a written transfer agreement with a local hospital assures for 24/7 back-up coverage." *Id.* & Ex. E at 1–2. Because WMCD was not able to identify a fourth backup doctor until recently, the clinic's variance applications for 2016, 2017, and 2018 are substantively unchanged. ODH denied each one, using substantially the same language as in its 2015 denial letter. *Id.* ¶ 41. WMCD was able to find a fourth backup in June of 2019—after a longtime supporter of WMCD's work had a change in professional situation that permitted her to enter into an agreement—but its situation remains precarious. *Id.* ¶ 42. Although WMCD submitted a revised variance application on June 26, 2019 and its annual variance on July 25, 2019, to date, ODH has not approved either of those applications. *Id.* & Exs. J–K.

Although ODH was able to identify four backup physicians, this should not overshadow the fact that ODH should not have been able to require such a thing to begin with. That is especially true where, as here, backup physicians are subject to extreme harassment. Physicians affiliated with abortion in any capacity may face professional repercussions and anti-abortion violence and harassment due to abortion stigma. Doe Decl. ¶¶ 21–28. In Dayton, there is a targeted campaign to intimidate physicians who provide backup coverage to WMCD. *See* Doe

13

Decl. ¶¶ 16–20, 22 & Exs. B–J; *see also* Deposition Transcript of Dr. Doe ("Doe Dep. Tr."), 82:25-83:16. For instance, while WMCD was trying to recruit backup physicians in the summer and fall of 2015, an anti-abortion group plastered the names and faces of the clinic's backup physicians on billboard trucks next to a photograph of allegedly dismembered fetal parts, drove the truck through each doctor's neighborhood, and parked outside of their places of work. Doe Decl. ¶¶ 16–20. On one occasion, the truck slowly followed the teenage daughter of one of the doctors while she was out jogging in her neighborhood, prompting her mother to call the police. *Id.* ¶ 19. Many local doctors who are supportive of WMCD's work have declined to be backup physicians because of fear of being similarly harassed. *Id.* ¶¶ 22, 27. Others declined because they believed they would face professional repercussions if they publicly affiliated with WMCD. *Id.* ¶ 27; Doe Dep. Tr. 107:23–108:23; 109:10–15; 109:25–110:8. Given the level of harassment these backup physicians face, it is clear that requiring multiple backup physicians is one of many tactics the State can use to push a variance out of the reach of WMCD.

### D. <u>The Effects on Women in Ohio if WMCD Is Forced to Close</u>

If WMCD's ASF license is revoked, it will no longer be able to provide surgical abortion care. Second Haskell Decl. ¶ 1. Because surgical abortion care comprises the majority of WMCD's services without an ASF license, WMCD will not be able to stay open unless this court intervenes. *Id*. ¶ 43.

If WMCD is forced to close, patients will face a significant increase in the financial and logistical barriers to obtaining abortion care. A woman who needs an abortion in the Dayton area would be forced to travel, at minimum, approximately 100 miles round-trip to Cincinnati, 160 miles round-trip to Columbus, or 440 miles round-trip to Cleveland. Second Haskell Decl. ¶¶ 46, 49; Declaration of Carolette Norwood, Ph.D. ("Norwood Decl."), ¶¶ 46–57. Women

14

more advanced in their pregnancies are likely to face even longer distances due to the more limited number of providers at this stage of pregnancy. *See* Second Haskell Decl. ¶¶ 46, 49. Without WMCD, there would be only two clinics within 200 miles round-trip of Dayton offering any abortion services after 10 weeks of pregnancy (PPSWO in Cincinnati and Planned Parenthood Greater Ohio ("PPGOH") in Columbus), and only two clinics left in the entire state offering abortion services after 19 weeks of pregnancy (PPSWO in Cincinnati and Preterm in Cleveland). *See id*. Because of Ohio's 24-hour mandatory delay law, Ohio Rev. Code § 2919.201, patients will have to make at least two trips to the clinic, or secure overnight lodging in one of these cities. Second Haskell Decl. ¶ 49; Norwood Decl. ¶ 58. If the patient has reached the point in pregnancy when an abortion procedure takes two days to complete (approximately 16 weeks LMP), the patient would either have to make this journey a *third* time, or find and pay for overnight lodging and associated costs for an additional night. Haskell Decl ¶¶ 9, 49; Norwood Decl. ¶¶ 58–59.

