UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD SOUTHWEST OHIO REGION, et al., | : : : | Case No. 1:15-cv-568 |
| | : | Judge Michael R. Barrett |
| Plaintiffs, | : : | |
| v. | : : | |
| RICHARD HODGES, | : : : | |
| Defendant. | | |

### PLAINTIFF WOMEN'S MED GROUP PROFESSIONAL CORPORATION'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION....................................................................................................................... 1

I. **Plaintiff is Likely to Succeed on Its Claim that the Challenged Restrictions as Enforced against WMCD Create an Undue Burden on the Right to Abortion.** ......... 2

Plaintiff has shown that the challenged restrictions impose burdens on plaintiff and its patients without any countervailing benefit and so should be invalidated. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016).

A. ***Whole Woman's Health* governs this case.** ................................................. 2

Defendant's arguments that *Whole Woman's Health*, 136 S. Ct. 2292 (2016), is inapplicable to this case and that *Woman's Medical Professional Corp. v. Baird*, 438 F.2d 595, 613 (6th Cir. 2006), is dispositive of this case are unsupported and should be rejected.

B. **Defendant Has Failed to Provide Any Evidence that the Challenged Restrictions Have Any Benefit to Patients.** ................................................. 6

Defendant has submitted no evidence that refutes Plaintiff's ample evidence to support its argument that the challenged provisions impose burdens on plaintiff's patients without any countervailing benefits. *See Whole Woman's Health*, 136 S. Ct. 2292 (2016); *Whole Woman's Health Alliance v. Hill*, No 19-2051, 2019 WL 3949690 (7th Cir. Aug. 22, 2019).

C. **The Enforcement of the Challenged Restrictions Will Burden WMCD Patients.** ..................................................................................................... 13

Defendant's enforcement of the challenged restrictions will result in the closure of Plaintiff's clinic which, in turn, will unduly burden Plaintiff's patients. See *Whole Woman's Health*, 136 S. Ct. 2292 (2016); *Whole Woman's Health Alliance v. Hill*, No 19-2051, 2019 WL 3949690 (7th Cir. Aug. 22, 2019).

II. **Plaintiff is Likely to Succeed on Its Claim That the Challenged Restrictions Unconstitutionally Delegate Licensing Power to Private Parties.** ............................ 18

Defendant mischaracterizes that nature of the delegation doctrine and minimizes the significant change in Ohio law between Baird and the present case. *Birth Control Ctrs., Inc. v. Reizen*, 508 F. Supp. 1366, 1375 (E.D. Mich. 1981); *Woman's Medical Professional Corp. v. Baird*, 438 F.2d 595, 613 (6th Cir. 2006).

**III.**     **Plaintiff is Likely to Succeed on its Claim That the Automatic Denial Provision of the Variance Statute Violates Plaintiff's Right to Procedural Due Process.** ............................................................................................... 22

The Variance Statute's provision mandating that a variance application is considered denied if not ruled on in sixty days threatens to deny Plaintiff its property interest in its license and in the continued operation of its business. *Baird*, 468 F.3d 595 (6th Cir. 2006).

**A. Facts** ........................................................................................................ 23

**B. Argument** ................................................................................................. 24

**IV.**     **Plaintiff Satisfies the Remaining Factors Necessary for a Temporary Restraining Order and/or Preliminary Injunction.** ................................................. 31

Plaintiff and Plaintiff's patients will suffer irreparable harm from the unconstitutional challenged restrictions. *See Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati*, 822 F.2d 1390 (6th Cir. 1987); *Planned Parenthood Se. Inc. v. Bently*, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013).

**CONCLUSION** ................................................................................................. 32

# TABLE OF AUTHORITIES

## Cases

*Am. Freedom Def. Initiative v. Suburban Mobility Auth. For Reg'l Transp.*,
 698 F.3d 885 (6th Cir. 2012) ................................................................................. 32

*Bell v. Burson*,
 402 U.S. 535 (1971) ............................................................................................. 26

*Birth Control Ctrs., Inc. v. Reizen*,
 508 F. Supp. 1366 (E.D. Mich. 1981) ............................................................. 19, 20

*Bonnell v. Lorenzo*,
 241 F.3d 800 (6th Cir. 2001) ............................................................................... 31

*Brookpark Entm't, Inc. v. Taft*,
 951 F.2d 710 (6th Cir. 1991) ............................................................................... 26

*Carter v. Carter Coal Co.*,
 298 U.S. 238 (1936) ............................................................................................. 19

*Cleveland Bd. of Educ. v. Loudermill*,
 470 U.S. 432 (1985) ............................................................................................. 25

*Doe v. Barron*,
 92 F. Supp. 2d 694 (S.D. Ohio 1999) .................................................................. 32

*Elrod v. Burns*,
 427 U.S. 347 (1976) ............................................................................................. 31

*EMW Women's Surgical Ctr. P.S.C. v. Glisson*,
 No. 3:17-cv-00189-GNS, 2018 WL 6444391 (W.D. Ky. Sept. 28, 2018) ................ 4

*Eubank v. Richmond*,
 226 U.S. 137 (1912) ............................................................................................. 19

*Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health & Envtl. Control*,
 317 F.3d 357 (4th Cir. 2002) ............................................................................... 21

*Gula v. Huron Cnty.*,
 600 F. Appx. 374 (6th Cir. 2015) ......................................................................... 30

*Hallmark Clinic v. N.C. Dep't of Human Res.*,
 380 F. Supp. 1153 (E.D.N.C. 1974) ................................................................. 19, 20

*Matthews v. Eldridge*,
 424 U.S. 319 (1976) ............................................................................................. 28

*Mazurek v. Armstrong*,
 520 U.S. 968 (1997) ............................................................................................. 20

*Performance Unlimited v. Questar Publishers*,
 52 F.3d 1373 (6th Cir. 1995) ............................................................................... 31

*Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati*,
 822 F.2d 1390 (6th Cir. 1987) ............................................................................. 32

*Planned Parenthood of Greater Ohio v. Hodges*,
 917 F.3d 908 (6th Cir. 2019) ................................................................................. 6

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
 748 F.3d 583 (5th Cir. 2014) ................................................................................ 20

*Planned Parenthood of Ind. & Ky. Inc. v. Comm'r of Ind. State Dep't of Health*,
 896 F.3d 809 (7th Cir. 2018) ................................................................................ 13

*Planned Parenthood of Se. v. Casey*,
 505 U.S. 833 (1992) ................................................................................... 3, 5, 8

*Planned Parenthood of Wis., Inc. v. Van Hollen*,
 738 F.3d 786 (7th Cir. 2013) ..................................................................... 6, 19, 20

*Planned Parenthood Se. Inc. v. Bently*,
 951 F. Supp. 2d 1280 (M.D. Ala. 2013) .............................................................. 31

*Ramsey v. Board of Education*,
 844 F.2d 1268 (6th Cir. 1988) .............................................................................. 28

*Revis v. Meldrum*,
 489 F.3d 273 (6th Cir. 2007) ................................................................................ 30

*State v. Hochhausler*,
 76 Ohio St. 3d 455 (1996) .................................................................................... 26

*Tucson Woman's Clinic v. Eden*,
 379 F.3d 531 (9th Cir. 2004) ................................................................................ 21

*W. Ala. Women's Ctr. v. Williamson*,
 900 F.3d 1310 (11th Cir. 2018) ......................................................................... 6, 17

*Wash. ex rel. Seattle Title Trust Co. v. Roberge*,
 278 U.S. 116 (1928) .............................................................................................. 19

*Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio*,
 610 F.3d 340 (6th Cir. 2010) ................................................................................ 25

*Whole Woman's Health Alliance v. Hill*,
 No. 19-2051, 2019 WL 3949690 (7th Cir. Aug. 22, 2019) ......................... 4, 5, 7, 8

*Whole Woman's Health v. Hellerstedt*,
 136 S. Ct. 2292 (2016) .................................................................................. passim

*Women's Health Ctr. Of W. Cty., Inc. v. Webster*,
 871 F.2d 1377 (8th Cir. 1989) .............................................................................. 20

*Women's Med Prof'l Corp. v. Baird*,
 438 F.3d 595 (6th Cir. 2006) ........................................................................ passim

*Women's Med. Prof'l Corp. v.Voinovich*,
 130 F.3d 187 (6th Cir. 1997) ................................................................................ 13

**Statutes**

42 U.S.C. § 1395dd .............................................................................................. 11

## Other Authorities

Capital Care of Toledo Ohio,
https://www.capitalcarenetwork.com/ ............................................................................................. 15

## Regulations

83 Fed. Reg. 47686 ................................................................................................................... 11

## State Regulations

Ohio Admin. Code § 3701-83-05 ............................................................................................... 26
Ohio Admin. Code § 3701-83-05.1 ........................................................................................... 24
Ohio Rev. Code § 2919.194 ...................................................................................................... 16
Ohio Rev. Code § 3702.30 ......................................................................................................... 24
Ohio Rev. Code § 3702.304 ........................................................................................... 21, 24, 29
Ohio Rev. Code § 3702.305 ....................................................................................................... 14
Ohio Rev. Code § 3702.32 ......................................................................................................... 24
Ohio Rev. Code § 3727.60 ......................................................................................................... 21
Ohio Rev. Code Ann. § 116.06 ............................................................................................ 26, 28

