## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **PLANNED PARENTHOOD SOUTHWEST OHIO REGION** | : | **Case No. 1:15-cv-568** |
| C/O B. Jessie Hill | : | |
| Case Western Reserve Univ., School of Law | : | **Judge Michael R. Barrett** |
| 11075 East Boulevard | : | |
| Cleveland, OH 44106 | : | |
| | : | |
| **WOMEN'S MED GROUP PROFESSIONAL CORPORATION** | : | **PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| C/O B. Jessie Hill | : | |
| Case Western Reserve Univ., School of Law | : | |
| 11075 East Boulevard | : | |
| Cleveland, OH 44106 | : | |
| | : | |
| **Plaintiffs,** | : | |
| **vs.** | : | |
| | : | |
| **BRUCE T. VANDERHOFF, M.D.** | : | |
| 246 N. High Street | : | |
| Columbus, OH 43215 | : | |
| In his official capacity as the Director of the Ohio Department of Health | : | |
| | : | |
| | : | |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## I.     PRELIMINARY STATEMENT

1.     This civil rights case pursuant to 42 U.S.C. § 1983 challenges Ohio's continuing assault on the right of women to exercise reproductive freedom and its efforts to shut down Ohio's abortion providers, including the last two ambulatory surgery facilities that perform abortions in Southwest Ohio. If both of these facilities are forced to shut their doors, surgical abortion services in Southwest Ohio will be virtually eliminated overnight.

2.     Ohio has pursued this strategy of shuttering the state's abortion providers by imposing an onerous and medically unnecessary requirement that clinics that provide surgical abortions maintain a written transfer agreement ("WTA") with a local hospital. The U.S. Supreme Court recently struck down similarly unnecessary and burdensome requirements in Texas in *Whole Woman's Health v. Hellerstedt*, --- U.S. ---, 136 S. Ct. 2292 (2016).

3.     The requirement to have a WTA is part of a deliberate strategy to severely reduce abortion access statewide by imposing and enforcing laws and regulations that do not promote women's health or any other valid state interest. In 1999, there were twenty-two clinics in Ohio providing surgical abortion. Today there are only six clinics providing surgical abortion, and at least two of the remaining clinics—Plaintiffs' two clinics—are in jeopardy of closing because of this medically unnecessary requirement.[1] If these clinics are also forced to shut down, there will be only *one* surgical abortion provider left in Ohio outside of the Cleveland metropolitan area.

4.     Even though surgical abortion is one of the safest medical procedures in modern medicine and such a requirement is medically unjustified, Ohio requires that surgical abortions performed by Plaintiffs be provided only in ambulatory surgical facilities ("ASFs") that maintain

---

[1] At the time this suit was commenced, there were three other Ohio clinics providing surgical abortions—one in Columbus, one in Toledo, and one in Akron. Since the filing of this suit, the provider in Toledo ceased offering surgical care and the clinics in Columbus and Akron closed completely.

a WTA with a local hospital.  However, WTAs have proven exceedingly difficult, if not impossible, for ASFs that provide abortions to obtain and/or retain, given the hostility to abortion.

5.     For many years, this requirement was imposed by administrative rule, and Defendant Ohio Department of Health ("ODH") could grant a "waiver" or "variance" of the WTA rule to ASFs that provided surgical abortions just as it could for any of the other regulatory rules for ASFs. On limited occasions, the agency did just that, granting variances from the rule to those clinics that could demonstrate that they met the requirement "in an alternative manner." Ohio Admin. Code § 3701-83-14 (C).

6.     The administrative rule requiring abortion clinics to have a WTA, however, apparently did not go far enough for Plaintiffs' opponents. In 2013, as a part of the biennial budget bill, Substitute Amended House Bill 59 of the 130th General Assembly ("HB 59"), the Ohio legislature enacted three new provisions designed to make it difficult or impossible for abortion clinics—the only ASFs already struggling to comply with the WTA rule—to maintain their licenses. First, HB 59 codified the requirement to have a WTA, eliminating the Director's discretion to grant a "waiver" or "variance" of the administrative rule. Ohio Rev. Code Ann. § 3702.303. Second, since these prior forms of discretionary relief were eliminated, HB 59 established a new, onerous application process that applies only to ASFs seeking WTA variances (which, in practice, is only abortion clinics), distinct from the ordinary regulatory process that applies to all other types of variance applications. Ohio Rev. Code Ann. § 3702.304(A) ("Statutory Variance Requirements"). Finally, HB 59 banned abortion clinics—and only abortion clinics—from obtaining the necessary WTA from any "public hospital," Ohio Rev. Code Ann.

3

§ 3727.60 ("Public Hospital Ban"), making the already difficult task of securing a WTA even more challenging.

7.      The WTA administrative rule, statute, and variance process (individually and collectively, the "WTA Requirement"), along with the Public Hospital Ban, threaten to shut down many of the remaining abortion providers in Ohio, including Plaintiffs, without an adequate safety or health justification.

8.      But HB 59, apparently, was also not enough. In 2015, as part of the biennial omnibus budget measure, House Bill 64 of the 131st General Assembly ("HB 64"), the Ohio Legislature enacted yet another law designed to shut down abortion clinics. HB 64 immediately and automatically suspends an ASF's license (1) if ODH fails to act on a WTA variance application within 60 days, or (2) if ODH denies the ASF's request for a variance pursuant to Ohio Rev. Code Ann. 3702.304(A). Ohio Rev. Code Ann. § 3702.309(A) ("Automatic Suspension Provision"). Again, because abortion clinics are the only ASFs seeking WTA variances, HB 64 functionally—and intentionally—singles out abortion clinics. The Automatic Suspension Provision was scheduled to take effect on September 29, 2015, and, absent an injunction from this Court, would have left all ASFs with variance applications pending subject to immediate licensure suspension at any time.[2]

9.      Yet, even HB 64 did not satisfy Plaintiffs' opponents. After Plaintiffs filed this litigation, ODH made the WTA Requirement harder still for abortion providers to comply with, imposing a new, arbitrary requirement that a variance application list no fewer than *four* backup physicians in order to be approved by ODH. ODH imposed this requirement even though the

---

[2] On September 30, 2015, this Court entered a Temporary Restraining Order that prevented the Automatic Suspension Provision from going into effect while the Court considered Plaintiffs' motion for a preliminary injunction. ECF No. 25. On October 13, 2015, this Court entered a Preliminary Injunction of the Automatic Suspension Provision, which remains in effect. ECF No. 28.

relevant regulations and statutes nowhere require a specific number of physicians to be listed on a variance request, and even though there is no legitimate reason to demand four backup physicians. Indeed, ODH imposed the requirement of four backup physicians only after the Plaintiffs submitted variance applications to ODH identifying *three* backup physicians, and then ODH denied Plaintiffs' variance requests on this basis.

10. Moreover, when one provider submitted a variance request naming four backup physicians, ODH rejected two of the backup physicians for arbitrary reasons having nothing to do with the physicians' willingness or ability to provide quality care to the provider's patients at a local hospital, and even though each of these physicians meet all of the backup physician qualifications listed in the Statutory Variance Requirements.

11. Because of the WTA Requirement (including the Statutory Variance Requirements), the Public Hospital Ban, and the Automatic Suspension Provision, as well as ODH's arbitrary implementation of the requirements, Plaintiffs Planned Parenthood Southwest Ohio Region ("PPSWO") and Women's Med Group Professional Corporation ("WMGPC") are at risk of being forced to immediately shut down operations at their ASFs and to turn away their patients, without any prior notice and without any opportunity for a hearing.

