UNITED STATES DISTRICT COURT

**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **PLANNED PARENTHOOD** | **:** | **Case No. 1:15-cv-568** |
| **SOUTHWEST OHIO REGION,** *et al.,* | **:** | |
| | **:** | |
| | **:** | |
| *Plaintiffs,* | **:** | **Judge Michael R. Barrett** |
| **vs.** | **:** | |
| | **:** | |
| | **:** | |
| **BRUCE T. VANDERHOFF, M.D.** | **:** | |
| In his official capacity as the Director of the Ohio Department of Health | **:** | |
| | | |
| *Defendant.* | | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STATUTORY FRAMEWORK ......................................................................................... 2

STATEMENT OF UNDISPUTED FACTS..................................................................... 6

    I.       PLAINTIFFS AND THEIR PRACTICES........................................................ 6

          A.    Plaintiffs' Variance Applications and ODH's Responses ........................ 7

          B.    Plaintiff PPSWO's Licensing History ..................................................... 8

          C.    Plaintiff WMGPC's Licensing History ................................................. 11

          D.    Abortion Safety. ..................................................................................... 14

ARGUMENT..................................................................................................................... 15

The Written Transfer Agreement ("WTA") Requirement, Ohio Rev. Code Ann. § 3702.303, the Public Hospital Ban, Ohio Rev. Code Ann. § 3727.60, and the Automatic Suspension Provision, Ohio Rev. Code Ann. § 3702.309(A), violate Plaintiffs' due process rights under the Fourteenth Amendment of the United States Constitution as a matter of law.

    I.       SUMMARY JUDGMENT STANDARD......................................................... 15

A movant is entitled to summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *France v. Lucas*, 836 F.3d 612, 624 (6th Cir. 2016); Fed. R. Civ. P. 56(a).

    II.      THE CHALLENGED LICENSING REQUIREMENTS ARE
           UNCONSTITUTIONAL AS A MATTER OF LAW UNDER
           THE RIGHT TO DUE PROCESS.................................................................. 15

          A.    The Automatic Suspension Provision Violates Procedural
                Due Process.............................................................................................. 16

The Fourteenth Amendment prohibits the government from taking away protected life, liberty, or property interests without providing adequate procedural rights before the deprivation. U.S. Const. Amend. XIV, § 1; *Wedgewood Ltd. P'ship I v. Twp. of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010). The Automatic Suspension Provision allows the Ohio Department of Health ("ODH") to automatically divest Plaintiffs of their constitutionally protected interests in the continued operations of their Ambulatory Surgical Facilities ("ASFs") and the continued possession of their licenses, *Women's Medical Professional Corp. v. Baird*, 438 F.3d 595 (6th Cir. 2006); *Johnson v. Morales*, 946 F.3d 911, 921, 937 (6th Cir. 2020), requiring immediate closure of Plaintiffs' ASFs. The Automatic Suspension Provision thus empowers ODH to immediately deprive Plaintiffs of constitutionally protected property interests without any pre-deprivation opportunity to respond or challenge the deprivation, in violation of their constitutional due process rights. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

B.     ODH's Arbitrary Enforcement Actions Violate Procedural Due Process by Depriving Plaintiffs of Their Property Interests Without Fair Notice. .................................................................. 20

A procedural due process violation occurs when the government fails to provide sufficient notice of conduct that is forbidden or required. *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). ODH has arbitrarily and systematically sought to deny Plaintiffs their constitutionally protected property and liberty interests based on requirements that are announced only *after* the denial, depriving Plaintiffs of fair notice and providing no opportunity to comply. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).

C.     The WTA Requirement and Public Hospital Ban Unconstitutionally Delegate Licensing Authority to Private Parties. ....................................... 23

Delegating arbitrary and unreviewable authority and discretion over protected liberty and property interests to private parties violates the Fourteenth Amendment guarantee of due process. *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Rice v. Vill. of Johnstown*, 30 F.4th 584, 590-91 (6th Cir. 2022). The WTA Requirement and the Public Hospital ban improperly delegate the determination of Plaintiffs' property rights in their respective licenses to private physicians and/or private hospitals with unreviewable and standardless discretion—discretion that the State itself cannot exercise. Such a delegation violates Plaintiffs' due process rights.

**CONCLUSION** .......................................................................................................................... **27**

## **INTRODUCTION**

The State of Ohio has undertaken a deliberate campaign to eliminate access to abortion care in Ohio, including through repeated assaults on the last two ambulatory surgical facilities that perform abortions in Southwest Ohio and their ability to operate. This campaign has taken many forms but has notably included imposing an onerous, medically unnecessary requirement that Ambulatory Surgical Facilities ("ASFs"), including those providing procedural abortions, maintain a written transfer agreement ("WTA") with a local hospital, or otherwise obtain a variance from that requirement, which involves meeting Defendant Ohio Department of Health's ("ODH") arbitrary, constantly changing, and surprise demands ("WTA Requirement").

Plaintiffs have a protected property interest in both the continued operation of their facilities and the continued possession of their ASF licenses. In violation of Plaintiffs' constitutional right to procedural due process, the Automatic Suspension Provision challenged in this case empowers ODH to suspend Plaintiffs' licenses automatically upon the denial of their variance applications or if ODH simply fails to act upon Plaintiffs' applications within 60 days. Ohio Rev. Code Ann. §§ 3702.309(A), 3702.304(A)(2) ("Automatic Suspension Provision"). These suspensions require immediate closure of Plaintiffs' clinics with no pre-deprivation or post-deprivation review.[1] These shifting requirements deprive Plaintiffs of their due process rights, ensuring that they have no meaningful opportunity to comply with new and arbitrary requirements.

---

[1] The administrative process does not provide any meaningful post-deprivation review, as it does not allow for substantive review of the variance denial, "which shall be final." Ohio Admin. Code 3701-83-14(F); Ohio Rev. Code Ann. §3702.304(A) and (C); *Women's Med Ctr. of Dayton v. Dep't of Health*, 2019-Ohio-1146, ¶¶ 54-55 (holding that variance denials are not judicially reviewable under Ohio law).

1

Lastly, Ohio law forbids public hospitals enter into WTAs with abortion clinics (but not other ASFs). Ohio Rev. Code Ann. § 3727.60 ("Public Hospital Ban"). The WTA Requirement and the Public Hospital Ban function together to unconstitutionally delegate unreviewable authority to private parties to grant or deny Plaintiffs' ASF licenses. Private hospitals and physicians may decide not to enter into a WTA agreement with Plaintiffs for any reason, or no reason whatsoever. With no statutory standards to provide procedural safeguards, this delegation of power over Plaintiffs' ASF licenses gives private actors veto power to determine who may or may not provide abortions.

The undisputed evidence proves that the Automatic Suspension Provision, WTA Requirement, and Public Hospital Ban violate Plaintiffs' due process rights under the Fourteenth Amendment to the United States Constitution as a matter of law. Defendants have presented no evidence to the contrary, nor can they. There is no genuine issue of material fact, and Plaintiffs are entitled to summary judgment on their claims: Count I: Due Process Nondelegation – WTA Requirement; Count II: Procedural Due Process – Automatic Suspension Provision; Count III: Procedural Due Process – Fair Notice. Pls.' Third Am. Compl. for Decl. and Inj, Relief at ¶¶ 138-43. (Apr. 28, 2022), ECF No. 177 ("Compl.").