The increased travel burden—which will translate to increased financial and logistical burden—will adversely impact all of WMCD's patients. The additional time it will take to travel hundreds of miles will cost patients more in childcare and lost wages than if they obtained an abortion in the city nearest to where they live and work. Hillard Decl. ¶ 32; Second Haskell Decl. ¶ 51. This will be especially burdensome for the overwhelming majority of WMCD's patients who, like most abortion patients nationally, have low incomes.[4] Second Haskell Decl. ¶¶ 48, 50-

---

[4] Dayton is one of the poorest cities in Ohio and in the nation. In 2017, 32.7% of Dayton residents were living in poverty, compared to 14.9% statewide in Ohio. Norwood Decl. ¶ 22. Approximately 17.5% of Dayton households are subsisting on less than $10,000 per year, or less than $834 a month. *Id.* ¶ 23. Poverty rates in Dayton are higher among women than among men (34.6% compared to 30.6%), and particularly high among Black women—50.5% of Black women between the ages of 15 and 34 in Dayton are living in poverty. *Id.* at ¶ 25.

51, 55; Norwood Decl. ¶¶ 60–67. The onerous and costly travel to Cincinnati, Columbus, or Cleveland (at least twice) will delay some patients in getting care and may entirely prevent others from obtaining care, particularly where patients must be accompanied by another adult because they will be receiving sedation. *Id.* ¶¶ 33, 36–39, 44–68, 73–75. To raise funds, some patients will make sacrifices in other areas, like not paying rent or utilities, or drastically reducing their food budgets and going hungry. *Id.* ¶ 69. Some will be forced to borrow money from an abusive former boyfriend or partner, jeopardizing their safety. *Id.* ¶ 70. In addition, the increased travel will compromise women's ability to keep their abortion confidential from employers, abusive partners, and others. *Id.*

People who are unable to obtain abortions because of these barriers will be left with two choices, both of which pose serious consequences for patients: (1) carry an unwanted pregnancy to term and face the increased risks of death and major complications from pregnancy and childbirth, Hillard Decl. ¶ 34; or (2) turn to potentially unsafe methods to terminate the pregnancy, *id.* ¶ 33; Second Haskell Decl. ¶ 56.

In addition to all these burdens, an influx of patients from the Dayton area would result in increased wait times at the surrounding clinics, resulting in higher medical risks, less choice, and more expense for patients. Liner Decl. ¶¶ 12-13; Declaration of Terrie Hubbard ("Hubbard Decl."), ¶¶ 6–7, 12; Declaration of Adarsh Krishen, M.D. ("Krishen Decl."), ¶¶ 7–11. Specifically, the influx of patients from Dayton will strain the capacity of the remaining abortion providers in southern and central Ohio. Liner Decl. ¶¶ 11–13; Krishen Decl. ¶¶ 8, 10; Hubbard Decl. ¶¶ 6–7, 12; *see also Whole Woman's Health*, 136 S. Ct. at 2318 (it is a "commonsense inference that the dramatic decline in the number of available facilities will cause a shortfall in capacity"). Although abortion is extremely safe, the risks associated with the procedure increase

16

as pregnancy advances, so increased wait times can have a significant negative effect on outcomes for abortion patients. Hillard Decl. ¶ 32; Second Haskell Decl. ¶ 53. Some patients who prefer a medication abortion, or for whom a medication abortion is medically indicated, will be delayed past the point in pregnancy when they can obtain that method, thus closing off care options for patients once they are able to secure an appointment. Hillard Decl. ¶¶ 31–32; Norwood Decl. ¶¶ 14, 28. The costs of an abortion also increase as pregnancy advances—which may force patients to delay their procedure even longer while they raise additional funds, which in turn means the costs and risks will continue to rise. Hillard Decl. ¶ 32; Second Haskell Decl. ¶ 54; Norwood ¶ 31. Some patients will be unable to surmount these financial barriers and will be pushed past the point at which they can obtain an abortion. Norwood Decl. ¶¶ 14, 28; Hillard Decl. ¶ 34; Second Haskell Decl. ¶ 55.

## IV.    ARGUMENT

### A.  Standard for Granting Relief

The standard for evaluating a request for a temporary restraining order or preliminary injunctive relief under Rule 65 is well established in this Circuit. The Court should consider the following four factors:

(1)    Whether the party seeking the injunction has shown a substantial likelihood of success on the merits;

(2)    Whether the party seeking the injunction will suffer irreparable harm absent the injunction;

(3)    Whether the injunction will cause others to suffer substantial harm;

(4)    Whether the public interest would be served by the preliminary injunction.

*Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 460 (6th Cir. 1999). As set out below and in the accompanying declarations, Plaintiff readily meets the test for temporary and preliminary relief.

17

**B.  Plaintiff Has Demonstrated a Substantial Likelihood of Success on the Merits**

Plaintiff is substantially likely to succeed on the merits of its claim that the WTA Statute, the Variance Statute, and ODH's Four Backup Physician Rule violate its patients' constitutional right to privacy under *Whole Woman's Health*, 136 S. Ct. at 2292, because the burdens imposed by these restrictions outweigh the benefits. Additionally, Plaintiff is likely to succeed on its claim that its due process rights are violated by the State's delegation of authority over the clinic's professional license to private actors.