## Other State Regulations

Cal. Health & Safety Code § 1248.15 ....................................................................................... 12
Conn. Agencies Regs. § 19-13-D56 .......................................................................................... 11
Haw. Code R. § 11-95-31 .......................................................................................................... 11
Mich. Comp. L. Servs. § 333.20821 ......................................................................................... 11
Mo. Code Regs. Tit. 19, § 30-30.020 ........................................................................................ 12
Tenn. Comp. R. & Regs. 1200-08-10-.05 ................................................................................. 12

## INTRODUCTION

Defendant has failed to provide any evidence to rebut Plaintiff's expert and fact declarations that demonstrate that the Written Transfer Agreement ("WTA") Statute and the Four Backup Physician Rule do not further Defendant's purported interest in improving patient safety. Similarly, Defendant has failed to provide any evidence to rebut Plaintiff's evidence that demonstrates that closing Women's Med Group Professional Corporation's ("WMGPC") clinic, Women's Med Center Dayton ("WMCD"), would impose burdens on people seeking access to abortion. The Supreme Court has held that where, as here, the burdens of an abortion restriction outweigh the benefits of that restriction, the restriction is unconstitutional. *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2300, 2310 (2016).

Additionally, Defendant has unlawfully delegated licensing power to private parties by giving hospitals and doctors veto power over Plaintiff's license. Contrary to Defendant's argument, *Women's Medical Professional Corp. v. Baird*, 438 F.3d 595 (6th Cir. 2006), does not foreclose this claim, given recent changes to Ohio law. Moreover, the Sixth Circuit has held that WMGPC has a property interest in maintaining its business, *id.* at 613, and this Court has held it has a property interest in its ambulatory surgical facility ("ASF") license, Opinion & Order ("ASP Order"), Doc. 28 at 7–8. The state's attempt to deprive Plaintiff of these interests by automatically denying Plaintiff's application for a variance after sixty days violates the procedural Due Process Clause. Accordingly, Plaintiff is likely to succeed on the merits of its substantive and procedural due process claims.

The other preliminary injunction factors weigh in Plaintiff's favor as well. Indeed, the challenged restrictions do not protect the health and safety of the people of Ohio. They only serve to make abortion more difficult, or impossible, to access by shuttering one more abortion

clinic. These unjustified restrictions fly in the face of the constitutional rights of Plaintiff and Plaintiff's patients and cause irreparable harm, and the public interest is served if the restrictions are blocked as to WMCD to allow WMCD to continue to provide quality care to its patients.  For all of the reasons discussed below, and in Plaintiff's opening brief, this Court should enter a temporary restraining order and/or preliminary injunction.

I.  **Plaintiff is Likely to Succeed on Its Claim that the Challenged Restrictions as Enforced against WMCD Create an Undue Burden on the Right to Abortion.**

Defendant completely fails to provide evidence that demonstrates that the Ohio Department of Health ("ODH")'s Four Backup Physician Requirement, the Variance Statute or the WTA Statute have any health benefits. Defendant similarly fails to rebut Plaintiff's evidence that closing WMCD would burden patients' ability access to abortion. In fact, Defendant does not contest that, if WMCD loses its ASF license, it will be forced to close or that this closure will burden patients. Rather, Defendant seeks to rely on *Baird* to resolve this motion, but that reliance is misplaced. As discussed below, *Baird* must be read in light of *Whole Woman's Health*, which, Defendant agrees, requires a "fact-intensive review" wherein the court must weigh the benefits of the challenged restrictions against the burdens the law imposes. Def.'s Resp. in Opp. to Pl.'s Mot. for TRO and/or Prelim. Inj. ("Def. Br."), at 22, 26; *Whole Woman's Health*, 136 S. Ct. at 2310. When the court examines the evidence and balances the lack of benefit to patients with the burden imposed upon them, it is clear that Plaintiff is likely to succeed on the merits.

A.  *Whole Woman's Health* **governs this case.**

Defendant's two main legal arguments are that (1) *Whole Woman's Health* should apply differently because the challenged restrictions here are "neutral laws of general applicability[,]" Def. Br. at 15–18 & 15 n.1&2, and do not require hospital admitting privileges; and (2) *Baird* is dispositive of this case, *id.* at 27. Both arguments lack merit.

As an initial matter, the three challenged restrictions are not neutral laws of general applicability. As Plaintiff explained in its opening brief, the Variance Statute—which did not exist when *Baird* was decided—has only ever been applied to abortion clinics. So, while it may appear neutral on its face, it is an abortion regulation. Pl. Women's Med Group Prof'l Corp.'s Mem. of Law in Supp. of Mot. for TRO and/or Prelim. Inj. ("Pl. Br.") 9–10. The Four Backup Physician Rule, which Defendant admits exists for the first time in his opposition, clearly applies only to abortion clinics. *See* Def. Br. at 11.

Even if the court were to credit Defendant's characterization of the challenged restrictions, Defendant's argument that neutral laws of general applicability should be treated differently than abortion-specific laws must be rejected. *Baird* explicitly stated: "The generally applicable and neutral regulation in this case. . . affects an abortion clinic. . . . Therefore *Casey* and other relevant case law regarding state restrictions on abortion apply." 438 F.3d at 603. "Other relevant case law" now includes *Whole Woman's Health*.

Furthermore, Defendant's argument that *Whole Woman's Health* is strictly limited to the admitting privileges context is unsupported. *Whole Woman's Health* affirms *Casey*'s holding that *all* "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." 136 S. Ct. at 2309 (quoting *Planned Parenthood of Se. v. Casey*, 505 U.S. 833, 877 (1992); *see also Baird*, 483 F.3d at 603 (quoting *Casey*, 505 U.S. at 877). Other courts have properly applied *Whole Woman's Health* to evaluate various abortion restrictions purportedly designed to further patient health. To give just two examples, just last month, the Seventh Circuit applied the *Whole Woman's Health* balancing test to an as-applied challenge to Indiana's licensing scheme and found that the plaintiffs were likely to succeed on their claim that Indiana's enforcement of

3

abortion licensing provisions constituted an undue burden. *Whole Woman's Health Alliance v. Hill*, No. 19-2051, 2019 WL 3949690 at *9–10 (7th Cir. Aug. 22, 2019). Last year, the Western District of Kentucky applied the *Whole Woman's Health* balancing test in finding a statute requiring abortion clinics to have a WTA with a local hospital to be unconstitutional. *EMW Women's Surgical Ctr. P.S.C. v. Glisson*, No. 3:17-cv-00189-GNS, 2018 WL 6444391, at *27–28 (W.D. Ky. Sept. 28, 2018).

Thus, *Whole Woman's Health* clearly applies here, just as it does in the cases above.[1] In such situations, it is the role of the court to weigh the actual benefit to patient health against the burdens the regulations impose on women seeking abortion, as demonstrated by the evidence. *See Whole Woman's Health*, 136 S. Ct. at 2310 (where the district court "considered the evidence in the record—including expert evidence, presented in stipulations, depositions and testimony" and "then weighed the asserted benefits against the burdens . . . the District Court applied the correct legal standard"); *see also Hill*, 2019 WL 3949690, at *10 (*Whole Woman's Health* requires the court "to scrutinize the facts rigorously, in order to determine" whether the Indiana Department of Health had acted unconstitutionally in denying plaintiff clinic's application for license).

Regarding Defendant's second argument, Plaintiff and Defendant agree that the undue burden analysis "requires a fact-intensive review" and that "the nature of the burden must be assessed with regard to the particular facts on the ground." *See* Def. Br. at 22, 26. This is exactly why *Baird* is not dispositive. Contrary to what Defendants imply, *Baird* did not make any determination about whether WTAs or backup physicians confer any benefits to patients. If

---

[1] Because the stated purpose of the challenged restrictions is to benefit patient health, Defendant's comparison of the challenged restrictions to tax law is inapposite.

anything, it accepted district court findings that indicated WTAs confer no benefits. *See* 438 F.3d at 601 ("Expert witnesses agreed that [WTAs] do not ensure optimum patient care."). Although *Baird* found that the WTA statute served a legitimate purpose, that is a different consideration from whether there is evidence to show that a law provides a medical benefit to patients. Put another way: "[T]o say that a state may require a license does not mean that every license regime, not matter how burdensome or arbitrary, passes constitutional muster." *Hill*, 2019 WL 3949690, at *16. In any event, the Supreme Court has long held that even laws with a legitimate purpose are unconstitutional if they have the effect of creating an undue burden. *Whole Woman's Health*, 136 S. Ct. at 2309 ("A statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.") (quoting *Casey*, 505 U.S. at 877); *see also Hill*, No 19-2051, 2019 WL 3949690 at *8 ("The undue burden standard . . . prohibits a state from preventing access to abortions even if it does so in pursuit of some other legitimate goal.").