12. Since 2013, PPSWO has been forced to seek a WTA variance on an annual basis, because University of Cincinnati Medical Center ("UCMC") terminated its WTA with PPSWO as required by the Public Hospital Ban, and PPSWO has been unable to obtain a replacement from any hospital in Cincinnati. Plaintiff WMGPC is in a similar situation, having been unable to obtain a WTA from any hospital in Dayton for the ASF it operates, Women's Med Dayton ("WMD"). Indeed, at the time this litigation was filed, both Plaintiffs had variance applications pending with ODH, and absent the TRO and Preliminary Injunction issued by this Court, they

would have been forced to close immediately if those applications had been denied. Lawson Decl. ¶¶ 20, 22, 23, 26; Haskell Decl. ¶¶ 26, 28, 32, 33.[3] And neither PPSWO nor WMGPC would have had any right to seek review of ODH's actions in violation of Plaintiffs' due process rights.

13.     If PPSWO and WMCD are forced to shut down because of the WTA Requirement, Public Hospital Ban, and/or the Automatic Suspension Provision, surgical abortion would become wholly unavailable in Southwest Ohio. The women of Southwest Ohio would be forced to travel hundreds of miles round-trip to the next closest surgical abortion providers in Columbus or the Cleveland metropolitan area, and, due to a statutory waiting period, make that trip twice, or stay overnight, in order to access surgical abortion. Since the filing of this suit Ohio has lost three surgical abortion providers. Clinics in Columbus and Akron closed completely. The sole remaining provider in Toledo is limited to providing medication abortion and barred from obtaining a WTA with the University of Toledo Medical Center (with which it previously had a WTA) because of the Public Hospital Ban. If Plaintiffs are also forced to shut down, Ohio women would be left with a single surgical abortion provider outside of the Cleveland metropolitan area. That remaining abortion provider, in Columbus, already has an approximately three-week wait for appointments.

14.     To protect the constitutional rights of Plaintiffs and their patients, this Court must act to declare the WTA Requirement and the Automatic Suspension Provision unconstitutional and enjoin their enforcement. This Court must further act to declare the Public Hospital Ban unconstitutional and enjoin its enforcement.

## II.     JURISDICTION AND VENUE

---

[3] The Declarations of Jerry Lawson and Martin Haskell, along with the exhibits, are incorporated herein by reference.

15.     Jurisdiction over Plaintiffs' claims is conferred on this Court by 28 U.S.C. § 1331, §§ 1343(a)(3) and (a)(4).

16.     Venue is proper under 28 U.S.C. § 1391.

### III.     PARTIES

17.     Plaintiff PPSWO is a non-profit corporation organized under the laws of the State of Ohio. It and its predecessor organizations have provided care in Ohio since 1929. PPSWO provides a broad range of medical services to women and men at seven health centers in Southwest Ohio, including: birth control, annual gynecological examinations, cervical pap smears, diagnosis and treatment of vaginal infections, testing and treatment for certain sexually transmitted diseases, HIV testing, pregnancy testing, and abortions. PPSWO operates an ASF in the Elizabeth Campbell Medical Center, at 2314 Auburn Avenue, Cincinnati, Ohio, where it provides surgical abortions through 21 weeks 6 days of pregnancy as dated from the first day of the woman's last menstrual period ("LMP"), and medication abortions through 70 days LMP. PPSWO provides approximately 3,000 abortions a year. PPSWO brings this action on its own behalf, on behalf of its current and future medical staff, servants, officers, and agents, and on behalf of its patients.

18.     Plaintiff Women's Medical Group Professional Corporation owns and operates the ASF currently known as Women's Med Dayton ("WMD") at 1401 E. Stroop Road in Kettering, Ohio. It formerly operated under the name Women's Med Center of Dayton ("WMCD"). WMGPC and its predecessors have been providing abortions to women in the Dayton area since 1975, soon after *Roe v. Wade*, 410 U.S. 113 (1973), was decided.  WMD provides surgical abortions, pregnancy testing, and birth control healthcare services to women. WMD provides approximately 2,800 abortions per year. WMD provides abortions to women to 21 weeks 6 days of pregnancy LMP.   Until 2017, WMGPC also operated a clinic in Sharonville,

7

Ohio, called Lebanon Road Surgery Center ("LRSC"). That clinic ceased providing surgical abortions in 2014 because it had no WTA and closed completely three years later. WMGPC brings this action on behalf of its current and future medical staff, servants, officers, and agents, and on behalf of its patients.

19.     Defendant Bruce T. Vanderhoff, M.D. is the Director of the Ohio Department of Health and is responsible for enforcing the ASF laws and rules, issuing ASF licenses, and granting or denying variances of the ASF requirements. Defendant Vanderhoff also has the authority to impose civil penalties and take actions to close an ASF that is operating without a license or that is operating with a suspended license. Defendant Vanderhoff is a "person" under 42 U.S.C. § 1983, and all of the actions alleged in this case have been taken under color of law. He is sued in his official capacity.[4]

## IV.     FACTS

### A.  Abortion Practice and Safety

20.     Women seek abortion for a variety of deeply personal reasons, including familial, medical, and financial. Some women have abortions because they conclude that it is not the right time in their lives to have a child or to add to their families; some to preserve their life or health; some because they receive a diagnosis of a severe fetal medical condition or anomaly; some because they have become pregnant as a result of rape; and others because they choose not to have children.

21.     Approximately one in three women in this country will have an abortion by age forty-five. A majority of women having abortions (61%) already have at least one child, while most (66%) also plan to have a child or additional children in the future.

---

[4] University of Cincinnati Medical Center ("UCMC") and UC Health were formerly defendants in this case. The claims against them were dismissed in 2016. Doc. 57.

22.    Women in Ohio may obtain two types of abortion: medication abortion and surgical abortion. Medication abortion is a method of ending an early pregnancy by taking medications that cause the woman to undergo a procedure similar to an early miscarriage. Medication abortion is currently available in Ohio only through 70 days LMP.

23.    Surgical abortion, despite its name, is not a typical surgical procedure: it does not involve any incision. It is legal in Ohio through 21 weeks 6 days LMP. Ohio Rev. Code Ann. § 2919.201.

24.    Most abortions are performed during the first trimester of pregnancy, when the gestational age of the fetus is at or less than fourteen weeks LMP.

25.    Because abortion is so safe, the vast majority of abortions can be and are safely provided in an outpatient setting. In 2020, 99.6% of Ohio abortions were performed in an outpatient center.

26.    Even though abortion rarely results in complications, Plaintiffs provide high quality care in the rare event that it does. Most of the rare complications related to abortion are safely and appropriately handled in the outpatient setting.

27.    In the exceedingly rare case that a patient requires hospital-based care, Plaintiffs' protocols and practices ensure that the patient receives the necessary, quality care.

28.    Regardless of whether an ASF has a WTA with a local hospital, appropriate care is also ensured because hospitals provide necessary care to patients who need it. Indeed, hospitals must comply with the federal Emergency Medical Treatment & Labor Act, which requires hospitals to treat and stabilize all emergency patients. 42 U.S.C. § 1395dd(b) (commonly referred to as EMTALA). In fact, Miami Valley Hospital in Dayton has assured the

Ohio Department of Health that it will treat WMCD's patients in an emergency. Haskell Decl. ¶ 14 & Ex. B page 000038.