## STATUTORY FRAMEWORK

ODH requires clinics that provide procedural abortion to maintain an ASF license. Ohio Rev. Code Ann. § 3702.30(E)(1). To maintain an ASF license, a clinic must either have a WTA with a local hospital "for transfer of patients in the event of medical complications, emergency situations, and for other needs as they arise" or be granted a variance from that requirement by the Director of ODH. Ohio Rev. Code Ann. § 3702.303; Ohio Admin. Code 3701-83-19(E). Not a single ASF in Ohio has needed to apply for a WTA variance, except for abortion providers.

2

Compl. at ¶ 37; Def. Bruce Vanderhoff's Answer to Pls.' Third Am. Compl. at ¶ 37, (May 12, 2022), ECF No. 181 ("Answer"); *see also* Dep. of Shannon Richey, 268:3-6, ECF No. 1309 ("Richey Dep.").

For many years, this requirement was imposed by administrative rule, and ODH could grant either a "waiver" or a "variance" from the WTA rule to ASFs that provided procedural abortions—just as it could for any of the other regulatory rules for ASFs. On various occasions, the agency did just that, granting variances from the rule to those clinics that could demonstrate that they met the requirement "in an alternative manner." Ohio Admin. Code 3701-83-14(C); Richey Dep., 186:2-190:7. In 2006, the Sixth Circuit upheld the administrative rule requiring a WTA as applied to Plaintiff WMGPC because at that time ODH could grant a waiver *or* variance of the requirement. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 610 (6th Cir. 2006).

In 2013, as a part of the biennial budget bill, Substitute Amended House Bill 59 of the 130th General Assembly ("HB 59"), the Ohio legislature enacted three new provisions that made it difficult or impossible for abortion clinics—the only ASFs already struggling to comply with the WTA rule—to maintain their licenses. First, HB 59 codified the requirement to have a WTA and eliminated the Director's discretion to grant a "waiver" of the administrative rule, but retained the Director's discretion with respect to variances. Ohio Rev. Code Ann. § 3702.303. Second, HB 59 established a new, onerous application process that applies only to ASFs seeking WTA variances (which, in practice, is only abortion clinics), distinct from the ordinary regulatory process that applies to all other types of variance applications. Ohio Rev. Code Ann. § 3702.304(A)-(B) ("Statutory Variance Requirements"). Finally, HB 59 banned abortion clinics from obtaining the necessary WTA from any "public hospital," Ohio Rev. Code Ann. § 3727.60(A)(4) ("Public Hospital Ban"). At the same time, the Public Hospital Ban also

3

prohibited physicians with staff membership or professional privileges at a public hospital "to use that membership or those privileges as a substitution for, or alternative to, a written transfer agreement for purposes of a variance application" for an ASF that performs abortions. Ohio Rev. Code Ann. § 3727.60(B)(2). The ban applies only to clinics that provide abortions and does not apply to any other ASFs in the state.

Because of HB 59, a WTA "waiver" is no longer available, and the ODH Director may grant a "variance" only if an applicant submits a "complete variance application" that contains agreements with consulting physicians possessing admitting privileges at a minimum of one local hospital (but not a public hospital), and verification that this hospital has been informed of the physician's agreement with the abortion clinic, and that the physician has committed to providing backup coverage for the abortion clinic when necessary.[2]

---

[2] Ohio Rev. Code Ann. § 3702.304 contains several additional requirements for a variance application, including:
(a) A signed statement in which the physician attests to all of the following:
(i) The physician actively practices clinical medicine within a twenty-five mile radius of the facility.
(ii) The physician is familiar with the facility and its operations.
(iii) The physician agrees to provide notice to the facility of any changes in the physician's ability to provide back-up coverage.
(b) The estimated travel time from the physician's main residence or office to each local hospital where the physician has admitting privileges;
(c) Written verification that the facility has a record of the name, telephone numbers, and practice specialties of the physician;
(d) Written verification from the state medical board that the physician possesses a valid license to practice medicine and surgery or osteopathic medicine and surgery issued under Chapter 4731. of the Revised Code;
(e) Documented verification that each hospital at which the physician has admitting privileges has been informed in writing by the physician that the physician is a consulting physician for the ambulatory surgical facility and has agreed to provide back-up coverage for the facility when medical care beyond the care the facility can provide is necessary.
(4) A copy of the facility's operating procedures or protocols that, at a minimum, do all of the following:
(a) Address how back-up coverage by consulting physicians is to occur, including how back-up coverage is to occur when consulting physicians are temporarily unavailable;
(b) Specify that each consulting physician is required to notify the facility, without delay, when the physician is unable to expeditiously admit patients to a local hospital and provide for continuity of patient care;
(c) Specify that a patient's medical record maintained by the facility must be transferred contemporaneously with the patient when the patient is transferred from the facility to a hospital.

In addition, 3702.304 allows ODH to require the variance application to provide "[a]ny other information the director considers necessary." 3704.304(B)(5).

In 2015, as part of the biennial omnibus budget measure, the Ohio Legislature enacted House Bill 64 of the 131st General Assembly ("HB 64"). HB 64 immediately and automatically suspends an ASF's license (1) if ODH fails to act on a WTA variance application within 60 days, or (2) if ODH denies the ASF's request for a variance pursuant to Ohio Rev. Code Ann. § 3702.304(A). Ohio Rev. Code Ann. § 3702.309(A) ("Automatic Suspension Provision"). Again, because abortion clinics are the only ASFs seeking WTA variances, HB 64 functionally singles out abortion clinics.

If an ASF were to provide procedural abortion services without a license, ODH could take action against it, including imposing civil penalties between one thousand and two hundred and fifty thousand dollars and/or imposing daily civil penalties between one thousand and ten thousand dollars for each day that the ASF operates without a license. Ohio Admin. Code 3701-83-05.1(A); Ohio Rev. Code Ann. § 3702.32(A). Thus, abortion providers whose licenses are suspended as a result of the Automatic Suspension Provision will be forced to cease providing procedural abortion services immediately, without any notice to providers, staff, or patients, and without even affording them an opportunity for a pre-deprivation hearing.