> **1.  *The Burdens Resulting from the Effect of the Challenged Restrictions on Plaintiff Outweigh Any Medical Benefit, in Violation of WMCD's Patients' Substantive Due Process Rights.***

Decades of Supreme Court precedent have established that the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution protects a woman's right to choose abortion. *See e.g. Roe v. Wade*, 410 U.S. 113, 153-54 (1973). Under this precedent, a restriction on pre-viability abortion creates "an 'undue burden' on a woman's right to decide to have an abortion, and consequently a provision of law is constitutionally invalid, if the 'purpose or effect' of the provision 'is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" *Whole Woman's Health*, 136 S. Ct. at 2300 (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 878 (1992)) (emphasis omitted). The undue burden test "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer," and a law may not be upheld unless the benefits of the justification outweigh the burdens it imposes. *Id.* at 2309.

This case is significantly similar to *Whole Woman's Health*, 136 S. Ct. at 2300, where the Supreme Court struck down two laws that Texas claimed were necessary to protect the safety of abortion patients: (1) a requirement that all abortion clinics be outfitted as ambulatory surgical

18

centers, and (2) a requirement that all abortion providers have admitting privileges at a local hospital. There, the Court found that "abortion was extremely safe with particularly low rates of serious complications and virtually no deaths occurring on account of the procedure" before the passage of the law and "[t]hus there was no significant health-related problem that the new law helped to cure." *Id.* at 2311. The Court also found that both of these laws would force clinics to close, resulting in "fewer doctors, longer waiting times, and increased crowding" and "forc[ing] women to travel long distances to get abortions in crammed to capacity superfacilities." *Id.* at 2313, 2318. Thus, the Court "conclude[d] that neither of these provisions confers medical benefits sufficient to justify the burdens upon access that each imposes." *Id.* at 2300. The same is true here, as discussed below.

### a. The Challenged Restrictions Serve No Medical Benefit.

As the Supreme Court found in *Whole Woman's Health* regarding Texas's admitting privileges requirement, the WTA Statute, the Variance Statute, and the Four Backup Physician Rule "do[] not benefit patients and [are] not necessary."*Id.*, 136 S. Ct. at 2315.

As an initial matter, the requirements "are minimally applicable because they purport to address situations that arise very rarely." *Glisson*, 2018 WL 6444391, at *12. As described *supra* Section III.A, abortion is one of the safest procedures in outpatient medicine. *Whole Woman's Health*, 136 S. Ct. at 2311-12.[5] Consistent with national statistics, WMCD patients very rarely experience a complication resulting in hospital transfer. Hillard Decl. ¶¶ 11, 13, 22; Second Haskell Decl. ¶¶ 13–15. When complications do arise, they generally do so after the patient has returned home, "rendering meaningless any transfer . . . agreement between the abortion clinic

---

[5] *See also Glisson*, 2018 WL 6444391, at *24 n. 27 ("Other courts have uniformly reached the same conclusion [that abortion is safe].") (citing cases).

and another entity." *Glisson*, 2018 WL 6444391, at *13; *see also Whole Woman's Health*, 136 S. Ct. at 2315. Thus, there is "no significant health-related problem" that WTAs or backup physicians would help to cure. *Id.* at 2311.

In the exceedingly rare case that a patient experiences a serious complication at the clinic requiring emergency hospital care, the quality of care the patient receives is not affected by the existence or nonexistence of a WTA or backup agreements "because hospitals have no choice under EMTALA: they *must* provide medical care to stabilize *all* emergency patients." *Glisson*, 2018 WL 6444391, at *14 (emphasis in original); *accord* Schneiderman Decl. ¶¶ 13, 18-23; Hillard Decl. ¶ 24; *see also* Second Haskell Decl. Ex. B at 000038 (letter from CEO of Miami Valley Hospital to ODH). Indeed, as one court considering a similar issue observed: "This [WTA] mandate . . . seems to be predicated on the notion that hospitals would have the option to choose *not* to provide medical care in these emergent situations [related to abortion complications]. This is not the case." *Glisson*, 2018 WL 6444391, at *14. The same is true here. Further, the WTA Statute is particularly "arbitrary and largely meaningless" since ODH does not regulate or impose any specifications on the provisions or content of a WTA. Croy Decl. ¶ 30; *see also Planned Parenthood Ark. & E. Okla. v. Jegley*, No. 4:15-CV-00784-KGB, 2018 WL 3029104, at *38 (E.D. Ark. June 18, 2018) (citing cases expressing skepticism that admitting-privilege laws for abortion clinics increase safety when those laws do not require that the contracted physicians see, treat, or admit a patient experiencing a complication).