Whole Woman's Health* also will have a significant impact on this Court's burden analysis. Indeed, at the time of *Baird* "[v]ery few courts ha[d] addressed whether requiring women to travel further for abortion constitutes an undue burden." 438 F.3d at 604. Now, not only have more courts addressed this issue, but the Supreme Court has held that increased driving distances are "one additional burden, which, when taken together with the others that the closing[] [of clinics] brought about, and when viewed in the light of the virtual absence of any health benefit" can amount to an undue burden. *Whole Woman's Health*, 136 S. Ct. 2313; *see also, e.g.*, *Hill*, 2019 WL 3949690, at *4–5 (citing "travel and time costs" for "not just medical fees, but also the costs of transportation and lodgings" when finding that Plaintiff was likely to succeed in showing that traveling to the next closest clinics (which were 65, 106, 150 and 199

5

miles away) would be an undue burden); *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1326–27 (11th Cir. 2018) (affirming injunction where law would, *inter alia*, "increase the costs of travel and lodging for women who do not live near the plaintiff clinics"); *see also Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 798 (7th Cir. 2013) ("The feebler the medical grounds, the likelier the burden, even if slight, to be 'undue' in the sense of disproportionate or gratuitous.").

Moreover, contrary to Defendant's claim, Def. Br. at 19, the Sixth's Circuit recent citation to *Baird* in *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908 (6th Cir. 2019), supports Plaintiff's position that *Baird* must be considered in light of *Whole Woman's Health*. In ruling that Planned Parenthood had not proven that Ohio's statute excluding it from state-funded programs created an undue burden, the Sixth Circuit wrote: "It is true that, if these two Planned Parenthood affiliates opted not to provide abortions, women seeking an abortion in Ohio would have to travel farther than they currently do to obtain an abortion. It is also true that this kind of evidence may support an undue burden challenge by establishing a 'substantial obstacle' in the way of those seeking abortions. *See Whole Woman's Health*, 136 S. Ct. at 2309–18; *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 604–605 (6th Cir. 2006)." *Hodges*, 917 F.3d 908 at 916. Thus far from "reaffirming *Baird*[,]" Def. Br. at 19, the Sixth Circuit has suggested that *Baird*'s holdings regarding travel burdens should be reexamined in light of *Whole Woman's Health*.

### B. Defendant Has Failed to Provide Any Evidence that the Challenged Restrictions Have Any Benefit to Patients.

Defendant fails to provide any evidence to rebut Plaintiff's evidence that the challenged restrictions are unjustified. Indeed, Defendant does not even attempt to show that the Four Backup Physician Rule has any medical benefits. Defendant explains that WMCD is subject to

6

the Four Backup Physician Rule because "the backup doctors [for WMCD] are not on staff at the clinic." Def. Br. at 11; *see also* Third Decl. of W. M. Martin Haskell, M.D., in Supp. of Pl.'s Mot. For TRO and/or Prelim. Inj. ("Third Haskell Decl."), Ex. L (letter from ODH noting that WMCD now meets the Four Backup Physician Rule). Why four rather than three (or two or one)? Further, why would "the number of backup doctors depend[] on whether the backup doctors are also the doctors performing the abortions"? Def. Br. at 11. What difference does that make? As Plaintiff's experts, Dr. Norman Schneiderman and Dr. Paula Hillard, explained, neither emergency medical care nor inpatient care is contingent on outpatient clinics having agreements with backup doctors. Pl. Br. at 6–8; Decl. of Norman Schneiderman, M.D. ("Schneiderman Decl.") ¶¶ 18–23, 26–28, 32–34; Decl. of Paula J. Hillard, M.D. ("Hillard Decl.") ¶¶ 19–21. Defendant has presented no evidence that the Four Backup Physician Rule improves patient health outcomes.

The Seventh Circuit's recent ruling on the Indiana licensing scheme is instructive here. There, the court considered the claim of a clinic in South Bend Indiana that sought preliminary injunctive relief after "almost two years, two unsuccessful applications, a statutory amendment to relevant definitions, and a moving target of wide-ranging requests for information [from the Indiana Department of Health]" had prevented it from obtaining the license it needed to operate. *Hill*, 2019 WL 3949690, at *1. The court examined the factual findings of the district court and affirmed the district court's injunction to the extent that it required the state to allow the clinic to operate under a "*de facto* or real provisional license[.]" [2] *Id.* at *12. The court reasoned: "When

---

[2] This case is also instructive on the appropriate remedy. Defendant claims that Plaintiff asks this court to allow WMCD to "perform[] surgical abortions without a license," Def. Br. at 14, but this court need not find that WMCD is "uniquely . . . exempt from licensing," *Hill*, 2019 WL 3949690, at *1; rather, WMCD can operate pursuant to a "*de facto* or provisional license" which would allow Ohio to "enforce the rest of its regulatory scheme on licensed clinics[,]" *id.* at *12,

the state burdens a constitutional right, it must have a constitutionally permissible reason. If the evidence does not support the state's proffered reason, or it reveals instead an impermissible reason, the state law cannot stand." *Id.* at *9. Thus, the court held "[t]o the extent that Indiana is using its licensing scheme to prevent the South Bend clinic from opening simply to block access to pre-viability abortions, rather than as a legitimate means of vetting and monitoring providers, it is acting unconstitutionally." *Id.* at *1.

Like Indiana, Ohio "is entitled to protect patient safety . . . through its licensing scheme, but if it is doing little more than throwing up one hurdle after another in an effort to keep the [clinic's] doors closed, it has gone beyond constitutional boundaries." *Id.* at *10. The Four Backup Physician Rule "serve[s] no purpose other than to make abortions more difficult" and thus should be enjoined. *See id.* at *9 (quoting *Casey*, 505 U.S. at 901); *see also id.* ("pretextual purposes do not receive any weight on the 'benefits' side of the ledger").

Defendant also fails to rebut Plaintiff's evidence that the WTA Statute does not confer any benefit on patients. In fact, Defendant admits that patient transfers directly from WMCD to a hospital are rare, Def. Br. at 19, and does not contest Plaintiff's evidence showing abortion is safe, *see* Hillard Decl. ¶¶ 14–17. Instead, she implies that WMCD has no safety procedures in place at all, which is completely untrue. As Plaintiff discussed in its opening brief, Dr. Haskell's declaration shows that WMCD's protocols ensure any patient requiring emergency care receives it as quickly as possible and that providers of care at hospitals receive all of the information they need to properly care for the patient. Pl. Br. at 5–6; Second Haskell Decl. ¶ 13 & Ex. B, at

---

or it could stay the revocation of WMCD's ASF license as the Ohio state court has done, Second Decl. of W.M. Martin Haskell, M.D., in Supp. of Pl.'s Mot. for TRO and/or Prelim. Inj. ("Second Haskell Decl."), Ex. H; *see also infra* 26 n.14. Either way, "the harm to the state . . . is *de minimis*, compared to the significant harm" WMCD and its clients would experience from the closure of the clinic. *Hill*, 2019 WL 3949690 at *12.

000041–47. Plaintiff's expert, Dr. Norman Schniederman, the longtime director of Dayton's Miami Valley Hospital's Emergency Medical Department, reviewed these protocols and said, in his expert opinion, that they are sufficient to ensure optimal patient care and communication between facilities in the event of an emergency. Schneiderman Decl. ¶ 42. Importantly, Defendant does not allege that WMCD's protocols for patient transfer are in any way deficient. Indeed, when the court undertakes the "fact-intensive review" that both parties agree this case requires, *see* Def. Br. at 22, it will be apparent that Defendant has presented no evidence to show that WMCD's patient outcomes would be improved if the WTA Statute were enforced.[3]

Defendant offers no expert testimony to refute Plaintiff's claim that the challenged restrictions do nothing to further patient safety, but instead attempts to rely on a few documents she claims supports her position that WTAs confer some sort of benefit. These documents are irrelevant and do not rebut Plaintiff's evidence. As an initial matter, two of the documents cited by Defendant are over 15 years old. Def. Br. at 7–8 (citing American College of Surgeons Safety Principles (approved in 2003) and Federation of State Medical Board's Special Report (published in 2002)). Another document speaks to the requirements for ambulatory surgical centers and makes no mention of abortion provision. *See* Def. Br. at 7 (citing American Association for Accreditation of Ambulatory Surgical Center Facilities Standards and Checklist). Secondly, as Defendant concedes, most of these documents present WTAs as one of many

---

[3] Defendant attempts to distinguish *Whole Woman's Health* by referring to the Court's conclusions that the admitting privileges requirement at issue in that case did not create any added benefit to the current law. Def. Br. at 21. The added benefit distinction is irrelevant. *Whole Woman's Health* requires that the court to balance the benefits of the challenged law against the burdens. 136 S. Ct. at 2310. That the plaintiffs in *Whole Woman's Health* did not challenge the existing law tells us nothing about what the benefits and burdens of that law might be. In any event, Plaintiff here complies with the statutory requirement of having one backup doctor with admitting privileges, and Defendants have put forth no evidence to show that a WTA or more than one backup doctor enhances patient safety.

options for outpatient centers to ensure patient safety. *Id.*at 7–8. Many of the documents list

relationships with doctors with admitting privileges as an alternative to WTAs. *Id.* While

Plaintiffs do not concede that agreements with any backup physicians (let alone four) are

necessary, Plaintiff does, in fact, have these relationships already, so would meet the standards

outlined in these documents.