29.     Even if a clinic were to have a WTA at a particular hospital, the clinic's patients may not go to that hospital. Some paramedics decide which hospital is closest or best suited for the patient's needs and do not care which hospital has a WTA with the clinic. Others may follow the patient's preference based on insurance or other issues.

30.     As a result, WTAs do nothing to increase patient safety or health and are not medically necessary.

31.     What does clearly decrease patient safety and threaten patients' health is the lack of access to abortion services.

32.     Continuing a pregnancy can pose a risk to the lives and to the physical, mental, and emotional health of some women, such as those seeking abortions because of their age, because they are pregnant as a result of rape or incest, or because there are or may be anomalies in the fetus, some of which are fatal to the fetus and are discovered later in the pregnancy.

**B.  History of the ASF Licensing Framework and WTA Requirement**

33.     In 1995, Ohio passed a law requiring ASFs to obtain a license from ODH. In 1999, ODH notified the abortion facilities in Ohio that they needed to apply for such a license.

34.     ODH regulations require all ASFs to have a WTA "for transfer of patients in the event of medical complications, emergency situations, and for other needs as they arise." Ohio Admin. Code § 3701-83-19(E).

35.     Yet Ohio permits physicians to perform outpatient surgeries in their offices that are comparable to the abortions that Plaintiffs provide in their ASFs without requiring the physicians' offices to obtain a WTA.

36.     The WTA Requirement has been difficult, and impossible in some cases, for abortion clinics to meet. Over the years, WMCD in Dayton, LRSC in Sharonville, Capital Care in Toledo, Founder's in Columbus, and PPSWO in Cincinnati have all been unable to obtain or maintain a WTA and have been forced to apply for waivers and/or variances of the requirement. Abortion clinics have had difficulty meeting the WTA Requirement because of hospitals' religious and political opposition to abortion, and/or because of hospitals' fear of the harassment and intimidation they and their doctors would face if they were to enter into a WTA with an abortion clinic. For example, there is a national campaign to harass and shame the Dayton doctors who provide backup services to patients of WMCD. An anti-abortion group plastered the doctors' faces on trucks next to a photograph of an alleged aborted fetus, drove the truck through each doctor's neighborhood, and parked the trucks at the hospital and outside of their respective homes and work sites.[5] This and other harassment takes place solely to intimidate and discourage the doctors from agreeing to admit WMCD's patients to a hospital.

37.     As a result, the only ASFs that have sought WTA variances are ASFs that provide abortions. Not a single ASF in Ohio has applied for a WTA variance, except for abortion providers.

38.     In 2006, the Sixth Circuit upheld the administrative rule requiring a WTA as applied to Plaintiff WMCD because it recognized that, at that time, ODH could grant a waiver or variance of the requirement. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595 (6th Cir. 2006).

39.     At the time of *Baird*, an abortion clinic could apply for a variance or waiver from the WTA regulation under the same standard applied to any other waiver or variance request: by demonstrating for a variance that "the requirement has been met in an alternative manner," or by

---

[5] *Killers Among Us: Dr. Martin Haskell and His Abortion Enablers*, CREATED EQUAL http://www.createdequal.org/wright-state.

11

demonstrating for a waiver that the ASF would suffer "undue hardship" from the requirement and that granting the waiver would not "jeopardize the health and safety of any patient." Ohio Admin. Code § 3701-83-14(C). Waivers and variances are available under Ohio law for all ASF building and safety requirements, except for those mandated by statute. *Id.* at (A).

40.     Since *Baird*, ODH has not granted any WTA waivers to abortion providers, only WTA variances, and even then, only on rare occasions.

41.     In 2008, ODH determined that WMCD's relationship with three backup physicians who had admitting privileges at a local hospital satisfied the WTA Requirement "in an alternative manner," and thereby granted a WTA variance to WMCD.

42.     In 2010, ODH determined that LRSC's physicians' admitting privileges at local hospitals and LRSC's Emergency Medical Protocol satisfied the WTA Requirement "in an alternative manner," and thereby granted a WTA variance to LRSC.

43.     Yet, in December 2011, ODH made WTA variances even harder to obtain and/or maintain by requiring ASFs to apply for a WTA variance annually, at the same time that the ASF applied for its license renewal. At the time of this informal rule change, WMCD and its affiliated clinic LRSC were the only ASFs in the state with WTA variances.

44.     As discussed below, because of HB 59, the waivers and variances purportedly available at the time of *Baird* are no longer an option for some Ohio abortion clinics.

**C.  HB 59**

45.     In 2013, as part of the omnibus budget bill HB 59, the Legislature altered the ASF licensing scheme with respect to the WTA provisions.

46.     The purpose of the changes to the ASF requirements in HB 59 was to reduce access to abortion. For example, upon its introduction in committee, State Senator Joe Ueker,

12

stated that, "Someone has to stand up for the rights of the unborn."[6] Similarly, when Governor

Kasich refused to use his line-item veto, his spokesperson stated that "[t]he governor is pro-life

and we believe these are reasonable policies to help protect human life."[7] Mike Gonidakis, a

member of the Ohio State Medical Board and president of Ohio Right to Life, stated regarding

the section: "Ohio has a history of advancing common-sense pro-life initiatives. We are very

conscious not to overreach. . . . We believe in the incremental approach: one step at a time,

advancing legislation that will withstand court scrutiny."[8] In addition, Governor Kasich touted

HB 59 as including a number of "pro-life provisions" in a letter to Ohio Right to Life. Haskell

Decl. Ex. B page 000039.

47.     HB 59 altered the WTA Requirement in three critical respects. First, the WTA

Requirement, which was originally required only by regulation, was incorporated into statute.

Ohio Rev. Code Ann. §3702.303(A) now provides:

> Except as provided in division (C) of this section, an ambulatory surgical facility
> shall have a written transfer agreement with a local hospital that specifies an
> effective procedure for the safe and immediate transfer of patients from the facility
> to the hospital when medical care beyond the care that can be provided at the
> ambulatory surgical facility is necessary, including when emergency situations
> occur or medical complications arise. A copy of the agreement shall be filed with
> the director of health.

48.     Second, HB 59 amended the ASF licensing provisions to prohibit any "public

hospital" from "enter[ing] into a written transfer agreement with an ambulatory surgical facility

in which nontherapeutic abortions are performed or induced." Ohio Rev. Code Ann.

---

[6] Ann Sanner, *Abortion-Related Issues Remain Part of Ohio Budget*, THE ASSOCIATED PRESS (June 6, 2013), http://www.crescent-news.com/editors%20pick/2013/06/06/abortion-related-issues-remain-part-of-budget.

[7] Juliet Eilperin, *Abortion Limits at State Level Return Issue to National Stage*, THE WASHINGTON POST (July 5, 2013), http://www.washingtonpost.com/politics/abortion-limits-at-state-level-return-issue-to-the-national-stage/2013/07/05/f86dd76c-e3f1-11e2-aef3-339619eab080_story.html.

[8] Rachel Weiner, *What makes Ohio's New Abortion Law Unique*, THE WASHINGTON POST (July 1, 2013), http://www.washingtonpost.com/blogs/the-fix/wp/2013/07/01/what-makes-ohios-new-abortion-law-unique/.