Providers are not only denied a pre-deprivation hearing—they are also denied any post-deprivation hearing rights. While HB 64 indicates that a provider's license could be reinstated pursuant to an order issued in accordance with Chapter 119 of the Revised Code, Ohio Rev. Code Ann. § 3702.309(A)(3), an abortion provider will in fact have no right to appeal the basis for this deprivation under Chapter 119. Because the variance itself is unappealable, the underlying reason leading to the variance denial, and therefore the license suspension, evades review. Ohio Admin. Code 3701-83-14(F) ("the refusal of the director to grant a variance or waiver, in whole or in part, shall be final and shall not be construed as creating any rights to a

5

hearing under Chapter 119 of the Revised Code"); Ohio Rev. Code Ann. § 3702.304(A) and (C); *see also Women's Med Center of Dayton v. Dep't of Health*, 133 N.E.3d 1047, ¶ 55 (Ohio Ct. App. 2019) ("Since WMCD did not have a WTA or a variance from the requirement to have one, ODH was entitled to '[r]evoke, suspend, or refuse to renew the license' pursuant to Ohio [law]."). Moreover, the automatic suspension of a license does not trigger any right to appeal under Chapter 119 because the automatic suspension does not qualify as an agency "adjudication" under Ohio Rev. Code Ann. § 119.06. An "adjudication" does not include "acts of a ministerial nature," Ohio Rev. Code Ann. §119.01(D), such as the automatic suspension of an abortion provider's license following a variance denial. Consequently, an abortion provider has no opportunity to appeal the suspension of its ASF license either pre- or post- deprivation.

This Court preliminarily enjoined the Automatic Suspension Provision on October 13, 2015, holding that Plaintiff PPSWO had established a likelihood of success on the merits of its claim that the Provision constituted an unconstitutional deprivation of its Fourteenth Amendment right to due process. Op. & Order at 17, (Oct. 13, 2015), ECF No. 28 ("ASP PI Op.").

## STATEMENT OF UNDISPUTED FACTS

### I. PLAINTIFFS AND THEIR PRACTICES

Plaintiff Planned Parenthood Southwest Ohio ("PPSWO") is a non-profit corporation organized under the laws of the State of Ohio. Decl. Jerry H. Lawson Supp. Pls' Mot. Prelim. Inj. ¶ 3, ECF No. 3-1 ("Lawson Decl."). PPSWO provides a broad range of medical services at seven health centers in Southwest Ohio. *Id.* ¶¶ 3-4. PPSWO operates an ASF in Cincinnati, Ohio, where it provides procedural and medication abortion up to the current legal limit, which is approximately six weeks in pregnancy. *See Preterm-Cleveland v. Yost*, No: 1:19-cv-00360 (S.D. Ohio July 7, 2022) (order granting motion to dismiss). In the past, PPSWO provided abortions

6

through 21 weeks and 6 days of pregnancy as dated from the first day of the patient's last menstrual period ("LMP") and provided approximately 3,000 abortions a year. Lawson Decl. ¶ 5.

Plaintiff Women's Medical Group Professional Corporation ("WMGPC") owns and operates the ASF currently known as Women's Med Dayton in Kettering, Ohio. Second Decl. W.M. Martin Haskell, M.D., Supp. Pls.' Mot. TRO & Prelim. Inj. ¶ 1, ECF No. 137-3 ("Second Haskell Decl."). It formerly operated under the name Women's Med Center of Dayton ("WMCD"). Decl. W.M. Martin Haskell, M.D., Supp. Pls.' Mot. Prelim. Inj. ¶ 7, ECF No. 3-2 ("Haskell Decl."). WMGPC and its predecessors have been providing abortions in the Dayton area since 1973. *Id.* ¶ 3. WMGPC provides a range of reproductive health care, including abortion up to the current legal limit, which is approximately six weeks in pregnancy. *See Preterm-Cleveland v. Yost*, No: 1:19-cv-00360 (S.D. Ohio July 7, 2022) (order granting motion to dismiss). In the past, WMGPC provided approximately 2,800 abortions per year through 21 weeks 6 days of pregnancy LMP. Second Haskell Decl. ¶ 6. Until 2017, WMGPC also operated a clinic in Sharonville, Ohio, called Lebanon Road Surgery Center ("LRSC"). *Id.* ¶ 7. Because it had no WTA and could not obtain a variance, that clinic ceased providing procedural abortions in 2014 and closed completely three years later. Haskell Decl. ¶ 31; Second Haskell Decl. ¶¶ 7, 31-33.

## A.    Plaintiffs' Variance Applications and ODH's Responses

According to the Ohio Revised Code, to obtain a variance from the WTA requirement, a clinic must have, among other things, a written agreement with at least one backup doctor who has admitting privileges at a local hospital and who can provide "[d]ocumented verification that each hospital at which the physician has admitting privileges has been informed in writing by the

physician that the physician is a consulting physician for the [ASF] and has agreed to provide back-up coverage." Ohio Rev. Code Ann. § 3702.304. ODH has expanded the scope of the current statutes and regulations governing licensing by adding requirements that abortion clinics seeking a variance have at least four backup doctors, all of whom must be obstetrician/gynecologists ("OBGYNs") and have voting privileges at their hospital—requirements that ODH announced only upon denying variance applications and without prior notice to the ASFs. Compl. ¶ 109; Answer ¶ 109.

**B.    Plaintiff PPSWO's Licensing History**

Since being informed by ODH that its provision of abortion services qualified it as an ASF, PPSWO has operated with an ASF license and has sought to comply with the WTA Requirement. Lawson Decl. ¶ 7. Initially, PPSWO maintained a WTA with University of Cincinnati Medical Center ("UCMC"). *Id.* ¶ 8. In 2013, UCMC terminated its WTA with PPSWO as required by the Public Hospital Ban. *Id.* ¶¶ 9-10. Prior to the expiration of the WTA with UCMC and pursuant to HB 59, PPSWO applied for a WTA variance. *Id.* at 12. The application included contracts with several backup physicians with admitting privileges at a local hospital who agreed to provide care to PPSWO's patients, as well as a patient hospital transfer policy to assure ODH that PPSWO provides continuous care to any patient who requires transfer to a hospital. *Id.* ¶¶ 12-13. Though PPSWO's variance application had been pending with ODH, on October 14, 2014, ODH informed PPSWO that it did not comply with the ASF licensing requirements because it lacked a WTA in a letter that threatened to revoke PPSWO's license. *Id.* ¶¶ 16-17. Because of ODH's threatened revocation of PPSWO's ASF license and PPSWO's exposure to substantial civil penalties, PPSWO filed litigation in this Court seeking to enjoin ODH from taking actions to revoke its ASF license. Compl. for Decl. & Inj. Relief, *Planned*

*Parenthood Southwest Ohio Region v. Hodges*, No. 1:14-cv-867 (S.D. Ohio Nov. 10, 2014) ("*Hodges I*"), ECF No. 1. ODH subsequently granted PPSWO's variance request on November 20, 2014, through May 31, 2015, and the litigation was dismissed without prejudice. Compl. ¶ 74; Answer ¶ 74; Notice of Voluntary Dismissal Without Prejudice, *Hodges I*, ECF No. 13.

On September 25, 2015, after this litigation was filed and a mere four days before the Automatic Suspension Provision was set to go into effect, Defendant Hodges denied PPSWO's 2015 variance request and proposed to revoke and not renew PPSWO's ASF license. Second Decl. Jerry H. Lawson Supp. Pls.' Mot. Prelim. Inj. ¶ 3, ECF No. 24-1 ("Second Lawson Decl."). The variance denial states that "PPSWO's provision of only three named backup physicians does not meet [the ODH Director's] expectation that a variance provide the same level of patient health and safety that a written transfer agreement with a local hospital assures for 24/7 backup coverage." Second Lawson Decl. Ex. B. The denial further notes that the prior variance that ODH granted to PPSWO was based on "backup agreements with four named physicians." *Id.* As a result, Defendant Hodges' denial of the variance appeared to require PPSWO to add a fourth backup doctor to its variance request. ODH had never before informed PPSWO that four backup doctors were required, Second Lawson Decl. ¶ 5, and this requirement is found nowhere in the relevant statutes or regulations.