The State's Variance Statute requiring one or more backup physicians in lieu of a WTA is equally unnecessary to protect patient safety, and ODH's demand that WMCD have backup agreements with *four* doctors is particularly "arbitrary and irrational." Croy Decl. ¶ 32; *accord* Hillard Decl. ¶¶ 9, 29, 34; Schneiderman Decl. ¶¶ 13, 50, 55. There is no medical justification

for ODH's position that a backup agreement with four backup doctors is required instead of, as WMCD provided in its 2015 variance application, three doctors plus *an entire practice* of doctors who would act as backups to the original three. *See* Haskell Decl. ¶ 36. As discussed *supra* Section III.B, the evidence shows that in the extremely rare event that a patient requires a transfer directly from WMCD to a hospital, that patient will receive appropriate care regardless of whether there is a WTA or one (or two or three or four) backup physicians at the ready.

Accordingly, courts have rejected abortion restrictions similar to those challenged here as "a solution in search of a problem." *Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 953 (W.D. Wis. 2015), *aff'd sub nom. Planned Parenthood of Wis, Inc. v. Schimel*, 806 F.3d 908 (7th Cir. 2015) (striking requirement that abortion providers have admitting privileges at a local hospital); *Planned Parenthood Southeast, Inc. v. Strange*, 33 F. Supp. 3d 1330, 1378 (M.D. Ala. 2014) (same). Indeed, the District Court for the Western District of Kentucky recently invalidated a WTA requirement for abortion clinics, finding that it did not "improve[] the safety of abortion procedures in Kentucky." *Glisson*, 2018 WL 6444391, at *12. Plaintiffs are equally likely to succeed in proving that the WTA Statute has "scant" medical benefits. *Id*. at *1.

For each of these reasons, Plaintiff is likely to succeed in proving that all of the challenged restrictions are not justified by any medical benefit.

### b. Forcing WMCD to Close Will Burden Ohio Patients.

Allowing the State to enforce the restrictions would close the only abortion clinic in Dayton—one of only two clinics left in southern Ohio that provide abortion past 19 weeks LMP, and one of only three clinics in the region that provide abortion past 10 weeks LMP. Second Haskell Decl. ¶¶ 46, 49. This closure would greatly diminish patient health. Without WMCD, thousands of patients each year will face increased financial and logistical barriers to

21

obtaining this time-sensitive medical care and, if they are able to obtain care at all, that care might be delayed. *See supra* Section III.D.

The Supreme Court, along with many other courts, has recognized that the closure of clinics and the resulting reduction in access to abortion constitutes a burden. *Whole Woman's Health*, 136 S. Ct. at 2313; *see also, e.g.*, *Glisson*, 2018 WL 6444391, at * 22 ("In analyzing whether the burden imposed by an abortion regulation is undue, courts must consider the impact of the regulation on the closure of abortion facilities and reduction in the number of abortion providers within the state.") (citing *Whole Woman's Health*, 136 S. Ct. at 2313); *Jegley*, 2018 WL 3029104, at *14 (temporarily enjoining enforcement of a backup physician requirement for medication abortion providers that would, *inter alia*, shut the only abortion clinic in Fayetteville, Arkansas); *Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1288 (M.D. Ala. 2013) (temporarily enjoining enforcement of an admitting privileges requirement that would have closed the only abortion clinics in Birmingham, Montgomery, and Mobile, Alabama); *Planned Parenthood of Wis., Inc. v. Van Hollen*, No. 13-CV-465-WMC, 2013 WL 3989238, at *1 (W.D. Wis. Aug. 2, 2013) (temporarily enjoining enforcement of admitting privileges requirement that would have closed half of the abortion clinics in Wisconsin), *aff'd*, 738 F.3d 786 (7th Cir. 2013) ; *Planned Parenthood of Kan. v. Drummond*, No. 07-4164-CV, 2007 WL 2811407, at *7–8 (W.D. Mo. Sept. 24, 2007) (preliminarily enjoining a law that could, *inter alia*, have the effect of "shutting down Missouri's only abortion facilities located outside the St. Louis area").

All women living in the Dayton metropolitan area will be forced to travel longer distances—in some cases much longer distances—to receive care in Ohio. Second Haskell Decl. ¶¶ 46–49. This, alone, constitutes a burden. In *Whole Woman's Health*, the Court

recognized that increases in distance "are but one additional burden, which, when taken together with the others the closing[] [of clinics] brought about, and when viewed in the light of the virtual absence of any health benefit, lead us to conclude that the record adequately supports the District Court's 'undue burden' conclusion." 136 S. Ct. at 2313; *see also Glisson*, 2018 WL 6444391, at *25 (citing *Whole Woman's Health*, 136 S. Ct. at 2313); *Jegley*, 2018 WL 3029104, at *22 ("While lengthy travel 'do[es] not always constitute an 'undue burden',' such travel is a 'legitimate burden' that, depending on the particular facts of the case, can ultimately contribute to a determination that a statute creates an undue burden." (quoting *Schimel* 806 F.3d at 919)); *Schimel*, 806 F.3d at 919 (requiring patients to travel 90 miles is a burden on women seeking abortions and especially for patients who have low incomes).