The two abortion-related sources cited by Defendant are also outdated and fail to support

Defendant's argument that WTAs provide a safety benefit. In April of 2019, many leading

medical and obstetrical and gynecological medical associations including the American College

of Obstetrics and Gynecology (a source heavily cited in Def. Br., Ex. E) and the National

Abortion Federation ("NAF") (cited in Def. Br. at 8, 18) endorsed the "Facility Guidelines for

the Safe Performance of Primary Care and Gynecology Procedures in Offices and Clinics" which

clearly state:

> Facilities should establish written policies and procedures for managing facility emergencies (e.g., natural disaster, fire) and patient emergencies (e.g., vasovagal reaction, hemorrhage) and should conduct periodic drills and staff trainings on those policies and procedures. **A formal transfer agreement with a hospital is not required as transfers are rare and hospitals are required to accept patients with emergent needs.** Good communications in the event of a transfer and working relationships with facilities that may receive or refer patients are encouraged.

NAF, Quality Assurance and Improvement, Facilities Guidelines at 3, available at

https://members.prochoice.org/iweb/upload/facility guidelines final apr 2019.pdf (emphasis

added). Even the 2018 NAF Guidelines that Defendant refers to, Def. Br. at 8, simply

"recommend" that "[c]linics *should consider developing* a transfer agreement with a hospital."

NAF, 2018 Clinical Policy Guidelines, § 14.1.3, available at https://prochoice.org/education-and-

advocacy/cpg (emphasis added). The Guidelines distinguish between "standards," which "are

intended to be applied in virtually all cases" and "recommendations," which are "steering" in nature and allow latitude in clinical management." *Id.* at ii. Considering whether to attempt to obtain a WTA is one way that a NAF member organization could begin to meet the actual "standard," which requires "[p]rotocols for the management of medical emergencies," but a WTA is neither necessary nor sufficient to do so. *See id.* § 14.1.3. WMCD is a NAF member and meets this standard with its protocols.[4]

Defendant urges the court to reject Plaintiff's argument that the Emergency Medical Treatment and Active Labor Act ("EMTALA") makes the WTA requirement unnecessary for patient safety, but the sources cited to by Defendant actually support Plaintiff's argument. For example, the federal Centers for Medicare and Medicaid Services' requirement for Medicare reimbursement for ambulatory surgical centers that Defendant refers to, Def. Br. at 3, was issued in 1982, years before EMTALA, enacted in April 1986, forbade hospitals from turning away patients. The current executive branch has determined that EMTALA "has rendered such transfer agreements unnecessary" and the requirement does not result in "any improvement in patient care or safety." 83 Fed. Reg. 47686, 47693 (Sept. 20, 2018). As a result, the administration has proposed repealing the regulation. Furthermore, several of the state laws cited by Defendant were similarly enacted *before* EMTALA. *Compare* 42 U.S.C. § 1395dd (EMTALA), *with* Conn. Agencies Regs. § 19-13-D56(e)(7)(B) (effective 1977); Haw. Code R. § 11-95-31 (adopted March 1986); Mich. Comp. L. Servs. § 333.20821 (effective 1978, *see* 1978 Mich. Pub. Acts

---

[4] Defendant's Exhibit E appears to be an article collecting the policies of some states (as they existed almost 10 years ago) and otherwise reflects the author's view that, almost 10 years ago, the author would have "advised" a WTA for a facility performing outpatient gynecological procedures. The author's opinion does not appear to have been endorsed by any major medical association.

378); Mo. Code Regs. Tit. 19, § 30-30.020(1)(B) (effective 1976); Tenn. Comp. R. & Regs. 1200-08-10-.05(6) (effective 1977).[5]

Contrary to what Defendant suggests, Def. Br. at 20, there is no medical uncertainty regarding the usefulness of WTAs. As discussed above, the evidence shows that WTAs are not needed for patient safety, and no major medical organization requires a WTA for abortion providers. However, even if there were medical uncertainty, the Supreme Court held in *Whole Woman's Health* that evidence of medical uncertainty alone does not give the state authority to enforce regulations that impose a substantial obstacle to patients seeking to obtain abortion care. When Texas made this same "medical uncertainty" argument, the court clearly stated: "The statement that the legislatures, and not the courts, must resolve questions of medical uncertainty is . . . inconsistent with th[e] Court's case law." 136 S. Ct. at 2310. Rather, "when determining the constitutionality of laws regulating abortion procedures, [the Court] has placed considerable weight upon the evidence and argument presented in judicial proceedings." *Id.* Ohio's bare assertion that it has a legitimate interest in regulating WMCD is simply not enough: Ohio must respond to Plaintiff's evidence with its own evidence that its interest is actually furthered by the challenged restrictions. *Id.* at 2311 (finding nothing in Texas' record evidence to support the conclusion that the restriction "advanced Texas' legitimate interest in protecting women's

---

[5] In any case, the existence of other state laws does not mean that they serve a medical benefit in the context of abortion. *Whole Woman's Health* has already recognized that "many surgical-center requirements are inappropriate as applied to surgical abortions" and upheld the district court's finding that many of these requirements have such a "tangential relationship to patient safety in the context of abortion as to be nearly arbitrary." 136 S. Ct. 2315–16 (internal citation omitted); *see also* Hillard Decl. ¶ 12 ("Despite the term, 'surgical,' a surgical abortion does not involve any surgical incisions into the patient's skin or membrane."). Moreover, WMCD's protocols would be sufficient to meet the requirements for some other states, like California. *See* Cal. Health & Safety Code § 1248.15(a)(2)(C) (allowing applicant to submit a "detailed procedural plan for handling medical emergencies" and stating "[n]o reasonable plan shall be disapproved[.]")

health"); *Planned Parenthood of Ind. & Ky. Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 818 (7th Cir. 2018) ("Not only does *Whole Woman's Health* confirm that courts must apply the undue burden balancing test of *Casey* to all abortion regulations, it also dictates how the test ought to be applied . . . . The proper standard is for courts to consider the evidence in the record. . ."). Defendant needs to show with actual evidence that WMCD patients benefit from the challenged restrictions. She completely fails to do so.

### C.  The Enforcement of the Challenged Restrictions Will Burden WMCD Patients.

Defendant does not contest that enforcement of these restrictions has prevented WMCD from obtaining the ASF license it needs to continue operating. She also does not dispute Dr. Haskell's testimony that, without the ASF license, WMCD will be forced to close. Instead, Defendant makes two unsubstantiated arguments: 1) that Plaintiff is not trying hard enough to meet the requirements of the challenged restrictions and 2) that WMCD's closure will not create a substantial obstacle in the path of patients seeking abortion. Both arguments must be rejected.

First, Defendant's argument that the WTA statute is constitutional as applied to the Plaintiff because four other clinics in other Ohio cities have WTAs with local hospitals is unpersuasive. This is an as-applied challenge. Plaintiff is only obliged to show that it cannot comply with the challenged requirements, not that no provider anywhere in state is able to do so. *See Baird*, 438 F.3d at 603 ("'an as-applied challenge is limited to plaintiff's particular situation'… and therefore, [a court] must consider the context in which the challenge to the regulation arises.") (quoting *Women's Med. Prof'l Corp. v.Voinovich*, 130 F.3d 187, 193) (6th Cir. 1997)). Other clinics in other cities tell the court nothing about WMCD's ability to obtain a WTA with a Dayton hospital. Dr. Haskell has submitted unrefuted testimony that he has requested a WTA from every local hospital to no avail. Second Haskell Decl. ¶ 23. As Plaintiff

explained in its opening brief, the extensive regulation of clinics together with the prevalence of religious hospitals and the extremely hostile climate towards abortion in the Dayton area has made it impossible for WMCD to comply with the WTA Statute. *See id.*; Pl. Br. at 9. Defendant has made no arguments, let alone introduced any evidence, to rebut this point.