§ 3727.60(B)(1) ("Public Hospital Ban"). The ban applies only to clinics that provide abortions and does not apply to any other ASF in the state.

49.     WTAs do nothing to increase patient safety or health and are not medically necessary. And there is certainly no legitimate reason, even if a WTA is required, to exclude public hospitals from the list of eligible hospitals. To the contrary, if the purpose of a WTA is to improve patient safety, it is irrational to exclude the hospitals in a community, such as teaching hospitals, that might provide the highest level of patient care.

50.     At the same time, the Public Hospital Ban also prohibits physicians with staff membership or professional privileges at a public hospital "to use that membership or those privileges as a substation for, or alternative to, a written transfer agreement for purposes of a variance application" for an ASF that performs abortions. Ohio Rev. Code Ann. § 3727.60(B)(2). In other words, HB 59 both makes it more difficult for abortion clinics to obtain a WTA and makes it more difficult for clinics to find doctors to support an application for a WTA variance.

51.     Third, HB 59 provided a new variance application process, which applies only to ASFs seeking a WTA variance. The contents of an application for such a variance are now set out in Ohio Rev. Code Ann. §3702.304 ("Statutory Variance Requirements"), which provides:

> (A) The director of health may grant a variance from the written transfer agreement requirement of section 3702.303 of the Revised Code if the ambulatory surgical facility submits to the director a complete variance application, prescribed by the director, and the director determines after reviewing the application that the facility is capable of achieving the purpose of a written transfer agreement in the absence of one. The director's determination is final.

> (B) A variance application is complete for purposes of division (A) of this section if it contains or includes as attachments all of the following:

> (1) A statement explaining why application of the requirement would cause the facility undue hardship and why the variance will not jeopardize the health and safety of any patient;

14

(2) A letter, contract, or memorandum of understanding signed by the facility and one or more consulting physicians who have admitting privileges at a minimum of one local hospital, memorializing the physician or physicians' agreement to provide backup coverage when medical care beyond the level the facility can provide is necessary;

(3) For each consulting physician described in division (B)(2) of this section:

(a) A signed statement in which the physician attests that the physician is familiar with the facility and its operations, and agrees to provide notice to the facility of any changes in the physician's ability to provide backup coverage;

(b) The estimated travel time from the physician's main residence or office to each local hospital where the physician has admitting privileges;

(c) Written verification that the facility has a record of the name, telephone numbers, and practice specialties of the physician;

(d) Written verification from the state medical board that the physician possesses a valid certificate to practice medicine and surgery or osteopathic medicine and surgery issued under Chapter 4731 of the Revised Code;

(e) Documented verification that each hospital at which the physician has admitting privileges has been informed in writing by the physician that the physician is a consulting physician for the ambulatory surgical facility and has agreed to provide backup coverage for the facility when medical care beyond the care the facility can provide is necessary.

(4) A copy of the facility's operating procedures or protocols that, at a minimum, do all of the following:

(a) Address how backup coverage by consulting physicians is to occur, including how backup coverage is to occur when consulting physicians are temporarily unavailable;

 (b) Specify that each consulting physician is required to notify the facility, without delay, when the physician is unable to expeditiously admit patients to a local hospital and provide for continuity of patient care;

(c) Specify that a patient's medical record maintained by the facility must be transferred contemporaneously with the patient when the patient is transferred from the facility to a hospital.

(5) Any other information the director considers necessary.

(C) The director's decision to grant, refuse, or rescind a variance is final.

(D) The director shall consider each application for a variance independently without regard to any decision the director may have made on a prior occasion to grant or deny a variance to that ambulatory surgical facility or any other facility.

52.    Prior to HB 59, it was solely within the ODH Director's discretion whether to grant a WTA waiver or variance. Ohio Admin. Code § 3701-83-14 (C).

53.    Now, because of HB 59, a WTA "waiver" is no longer available, and the ODH Director can grant a "variance" only if an applicant submits a "complete variance application" that contains agreements with consulting physicians possessing admitting privileges at a minimum of one local hospital, but *not* a public hospital, and that contains verification that this hospital has been informed of the physician's agreement with the abortion clinic and that the physician has committed to providing backup coverage for the abortion clinic when necessary.

54.    Thus, because of HB 59, an abortion clinic that cannot obtain an agreement with enough consulting physicians with admitting privileges at a local hospital will not be able to obtain a variance. The ODH Director no longer has discretion to grant variances (or waivers) to such clinics.

55.    There is no valid state interest that is served by the restrictions on abortion clinics, and abortion clinics alone, imposed by HB 59.

**D.  HB 64**

56.    At the end of June 2015, the Legislature yet again altered the WTA variance process as part of another biennial omnibus budget bill ("HB 64"), making it harder still for abortion providers to keep their doors open.

57.    HB 64 amends Ohio Rev. Code Ann. § 3702.304 to require Defendant Vanderhoff, the director of ODH, to grant or deny an application for a WTA variance within 60 days. Any variance application "that has not been approved within 60 days is considered denied." Ohio Rev. Code Ann. § 3702.304 (A)(2) ("60-Day Deadline").

16

58.     HB 64 also adds a new section, § 3702.309, that requires an ASF's license to be automatically suspended in the event of a WTA variance denial: "If a variance application is denied under section 3702.304 of the Revised Code, the license of such an ambulatory surgical facility is automatically suspended." ("Automatic Suspension Provision"). Thus, if a WTA variance application is either explicitly denied by the director of ODH, or if the variance application is considered denied because of the 60-Day Deadline, ODH must automatically suspend the ASF's license. Immediately upon the suspension of its license, an ASF must cease operations. Ohio Rev. Code Ann. § 3702.30(E)(1); Ohio Admin. Code 3701-83-03.

59.     Like HB 59, the purpose of HB 64 is to target abortion clinics and to restrict abortion access across the state. The 60-Day Deadline and the Automatic Suspension Provision only apply to an ASF seeking a WTA variance. No other ASF requesting a variance from any other requirement is subject to these harsh penalties. During the Senate floor debate over HB 64, a State Senator who is a former President of Ohio Right to Life,[9] made clear that these amendments were targeted at abortion clinics, describing the variance process as applying "in those situations where you cannot find a hospital who is willing to serve as a backup to an abortion clinic, and you can seek a variance by having some physicians who are willing to take ownership of the complications that occur in that clinic."[10] She stated that HB 64's new 60-Day Deadline for responding to variance requests was designed to make sure that ODH will rule swiftly on variance requests from abortion clinics.[11] On HB 64's signing by Governor Kasich, Ohio Right to Life issued a press release celebrating the bill's "pro-life measures" that "will hold

---

[9] Catherine Candisky, *Group Pushes for More Abortion Restrictions, Defunding of Planned Parenthood*, COLUMBUS DISPATCH (Feb. 11, 2015, 12:36 AM), http://www.dispatch.com/content/stories/local/2015/02/10/ohio-right-to-life-legislative-agenda.html; *Peggy Lehner*, LINKEDIN https://www.linkedin.com/pub/peggy-lehner/8/943/461 (listing her role as President of Ohio Right to Life from 1984-1988).
[10]*Senate Session*, THE OHIO CHANNEL (June 18, 2015)
http://www.ohiochannel.org/MediaLibrary/Media.aspx?fileId=146746&startTime=9777.
[11]*Id.*

abortion facilities accountable." Ohio Right to Life's press release admits that the Automatic Suspension Provision will shut down abortion clinics, and specifically references WMCD as a clinic that could be shut down.[12]

60.     If an ASF were to provide surgical services without a license, ODH could take action against it, including imposing civil penalties between one thousand and two hundred and fifty thousand dollars and/or imposing daily civil penalties between one thousand and ten thousand dollars for each day that the ASF operates. Ohio Admin. Code § 3701-83-05.1(A); Ohio Rev. Code Ann. § 3702.32 (A).