Indeed, PPSWO had previously been granted a WTA variance from ODH with only three backup doctors. After the Public Hospital Ban in HB 59 caused UCMC to terminate its WTA with PPSWO, PPSWO requested a variance for 2013 and named three backup doctors in its application. Second Lawson Decl. ¶ 5. ODH granted it. In 2014, PPSWO added a fourth backup doctor to its variance request, but when one of the four doctors resigned, PPSWO immediately notified ODH of the resignation, and ODH never objected to that change. *Id.*

9

On September 28, 2015, PPSWO submitted a new variance request to ODH adding a fourth backup doctor. *Id.* ¶¶ 6-7. On September 29, 2015, HB 64 became effective, *Id.* ¶ 8, but because of this Court's Temporary Restraining Order and subsequent Preliminary Injunction, the Automatic Suspension Provision is currently enjoined. ECF Nos. 25, 28. ODH granted PPSWO's variance request listing four backup physicians on November 27, 2015. Compl. ¶ 85; Answer ¶ 85. PPSWO continued to submit timely variance requests in compliance with Ohio law. Compl. ¶ 86; Answer ¶ 86. From March 25, 2020, through July 1, 2021, ODH suspended all licensing action, including removals and revocations of ASF licenses, due to the COVID-19 health emergency. Compl. ¶ 89; Answer ¶ 89. On August 30, 2021, ODH granted PPSWO's variance request. Letter from Def. Vanderhoff to Pl. PPSWO (Aug. 30, 2021), attached as exhibit No. 1.

On December 22, 2021, the Ohio legislature passed SB 157, which was set to take effect on March 23, 2022. Ohio Rev. Code Ann. § 3702.305. SB 157 prohibits physicians who are employed by or compensated pursuant to a contract with, and provide instruction or consultation to, a medical school associated with a state university or college and those who teach or provide instruction, directly or indirectly, at a medical school affiliated with a state university or college from serving as backup physicians in support of a variance. On February 23, 2022, ODH sent a letter to PPSWO requesting that it demonstrate compliance with SB 157, even though the statute's effective date was March 23, 2022, and the statute granted ASFs an additional 90 days—until June 21, 2022—to demonstrate compliance to ODH. Letter from James Hodge to Pl. PPSWO (Feb. 23, 2022), attached as exhibit No. 2. The premature enforcement and the additional arbitrary and irrational requirements of SB 157 are the subject of ongoing litigation in Ohio state court and are not the subject of this federal litigation. The state court enjoined enforcement of SB 157, allowing Plaintiffs to continue providing procedural abortion. *Women's*

10

*Med. Group Prof'l Corp v. Vanderhoff*, No. A 2200704 (Hamilton Ct. Com. Pl. June 17, 2022)

(entry granting preliminary injunction), attached as exhibit No. 3.

**C.    Plaintiff WMGPC's Licensing History**

In 2008, ODH determined that WMGPC's relationship with two backup physicians who

had admitting privileges at a local hospital satisfied the WTA Requirement "in an alternative

manner," and granted a WTA variance to WMGPC. Second Haskell Decl. ¶ 24. Since ODH

started requiring the filing of variance applications on an annual basis, in 2011, WMGPC has

diligently applied for variances each year. WMGPC continued to operate while its annual

applications remained pending. *Id.* ¶¶ 24, 28. On June 24, 2015, ODH denied WMGPC's 2012,

2013, and 2014 variance applications. Letter from Richard Hodges to Pl. WMGPC (June 25,

2015), attached as exhibit No. 4.

On September 25, 2015, after this litigation was filed—a mere four days before the

Automatic Suspension Provision was scheduled to go into effect—ODH denied WMGPC's 2015

variance application submitted on July 24, 2015, on the basis that although WMGPC listed three

backup doctors on its application, ODH now required four. *Id.* ¶ 37. From September 2015 to

October of 2019, WMGPC was able to stay open and continue providing services while it sought

administrative review of ODH's denial of its 2015 variance application. *Id.* ¶ 40. WMGPC was

not able to successfully reapply for a variance until 2019 because, until then, it had been unable

to find a fourth backup doctor to list on the variance application. *Id.* ¶¶ 41-42.

On September 23, 2019, sixty days after WMGPC filed a variance request

listing four backup doctors as part of its license renewal application, ODH rejected the renewal

application and declined to rule on the variance request. Fourth Decl. W.M. Martin Haskell,

M.D., Supp. Pls.' Mot. TRO & Prelim. Inj. ¶ 7, ECF No. 140-3 ("Fourth Haskell Decl."). ODH

deemed the application "no longer relevant" because the original license revocation had been

upheld by the Ohio Supreme Court. *Id.* ¶ 8. In the same letter, ODH informed WMGPC it would

"promptly" rule on WMGPC's new license application and variance request that had been filed

on August 27, 2019. *Id.* On October 25, 2019, exactly sixty days after it was filed, ODH

approved the variance request that was part of the new license application but did not issue a new

license to WMGPC. *Id.* ¶ 12. On October 29, 2019, the Ohio Supreme Court denied WMGPC's

motion for reconsideration, thus finalizing the revocation of WMGPC's license. Fifth Decl.

W.M. Martin Haskell, M.D., Supp. Pls.' Mot. TRO & Prelim. Inj. ¶ 2, ECF No. 143 ("Fifth

Haskell Decl.").

      Having lost the license under which it had been providing safe abortion care, and

unable to obtain a new license despite meeting every requirement (including ODH's

four-backup-physician rule), WMGPC was forced to abruptly stop providing procedural abortion

services on October 29, 2019. *Id.* ¶ 3. ODH did not issue a new license until November 12, 2019,

Compl. ¶ 106, Answer ¶ 106, though ODH was aware the license WMGPC had been operating

under had been revoked and that WMGPC's application, including a variance that had been

granted days earlier, was pending. Fifth Haskell Decl. ¶¶ 2-8. As a result, WMGPC was unable

to provide any patients with procedural abortion care for two weeks. Compl. ¶¶ 104-106.

      From March 25, 2020, through July 1, 2021, ODH suspended all licensing action,

including renewals and revocations, due to the COVID-19 health emergency. WMGPC is

currently operating under the license issued in 2019. Compl. ¶ 107; Answer ¶ 107.