Patients will also face the increased burdens associated with that travel, including arranging and affording transportation, childcare, and time off work to travel to Cincinnati, Columbus, or Cleveland (twice). *See supra* Section III.D. "[A]dditional travel expenses, childcare costs, loss of entire days' wages, [and] risk of losing jobs" have all been considered "significant burdens" by the courts. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health* ("*PPINK*"), 896 F.3d 809, 827 (7th Cir. 2018) (blocking requirement that patients obtain an ultrasound 18 hours prior to an abortion due to increased travel burden with no accompanying medical benefit); *see also Jegley*, 2018 WL 3029104, at *22 (citing *PPINK*); *Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 915 (9th Cir. 2014) (in applying undue burden test, courts may "consider the ways in which an abortion regulation interacts with women's lived experience [and] socioeconomic factors").

These burdens are especially acute for people who have low incomes, a population that makes up a large proportion of abortion patients nationally and in Ohio and that will be

23

disproportionately impacted if abortion access in Ohio is restricted. *See supra* p. 14-15. Courts have recognized that the "particularly high barrier[s]" that distance can erect for "poor, rural or disadvantaged women" should factor into a burden analysis. *PPINK*, 896 F.3d at 818–19 (the relevant focus of the constitutional inquiry was "low income women who do not live near one of [the plaintiff's] six health centers where ultrasounds are available"); *Whole Woman's Health*, 136 S. Ct. at 2302 (crediting district court's finding that the travel distances caused by Texas abortion restrictions "erect a particularly high barrier for poor, rural, or disadvantaged women" (quotation marks and citation omitted)); *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1326-27 (11th Cir. 2018) (affirming injunction where law would, *inter alia*, "increase the costs of travel and lodging for women who do not live near the plaintiff clinics," which "would be especially burdensome for low-income women, who comprise a large proportion of the plaintiffs' patients"); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 796 (7th Cir. 2013) (hundreds of miles of travel for two required appointments is "a nontrivial burden on the financially strapped and others who have difficultly traveling long distances to obtain an abortion, such as those who already have children").

Women who are not able to travel to obtain an abortion from a health care provider may attempt abortion without medical assistance and at risk to their health. Hillard Decl. ¶¶ 15, 30, 33, 34; Second Haskell Decl. ¶ 56; *see also, e.g.*, *Whole Woman's Health*, 136 S. Ct. at 2321 (Ginsburg, J., concurring) ("[W]omen in desperate circumstances may resort to unlicensed rogue practitioners, *faute de mieux*, at great risk to their health and safety."); *Strange*, 33 F. Supp. 3d at 1362-63 (W.D. Ala 2014) (state regulation that makes it more difficult to obtain a legal abortion "creates a greater risk that women would attempt to obtain abortion illegally without medical supervision").

Even patients that have resources to obtain abortions at other clinics will face "longer waiting times [and] increased crowding," and may therefore lose out on "the kind of individualized attention, serious conversation, and emotional support that doctors at less taxed facilities may have offered." *Whole Woman's Health*, 136 S. Ct. at 2313, 2318. The facts in this case show, as commonsense suggests, that the other Ohio clinics cannot simply take on the patients that would have been seen at WMCD without delays to patient care. Liner Decl. ¶¶ 11-13; Hubbard Decl. ¶¶ 6-7, 12; Krishen Decl. ¶¶ 7-11; *see also Whole Woman's Health*, 136 S. Ct. at 2318 ("Healthcare facilities and medical professionals are not fungible commodities. Surgical centers attempting to accommodate sudden, vastly increased demand, may find that quality of care declines.") (citations omitted); *id.* at 2316 ("Courts are free to base their findings on commonsense inferences drawn from the evidence."); *W. Ala. Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244, 1249, 1263-64 (M.D. Ala. 2017) (closing all but three abortion clinics in Alabama will reduce capacity and impose a burden on women seeking abortions from those clinics); *Jegley*, 2018 WL 3029104, at *25 (even if the one remaining clinic were able to absorb increased demand after an abortion restriction closed the only other clinic in the state, the remaining clinic's patients would "endure longer wait times and reduced quality of care compared to the quality of care they would have received if [the restriction] were not enforced").