The same is true regarding Defendant's argument that the Variance Statute and the Four Backup Physician Rule are constitutional as applied to the Plaintiff because two other clinics have received variances. Plaintiff is not obligated to show that no one has ever obtained a variance under Ohio's new Variance Statute; rather WMGPC only needs to show that it cannot obtain a variance under the statute. As explained in Plaintiff's opening brief, Plaintiff has long satisfied the Variance Statute's medically unnecessary requirement that a clinic have an agreement with at least one backup physician, Pl. Br. at 11, but ODH arbitrarily decided that one (or two, or three) backup physicians was not enough, *see id.* When Plaintiff submitted a revised 2018 variance application with four backup physicians earlier this summer, the application was still denied (on the sixty first day) for arbitrary reasons. *See infra* 23; Third Haskell Decl. ¶¶ 4–5. Plaintiff submitted its 2019 variance application on July 25, 2019, on which ODH has yet to rule. Third Haskell Decl. ¶¶ 6–7. Clearly, WMCD has presented more than enough evidence to show that, despite WMGPC's best efforts, WMCD cannot obtain a variance under the Variance Statute as ODH is interpreting it.[6]

---

[6] Even if Plaintiff's most recent variance application is approved, the Court should at least consider enjoining the Four Backup Physician Rule. As shown above, the Four Backup Physician Rule has absolutely no medical benefit and burdens patients who, at any moment, face the loss of the only clinic in the Dayton area when, for example, one doctor choses to move or ODH decides to increase the arbitrary backup physician requirement (yet again) from four to five. *See* Ohio Rev. Code § 3702.305 ("The director may, at any time, rescind the variance for any reason, including a determination by the director that the facility is failing to meet one or more of the conditions [a director may impose on a variance] or no longer adequately protects public health and safety.")

14

As to the second argument, Defendant claims that the closure of WMCD will not present a substantial obstacle to patients seeking an abortion. This is clearly false. Dr. Haskell, who is intimately familiar with the needs of his patients, and Dr. Carolette Norwood, a well-credentialed PhD who has spent years studying the lives of women with low incomes in southwestern Ohio (and Black women in particular), both provided declarations about the burden WMCD patients would face if WMCD were forced to close. Defendant submitted no evidence that refutes this testimony.

Defendant either misconstrues or misunderstands Plaintiff's evidence on clinic capacity. The remaining Ohio clinics do not have capacity to take on all the patients that would have been seen at WMCD. As an initial matter, Defendant incorrectly states that there are six abortion clinics offering surgical abortions across Ohio. This is incorrect: there are only five. At the time Terrie Hubbard signed her declaration, Capital Care Toledo provided surgical abortions, but in the summer of 2019 it limited its services to medication abortions. *See* Capital Care of Toledo Ohio, https://www.capitalcarenetwork.com/ (stating the clinic provides "medication abortion up to 9.6 weeks"). Further, while it is true that WMCD performed 2,129 *surgical abortions* in the last twelve months, if the challenged restrictions are enforced, WMCD will be forced to close completely, thus WMCD patients will not just lose access to surgical abortion care, they will lose access to all abortion care.[7] *See* Pl. Br. at 15–16. The capacity evidence from other clinics cited by Defendant reflects an estimate of the maximum number of patients, both medical and surgical, that each clinic could accommodate. Def. Br. at 13. The other clinics, combined, are

---

[7] As explained in Plaintiff's opening brief and declarations, abortions can be performed by medical means, where a patient ingests medication that results in a process similar to a miscarriage, or surgical means, where a provider evacuates the uterus using a combination of suction and instruments. Pl. Br. at 3–4; Hillard Decl. ¶¶ 11–12.

only able to take on about 1200 surgical abortion patients, leaving a gap of over 900 surgical patients. *See* Decl. of Adarsh Krishen, M.D. in Supp. of Pl.'s Mot. for TRO ("Krishen Decl.") ¶¶ 8, 10 (Planned Parenthood in Columbus and Bedford Heights could accommodate approximately 312 and 175–250 additional surgical abortion patients, respectively); Decl. of Sharon Liner, M.D., in Supp. of Pl.'s Mot. for TRO ("Liner Decl.") ¶ 11 (Planned Parenthood in Cincinnati could accommodate approximately 600 surgical abortion patients). Moreover, as the Supreme Court held in *Whole Woman's Health*, it is common sense that patient care will suffer when patients are forced to get abortions at "crammed-to-capacity superfacilities." *Whole Woman's Health*, 136 S. Ct. at 2318. Thus, even those that are able to travel to obtain care might still suffer harmful delays and lack the personal attention they would have received had Ohio not shuttered WMCD. *See id.* (the increased demand on remaining clinics "would be harmful to, not supportive of, women's health").

More fundamentally, Plaintiff has proven by unrebutted evidence that many of WMCD's patients will have extreme difficulty traveling to another city to obtain abortion care and that some patients may not be able to do so at all. As Plaintiff explained in its opening brief, Ohio has already erected several barriers to obtaining abortion care that make it financially and logistically difficult for many patients, especially those who have low incomes, to do so. Pl. Br. at 13–16. One of those barriers is a requirement that patients have to make at least two in-person trips to the clinic at least 24 hours apart to obtain abortion care. *See* Ohio Rev. Code § 2919.194. That means that patients in the Dayton area, who may already be struggling to afford care, will have to come up with money for transportation for two trips to another city or pay for one trip and find and pay for overnight lodging in another city. Thus, what Defendant callously refers to as a "short hop" to Cincinnati, Def. Br. at 16, is actually, at minimum, a 200-mile trip for which

patients will have to pay for transportation to another city, arrange time off work and childcare, and manage other associated costs and logistical issues.[8] Second Haskell Decl. ¶¶ 48–52. And that is if the patient can get a one-day procedure at the next closest clinic. Evidence shows that some patients will require a two-day procedure, thus necessitating a third trip or another night of lodging and associated costs. *See* Second Haskell Decl. ¶ 9. Further, as explained above, not all WMCD patients can be accommodated in Cincinnati. Some patients' only option will be Columbus, a 320-mile trip in total, or Bedford Heights, an 852-mile trip in total (or, perhaps more likely a 426-mile trip where a patient must find at least one night of lodging). Patients seeking abortion after 19 weeks who are unable to get care in Cincinnati will be forced to travel all the way to Cleveland, which, like Bedford Heights, is over 200 miles away from Dayton. Defendant shrugs off these burdens but, as Plaintiff's expert Dr. Norwood testified, they will present real, and sometimes insurmountable, barriers. Norwood Decl. ¶¶ 30, 68; *see also e.g. Whole Woman's Health*, 136 S. Ct. 2313 (increased driving distances are "one additional burden, which, when taken together with the others that the closing[] [of clinics] brought about, and when viewed in light of the virtual absence of any health benefit" can amount to an undue burden); *Hill*, 2019 WL 3949690, at *2 (citing "travel and time costs" for "not just medical fees, but also the costs of transportation and lodgings" when finding that Plaintiff was likely to succeed in showing that traveling to the next closest clinics (65, 106, 150 and 199 miles away) would be an undue burden); *W. Ala. Women's Ctr.*, 900 F.3d at 1326–27 (affirming injunction where law would, *inter alia*, "increase the costs of travel and lodging for women who do not live near the plaintiff clinics").

---

[8] Defendant seems to forget about Ohio's two-trip requirement when she argues that "the two- or three-hour drive across West Texas. . . is far different" from a drive across Ohio. *See* Def. Br. at 16. Patients unable to be seen in Cincinnati will be driving over two hours back and forth across Ohio on two different days to obtain care at the next closest clinic in Columbus.

Defendant has failed to rebut Plaintiff's evidence that demonstrates that the challenged restrictions would impose a burden on patients. These burdens clearly outweigh the virtually nonexistent benefits of the challenged restrictions. Thus, Plaintiff is likely to prevail on its claim that the challenged restrictions impose an undue burden.

## II. Plaintiff is Likely to Succeed on Its Claim That the Challenged Restrictions Unconstitutionally Delegate Licensing Power to Private Parties.

Plaintiff has established a likelihood of success on the merits of its claim that its due process rights are violated by the State's delegation of authority over the clinic's professional license to private actors. Defendant mischaracterizes the nature of the delegation doctrine and minimizes the significant change in Ohio law between *Baird* and the present case in an attempt to undermine Plaintiff's claim, but it remains true that, under current Ohio law, Plaintiff simply cannot obtain or retain its license without support from private physicians and/or a hospital. This is an unconstitutional delegation of government power.

Defendant mischaracterizes the delegation doctrine as a doctrine that concerns itself only with lawmaking authority and argues that it is inapplicable here because private hospitals and doctors do not write statutes or regulations. Def. Br. at 28–31. The delegation doctrine is plainly not so limited. It has been applied where authority to determine property or liberty rights is vested in a private party, which is exactly the case here. WMGPC's property rights in its license, *see infra* 25–26, and WMCD's patients' liberty rights, *see* Pl. Br. 21–27; *supra* 15–18, are being determined by private hospitals and physicians who can either enter into agreements with the clinic (thus making WMCD eligible for a license) or not (thus making it impossible for WMCD to get a license).[9] A long line of precedent holds that delegating this kind of arbitrary and

---

[9] The challenged restrictions—the enforcement of which could result in the closure of the only abortion clinic in Dayton and create a substantial obstacle to thousands of people seeking to

unreviewable discretion affecting protected liberty and property interests—discretion that the State itself cannot exercise—to private parties violates due process. *See, e.g.*, *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Wash. ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 121–22 (1928); *Eubank v. Richmond*, 226 U.S. 137, 143–45 (1912).