61.     Thus, abortion providers whose licenses are suspended will be forced to shut down and cease providing abortion services immediately, even to patients with scheduled appointments, and even to patients who will be unable to obtain an abortion anywhere else because of the costs and burdens of travel.  Moreover, the Automatic Suspension Provision will shut these clinics down without giving these providers (or their staff members) any notice, and without even affording them an opportunity for a pre-deprivation hearing.

62.     Providers are not only denied a pre-deprivation hearing—they are also denied any *post*-deprivation hearing rights. While HB 64 indicates that a provider's license could be reinstated pursuant to an order issued in accordance with Chapter 119 of the Revised Code, Ohio Rev. Code Ann. § 3702.309(A)(3), an abortion provider will in fact have no right of appeal under Chapter 119. That is because Ohio law explicitly states that "the refusal of the director to grant a variance or waiver, in whole or in part, shall be final and shall not be construed as creating any rights to a hearing under Chapter 119 of the Revised Code." Ohio Admin. Code § 3701-83-14(F); Ohio Rev. Code Ann. § 3702.304(A) and (C). Moreover, the automatic suspension of a

---

[12]Katherine Franklin, *Governor Kasich Signs Pro-Life Budget*, OHIO RIGHT TO LIFE (June 30, 2015), http://www.ohiolife.org/governor_kasich_signs_pro_life_budget.

license does not trigger any right to appeal under Chapter 119 because the automatic suspension does not qualify as an agency "adjudication" under Ohio Rev. Code Ann. § 119.06. An "adjudication" does not include "acts of a ministerial nature," Ohio Rev. Code Ann. §119.01(D), such as the automatic suspension of an abortion provider's license following a variance denial. As a consequence, an abortion provider also cannot appeal the suspension of its ASF license either pre- or post- deprivation.

63.     The Legislature enacted the Automatic Suspension Provision knowing that abortion providers are the only ASFs in Ohio to seek WTA variances, and that the Automatic Suspension Provision would mean that abortion providers, and only abortion providers, would be subject to deprivation of their licenses without procedural protections. In fact, the Automatic Suspension Provision's effect on abortion clinics was the motivation behind the Legislature's actions.

64.     There is no valid state interest that is served by the restrictions on abortion clinics, and abortion clinics alone, imposed by HB 64.

**E. PPSWO's ASF Licensing History**

65.     Since being informed by ODH that its provision of abortion services qualified it as an ASF, PPSWO has operated with an ASF license and has sought to comply with the WTA Requirement.

66.     Its most recent WTA was with UCMC. The agreement was dated May 29, 2013, and was effective for one year with an automatic one-year renewal period.

67.     UCMC, the nation's first teaching hospital, is an internationally recognized hospital with state-of-the-art medical facilities. UCMC is the only hospital in the region that is designated as a Level 1 trauma center by the American College of Surgeons because of its highly

specialized emergency medicine team and its ability to treat the most complex emergency situations the fastest.

68.     After HB 59 was signed, UCMC acknowledged that it was a "public hospital" within the meaning of the new prohibition. As a public hospital, UCMC was compelled by HB 59 to arbitrarily and discriminatorily terminate any WTAs with abortion providers without due process of law. UCMC provided notice to PPSWO that it would terminate the WTA with PPSWO as of September 28, 2013, the day before the effective date of the Public Hospital Ban. Thus, UCMC was compelled by the State to end its WTA with PPSWO. The decision to terminate the WTA was dictated by the State and was not based on any medical or professional discretion or judgment.

69.     UCMC is a non-profit institution that is privately operated. On information and belief, the Legislature drafted the definition of "public hospital" broadly in part with the intent to include UCMC so that the WTA between UCMC and PPSWO would be terminated.

70.     After receiving notice of the termination of its WTA with UCMC, PPSWO approached all the local hospitals in Hamilton County and surrounding counties seeking a WTA, but those hospitals either rejected or ignored PPSWO's requests. Many of the local hospitals are Catholic institutions with a stated opposition to cooperating in the provision of abortion services. Thus, PPSWO was unable to secure a WTA with a non-"public" hospital because of the complete discretion exercised by those hospitals to refuse or ignore PPSWO's requests.

71.     Prior to the expiration of the WTA with UCMC and pursuant to HB 59, PPSWO applied for a WTA variance. The application included contracts with several backup physicians with privileges at a local hospital who agreed to provide care to PPSWO's patients, as well as a

patient hospital transfer policy in order to assure ODH that PPSWO provides continuous care to any patient who requires transfer to a hospital.

72.     Though PPSWO's variance application had been pending with ODH, on October 14, 2014, ODH informed PPSWO that it did not comply with the ASF licensing requirements because it lacked a WTA. The letter threatened to revoke PPSWO's license.

73.     Because of ODH's threatened revocation of PPSWO's ASF license and PPSWO's exposure to substantial civil penalties, PPSWO was forced to file litigation in this Court seeking to enjoin ODH from taking actions to revoke its ASF license. *See* Complaint, *Planned Parenthood Southwest Ohio Region v. Hodges*, No. 1:14-cv-867 (S.D. Ohio Nov. 10, 2014) (*Hodges I*).

74.     In response to this litigation, ODH granted PPSWO's variance request on November 20, 2014, and the litigation was dismissed without prejudice.

75.     PPSWO's variance was approved through May 31, 2015, the date that coincides with PPSWO's license renewal application deadline. The ASF license renewal request and a new variance request were submitted in May 2015. Under the law in place at the time, which the Automatic Suspension Provision changed, ASFs with pending license renewal applications could continue operating as long as the renewal application was timely filed. Ohio Admin. Code §3701-83-05.

76.     On September 25, 2015, after this litigation was filed and a mere four days before the Automatic Suspension Provision was set to go into effect, Defendant Hodges denied PPSWO's request for a variance. This denial is attached to Lawson Second Decl. as Ex. B (ECF No. 24-1 PageID# 291).

21

77.     On September 25, 2015, Defendant Hodges proposed to revoke and not renew PPSWO's ASF license and offered PPSWO the opportunity to request a hearing on the proposed revocation within 30 days. This proposed revocation is attached to Lawson Second Decl. as Ex. C (ECF No. 24-1 PageID# 293).

78.     The variance denial states that "PPSWO's provision of only three named backup physicians does not meet [the ODH Director's] expectation that a variance provide the same level of patient health and safety that a written transfer agreement with a local hospital assures for 24/7 backup coverage." Lawson Second Decl. Ex. B. The denial also notes that the prior variance that ODH granted to PPSWO was based on "backup agreements with four named physicians." *Id.*

79.     As a result, Defendant Hodges' denial of the variance appeared to require PPSWO to add a fourth backup doctor to its variance request. The Ohio Department of Health ("ODH") had never before informed PPSWO that four backup doctors were required, and this requirement is found nowhere in the relevant statutes or regulations.