      On September 14, 2020, WMGPC submitted its annual license renewal application

for 2021 that included four backup doctors listed on the variance request. Compl. ¶ 108; Answer

¶ 108. Even though the variance request included four backup doctors who each had admitting

privileges at a local hospital and met all of the Statutory Variance Requirements, ODH denied WMGPC's variance request on August 30, 2021. Compl. ¶ 109; Answer ¶ 109. In the letter explaining the denial, ODH claimed that two of the four listed backup doctors were not qualified. Letter from Def. to Pl. WMGPC (Aug. 30, 2021), attached as exhibit No. 5. According to ODH, one was disqualified (even though she had previously been accepted as a backup doctor), because she was a general surgeon rather than an OBGYN. *Id.* The other physician was disqualified because he lacked hospital staff voting rights. *Id.*

On September 13, 2021, WMGPC submitted a new variance request and a simultaneous request that ODH reconsider the August 30 variance denial, Compl. ¶ 113; Answer ¶ 113, explaining (1) that the non-OBGYN was a general surgeon who is well-qualified to treat WMGPC's patients, and OBGYN specialization was neither medically necessary nor legally required; and (2) staff voting rights have nothing to do with a doctor's qualifications or ability to admit or treat patients at the hospital where they have admitting privileges. Pl. WMGPC Request for Variance to the Hosp. Transfer Agreement Requirement (Sep. 13, 2021), attached as exhibit No. 6. WMGPC further informed ODH that the doctor who lacked voting rights had acquired them in August 2021. *Id.* ODH notified WMGPC that it would not reconsider its decision on the variance and denied the renewed variance request WMGPC submitted on September 13, 2021. Compl. ¶ 114; Answer ¶ 114. While the Director agreed that his objection based on one backup doctor's lack of voting rights was no longer an issue, ODH continued to maintain that the previously accepted general surgeon was not an acceptable backup doctor. *Id.*

WMGPC requested a hearing on the proposed license revocation decision on September 20, 2021. Compl. ¶ 117; Answer ¶ 117. On November 30, 2021, WMGPC submitted a new variance request to ODH. Compl. ¶ 116; Answer ¶ 116. The latest variance request lists four

backup doctors, all of whom are OBGYNs with voting rights at the hospitals at which they have admitting privileges. Pl. WMGPC Request for Variance to the Hosp. Transfer Agreement Requirement (Nov. 30, 2021), attached as exhibit No. 7.

In support of its November 2021 license application, WMGPC submitted a variance request to ODH on November 30, 2021, that met all of ODH's requirements. *Id.* On January 28, 2022, WMGPC received a letter from ODH denying the November 30, 2021, variance application, citing noncompliance with SB 157. Letter from D. Vanderhoff to Pl. WMGPC (Jan. 28, 2022), attached as exhibit No. 8. WMGPC continues to provide procedural abortions because SB 157 was preliminarily enjoined by the Hamilton County Court of Common Pleas. *Women's Med. Group Prof'l Corp v. Vanderhoff*, exhibit No. 2.

## D.    Abortion Safety

Abortion is very safe and is much safer than giving birth. Second Haskell Decl. ¶ 12; Lawson Decl. ¶ 6; Decl. Paula J. Hillard, M.D. ¶¶ 10, 15, ECF No. 137-5 ("Hillard Decl."). Because abortion is so safe, the vast majority of abortions, including the abortions provided by Plaintiffs, are provided in an outpatient setting. Hillard Decl. ¶ 17; Second Haskell Decl. ¶ 12; Lawson Decl. ¶ 6. Complications rarely occur, and complications requiring hospital-based care are even more unlikely to occur. Hillard Dec. ¶¶ 13-14, 18-19; Second Haskell Decl. ¶¶ 12-13. Plaintiffs' policies and procedures ensure that a patient will receive the best available care as quickly as possible. Haskell Decl. ¶ 13; Second Haskell Decl. ¶ 16; Hillard Decl. ¶¶ 24-28. Furthermore, in the event a complication requiring hospital care does occur, the federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd(b), requires hospitals to stabilize all emergency patients, establishing a pre-existing legal duty for the hospital to treat

patients suffering from an abortion-related complication unless transfer to another facility is indicated.

## ARGUMENT

### I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *France v. Lucas*, 836 F.3d 612, 624 (6th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). While the court must view the relevant facts and inferences in the light most favorable to the nonmoving party, *see Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012), "the mere existence of *some* alleged factual dispute . . . will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

### II. THE CHALLENGED LICENSING REQUIREMENTS ARE UNCONSTITUTIONAL AS A MATTER OF LAW UNDER THE RIGHT TO DUE PROCESS

The undisputed evidence shows that the WTA Requirement, the Public Hospital Ban, and the Automatic Suspension Provision violate Plaintiffs' due process rights under the Fourteenth Amendment of the United States Constitution as a matter of law. Plaintiffs have constitutionally protected property and liberty interests in the continued operation of their facilities and the continued possession of their licenses. The Automatic Suspension Provision, by allowing ODH to immediately suspend an ASF's business operations upon the denial of, or ODH's inaction on, a variance application deprives Plaintiffs of their protected interests without pre-deprivation or post-deprivation review. Plaintiffs' due process rights have been further infringed upon by

15

ODH's practice of announcing new and arbitrary WTA variance requirements after Plaintiffs have submitted their applications. With no opportunity to comply, Plaintiffs are deprived of their liberty and property rights without fair notice and without constitutionally sufficient process. Additionally, in conjunction with the Public Hospital Ban, the WTA Requirement impermissibly delegates unreviewable and standardless authority to private parties over Plaintiffs' licenses and continued operation.

## A. The Automatic Suspension Provision Violates Procedural Due Process.

To establish a procedural due process claim, a plaintiff must show "(1) that it had a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that it was deprived of that protected interest within the meaning of the due process clause; and (3) that the state did not afford it adequate procedural rights before depriving it of its protected interest." *Wedgewood Ltd. P'ship I v. Twp. of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). The undisputed facts show that Plaintiffs meet all three of these of these elements and that the Automatic Suspension Provision clearly violates Plaintiffs' procedural due process rights.

First, as this Court recognized when granting Plaintiff PPSWO's motion for a preliminary injunction, the procedural due process analysis in this case is nearly identical to that in *Women's Medical Professional Corp. v. Baird*, 438 F.3d 595 (6th Cir. 2006). There, the Sixth Circuit held that ODH violated Plaintiff WMGPC's right to procedural due process by abruptly denying its ASF license, forcing the clinic to shut down immediately without an opportunity for pre-deprivation review. *Baird*, 438 F.3d at 613. The Supreme Court has made clear that "the root requirement" of the Due Process Clause is that generally "an individual [must] be given an opportunity for a hearing before he is deprived of any significant property interest." *Cleveland*

16

*Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (internal quotation marks omitted).

Following this clear precedent, the Sixth Circuit held that "[t]he case law contemplates at a

minimum some chance to react to proposed governmental action before deprivation occurs."

*Baird*, 438 F.3d at 614 (citing *Loudermill*, 470 U.S. at 547). ODH provided no such opportunity,

and its actions were held unconstitutional. *Id.* at 613.

As this Court has already held, the same is true here. ASP PI Op. 9-12. This is a purely

legal matter—the Automatic Suspension Provision permits ODH to suspend Plaintiffs' licenses

automatically and shut down their ASFs immediately without providing the opportunity for any

pre-deprivation, or even post-deprivation, hearing. *Id.* at 5-6, 9. Under Sixth Circuit and Supreme

Court precedent, the Automatic Suspension Provision cannot withstand constitutional scrutiny.