As described above, these delays will increase medical risk to patients who are unable to obtain an abortion until later in pregnancy and may push other patients past the point where they can obtain abortion at all. Hillard Decl. ¶¶ 32–34; Second Haskell Decl. ¶ 55; Norwood Decl. ¶¶ 14, 28. Accordingly, the delays caused by WMCD's forced closure would unduly burden patients seeking abortions. *See, e.g.*, *Schimel*, 806 F.3d at 918 (affirming injunction where law would delay access to abortion care, causing some patients "to forgo first-trimester abortions and

25

instead get second-trimester ones, which are more expensive and present greater health risks");
*Humble*, 753 F.3d at 917 (finding undue burden where law would prevent some patients from
obtaining a medication abortion, even if some "will nonetheless obtain an abortion"); *Tucson
Woman's Clinic v. Eden*, 379 F.3d 531, 542 (9th Cir. 2004) (recognizing delays as evidence of
undue burden).

### c. The Burdens Outweigh the Benefits.

As in *Whole Woman's Health*, here, the increased distances that patients in Ohio will be
forced to travel "when taken together with the other[] [burdens] the closing[] [of clinics]
brought about, and when viewed in the light of the virtual absence of any health benefit" should
lead this court to conclude that Plaintiff is likely to prevail on the merits of its claim that the
challenged restrictions impose an undue burden on the right of women in Ohio to obtain an
abortion. *Whole Woman's Health*, 136 S. Ct. at 2313.

"[A] state may impose restrictions on the woman's access to an abortion . . . that serve
some . . . valid state interest; however, a state may not erect procedural hurdles in the path of a
woman seeking an abortion simply to make it more difficult for her to obtain an abortion."
*Memphis Planned Parenthood*, 175 F.3d at 461. The state is clearly doing that here. These
restrictions have no medical benefit, but "[e]ven if the challenged regulations further[]
women's health to a minimal degree, the burdens will still outweigh any such feeble benefit
and constitute an undue burden to women's access to abortion[.]" *Glisson*, 2018 WL 6444391,
at \*27; *see also Whole Woman's Health*, 136 S. Ct. at 2318 ("[I]n the face of no threat to
women's health," the enforcement of regulations that increase travel burdens and cause clinic
closures are "harmful to, not supportive of, women's health."); *Van Hollen*, 738 F.3d at 798
("The feebler the medical grounds, the likelier the burden, even if slight, to be 'undue' in the

sense of disproportionate or gratuitous."); *Jegley*, 2018 WL 3029104, at *45 (requiring clinics providing medication abortions to have a contract with a doctor with admitting privileges presents burdens with no benefits); *Miller*, 299 F. Supp. 3d at 1286 (fetal demise law was passed in the pursuit of legitimate goals, but those goals were not sufficient to justify "such a substantial obstacle to the constitutionally protected right to terminate a pregnancy before viability"); *June Medical Servs. v. Kliebert*, 250 F. Supp. 3d 27, 88 (M.D. La. 2017) (admitting privileges law provided no "measurable benefit to women's health, but it is clear that the Act will drastically burden women's right to choose abortion"); *Comprehensive Health of Planned Parenthood Great Plains v. Williams*, 263 F. Supp. 3d 729, 735 (W.D. Mo. 2017) (case was "not a close one" where hospital affiliation law forced women into two round-trips of hundreds of miles with little concomitant benefit); *Planned Parenthood of Ind. and Ky., Inc.*, *v. Comm'r of Ind. State Dep't of Health*, 273 F. Supp. 3d 1013, 1039 (S.D. Ind. 2017) (finding undue burden where law required ultrasound viewing a day before an abortion rather than the day of the abortion because this change provided little to no benefit when measured against prior law).

Defendants will inevitably point to *Women's Medical Professional Corporation v. Baird*, 438 F.3d 595 (6th Cir. 2006), but to the extent that *Baird* held that forcing patients to travel hundreds of miles to obtain care was not per se an undue burden, *see id*. at 605–06, that case must now be reconsidered in light of *Whole Woman's Health*. *See Glisson*, 2018 WL 6444391, at *55. The *Baird* analysis cannot be reconciled with *Whole Woman's Health* for two reasons. First, it does not give appropriate weight to the burden imposed by the increased travel distances that would result from the forced closure of WMCD. Second, it completely failed to scrutinize the supposed benefits of the challenged law and then weigh those benefits against the burdens that

27

the law imposes as *Whole Woman's Health* requires. 136 S. Ct. 2309. Under current, binding Supreme Court precedent, the burdens plainly outweigh the benefits of the challenged law.

For all the reasons above, it is clear that neither the WTA Statute, the Variance Statute, nor the Four Backup Physician Rule confers medical benefits sufficient to justify the burdens upon access these provisions create, and that their enforcement places a substantial obstacle in the path of patients seeking a previability abortion, thus creating an undue burden on abortion access in violation of the Fourteenth Amendment. *See id.*, 136 S. Ct. at 2300.