Further, contrary to what Defendant suggests, Def. Br. at 30, federal circuit courts have affirmed lower courts' proper application of the delegation precedent to invalidate similar state laws that effectively gave private hospitals a veto over who may provide abortions. *Birth Control Ctrs., Inc. v. Reizen*, 508 F. Supp. 1366, 1375 (E.D. Mich. 1981) (holding that "[t]he power to prohibit licensure may not constitutionally be placed in the hands of hospitals"), *aff'd in part, vacated in part on other grounds*, 743 F.2d 352 (6th Cir. 1984); *Hallmark Clinic v. N.C. Dep't of Human Res.*, 380 F. Supp. 1153, 1158–59 (E.D.N.C. 1974) (North Carolina could not confer on hospitals "the arbitrary power to veto the performance of abortions" by withholding transfer agreements or denying staff privileges), *aff'd,* 519 F.2d 1315 (4th Cir. 1975); *see also Van Hollen*, 94 F. Supp. 3d at 996–97 (the state cannot impose an admitting privileges requirement "through third parties, at least in the admitted absence of a waiver or some other mechanism to ensure due process"). These rulings make sense in light of the fact that—unlike backup generators, anesthesia, or resuscitation equipment, *see* Def. Br. at 29— local hospitals are not fungible commodities. WMCD cannot just expand its search to find a hospital willing to enter into a WTA. Consistent with delegation principles, courts held that delegating a veto function to a private party without any legitimate standards to guide their

---

engage in constitutionally protected activity—is not, as Defendants suggest, comparable to a law which resulted in the "delayed establishment of a new [car] franchise," Def. Br. at 28. *See Hallmark Clinic v. N.C. Dep't of Human Res.*, 380 F. Supp. 1153, 1158 (E.D.N.C. 1974) (the standardless delegation of government authority is "especially suspect when the subject of regulation is the exercise of constitutional rights.").

decisions, or a waiver or other due process mechanism, constituted an unlawful delegation to a private party. *See Reizen*, 508 F. Supp at 1374–75; *Van Hollen*, 94 F. Supp. 3d at 996–97; *Hallmark Clinic*, 380 F. Supp. at 1158–59.

Here, Defendant concedes that "there is no . . . evidence" of any conditions or standards that Ohio hospitals have adopted to determine whether they will enter into a WTA. Def. Br. at 24–25. Indeed, this court has characterized hospitals as having "unfettered power to decide whether or not to enter into an agreement." Mot. Dismiss Order & Opinion ("MTD Opinion"), Doc. 57, at 8 (quoting *Baird*, 438 F.3d at 609). Nor does Ohio law guide physician discretion in deciding whether to serve as a backup physician. This "complete lack of standards is especially suspect when the subject of regulation is the exercise of constitutional rights*." Hallmark Clinic*, 380 F. Supp. at 1158. The fact that this standardless delegation "applies to all [outpatient facilities], rather than only to abortion clinics does not change the result." *Reizen*, 508 F. Supp. at 1374–75.

The cases upon which Defendant relies are either inapposite or clearly distinguishable from this case. Two of the cases explicitly distinguish the restrictions at issue there from restrictions that govern the licensure of abortion clinics. *Women's Health Ctr. Of W. Cty., Inc. v. Webster*, 871 F.2d 1377, 1382 (8th Cir. 1989) ("This case involves state regulation of the qualifications of persons who perform abortions rather than standards for licensure of abortion clinics"); *see also Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 600 (5th Cir. 2014) (plaintiffs' "unlawful delegation argument fails for the reasons set forth in *Webster*").[10] The state laws at issue in the two other cases cited by Defendant contained

---

[10] *Mazurek v. Armstrong*, 520 U.S. 968 (1997), is a case that upheld a state restriction that limited abortion provision to physicians. There was no unlawful delegation claim in that case and it is completely inapposite here.

the key due process protections the Ohio laws lack: hospital guidance and/or the possibility of a waiver or judicial review of hospital decisions. *Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health & Envtl. Control*, 317 F.3d 357, 362–63 (4th Cir. 2002) (South Carolina required that public hospitals "not act unreasonably, arbitrarily, capriciously, or discriminatorily" and the challenged restriction contained the right "for clinics to seek a waiver or exception" from the challenged requirement); *Tucson Woman's Clinic v. Eden,* 379 F.3d 531, 555–56 (9th Cir. 2004) (rejecting a facial challenge where Arizona law "requires hospital procedures to comport with due process, i.e., notice and hearing" and hospital policies were subject to judicial review) (internal citation omitted). The Ohio law provides no such standards to guide hospital discretion in deciding whether to enter into a WTA. *See* MTD Opinion at 8. Under Ohio law, the only way to get a variance from the WTA Statute is to look to a different private actor, a backup physician, whose decision is also constrained by no standards under Ohio law, except for prohibiting doctors with admitting privileges at a public hospital from being a backup physician for an abortion clinic. *See* Ohio Rev. Code § 3727.60(B)(2).

Defendant tries to rely on *Baird*, but significant changes to Ohio law means that *Baird*'s analysis is no longer apt.  The *Baird* decision hinged on the fact that ODH "make[s] the final decision about whether ASFs obtain a license." 438 F.3d at 610. This is no longer the case. The new Variance Statute sets out a number of specific requirements for obtaining a variance from the WTA Statute. This includes a requirement—which did not appear in the regulation that existed at the time of *Baird*—that a clinic have a relationship with "one or more consulting physicians who have admitting privileges at a minimum of one local hospital[.]" *See* Ohio Rev. Code § 3702.304. Thus, while the Director does retain discretion to *deny* a variance (even if the variance application meets all the statutory requirements), the Director does not have the

21

discretion to *approve* a variance unless there is at least one backup physician agreement. Moreover, as Plaintiff explained in its opening brief, hospitals retain a large amount of power in determining whether a clinic will be able to obtain an agreement with a backup physician. Pl. Br. at 9. Thus, not only does the hospital hold veto power over whether a clinic can meet the WTA Statute, it also holds veto power over whether a clinic will be able to obtain a variance.

Defendant suggests that the changes to the law are immaterial because at the time of *Baird*, the Director had, "in practice," required names of backup doctors when deciding whether to grant WMCD a waiver. Def. Br. at 31. But this ignores the fact that Director Baird's voluntary considerations when granting a waiver or variance was distinct from his independent and ultimate authority to grant a waiver or variance without a WTA or backup doctors. In contrast to *Baird*, there is no scenario now in which an abortion clinic can obtain or retain its ASF license without support from private hospitals and/or physicians.  With the WTA Statute and the Variance Statute, the State has thus delegated final, unreviewable, and unfettered authority to private parties to determine whether an abortion provider is entitled to an ASF license. Such an unlawful delegation is in violation of the Plaintiff's due process rights. Thus, Plaintiff is likely to succeed on this claim.

### III.    Plaintiff is Likely to Succeed on its Claim That the Automatic Denial Provision of the Variance Statute Violates Plaintiff's Right to Procedural Due Process.[11]

Plaintiff has complied with every single one of ODH's onerous and detailed requirements for the contents of the variance application, even those which are entirely unnecessary and have no medical justification. But because of the Variance Statute's provision mandates that a variance application not ruled on within sixty day is considered denied ("Automatic Denial Provision"),

---

[11] This court has given Plaintiff permission to brief its claim that Variance Statute violates Plaintiff's right to procedural due process. Plaintiff understands that Defendant will have an opportunity to reply to this claim.

its pending variance applications put WMCD at risk of losing its ASF license and being forced to close. This is a violation of Plaintiff's procedural due process rights under Sixth Circuit case law requiring abortion providers to be afforded due process before they can be deprived of their protected liberty and property interests in their licenses and the continued operation of their businesses. *See Baird*, 438 F.3d at 610–12.

## A. Facts

Because the facts relevant to this claim have been presented in some detail in Plaintiff's opening brief and declarations and in the reply brief above, they are only briefly summarized here. *See* Pl. Br. at 3–13. Because Plaintiff is unable to obtain a WTA from any local hospital, it has applied for a variance from the WTA Statute on an annual basis since 2012. On June 26, 2019, WMCD filed a revised 2018 variance request that met every single statutory requirement for a variance and even met ODH's medically unnecessary Four Backup Physician Rule. Second Haskell Decl., Ex. J. This application was denied on Monday, August 26, 2019—sixty-one days after it was filed.[12] Third Haskell Decl., Ex. L. On July 25, 2019, WMCD submitted its 2019 variance request that, like the revised 2018 variance request, met every single statutory requirement and Four Backup Physician Rule. Second Haskell Decl., Ex. K. That application is still pending. On August 26, 2019, WMCD submitted another variance request that addressed the concerns ODH highlighted in its denial of the revised 2018 variance request. Third Haskell Decl., Ex. M. That application is also still pending.