80.     Requiring a variance request to include four backup physicians is an unjustifiable, medically unnecessary requirement.

81.     PPSWO has previously been granted a WTA variance from ODH with only three backup doctors. After the Public Hospital Ban in HB 59 caused UCMC to rescind its WTA with PPSWO, PPSWO requested a variance for 2013 and named three backup doctors in its application. ODH granted it. In 2014, PPSWO added a fourth backup doctor to its variance request, but when one of the four doctors resigned approximately five months later in January 2015, PPSWO was left with three again. PPSWO immediately notified ODH of the resignation, and ODH never objected to that change. Indeed, the first time ODH notified PPSWO that three

backup doctors was insufficient was when the agency denied PPSWO's 2015 variance request nine months later, on September 25, 2015. Lawson Second Decl. Ex. B.

82.     As soon as ODH informed PPSWO of the need for a fourth backup doctor, PPSWO diligently searched for a fourth doctor. On Monday September 28, 2015, PPSWO signed a contract with a fourth backup doctor.

83.     On September 28, 2015, PPSWO submitted a new variance request to ODH adding the fourth backup doctor. Lawson Second Decl. Ex. D (ECF No. 24-1 PageID# 296).

84.     On September 29, 2015, HB 64 became effective, but because of this Court's Temporary Restraining Order and subsequent Preliminary Injunction, the Automatic Suspension Provision is currently enjoined.  ECF Nos. 25 & 28.

85.     ODH granted PPSWO's variance request listing four backup physicians on November 27, 2015. At the same time, Director Hodges notified PPSWO that it would be required to submit a new variance request by April 1, 2016, sixty days in advance of the expiration of PPSWO's license, due to Ohio Rev. Code Ann. § 3702.304 (A)(2) ("60-Day Deadline").

86.     PPSWO diligently applied for new variances on March 31, 2016, March 31, 2017, March 31, 2018, and March 21, 2019, each time listing four backup physicians. ODH granted each of these variances.

87.     On December 20, 2019, PPSWO notified ODH that one of its backup physicians had resigned. As a result, ODH rescinded PPSWO's variance on December 26, 2019. PPSWO contracted with a replacement backup physician on January 8, 2020 (less than 2 weeks later) and submitted a new variance request that same day.

88.     ODH never ruled on PPSWO's January 8, 2020 variance request. Therefore, PPSWO re-filed this variance request 60 days later on March 30, 2020, and again on March 31, 2021 and July 2, 2021.

89.     During this same time period, ODH suspended all licensing action, including renewals and revocations, from March 25, 2020 through July 1, 2021, due to the COVID-19 health emergency.

90.     On August 23, 2021, ODH requested additional information from PPSWO regarding its back-up physicians including information about their admitting privileges, the distance between their practices and PPSWO, and their board certifications. On August 25, 2021, PPSWO responded to ODH's request for additional information. On August 30, 2021, ODH granted PPSWO's July 2, 2021 variance request for the 2021 renewal period, which was consolidated with all other pending variance requests.

91.     Because of the Public Hospital Ban, PPSWO is unable to obtain a WTA and will instead continue to be forced to go through the annual process of applying for a variance from ODH.  PPSWO is constantly at risk of losing, or being unable to renew, its variance if one of its backup doctors resigns or succumbs to anti-abortion harassment, or if ODH suddenly imposes another arbitrary and medically unnecessary requirement.

**F.  WMGPC's ASF Licensing History**

92.     WMGPC and its predecessors have been providing reproductive health services to women in the Dayton, Ohio area since 1975. In October 2002, after losing its legal challenge to ODH's decision to classify abortion clinics as ASFs, WMCD applied for an ASF license. The application met the requirement for a license in all respects. WMCD had entered into a WTA with Miami Valley Hospital in October 2002. However, the following month, Miami Valley Hospital rescinded the WTA after pressure from a Board member who did not want the hospital

to be associated with an abortion clinic. While the application was pending, WMCD requested a waiver of the WTA Requirement since it had all medically necessary protocols in place for admitting patients to a hospital in an emergency and non-emergency situation. WMCD met all the other requirements for an ASF license. Nonetheless, in January 2003, ODH denied WMCD's waiver request and ASF license application and issued a cease and desist order requiring the clinic to close immediately. Litigation over ODH's actions ensued. *See Women's Med. Prof'l Corp v. Baird*, 438 F.3d 595, 603 (6th Cir. 2006); *Women's Med. Prof'l Corp v. Baird*, SDOH Case No. 2:03-cv-162.

93.     In 2008, WMCD applied for a WTA variance. At that time, WTAs were only required by regulation. ODH granted WMCD's variance request based on WMCD's hospital transfer protocol and relationship with backup physicians who could admit a WMCD patient to a local hospital.

94.     Since ODH started requiring the filing of variance applications on an annual basis, WMCD has diligently applied for variances each year.

95.     WMCD filed its annual license renewal application and variance application for 2015 on July 24, 2015.

96.     On September 25, 2015, after this litigation was filed and a mere four days before the Automatic Suspension Provision was scheduled to go into effect, ODH denied WMCD's variance application. Although WMCD listed three backup doctors in its variance application, as discussed above, ODH now arbitrarily requires four. WMCD was not able to successfully reapply for a variance until 2019 because, until then, it had been unable to find a fourth backup doctor to list on the variance application.

97.     From 2015 to October of 2019, WMCD was able to stay open and continue providing services while it sought administrative review of ODH's denial of its 2015 variance application.

98.     While administrative review of ODH's denial of WMCD's 2015 variance application was pending, it diligently searched for a fourth backup doctor. In June of 2019, it found one when a local physician became eligible to serve as a backup physician due to a change in employment.

99.     WMCD submitted its application for license renewal, including a variance request listing four backup doctors, on July 25, 2019.

100.     On August 27, 2019, WMCD applied for a new license, supported by a complete variance application listing four backup doctors, under the trade name Women's Med Dayton (WMD) so that, in the event it did not prevail in the administrative process, it would be able to provide uninterrupted services.

101.     On September 23, 2019, fifty-nine days after WMCD filed a variance request listing four backup doctors as part of its license renewal application, ODH rejected the renewal application and declined to rule on the variance request. ODH deemed the application "no longer relevant." In the same letter, ODH informed WMCD it would "promptly" rule on the new license application and variance request that had been filed by WMD on August 27, 2019.

102.      On October 25, 2019, exactly sixty days after it was filed, ODH approved the variance request that was part of the new license application, but did not issue a new license.

103.     October 29, 2019, WMCD exhausted its administrative remedies, thus finalizing the revocation of its license.

26

104.     Having lost the license under which it had been providing safe, legal care and unable to obtain a new license despite meeting every requirement, including ODH's arbitrary four backup physician rule, WMCD was forced to abruptly stop providing surgical abortion services on October 29, 2019.[13]

105.     Despite being aware the license WMCD had been operating under had been revoked and that WMD's application, including a variance that had been granted days earlier, was pending, ODH delayed issuing the new license. As a result, WMCD was unable to provide any patients with surgical care for two weeks.

106.     ODH received notice on November 12, 2019 that ODH issued WMD a new license effective November 5, 2019.

107.     From March 25, 2020 through July 1, 2021, ODH suspended all licensing action, including renewals and revocations, due to the COVID-19 health emergency. As a result, WMD is currently operating under the license issued in 2019.

108.     On September 14, 2020, WMD submitted its annual license renewal application for 2021, which included a variance request listing four backup doctors.