Indeed, as both this Court and the Sixth Circuit have agreed, the precedents of the United

States Supreme Court, Sixth Circuit, and Ohio Supreme Court all recognize that Plaintiffs

maintain a protected property interest in both the continued operation of their ASFs and the

continued possession of their licenses. *See Baird*, 438 F.3d at 611-612 ("Due process protects an

interest in the continued operation of an existing business," and Dr. Haskell and WMGPC "have

a protected property interest in the continued operation of the Dayton clinic."); ASP PI Op. 7-8

(PPSWO's "property interest plainly exists in the continued operation of its ASF" and "PPSWO

also has a protected property interest in its ASF license because PPSWO previously has obtained

and currently has a valid license for operation pursuant to Ohio Rev. Code Ann. § 3702.304 and

will be unable to operate its business without it under the new Ohio statutory scheme." (citing,

*inter alia*, *Bell v. Burson*, 402 U.S. 535, 539 (1971)). *See also Johnson v. Morales*, 946 F.3d 911,

921, 937 (6th Cir. 2020) (relying on Supreme Court precedent that "has long recognized that an

individual may have a significant interest in maintaining a license," and the "Court has

17

repeatedly recognized the severity of depriving someone of his or her livelihood.") (internal quotation marks omitted); *Brookpark Entm't, Inc. v. Taft*, 951 F.2d 710, 716 (6th Cir. 1991); *Hillside Prods., Inc. v. Duchane*, 249 F. Supp. 2d 880, 897 (E.D. Mich. 2003) (collecting cases); *State v. Hochhausler*, 668 N.E.2d 457, 463 (Ohio 1996).

It is well established, even outside of the abortion and ASF contexts, that the suspension of a license infringes on the license-holder's protected property interests. *See, e.g.*, *Mackey v. Montrym*, 443 U.S. 1, 10 n.7 (1979) ("the Due Process Clause applies to a state's suspension or revocation of a driver's license"); *Burson*, 402 U.S. at 539 ("Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees."); *Morales*, 946 F.3d at 923 ("In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment."); *O'Daniel v. Ohio State Racing Comm'n*, 307 N.E.2d 529, 533 (Ohio 1974) (finding that suspension of a horse trainer's license deprives the licensee of a protected property interest).

Applying the second prong of the due process analysis, the automatic suspension of Plaintiffs' ASF licenses and the forced closure of their ASFs serve to deprive Plaintiffs of these protected interests under the Due Process Clause. *See* ASP PI Op. 8. Again, *Baird* is instructive here. In that case, ODH issued a cease-and-desist order requiring WMGPC to shut down immediately after denying WMGPC's license. The Sixth Circuit held that this order deprived Dr. Haskell of his protected interests in operating his business. *Baird*, 438 F.3d at 612. Like ODH's activity in *Baird*, the Automatic Suspension Provision will also force Plaintiffs to immediately close their ASFs upon the denial of their variance applications. This immediate action is required whether ODH denies these applications explicitly or by inaction in the form of failing to act upon these applications within 60 days. Once an ASF's license is suspended, an

18

ASF must cease operations immediately. Ohio Rev. Code Ann. § 3702.30(E)(1); Ohio Admin. Code 3701-83-03(A). The Automatic Suspension Provision thus empowers ODH to immediately deprive Plaintiffs of their protected interests based on an arbitrary variance denial or even simply a failure to act. Finally, as this Court recognized, the automatic suspension of Plaintiffs' ASF licenses and subsequent forced closures of Plaintiffs' ASFs do not afford Plaintiffs adequate pre-deprivation process. ASP PI Op. 9-11.[3]

Third and finally, the Due Process Clause requires an opportunity for a hearing "before the individual is deprived of any significant property interest." *Loudermill*, 470 U.S. at 542. These pre-deprivation hearings require more than the opportunity to be heard; they must provide an opportunity to *respond* to the specific basis for the proposed action that will result in the deprivation of the protected interests. *Id.* at 542-46. *See also Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 789, 800 (6th Cir. 2018) (clarifying that notice of the factual basis for deprivation and opportunity to rebut those assertions constitute the minimum level of process required for any property interest).

*Baird* also noted this requirement and the lack of a pre-deprivation hearing here. Plaintiffs' opportunity to present variance applications to the ODH Director cannot "be appropriately characterized as an opportunity to be heard and respond" because "the case law contemplates as a minimum some chance to react to the proposed governmental action before deprivation occurs." *Baird*, 438 F.3d at 614; *see* ASP PI Op. 9; *Johnson v. City of Saginaw*, 980

---

[3] If Plaintiffs were to continue operating and providing procedural abortion services at their ASFs without a license, ODH could take action against them, including imposing civil penalties between $1,000 and $250,000 and/or imposing daily civil penalties between $1,000 and $10,000 for each day that the ASF operates. Ohio Admin. Code 3701-83-05.1(A); Ohio Rev. Code Ann. § 3702.32 (A); *see Baird*, 438 F.3d at 613 (noting that ODH threatened to "impose a civil penalty for operating without a license as well as additional penalties for each day that the clinic continued operating" if the clinic did not immediately shut down). Plaintiffs would have no choice but to cease operations immediately.

F.3d 497, 510-11 (6th Cir. 2020) (finding a violation of procedural due process where the City ceased providing water service prior to a deprivation hearing).

The variance process provides no opportunity to respond to Defendants' decision, which automatically triggers the suspension of Plaintiffs' licenses based on the ODH Director's unreviewable decision on the variance application, which—as noted below—is often based on standards for which Plaintiffs have no prior notice. The Automatic Suspension Provision, and the challenged scheme as a whole, provide Plaintiffs with no opportunity to respond prior to the deprivation of the interests.[4] For these reasons, as this Court has previously held, the Automatic Suspension Provision violates Plaintiffs' procedural due process rights as a matter of law. No facts have been developed to change this Court's prior finding.

**B.      ODH's Arbitrary Enforcement Actions Violate Procedural Due Process by Depriving Plaintiffs of Their Property Interests Without Fair Notice.**

As discussed at *supra* Section II.A, to establish a procedural due process claim, a plaintiff must show that it has a protected interest, has been deprived of that interest, and the State's procedures in depriving it of its interest do not comport with due process. *Wedgewood Ltd.*

---

[4] Any argument that Defendants can meet constitutional requirements with a post-deprivation hearing is foreclosed as a matter of law. Notice and a pre-deprivation hearing are required except for those "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) (internal quotation marks omitted); *see also Morales*, 946 F.3d at 921 ("the failure to provide a pre-deprivation hearing does not violate due process in situations where a government official reasonably believed that immediate action was necessary to eliminate an emergency situation and the government provided adequate post-deprivation process." (quoting *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 486 (6th Cir. 2014))); *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 240 (1988) (denial of pre-deprivation hearing warranted in only "limited cases demanding prompt action" where the government offers "substantial assurance that the deprivation is not baseless or unwarranted" and where a post-deprivation hearing is available). Here, just as in *Baird*, Plaintiffs' "interest in continuing to operate [their] business[es] is strong," and ODH can fully anticipate the property deprivation and need for pre-deprivation hearing. *Baird*, 438 F.3d at 614. In requiring pre-deprivation process under the same requirement challenged here, *Baird* forecloses an argument that the Automatic Suspension Provision is justified in denying pre-deprivation hearing because of any health and safety justification. *See also* PI ASP Op. 15 (in evaluating the justification for the Automatic Suspension Provision, "the connection to health and safety is tenuous."). And in any event, as explained above, *supra* Section II.A, no substantive post-deprivation review is afforded to Plaintiffs after the denial of their variance applications, either.