### 2. *The Challenged Restrictions Violate Plaintiff's Due Process Rights by Delegating Unreviewable Authority Over Plaintiff's License and Livelihood to Private Actors*

Ohio law provides no standards to guide or restrict the exercise of discretion by the hospitals or physicians that are considering whether to enter into agreements with WMCD, and thus fails to provide both the necessary procedural and substantive due process protections to Plaintiff. *See, e.g.*, *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) (Due Process Clause prohibits standardless delegation of legislative authority to private individuals); Mot. Dismiss Order & Opinion, ECF No. 57, at 8 ("hospitals have the 'unfettered power to decide whether or not to enter into an agreement'") (quoting *Baird*, 438 F.3d at 609); *id.* ("Ohio has no power over hospitals to direct them as to how to respond to requests for written transfer agreements."). Because the State may not refuse an ASF license for arbitrary reasons unrelated to the ASF's qualifications as a provider, it violates the non-delegation doctrine when it permits private hospitals or physicians to do the same. *See Birth Control Ctrs., Inc. v. Reizen*, 508 F. Supp. 1366, 1374 (E.D. Mich. 1981), *aff'd in part, vacated in part on other grounds*, 743 F.2d 352 (6th Cir. 1984); *Van Hollen*, 94 F. Supp. 3d at 997; *Hallmark Clinic v. N.C. Dep't of Human Res.*, 380 F. Supp. 1153, 1158-59 (E.D.N.C. 1974), *aff'd*, 519 F.2d 1315 (4th Cir. 1975).

28

While the Sixth Circuit rejected plaintiff's non-delegation claim in *Baird*, there has

since been a significant change to Ohio's regulatory scheme. At the time of *Baird*, ODH could

grant a waiver from the WTA Statute if the clinic showed "undue hardship" or a variance from

the WTA Statute if the clinic showed that the purpose of the regulation had been served "in an

alternative manner." *Baird*, 438 F.3d at 599. In *Baird*, the Court reasoned that the WTA

Statute's non-delegation problem was cured because ODH "retains authority to grant a waiver

of the transfer agreement requirement," which meant that the State "make[s] the final decision

about whether ASFs obtain a license." *Id.* at 610. But that is no longer the law. Under current

law, there is no scenario in which an abortion clinic can obtain or retain its ASF license without

support from a local hospital and private physicians.

Thus, Plaintiff's ability to obtain or retain its ASF license is entirely contingent on the

unconstrained decisions of the hospitals and physicians local to WMCD. This is an

unconstitutional delegation of government power.

**C.  Plaintiff Will Suffer Irreparable Harm**

The loss of WMCD's ASF license will cause irreparable harm to both the clinic and its

patients. As this Court recognized, "when a constitutional right is being threatened or impaired,

a finding of irreparable harm is mandated."  Op. & Order, ECF No. 28, at 17 (citing *Bonnell v.

Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

As explained *supra* Section IV.B, allowing the State to shutter WMCD without medical

justification violates the constitutional rights of Plaintiff and its patients. This alone demands a

finding of irreparable harm.

The closure of WMCD—and the elimination of abortion access in Dayton—will also

impose other tangible injuries on WMCD's patients through all the burdens described above.

29

*See supra* Sections III.D, IV.B.1.b. These threats to Plaintiff's patients' health and wellbeing are irreparable harm. *See, e.g.*, *Jegley*, 2018 WL 3029104, at *46; *W. Ala. Women's Ctr. v. Miller*, 217 F. Supp. 3d 1313, 1334-35 (M.D. Ala. 2016); *Planned Parenthood of Wisc., Inc. v. Van Hollen*, 963 F. Supp. 2d 858, 868 (W.D. Wis. 2013). "Even if, against all record evidence, . . . the clinic[] should reopen or a new clinic opens to fill the gap, the likelihood of at least a temporary gap of 'unknown duration' in which abortions would be unavailable supports a finding of irreparable harm." *W. Ala. Women's Ctr.*, 217 F. Supp. 3d at 1335 (quoting *Van Hollen*, 738 F.3d at 795).

Plaintiff will also be irreparably harmed in the absence of relief as it will be forced to eliminate services and close altogether. Second Haskell Decl. ¶¶ 1, 40. As this Court recognized, "the inability to operate an ongoing business for an unknown period of time constitutes irreparable harm." Op. & Order, ECF No. 28, at 17; *see also Performance Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373, 1382 (6th Cir. 1995) ("impending loss . . . of . . . business constitutes irreparable injury"). Even if WMCD is able to reopen during the course of this litigation, closing for a short period of time will cause significant damage. Second Haskell Decl. ¶ 45. Plaintiff's clinics and the Women's Med Center brand will lose patients and patient trust and all staff members are likely to be laid off, causing irreparable harm. *Id.*; *see also NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 943-44 (6th Cir. 2007) (forcing plaintiff to lay off employees because of inability to offer certain services constitutes irreparable harm).