The new Variance Statute contains the following language, which did not appear in the prior variance regulation: "Not later than sixty days after receiving a variance application from

---

[12] According to ODH, WMCD's protocols for contacting backup physicians were inadequate, though the fact that these protocols had been part of WMCD's variance application for the past several years and never previously cited as the basis for prior denial raises the question of whether this reason was pretextual.

an ambulatory surgical facility, the director shall grant or deny the variance. A variance application that has not been approved within sixty days is considered denied." Ohio Rev. Code § 3702.304(A)(2). When a variance application is denied, an ASF is not in compliance with the requirements necessary to possess a valid license under the licensing scheme. *See* Ohio Rev. Code § 3702.30.

Because of WMCD's unique position, an automatic denial of its pending variance applications could result in the immediate loss of its ASF license. As explained in Plaintiff's opening brief, WMCD is able to perform surgical abortions pursuant to an Ohio State Court order staying the revocation of its current ASF license. Pl. Br. at 2; Second Haskell Decl., Ex. H. That stay could be lifted any day. Once that stay is lifted, WMCD's license revocation will become immediately effective. If WMCD's current license is revoked and its 2019 variance application is denied without explanation, WMCD will have lost its ASF license and, therefore, will be unable to provide surgical abortion services, even though there is no evidence that WMCD's continued operation poses a risk of harm to its patients.[13] In fact, as shown above and in Plaintiff's opening brief and declarations, if WMCD is forced to stop providing surgical abortions, it will be forced to shut down, thus causing harm to its patients by obstructing their access to, and in some case completely preventing them from obtaining, abortion care. *See* Pl. Br. at 13–16; *supra* 15–18.

### B. Argument

To establish a procedural due process claim, a plaintiff must show that "(1) it had a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment;

---

[13] If WMCD were to provide surgical services without a license, ODH could take action against it, including imposing a civil penalty between $1,000 and $250,000 and/or imposing an additional civil penalty between $1,000 and $10,000 for each day that it operates. (A); Ohio Rev. Code § 3702.32(A).

(2) that it was deprived of the protected interest within the meaning of the due process clause; and (3) that the state did not afford it adequate procedural rights before depriving it of its protected interest." *Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio*, 610 F.3d 340, 349 (6th Cir. 2010). As discussed below, Plaintiff meets all three of these elements.

The procedural due process analysis here is substantially similar to that in the Sixth Circuit's decision in *Baird* and this court's analysis in granting Plaintiff Planned Parenthood of Southwestern Ohio ("PPSWO")'s request for a preliminary injunction of Ohio's law requiring the automatic suspension of a license upon the denial of a variance request ("Automatic Suspension Provision"), Order & Op. ("ASP Order"), Doc. 28. In *Baird*, the court held that ODH had violated Plaintiff WMCD's right to procedural due process by abruptly denying its ASF license and forcing the clinic to shut down immediately. 438 F.3d at 613. The court explained "[t]he case law contemplates at minimum some chance to react to proposed governmental action before deprivation occurs." *Id.* at 614. (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 432, 547 (1985)). When considering the Automatic Suspension Provision, this court agreed that "[t]he pre-deprivation opportunity to respond must come *after*, not *before*, the discretionary decision." ASP Order at 11 (emphasis in original).

Here, the Automatic Denial Provision is unconstitutional, at least as applied to WMCD, for the same reason that the Automatic Suspension Provision is likely unconstitutional and the same reason that ODH's actions were unconstitutional in *Baird*. The provision will deny Plaintiff its license automatically—and immediately eliminate all surgical abortion services in Dayton—without providing WMCD due process.

Plaintiff clearly has protected property and liberty interests in the continued operation of its business and in its ASF license. Plaintiff's property interest in the continued operation of its

ASF "plainly exists." ASP Order at 7. *Baird* held that "due process protects an interest in the continued operation of an existing business," and that Dr. Haskell and WMGPC have "a protected property interest in the continued operation of the Dayton clinic." 438 F.3d at 611–12. Additionally, this Court has held that Plaintiff has a protected property interest in its ASF license because WMCD—which has held an ASF license since 2008 and filed timely annual renewal applications since that time—"previously has obtained and currently has a valid license for operation pursuant to Ohio Revised Code § 3702.302 and will be unable to operate its business without it under the new Ohio statutory scheme."[14] ASP Order at 7–8 (citing *Bell v. Burson*, 402 U.S. 535, 539 (1971) ("Once licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood. . . . In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment."); *Brookpark Entm't, Inc. v. Taft*, 951 F.2d 710, 716 (6th Cir. 1991) (recognizing that an Ohio liquor licensee has a property interest protected under Due Process Clause); *State v. Hochhausler*, 76 Ohio St. 3d 455, 460 (1996) (holding that a driver has a protected property interest in his or her driver's license)).

The automatic denial of WMCD's variance request will, in the absence of an injunction, deprive Plaintiff of its protected interest under the Due Process Clause. The Sixth Circuit held that the cease-and-desist order deprived Dr. Haskell of his protected interest in operating his business. *Baird*, 438 F.3d at 612. If Plaintiff's current valid license is revoked and its pending

---

[14] Under Ohio law, an ASF license "is valid unless revoked or suspended pursuant to Chapter 119 of the Revised Code, or voided at the request of the owner or . . . [unless the ASF] fails to timely apply for a renewal." Ohio Admin. Code § 3701-83-05. *See also* Ohio Rev. Code Ann. § 116.06 ("[A] licensee who has filed an application for registration or renewal within the time and in the manner provided by statute or rule of the agency shall not be required to discontinue a licensed business or profession merely because of the failure of the agency to act on the licensee's application.").

2019 applications are denied, Plaintiff would have to apply for a new ASF license as a new licensee. *See* Third Haskell Decl., Ex. L (letter from ODH instructing Dr. Haskell to apply for a new license). If forced to apply for a new license, Dr. Haskell and WMGPC will be without the protected property interest of a current licensee. *Baird*, 438 F.3d at 611 (recognizing that first time applicants for a license do not have a protected property interest in the obtainment of a license); *see also* ASP Order at 8 (citing *Baird*). Here, the Automatic Denial Provision might force this situation on Plaintiff simply because ODH failed to act upon WMCD's pending applications within sixty days. Thus, Plaintiff is in immediate danger of being deprived its protected interest.

WMCD's variance request being denied due to the Automatic Denial Provision is an imminent threat. ODH has a pattern of waiting until the sixtieth day, or after, to rule on abortion clinics' variance requests. As described above, WMCD's revised 2018 variance request was denied on the sixty-first day. Third Haskell Decl., Ex. L. PPSWO's 2019 variance request was also not ruled on until the sixty-first day. Decl. of Jennifer Branch in Supp. of Mot. for TRO ("Branch Decl."), Exs. A & B. PPSWO, a co-plaintiff in this case, had to move for a temporary restraining order after its 2015 variance application was denied over four months after it was initially filed. *See* ASP Order at 3–4 (this application ruled on four days before the Automatic Denial Provision went into effect, so was not subject to it). WMCD's constitutional right to procedural due process is "imminently threatened" by the Automatic Denial Provision. *Id.* at 17 (finding PPSWO's constitutional right to procedural due process was "imminently threated" because its pending variance application was subject to the Automatic Denial Provision and the Automatic Suspension Provision).

"Determining what process is due in a given case requires consideration of a number of factors" "including the nature of the property interest involved (particularly its importance to the individual possessing it); the risk of an erroneous deprivation cause by inadequate procedures designed to safeguard the interest; the value, if any, that additional procedures might provide; and the state's burden in having to provide additional procedures." *Ramsey v. Board of Education*, 844 F.2d 1268, 1272 (6th Cir. 1988) (citing *Matthews v. Eldridge*, 424 U.S. 319, 334–35 (1976)).

*Baird* is instructive here. In *Baird*, the Sixth Circuit held that the cease-and-desist order requiring WMCD to immediately shut down without any hearing did not provide WMCD with adequate procedural protections. The Court was aware that Ohio law provided several procedural protections to the abortion clinic after the initial denial of the license application, including administrative hearings under Ohio Revised Code § 119.06, and nevertheless it determined that a this remedy alone would not suffice to meet the requirements of due process in that case. *Baird*, 438 F.3d at 612–14. In reaching that conclusion, the Sixth Circuit recognized that the proposed denial letter from ODH (which offered a hearing under Ohio laws) was sent the same day as a cease-and-desist order requiring the abortion clinic to close or face civil penalties, which operated to prevent the abortion clinic from obtaining a hearing prior to the deprivation of its property interest in its ongoing business. *Id.* at 613. It further determined that the property interest at stake—the continued operation of the business—outweighed any undefined burden, and that ODH was not truly unable to anticipate and prevent the deprivation because it served the letter to close the clinic. *Id.* ODH also did not demonstrate any public policy reason for shutting down the operations simultaneously with the denial of the license application whereas the

interest in continuing to operate the business was strong. *Id.* at 614. Finally, the circuit court held

that there were material facts for resolution at hearing. *Id.*

The facts here are strikingly similar to those in *Baird*. The Automatic Denial Provision

will have the same effect on WMCD as the denial and the cease-and-desist letter in *Baird*.