109.     Even though the variance request included four backup doctors who each had admitting privileges at a local hospital and met all of the Statutory Variance Requirements, ODH denied WMD's variance request on August 30, 2021. In the letter explaining the denial, ODH claimed that two of the four listed backup doctors were not qualified. According to ODH, one was disqualified, even though she had been accepted as a backup doctor before, because she was

---

[13] Recognizing that the loss of its current ASF license was imminent and ODH would not imminently issue a new license, WMCD moved for emergency relief from this court so that no patients would be denied care. That request was ultimately denied as moot when WMD obtained a new license.

not an OBGYN, but rather a general surgeon, and the other physician was disqualified because he lacked hospital staff voting rights.

110.    The two physicians who were disqualified by ODH are more than capable of caring for WMD patients in the rare event that hospital care is needed.

111.    As described above, ODH's four backup physician requirement is an arbitrary, unjustifiable, and medically unnecessary requirement. The additional arbitrary requirements of OBGYN specialization or staff voting privileges—neither of which has anything to do with a physician's ability or willingness to admit or treat Plaintiff's patients in the rare event that a complication necessitates urgent hospital care—further illustrates and exacerbates these problems.

112.    In a letter August 30, 2021, ODH informed WMD it proposed to revoke WMD's ASF license.

113.    On September 13, 2021 WMD submitted a new variance request and simultaneous request that ODH reconsider the August 30 variance denial, explaining (1) that the non-OBGYN was a general surgeon who is well-qualified to treat WMD's patients, and OBGYN specialization was neither medically necessary nor legally required; and (2) staff voting rights have nothing to do with a doctor's qualifications or ability to admit or treat patients at the hospital where they have admitting privileges. WMD further informed ODH that the doctor who lacked voting rights had acquired them in August 2021.

114.    On November 12, 2021, ODH notified WMD that it would not reconsider its decision on the variance and denied the variance request WMD submitted on September 13, 2021. While the Director agrees that his objection based on one backup doctor's lack of voting

rights is no longer an issue, ODH continues to maintain that the general surgeon is not an acceptable backup doctor.

115.    On October 13, 2021, WMD's filed its annual ASF license renewal application for 2022, which includes a variance request. That application is pending with ODH.

116.     On December 1, 2021, WMD submitted a new variance request to ODH. The latest variance request lists four backup doctors, all of whom are OBGYNs with voting rights at the hospitals at which they have admitting privileges.

117.    WMD requested a hearing on the proposed license revocation decision on September 20, 2021. Because action on the license is stayed until all administrative remedies are exhausted, WMD is able to continue providing surgical abortion services as it seeks an administrative remedy for this arbitrary revocation.

### i.    LRSC Licensing History

118.    WMCD's affiliated clinic in Sharonville, LRSC,[14] however, has already been forced to cease providing surgical abortion services because of the WTA Requirement and ODH's refusal to grant LRSC's variance application. After the rule change requiring ASFs to apply for a variance annually, ODH refused to approve LRSC's application for a renewal of its variance and instead took actions to revoke LRSC's ASF license.

119.    Moreover, because of the Public Hospital Ban, LRSC was unable to obtain a WTA with any public hospital in Cincinnati. As a public hospital, UCMC was compelled by law to arbitrarily and discriminatorily deny a WTA to LRSC because LRSC is an abortion provider. The decision to deny a WTA was dictated by the State and was not based on any medical or

---

[14] Both WMCD and LRSC are operated by Plaintiff Women's Med Group Professional Corporation ("WMGPC").

professional discretion or judgment. UCMC specifically referenced the Public Hospital Ban as the reason for its inability to enter into a WTA with LRSC. In a letter dated August 5, 2013, UCMC denied LRSC's request for a WTA, stating that HB 59 prohibits it from entering into a WTA with LRSC: "Due to recent changes in Ohio law and the ownership and leasehold interests of the City of Cincinnati and the University in [UCMC], we are not able to execute and provide the transfer agreement you requested."

120.     ODH formally denied LRSC's variance request, and LRSC was forced to cease providing surgical abortions, making PPSWO the only remaining surgical abortion provider in Cincinnati. In 2017, LRSC closed entirely.

**G. The Threat to Abortion Access in Ohio**

121.     The WTA Requirement, the Statutory Variance Requirements, the Public Hospital Ban, the Automatic Suspension Provision, and ODH's arbitrary enforcement of these requirements together threaten to decimate abortion access in Ohio.

122.     If the Automatic Suspension Provision is allowed to take effect, the last two remaining surgical abortion providers in Southwest Ohio will be at risk of immediate shutdown any time they have an application  or variance pending in front of ODH or if they lose a backup doctor , causing Plaintiffs, their staff, and their patients irreparable injury from exposure to penalties, denial of abortion services, closure of the ASFs, suspension of their ASF licenses, loss of income, and inability to provide or receive comprehensive reproductive health care.

123.     But for the Public Hospital Ban, PPSWO would have the opportunity to obtain a WTA with UCMC, and—if successful—would neither be required to apply for a yearly variance, nor be subjected to the Automatic Suspension Provision.

124.     If PPSWO and WMD are forced to shut down their ASFs because of their inability to meet the WTA Requirement, the women of Southwest Ohio, including patients with

already scheduled procedures at PPSWO and WMD, will be forced to seek surgical abortions elsewhere, and to travel hundreds of miles in order to access care.

125.    Medication abortion is available in Ohio, but must be accessed in the first ten weeks of pregnancy LMP. Therefore, if Plaintiffs were forced to close their ASFs, all forms of abortion for women past 10 weeks LMP would be unavailable in Southwest Ohio. Moreover, medication abortion is contraindicated for some women, and other women strongly prefer surgical abortion over medication abortion. These women will all be forced to seek surgical abortion services outside of Southwest Ohio.

126.    If the PPSWO ASF is forced to close, Cincinnati will be the largest metropolitan area in the entire United States without a surgical abortion provider. As of the 2020 Census, the Cincinnati metropolitan area had a population of over 2.2 million residents, making it the largest metropolitan area in all of Ohio.

127.    If WMD is forced to close, Dayton will be left without any surgical abortion providers. As of the 2020 Census, the Dayton metropolitan area had a population of over 814,000 residents.

128.    If Plaintiffs are forced to shut down their ASFs, any woman who would have sought a surgical abortion at these clinics will have to travel to another city outside of Southwest Ohio to obtain an abortion—and will need to make that trip at least twice because of a state law that requires two trips to the clinic (the first for counseling and an ultrasound, and the second visit, at least 24 hours later, for the abortion). The next closest clinic in Ohio outside of Southwest Ohio is located in Columbus, approximately 220 miles round-trip from Cincinnati, and 150 miles round-trip from Dayton.

129.    That clinic, Planned Parenthood of Greater Ohio's clinic in Columbus performs surgical abortions through 17 weeks 6 days LMP, currently has an approximately three week wait for abortion appointments, and cannot accommodate these additional patients from Southwest Ohio. While there was formerly another clinic located in Columbus, Founder's Women's Health Center, that clinic closed in the summer of 2020.

130.    The next closest abortion clinic in Ohio is located in Toledo—300 miles round-trip from Dayton. This clinic, Capital Care Network of Toledo, previously provided surgical abortion, but currently provides only medication abortion up to 9 weeks 6 days and, in any case, lacks capacity to absorb 5,500 annual patients from PPSWO and WMD.