*P'ship I*, 610 F.3d at 349; *Sullivan*, 526 U.S. at 59. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Providing no opportunity to comply with new requirements deprives Plaintiffs of fair notice and constitutes a procedural due process violation. *See Campbell v. Bennett*, 212 F. Supp. 2d 1339, 1343 (M.D. Ala. 2002) ("[A]ny law that requires you to do something by a certain date must give you adequate time to do it; otherwise, the law would be irrational and arbitrary for compliance with it would be impossible."). ODH has repeatedly denied Plaintiffs' variance applications for Plaintiffs' failure to meet arbitrary requirements invented by ODH only *after* the submission of their respective applications, providing Plaintiffs no meaningful opportunity to comply. By continually moving the goal posts, repeatedly denying variances based on newly minted requirements not contained in any statute or regulation, ODH deprives Plaintiffs of fair notice of what is required to obtain a variance. The undisputed facts show that Plaintiffs meet all three elements of a procedural due process claim and that the ODH's ongoing practice of arbitrary enforcement of the WTA Requirement, and specifically of the variance application process, violates Plaintiffs' procedural due process rights.

As previously established, there is no question that Plaintiffs have protected property interests in both the continued operation of their ASFs and the continued possession of a license. *See supra* Section II.A. By repeatedly imposing new, arbitrary requirements for variance applications only after Plaintiffs have submitted their applications, ODH strips Plaintiffs of any meaningful ability to comply with the WTA Requirement under the threat of automatic license suspension. The inability of Plaintiffs to continue operating their ASFs and providing procedural

abortion care clearly constitutes a deprivation of Plaintiff's protected property and liberty interests. *Id.*

Finally, by continually inventing new deficiencies in Plaintiffs' applications, including by rejecting back-up physicians previously deemed acceptable, changing the number of required back-up physicians, and basing denials on the requirements of a law not yet in effect, Defendant seeks to eviscerate Plaintiffs' protected interests without any pre-deprivation procedural protections. Defendant can point to no justification for such severe and unreasonable actions. Although "due process is flexible and calls for such procedural protections as the particular situation demands," *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976), providing *no* opportunity for a party to learn of and ensure compliance with new requirements before depriving that party of its protected interests is a constitutional violation. *See Campbell*, 212 F. Supp. 2d at 1343; *Van Hollen*, 738 F.3d at 789; *United States v. Dumas*, 94 F.3d 286, 291 & n.3 (7th Cir. 1996). ODH's erratic and arbitrary process imposes new requirements on Plaintiffs with no corresponding opportunity to comply, depriving Plaintiffs of protected interests not simply with inadequate process but with *no* process, and no notice, whatsoever. *Hallmark Clinic, v. N.C. Dep't of Hum. Res.*, 380 F. Supp. 1153, 1158 (E.D.N.C. 1974) ("due process cannot tolerate a licensing system that makes the privilege of doing business dependent on official whim").

Courts have not hesitated to find a due process violation under these circumstances. *See* Tr. of TRO Hr'g at 40:16-19, *Hodes & Nauser, MD's, P.A. v. Moser*, No. 11-2365-CM (D. Kan. July 1, 2011), attached hereto as exhibit No. 9 (granting preliminary injunction against enforcement of facility licensing requirements and stating that "[t]he right to pursue a lawful business has long been recognized as a property right within the protection of the Fourteenth Amendment."); *Baird*, 438 F.3d at 611-13 (holding that immediate shut-down of abortion

provider's practice violated procedural due process, notwithstanding the availability of post-deprivation remedies); *cf. Planned Parenthood of Kan. & Mid-Mo. Inc. v. Drummond*, No. 07-4164-CV-C-ODS, 2007 WL 2669089 (W.D. Mo. Sept. 6, 2007) (issuing temporary restraining order to ensure adequate time for plaintiffs to work out compliance issues with defendants). ODH's systematic and arbitrary changes to the WTA Requirements violate Plaintiffs' procedural due process rights and cannot stand.

**C.** **The WTA Requirement and Public Hospital Ban Unconstitutionally Delegate Licensing Authority to Private Parties.**

Plaintiffs' due process rights are further violated by the State's delegation of authority over the clinics' professional licenses to private actors through the WTA Statute and Public Hospital Ban. A long line of precedent holds that delegating arbitrary and unreviewable authority and discretion to determine protected liberty and property interests—discretion that the State itself cannot exercise—to private parties violates due process. *See, e.g.*, *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Wash. ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 121-22 (1928); *Eubank v. Richmond*, 226 U.S. 137, 143-45 (1912); *Rice v. Vill. of Johnstown*, 30 F.4th 584, 590-91 (6th Cir. 2022) (explaining that the private nondelegation doctrine remains vital and applies when there is a deprivation of "life, liberty, or property," a delegation of governmental authority to third parties, "little or no guidance" given to the delegee, and where there is reason for "particular concern about the delegee's self-interest."); *id.* (collecting cases).

Plaintiffs' property rights in their respective licenses are being determined by private hospitals and physicians who have unreviewable institutional and individual discretion to either enter into agreements with the clinic (thus making Plaintiffs eligible for a license) or not (thus making it impossible for Plaintiffs to secure a license). Richey Dep. 204:24-205:7. Because of the Public Hospital Ban, Plaintiffs are categorically prevented from entering into agreements

23

with public hospitals in Ohio. Therefore, to remain in compliance with the Public Hospital Ban and satisfy the WTA requirement, Plaintiffs may only obtain or retain their licenses by entering agreements with private physicians and/or a private hospital. Defendant has previously conceded that "there is no . . . evidence" of any conditions or standards that Ohio hospitals have adopted to determine whether they will enter into a WTA. Def.'s Resp. Opp'n to Pl.'s Mot. for TRO &/or Prelim. Inj. 24-25, ECF No. 139. Indeed, this court has characterized hospitals as having "unfettered power to decide whether or not to enter into an agreement." Op. & Order 8, ECF No. 57; *see also id.* ("Ohio has no power over hospitals to direct them as to how to respond to requests for written transfer agreements . . . ." (quoting *Baird*, 438 F.3d at 609)). Moreover, the only way to get a variance from the WTA Statute is to defer to a different private actor, a backup physician, whose decision is also constrained by no standards under Ohio law, except for statutes that limit the pool of doctors who can serve in that role. *See* Ohio Rev. Code Ann. § 3727.60(B)(2) (limiting doctors with admitting privileges at a public hospital from serving as a backup physician for an abortion clinic); Ohio Rev. Code Ann. § 3702.305 (limiting physicians who provide instruction, directly or indirectly, at a medical school or osteopathic medical school affiliated with a state university or college).