## D. <u>Neither Defendants Nor Anyone Else Will Suffer Harm If Preliminary Relief Is Granted</u>

Granting temporary or preliminary relief to maintain the longstanding status quo will cause no harm to the State. WMCD has been providing safe, legal abortion care in Ohio for

decades without the enforcement of this regulatory scheme. Second Haskell Decl. ¶ 5. As explained *supra* in Sections III.B, IV.B.1.a, WMCD's policies and procedures, commitments from local hospitals and physicians, and federal law individually and together ensure that, in the rare event a patient needs to be transferred from WMCD to a hospital, patients will receive high quality care. Indeed, as described above, it is the denial of an injunction that will lead to WMCD's patients being harmed.

## E. Granting Preliminary Relief Serves the Public Interest

This Court has already found that "[t]he public interest in preserving the status quo and in ensuring access to the constitutionally protected health care services while this case proceeds is strong." Op. & Order, ECF No. 28, 19 (citing *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir. 2012); *Doe v. Barron*, 92 F. Supp. 2d 694, 697 (S.D. Ohio 1999)). Indeed, the public interest is always served by preventing the violation of constitutional rights, including the constitutional right to abortion. *See Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) (holding that there was no substantial harm in preventing the enforcement of an ordinance that was likely unconstitutional).

## V. CONCLUSION

For all of the foregoing reasons, the Court should grant Plaintiff's motion for a temporary restraining order and/or preliminary injunctive relief.

Date: October 28, 2019

Respectfully submitted,

/s/Jennifer L. Branch
Jennifer L. Branch # 0038893
*Trial Attorney for Plaintiffs*
Alphonse A. Gerhardstein # 0032053

31

GERHARDSTEIN & BRANCH CO. LPA
441 Vine Street, Suite 3400
Cincinnati, OH 45202
(513) 621-9100
(513) 345-5543 (fax)
agerhardstein@gbfirm.com
jbranch@gbfirm.com
*Counsel for Plaintiff Planned Parenthood Southwest*
*Ohio Region, Plaintiff Women's Med Group,*
*Planned Parenthood of Greater Ohio, and T&S*
*Management*

Ruth E. Hartman #0078860
Michael E. Mumford #0073931
BAKER HOSTETLER LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200
(216) 696-0740 (fax)
mmumford@bakerlaw.com
rhartman@bakerlaw.com
*Attorneys for Plaintiff Women's Med Group*
*Professional Corporation*

Carrie Y. Flaxman
Julie Murray
Planned Parenthood Federation of America
1110 Vermont Avenue, NW, Suite 300
Washington, DC 20005
(202) 973-4800
(202) 296-3480 (fax)
carrie.flaxman@ppfa.org
julie.murray@ppfa.org
*Admitted Pro Hac Vice*
*Co-counsel for Plaintiff Planned Parenthood*
*Southwest Ohio Region and Planned Parenthood of*
*Greater Ohio*

Julia Kaye
Elizabeth Watson
Rachel Reeves *
Brigitte Amiri
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

32

(212) 284-7358
(212) 549-2651 (fax)
jkaye@aclu.org
ewatson@aclu.org
rreeves@aclu.org
bamiri@aclu.org
*Admitted Pro Hac Vice*
*\* Application for admission pro hac vice*
*forthcoming*
*Of-Counsel for Plaintiff Women's Med Group*
*Professional Corporation*


Freda J. Levenson #0045916
ACLU of Ohio Foundation, Inc.
4506 Chester Avenue
Cleveland, OH 44103
(216) 472-2220
(216) 472-2210 (fax)
flevenson@acluohio.org
*Of-Counsel for Plaintiff Women's Med Group*
*Professional Corporation*


B. Jessie Hill #0074770
Cooperating Counsel for the ACLU of Ohio
Case Western Reserve Univ., School of Law
11075 East Boulevard
Cleveland, Ohio 44106
(216) 368-0553
(216) 368-2086 (fax)
bjh11@cwru.edu
*Co-Counsel for Women's Med Group Professional*
*Corporation*


## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2019 a copy of the foregoing pleading was filed

electronically. Notice of this filing will be sent to all parties for whom counsel has entered an

appearance by operation of the Court's electronic filing system. Parties may access this filing

through the Court's system. I further certify that a copy of the foregoing pleading and the Notice

33

of Electronic Filing has been served by ordinary U.S. mail and email upon all parties for whom

counsel has not yet entered an appearance electronically.

/s/ Jennifer L. Branch
Trial Attorney for Plaintiffs