Specifically, the loss of WMCD's property interest in its license will occur simultaneously with

the denial of the variance.[15] Indeed, ODH has already indicated its intention to treat WMCD as a

new applicant and thus deprive it of its property interest as a current licensee. Third Haskell

Decl., Ex. L. While ODH cannot do this while the stay of revocation of WMCD's current license

is still in effect, it may be able to do so once the stay is lifted, if a new license has not been

issued. As a result, once the stay is lifted, WMCD will have lost its license and will be forced to

stop providing surgical abortions immediately or face penalties.

Also as in *Baird*, it is not the case that ODH is "truly unable to anticipate and prevent a

random deprivation" of the protected interest. 438 F.3d at 614 (internal citation omitted). Under

Ohio Revised Code § 3702.304, the director is able to control the timing of a decision on a

pending variance application. It is completely within her discretion to act within sixty days or fail

to do so and allow a random deprivation to occur. *Id.* (noting that the state had not presented any

evidence that a pre-deprivation hearing would impose any burden or that any public policy

reason existed for shutting down the clinic's operations simultaneously with the denial of the

---

[15] In enjoining the Automatic Suspension Provision, this court has already found that a clinic's "opportunity to present its variance application to the Director cannot constitute a pre-termination opportunity to respond to a subsequent denial of a variance application before its license is suspended and it is forced to cease operations." ASP Order at 10; *see also Baird*, 438 F.3d at 614 ("Indeed, since [a waiver application] preceded the decision, it can hardly be characterized a pre-termination opportunity to respond.") (internal citation omitted). Here, the denial of the variance is the mechanism by which WMCD will lose its property interest. Thus, it will have no opportunity to respond after the decision is made but before it is actually denied its property interest. *See* ASP 10–11.

license); *Gula v. Huron Cnty.*, 600 F. Appx. 374, 384 (6th Cir. 2015) (plaintiffs had stated a due process claim where deprivation of property was a "direct result of county personnel's deliberate action at a specific, predictable point" and there was no government interest in failure to provide notice and a hearing) (internal citation omitted); *see also Revis v. Meldrum*, 489 F.3d 273, 284 (6th Cir. 2007) (post-deprivation remedies of any type are inadequate to redress unconstitutional eviction given the important rights at stake).

Also, like in *Baird*, there are material facts that need to be resolved. *See* 438 F.3d at 614. Namely, because the Automatic Denial Provision results in a variance denial regardless of the merits of the variance application, there needs to be a process to "resolve whether the variance application actually demonstrated an inability to protect patients through alternative arrangement or whether it was denied due to, for example, administrative oversight" before WMCD is denied its property interest.[16] ASP Order 14.

Like with the Automatic Suspension Provision, the Automatic Denial Provision's "connection to health and safety is tenuous." ASP Order 16. A license denied at the result Automatic Denial Provision is, of course, an arbitrary denial. The Provision can result in the denial of a variance application that meets every single statutory requirement for a variance, as WMCD's applications do. *See* ASP Order 14. There is absolutely no evidence that the continued operation of WMCD will pose a risk of harm to patients. In fact, as shown above and in Plaintiff's opening brief, the immediate closure of WMCD will harm patient health by raising the financial and logistical barriers to obtaining care. *Supra* 15–18; Pl. Br. at 13–16.

---

[16] Indeed, enjoining the Automatic Denial Provision would allow ODH sufficient time to actually review the merits of variance applications.

IV.     **Plaintiff Satisfies the Remaining Factors Necessary for a Temporary Restraining Order and/or Preliminary Injunction.**

If ODH is allowed to enforce the challenged provisions and shutter WMCD, Plaintiff and Plaintiff's patients will be subject to irreparable harm. Plaintiff and its patients will both be subject to the irreparable harm of being denied their constitutional rights. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (when a constitutional right is being threatened or impaired, a finding of irreparable harm is mandated) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also* ASP Order 17 (citing *Bonnell*). Plaintiff's harm derives not from a purported right to perform abortions, Def. Br. at 32, but rather from being denied its right to procedural due process by being deprived of its property interest without due process, *see supra* 22–30, and as a result of an unlawful delegation of licensing authority to private parties, *see supra* 18–22. *See Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1382 (6th Cir. 1995) (the inability to operate a business for an unknown period of time constitutes irreparable harm); ASP Order 17 (finding "the threatened constitutional violation" by the Automatic Suspension Provision "is sufficient ground upon which to find irreparable harm"). Plaintiff's patients will suffer constitutional harm in being denied the right to an abortion, which can also result in physical, medical, psychological and emotional harms. *See Planned Parenthood Se. Inc. v. Bently*, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013) (finding irreparable harm where abortion restriction would impose delays and prevent some women from accessing abortion); ASP Order 18 (explaining why closing PPSWO would result in irreparable harm to patients); Pl. Br. at 13–16 (citing declarations describing harm to patients if WMCD closes).

An injunction will not harm Defendant or others. As Plaintiff has shown, the challenged restrictions confer no medical benefit. *See supra* 6–13; Pl. Br. at 3–8. They do not increase the safety of abortion. *Id.*; *see also* ASP Order at 18 ("the connection between the denial of the

31

variance and the health and safety concerns is tenuous"). Plaintiff has been safely performing

abortion in Ohio for decades without the enforcement of these laws. Pl. Br. at 3–8. Indeed, as

described above, enforcing these laws will harm, not help, patients. *See supra* 15–18*;* Pl. Br. 13–

16. Further, Ohio has no interest in enforcing laws that are likely unconstitutional. *See Planned*

*Parenthood Ass'n of Cincinnati v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987).

The public interest in preserving the status quo and ensuring access to the constitutionally

protected health care services while this case proceeds is strong. ASP Order at 19 (citing *Am.*

*Freedom Def. Initiative v. Suburban Mobility Auth. For Reg'l Transp.*, 698 F.3d 885, 896 (6th

Cir. 2012); *Doe v. Barron*, 92 F. Supp. 2d 694, 697 (S.D. Ohio 1999)). Thus, the balance of

interests weighs in favor of Plaintiff. ASP Order at 18 ("[g]iven the temporary nature of the

relief, the Court finds that the harm to women seeking abortion services outweighs the more

theoretical harm to the patients' health and safety").

## CONCLUSION

For the reasons explained above, this Court should temporarily restrain Defendant from

enforcing and/or preliminarily enjoin the enforcement of the challenged statutes.

Respectfully submitted,

/s/Jennifer L. Branch
Jennifer L. Branch # 0038893
*Trial Attorney for Plaintiffs*
Alphonse A. Gerhardstein  # 0032053
GERHARDSTEIN & BRANCH CO. LPA
441 Vine Street, Suite 3400
Cincinnati, OH 45202
(513) 621-9100
(513) 345-5543 (fax)
agerhardstein@gbfirm.com
jbranch@gbfirm.com
*Counsel for Plaintiff Planned Parenthood Southwest*

*Ohio Region, Plaintiff Women's Med Group,*
*Planned Parenthood of Greater Ohio, and T&S*
*Management*

Ruth E. Hartman #0078860
Michael E. Mumford #0073931
BAKER HOSTETLER LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200
(216) 696-0740 (fax)
mmumford@bakerlaw.com
rhartman@bakerlaw.com
*Attorneys for Plaintiff Women's Med Group*
*Professional Corporation*

Carrie Y. Flaxman
Julie Murray
Planned Parenthood Federation of America
1110 Vermont Avenue, NW, Suite 300
Washington, DC 20005
(202) 973-4800
(202) 296-3480 (fax)
carrie.flaxman@ppfa.org
julie.murray@ppfa.org
*Admitted Pro Hac Vice*
*Co-counsel for Plaintiff Planned Parenthood*
*Southwest Ohio Region and Planned Parenthood of*
*Greater Ohio*

Julia Kaye
Elizabeth Watson
Rachel Reeves *
Brigitte Amiri
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 284-7358
(212) 549-2651 (fax)
jkaye@aclu.org
ewatson@aclu.org
rreeves@aclu.org
bamiri@aclu.org
*Admitted Pro Hac Vice*
*\* Application for admission pro hac vice pending*

33

*Of-Counsel for Plaintiff Women's Med Group*
*Professional Corporation*


Freda J. Levenson #0045916
ACLU of Ohio Foundation, Inc.
4506 Chester Avenue
Cleveland, OH 44103
(216) 472-2220
(216) 472-2210 (fax)
flevenson@acluohio.org
*Of-Counsel for Plaintiff Women's Med Group*
*Professional Corporation*


B. Jessie Hill #0074770
Cooperating Counsel for the ACLU of Ohio
Case Western Reserve Univ., School of Law
11075 East Boulevard
Cleveland, Ohio 44106
(216) 368-0553
(216) 368-2086 (fax)
bjh11@cwru.edu
*Co-Counsel for Women's Med Group Professional*
*Corporation*


## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2019 a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail and email upon all parties for whom counsel has not yet entered an appearance electronically.

/s/ Jennifer L. Branch
Trial Attorney for Plaintiffs

34