131.    Prior to closure or reduction of service, Founder's Women's Health Center's and Capital Care Network of Toledo's ability to provide surgical abortion care was precarious. Because they could not obtain a WTA with a non-public hospital in Ohio or a variance from the WTA requirement, both had difficulty maintaining an ASF license.

132.    Those patients Plaintiffs treat who are over 17 weeks 6 days LMP and everyone unable to access care in Columbus would have to travel to Cleveland to obtain an abortion. Those patients who are unable to obtain abortions in Columbus because of the lack of providers and/or wait time in that city will also be forced to travel to the Cleveland metropolitan area. Cleveland is approximately 502 miles round trip from Cincinnati and 438 miles round-trip from Dayton.  Akron, which is part of the Cleveland metropolitan area, is 464 miles round-trip from Cincinnati and 390 miles round-trip from Dayton.

133.    Due to significant delays in scheduling an abortion because of the reduced availability of abortion providers in Ohio, women will face significant and possibly dangerous delays. For other women, the additional travel required to obtain an abortion at one of the few

remaining providers in Ohio will increase costs and delay the abortion. Although abortion is one of the safest surgical procedures, the risk of complications (as well as the cost of the procedure) increases as the pregnancy advances.

134. Given that the vast majority of Plaintiffs' patients are low-income, the increased costs, travel, and delays will make it impossible for a large fraction of women to obtain an abortion.

135. Women seeking abortions after 17 weeks 6 days LMP would have to make a minimum of three trips to Cleveland. The final two visits must be on back to back days, thus requiring out of town patients to stay overnight in a hotel. Given the number of Plaintiffs' patients who seek abortions after 17 weeks 6 days, the increased costs, travel and delays will make it extremely difficult, if not impossible for a significant number of women to obtain an abortion past 17 weeks 6 days LMP.

136. If the Automatic Suspension Provision is allowed to take effect, and if (1) ODH denies a clinic's pending variance application, or (2) ODH fails to act on a clinic's variance application that has been pending for 60 days, those clinics will be forced to shut their doors immediately, without any opportunity for a hearing either pre- or post- license suspension.

137. Shutting down Plaintiffs' ASFs will jeopardize women's health and deprive women of their constitutionally protected right to obtain a pre-viability abortion.

## V.     CLAIMS FOR RELIEF – 42 U.S.C. § 1983

### COUNT I
### (Due Process Nondelegation – Plaintiffs – WTA Requirement)

138. The allegations of paragraphs 1 through 137 are incorporated as though fully set forth herein.

139.    The WTA Requirement, ODH's arbitrary enforcement thereof, and the Public Hospital Ban violate Plaintiffs' due process rights under the Fourteenth Amendment to the United States Constitution by delegating standardless and unreviewable authority to private parties (hospitals and potential backup doctors) and by employing a constitutionally insufficient variance process.

**COUNT II**
**(Procedural Due Process – Plaintiffs – Automatic Suspension Provision)**

140.    The allegations of paragraphs 1 through 137 are incorporated as though fully set forth herein.

141.    The Automatic Suspension Provision violates the right to procedural due process secured to Plaintiffs by the due process clause of the Fourteenth Amendment to the United States Constitution. The Automatic Suspension Provision deprives Plaintiffs of their protected property interests without affording them any procedural protections.

**COUNT III**

**(Procedural Due Process – Plaintiffs – Fair Notice)**

142.    The allegations of paragraphs 1 through 137 are incorporated as though fully set forth herein.

143.    The WTA Requirement, and ODH's arbitrary enforcement thereof, violates Plaintiffs' procedural due process rights secured by the due process clause of the Fourteenth Amendment to the United States Constitution by threatening to deprive Plaintiffs of their protected property interests without affording them fair notice of what the law requires and adequate procedural protections.

**VI.    PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court:

34

A.      Issue a declaratory judgment that Ohio Rev. Code Ann. § 3702.303, Ohio Rev. Code Ann. § 3702.304, and Ohio Admin. Code § 3701-83-19(E) (collectively, the WTA Requirement) are unconstitutional facially and as applied to PPSWO and WMGPC;

B.      Issue a permanent injunction against Defendant Vanderhoff and all those acting in concert with him from enforcing the WTA Requirement and/or any of its parts, or, in the alternative an injunction preventing Defendant from enforcing of these requirements in an arbitrary manner;

C.      Issue a declaratory judgment that Ohio Rev. Code Ann. § 3727.60 (the Public Hospital Ban) is unconstitutional facially and as applied to PPSWO and WMGPC;

D.      Issue a permanent injunction against Defendant Vanderhoff and all those acting in concert with him from enforcing the Public Hospital Ban;

E.      Issue a declaratory judgment that Ohio Rev. Code Ann. § 3702.309 (the Automatic Suspension Provision) is unconstitutional facially and as applied to PPSWO and WMGPC.

F.      Issue a preliminary and permanent injunction against Defendant Hodges and all those acting in concert with him from enforcing the Automatic Suspension Provision;

G.      Award to Plaintiffs reasonable costs, expenses, and attorney fees;

H.      Award such other and further relief as this Court shall deem just and reasonable.

Respectfully submitted,

/s/ B. Jessie Hill

CARRIE Y. FLAXMAN
JULIE MURRAY
Planned Parenthood Federation of America
1110 Vermont Avenue, NW, Suite 300
Washington, DC 20005
(202) 973-4800
(202) 296-3480 (fax)
carrie.flaxman@ppfa.org
julie.murray@ppfa.org
*Admitted Pro Hac Vice*

*Co-counsel for Plaintiff Planned Parenthood
Southwest Ohio Region and Planned
Parenthood of Greater Ohio*

FREDA J. LEVENSON #0045916
ACLU of Ohio Foundation, Inc.
4506 Chester Avenue
Cleveland, OH 44103
(216) 472-2220
(216) 472-2210 (fax)
flevenson@acluohio.org
*Counsel for Plaintiff Planned Parenthood
Southwest Ohio Region and Plaintiff
Women's Med Group Professional
Corporation*

B. JESSIE HILL #0074770
*Trial Attorney for Plaintiffs*
Cooperating Counsel for the ACLU of
Ohio
Case Western Reserve Univ., School of
Law
11075 East Boulevard
Cleveland, Ohio 44106
(216) 368-0553
(216) 368-2086 (fax)
bjh11@cwru.edu

*Counsel for Plaintiff Planned
Parenthood Southwest Ohio Region
and Plaintiff Women's Med Group*

RUTH E. HARTMAN #0078860
MICHAEL E. MUMFORD #0073931
BAKER HOSTETLER LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200
(216) 696-0740 (fax)
mmumford@bakerlaw.com
rhartman@bakerlaw.com

*Counsel for Plaintiff Women's Med
Group Professional Corporation*

JULIA KAYE
ELIZABETH WATSON
RACHEL REEVES
BRIGITTE AMIRI
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 284-7358
(212) 549-2651 (fax)
jkaye@aclu.org
ewatson@aclu.org
rreeves@aclu.org
bamiri@aclu.org

36

*Admitted Pro Hac Vice*
*Of-Counsel for Plaintiff Women's Med*
*Group Professional Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 28, 2022, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail and email upon all parties for whom counsel has note entered an appearance electronically.

/s/ B. Jessie Hill
*Attorney for Plaintiffs*