In effect, these laws work in tandem to ensure that Plaintiffs' eligibility for licenses is exclusively dependent upon private actors. At the same time, Ohio law provides no standards to guide or restrict the exercise of discretion by the hospitals or physicians considering whether to enter into agreements with clinics providing procedural abortion. Thus, the WTA Requirement and Public Hospital Ban delegate unreviewable authority and discretion over Plaintiffs' protected liberty and property interests—discretion that the State itself cannot exercise. In light of the

24

undisputed facts, this is plainly an unconstitutional delegation of government power, and this scheme violates nondelegation doctrine as a matter of law.

Federal circuit courts have affirmed lower courts' proper application of the nondelegation precedent to invalidate similar state laws that effectively gave private hospitals a veto over who may provide abortions. *Birth Control Ctrs., Inc. v. Reizen*, 508 F. Supp. 1366, 1375 (E.D. Mich. 1981) (holding that "[t]he power to prohibit licensure may not constitutionally be placed in the hands of hospitals"), *aff'd in part, vacated in part on other grounds*, 743 F.2d 352 (6th Cir. 1984); *Hallmark Clinic*, 380 F. Supp. at 1158-59 (holding that North Carolina could not confer on hospitals "the arbitrary power to veto the performance of abortions" by withholding transfer agreements or denying staff privileges), *aff'd*, 519 F.2d 1315 (4th Cir. 1975); *see also Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 996-97 (2015) (holding that the state cannot impose an admitting privileges requirement "through third parties, at least in the admitted absence of a waiver or some other mechanism to ensure due process"). Consistent with nondelegation principles, courts have held that delegating a veto function to a private party without any legitimate standards to guide their decisions, or a waiver, or other due process mechanism, constituted an unlawful delegation to a private party. *See Reizen*, 508 F. Supp. at 1374-75; *Van Hollen*, 94 F. Supp. 3d at 996-97; *Hallmark Clinic*, 380 F. Supp. at 1158-59. The fact that this standardless delegation "applies to all [ASFs], rather than only to abortion clinics does not change the result." *Reizen*, 508 F. Supp. at 1374-75.

By eliminating the possibility of a waiver, leaving only the variance provision in place, HB 59 rendered *Baird*'s analysis inapt here. Under current law, the discretion over Plaintiffs' licenses lies with private hospitals or private physicians, not ODH. The *Baird* decision hinged on the fact that ODH "make[s] the final decision about whether ASFs obtain a license." 438 F.3d at

610. This is no longer the case. HB 59 sets out a number of specific requirements for obtaining a variance. This includes a requirement—which did not appear in the regulation that existed at the time of *Baird*—that a clinic have a relationship with "one or more consulting physicians who have admitting privileges at a minimum of one local hospital[.]" *See* Ohio Rev. Code Ann. § 3702.304. Thus, while the Director retains arbitrary discretion to *deny* a variance (even if the variance application meets all the statutory requirements), the Director's discretion can only apply to a variance where there is at least one backup physician agreement.

Furthermore, hospitals retain a large amount of power in determining whether a clinic will be able to obtain an agreement with a backup physician. Under the statute, an application for a variance must include, among other things, "[a] letter, contract, or memorandum of understanding signed by the facility and one or more consulting physicians who have admitting privileges at a minimum of one local hospital, memorializing the physician or physicians' agreement to provide back-up coverage when medical care beyond the level the facility can provide is necessary[.]" *Id.* § 3702.304(B)(2). Each backup agreement must include "[d]ocumented verification that each hospital at which the physician has admitting privileges has been informed in writing by the physician that the physician is a consulting physician for the [ASF] and has agreed to provide back-up coverage for the facility when medical care beyond the care the facility can provide is necessary." *Id.* § 3702.304(B)(3)(e). This verification requirement, in effect, enables hospitals to exercise their authority over physicians and prevent them from serving as backup doctors. Additionally, Ohio law prohibits physicians with admitting privileges at public hospitals from entering into backup agreements with abortion clinics. *See id.* § 3727.60. In effect, the law requires hospital approval for an individual to serve as a backup

doctor; without such approval, the ODH Director lacks authority to approve a variance application.

Thus, not only does the hospital hold veto power over whether a clinic can meet the WTA Requirement, it also holds veto power over whether a clinic will be able to obtain a variance. Through the WTA Requirement and Public Hospital Ban, the State has thus delegated final, unreviewable, and unfettered authority to private parties to determine whether an abortion provider is entitled to an ASF license. Such an unlawful delegation violates the Plaintiffs' due process rights, and summary judgment is warranted.

## CONCLUSION

For all of the foregoing reasons, this Court should grant Plaintiffs' motion for summary judgment as to: Count I (Due Process Nondelegation – WTA Requirement); Count II (Procedural Due Process – Automatic Suspension Provision); and Count III (Procedural Due Process – Fair Notice).

Respectfully submitted,

/s/ B. Jessie Hill

CARRIE Y. FLAXMAN
Planned Parenthood Federation of America
1110 Vermont Avenue, NW, Suite 300
Washington, DC 20005
(202) 973-4800
(202) 296-3480 (fax)
carrie.flaxman@ppfa.org
*Admitted Pro Hac Vice*
*Co-counsel for Plaintiff Planned Parenthood*
*Southwest Ohio Region*

MELISSA COHEN
Planned Parenthood Federation of America

B. JESSIE HILL #0074770
*Trial Attorney for Plaintiffs*
Cooperating Counsel for the ACLU of Ohio
Case Western Reserve Univ., School of Law
11075 East Boulevard
Cleveland, Ohio 44106
(216) 368-0553
(216) 368-2086 (fax)
bjh11@cwru.edu
*Counsel for Plaintiff Planned*
*Parenthood Southwest Ohio Region*

123 William Street, Floor 9
New York, NY 10038
Telephone: (212) 541-7800
Fax: (212) 247-6811
melissa.cohen@ppfa.org
*Admitted Pro Hac Vice*
*Co-counsel for Plaintiff Planned Parenthood*
*Southwest Ohio Region*

FREDA J. LEVENSON #0045916
ACLU of Ohio Foundation, Inc.
4506 Chester Avenue
Cleveland, OH 44103
(216) 472-2220
(216) 472-2210 (fax)
flevenson@acluohio.org
*Counsel for Plaintiff Planned Parenthood*
*Southwest Ohio Region and Plaintiff*
*Women's Med. Group Professional*
*Corporation*

*and Plaintiff Women's Med. Group*
*Professional Corporation*

RACHEL REEVES
BRIGITTE AMIRI
KYLA EASTLING*
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 284-7358
(212) 549-2651 (fax)
rreeves@aclu.org
bamiri@aclu.org
keastling@aclu.org
*Admitted Pro Hac Vice*
*\*Admission for Pro Hac Vice*
*forthcoming*
*Of-Counsel for Plaintiff Women's Med.*
*Group Professional Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 29, 2022, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail and email upon all parties for whom counsel has not entered an appearance electronically.

<u>/s/ B. Jessie Hill</u>

*Attorney for Plaintiffs*