**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

PLANNED PARENTHOOD        :
SOUTHWEST OHIO REGION, *et al.*,   :
                                           :
             *Plaintiffs*,           :    **Case No. 1:15-cv-568**
                                           :
              v.                 :    **JUDGE MICHAEL R. BARRETT**
                                           :
BRUCE T. VANDERHOFF, M.D.        :
In his official capacity as Director of the   :
Ohio Department of Health            :
                                           :
            *Defendant*.           :

---

**DEFENDANT BRUCE VANDERHOFF'S OMNIBUS MOTION FOR SUMMARY
JUDGMENT AND MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

---

Now comes Defendant Vanderhoff and hereby moves this Court to grant him judgment as

a matter of law pursuant to Federal Rule of Civil Procedure 56(a). The reasons for this combined

Motion and Opposition are set forth in the attached Memorandum.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Amanda Narog*

Amanda Narog (0093954)*
 *Lead and Trial Counsel*
Heather L. Buchanan (0083032)
Andrew D. McCartney (0099853)
Assistant Attorneys General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
Amanda.Narog@OhioAGO.gov
Heather.Buchanan@OhioAGO.gov

Andrew.McCartney@OhioAGO.gov

*Counsel for Defendant Director Bruce Vanderhoff*

## TABLE OF CONTENTS

**INTRODUCTION** ......................................................................................................... 1

**STATUTORY FRAMEWORK** ........................................................................................ 6

**RELEVANT FACTS AND PROCEDURAL HISTORY** ............................................. 8

**RESPONSE TO PLAINTIFFS STATEMENT OF FACTS** ........................................11

**LEGAL STANDARD** ................................................................................................. 16

**ARGUMENT** .............................................................................................................. 17

   I.   Plaintiffs Do Not Have A Property Interest in Their ASF Licenses or Their Surgical Abortion ASFs. ............................................................................................. 17

  II.  Plaintiffs Cannot Establish That They Have Been Deprived of a Protected Property Interest Without Due Process, so the Director Is Entitled to Judgment as a Matter of Law. ......... 21

      A.   Plaintiffs Have Failed to Establish That They Have Been Denied Fair Notice Regarding a Protected Property Interest. ................................................................. 21

          i.   *Plaintiffs do not have a protected property interest in receiving a variance from the WTA Requirement.* ................................................................................ 21

          ii.   *Regardless, the Director has not deprived Plaintiffs of any protected property interest without due process.* ...................................................................... 23

      B.   Ohio's Public Hospital Limitation is not an unconstitutional delegation of licensing authority. .................................................................................................................. 25

      C.   The License Suspension Provision does not violate due process. ............................. 27

**CONCLUSION** ........................................................................................................... 30

## TABLE OF AUTHORITIES

### Federal Cases

*Dobbs v. Jackson Women's Health Org.*, ____U.S.____, 142 S.Ct. 2228 (2022) ...................... passim

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) ........................................................ 21, 22

*Cafeteria & Restaurant Workers Union* v. *McElroy*, 367 U.S. 886 (1961) ...................................... 21

*Campbell v. Bennett*, 212 F. Supp. 2d 1339 (M.D. Ala. 2002) ........................................................ 28

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................................. 18

*Doe v. Barron*, 92 F. Supp. 2d 694 (S.D. Ohio 1999) .................................................................... 11

*Durham v. Martin*, No. 21-5099, 2021 U.S. App. LEXIS 34870 (6th Cir. Nov. 23, 2021) ........... 21

*EM Women's Surgical Ctr., P.S.C. v. Friedlander*, 978 F.3d 418 (6th Cir.2020) ........................... 30

*Experimental Holdings, Inc. v. Farris*, 503 F.3d 514 (6th Cir. 2007) .............................................. 22

*Hahn v. Star Bank*, 190 F.3d 708 (6th Cir. 1999) ............................................................................ 33

*Hallmark Clinic v. N.C. Dep't of Human Res.*, 380 F. Supp. 1153 (E.D.N.C. 1974) ...................... 28

*Harris v. McRae*, 448 U.S. 297 (1980) .............................................................................................. 8

*Hodes & Nauser, MDs, P.A. v. Moser,* No. 2:11-cv-02365-CM-KMH, 2012 U.S. Dist. LEXIS 69406

    (D. Kan. May 18, 2012) ............................................................................................................ 29

*Hudson v. PaFlmer*, 468 U.S. 517 (1984) .......................................................................................... 5

*Jefferson v. Jefferson Cnty. Pub. Sch. Sys.*, 360 F.3d 583 (6th Cir. 2004) ........................................ 5

*Leary v. Daeschner*, 228 F.3d 729 (6th Cir. 2000) ........................................................................... 34

*Maher v. Roe*, 432 U.S. 464 (1977) ...................................................................................... 7, 8, 30

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ......................................................................... 20, 21, 35

*Med Corp., Inc. v. City of Lima*, 296 F.3d 404 (6th Cir. 2002) ................................................. 26, 27

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ............................................................................. 20

*Planned Parenthood of Greater Ohio v. Hodges,* 917 F.3d 908 (6th Cir.2019) ....................... 8, 24, 30

*Planned Parenthood of Kan. & Mid-Missouri Inc. v. Drummond*, No. 07-4164-CV-C-ODS, 2007 U.S. Dist. LEXIS 70808 (W.D. Mo. Sep. 24, 2007) ......................................................................... 28

*Planned Parenthood of Southeastern PA v. Casey,* 505 U.S. 883 (1992) ............................... 11, 13, 22

*Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786 (7th Cir. 2013) ................................ 28

*Planned Parenthood SW OH Region v. Hodges*, 138 F. Supp. 3d 948 (S.D. Ohio 2015) ....... 19, 20, 25

*Preterm-Cleveland v. Yost*, No. 1:19-cv-00360 (S.D. Ohio May 15, 2019) ............................. 3, 4, 13

*Proctor v. Krzanowski*, 820 F.App'x 436 (6th Cir.2020) ................................................................. 4

*Ramsey v. Board of Educ.,* 844 F.2d 1268 (6th Cir. 1988) ........................................................ 20, 35

*Roe v. Wade,* 410 U.S. 113 (1973) .......................................................................................... passim

*Rust v. Sullivan*, 500 U.S. 173 (1991) ...................................................................................... 8, 30

*Small v. United States*, 333 F.2d 702 (3d Cir. 1964) ....................................................................... 24

*Smith v. Doe*, No. 1:14-cv-948, 2017 U.S. Dist. LEXIS 28321 (S.D. Ohio Feb. 28, 2017) ............ 19

*United States v. Dumas*, 94 F.3d 286 (7th Cir. 1996) ...................................................................... 28

*United States v. Tropiano*, 418 F.2d 1069 (2d Cir. 1969) ................................................................ 24

*Women's Med. Professional Corp. v. Baird*, 438 F.3d 595 (6th Cir.2006) ............................... passim

*Zinermon v. Burch,* 494 U.S. 113 (1990) ...................................................................................... 19

### State Cases

*State ex rel. Zugravu v. O'Brien*, 130 Ohio St. 23 (1935) ................................................................ 5

*State ex. rel Preterm-Cleveland v. Yost*, No. 2022-0803 (Ohio June 29, 2022) ........................... 4, 14

*State v. Guerrieri*, 20 Ohio App.2d 132 (7th Dist.1969) ................................................................... 2

*State v. Holden*, 28 Ohio Dec. 123 (C.P.1917) .................................................................. 3

*State v. Kruze,* 34 Ohio St.2d 69 (1973) ........................................................................... 2

*State v. Tippie*, 89 Ohio St. 35 (1913) ............................................................................. 3

*Steinberg v. Brown*, 26 Ohio Misc. 77 (N.D. Ohio 1970) ................................................ 2

*WCI, Inc. v. Ohio Liquor Control Comm'n*, 116 Ohio St.3d 547, 2008-Ohio-88 ............. 5

*Women's Med. Grp. Prof. Corp., v. Vanderhoff,* Hamilton Cnty. C.P. No. 2200704 (2022) .......... 31

*Women's Med Ctr. of Dayton v. State Dept. of Health*, 2019-Ohio-1146, 133 N.E.3d 1047 (2d Dist.).

.................................................................................................................................... 6

## Statutes

Ohio Gen. Stat. §111 (1834) ............................................................................................. 2

Ohio Gen. Stat. §111 (1841) ............................................................................................. 2

Ohio Gen. Stat. §112 (1834) ............................................................................................. 2

Ohio Gen. Stat. §112 (1841) ............................................................................................. 2

Ohio Rev. Code §119.06 ............................................................................................. 33, 34

Ohio Rev. Code §119.07 ................................................................................................... 34

Ohio Rev. Code §119.12 ..................................................................................................... 5

Ohio Rev. Code §1919.195 ......................................................................................... 6, 23

Ohio Rev. Code §2317.56 ................................................................................................. 23

Ohio Rev. Code §2901.16 (1972) ....................................................................................... 2

Ohio Rev. Code §2919.10 ................................................................................................. 23

Ohio Rev. Code §2919.121 ............................................................................................... 23

Ohio Rev. Code §2919.123 ........................................................................................... 6, 23

Ohio Rev. Code §2919.17 ........................................................................................ 6, 23

Ohio Rev. Code §2919.192 ........................................................................................ 23

Ohio Rev. Code §2919.195 ........................................................................................ 3, 13

Ohio Rev. Code §2919.201 ........................................................................................ 6, 23

Ohio Rev. Code §3702.30 ........................................................................................ 36

Ohio Rev. Code §3702.3011 ........................................................................................ 7, 9, 27

Ohio Rev. Code §3702.303 ........................................................................................ 7, 8

Ohio Rev. Code §3702.304 ........................................................................................ 7, 9, 26, 31

Ohio Rev. Code §3702.309 ........................................................................................ 10, 32, 33, 36

Ohio Rev. Code §3702.32 ........................................................................................ 32

Ohio Rev. Code §3727.60 ........................................................................................ 6, 7, 8, 10, 23

## Regulations

Ohio Adm. Code §3701-83-14 ........................................................................................ 26

## Rules

Fed. R. Civ. P. 56 ........................................................................................ 19

## Other Authorities

Loren G. Stern, *Abortion: Reform and the Law,* 59 J. Crim. L. Criminology & Police Sci. 84 (1968)

........................................................................................ 2

## MEMORANDUM IN SUPPORT

### INTRODUCTION

This June, the United States Supreme Court definitively overruled *Roe v. Wade,* 410 U.S. 113 (1973), and its progeny, holding that the United States Constitution confers no right to abortion. *Dobbs v. Jackson Women's Health Org.*, \_\_\_\_U.S.\_\_\_\_, 142 S.Ct. 2228 (2022). That decision relieved the federal courts of the legislative task of defining the limits on abortion, returning that authority to the States and the political process.

At issue here is duly enacted Ohio legislation regulating the practice of abortion in Ohio. Plaintiffs argue that "Ohio has undertaken a deliberate campaign to eliminate access to abortion care in Ohio" by "imposing an onerous, medically unnecessary requirement that Ambulatory Surgical Facilities, including those providing procedural abortions, maintain a written transfer agreement with a local hospital, or otherwise obtain a variance from that requirement." Pls.' MSJ, DE 184-1 at PageID 3342 (internal abbreviations omitted). Of course, written transfer agreements are not "medically unnecessary. But even if what they say is true about Ohio's efforts to eliminate abortion, "[t] he Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion." *Dobbs,* 142 S.Ct. at 2284.

Plaintiffs ignore the full import of the *Dobbs* decision. They claim that they "have a protected property interest in both the continued operation of their facilities and the continued possession of their ASF licenses", Pls.'MSJ, DE 184-1 at PageID 3342, but disregard entirely that the Ohio General Assembly may regulate or prohibit abortion without offending the Constitution. Of course, the now overruled substantive right to abortion created by *Roe* invalidated Ohio statutes that made the practice of abortion a crime for almost 150 years. Starting in 1834, Ohio prohibited *all* abortions when it enacted a law declaring that "any attempt to abort a pregnant woman unless

1

necessary to preserve her life, actually or in the opinion of two doctors, to be a misdemeanor." Loren G. Stern, *Abortion: Reform and the Law,* 59 J. Crim. L. Criminology & Police Sci. 84, 85 (1968), (quoting Ohio Gen. Stat. §§111(1), 112 (2) at 252 (1834)). Any attempt after quickening 'with intent thereby to destroy such child' was a high misdemeanor punishable by up to seven years imprisonment." *Id*. From 1834 until *Roe* was decided in 1973, the State *continued* to outlaw abortions. *See* Ohio Gen. Stat. §§111, 112 (1841); Ohio Rev. Code §2901.16 (1972); *see also State v. Kruze,* 34 Ohio St.2d 69, 70 (1973) ("By reason of the holding and mandate of the Supreme Court of the United States in *Roe v. Wade* (1973), 410 U.S. , 35 L. Ed. 2d 147, which we are required to follow, the judgment of the Court of Appeals must be reversed."); *Steinberg v. Brown*, 26 Ohio Misc. 77 (N.D. Ohio 1970); *State v. Guerrieri*, 20 Ohio App.2d 132, 133 (7th Dist.1969); *State v. Holden*, 28 Ohio Dec. 123, 123, 20 Ohio N.P.(n.s.) 200 (C.P.1917); *State v. Tippie*, 89 Ohio St. 35, 39–40 (1913).

Ohio law, both before *Roe* and today, has at all times drastically limited the provision of abortion or banned it outright. Indeed, had *Roe* not required Ohio to allow abortion within the state, plaintiffs may never have been able to perform abortion here, let alone acquire a license for their abortion ASFs. And now that *Dobbs* has returned to the Ohio General Assembly its proper authority to regulate abortion, Ohio's Human Rights and Heartbeat Protection Act ("Heartbeat Act") is enforceable law, making it a criminal offense to "knowingly and purposefully perform or induce an abortion on a pregnant woman with the specific intent of causing or abetting the termination of the life of the unborn human individual the pregnant woman is carrying and whose fetal heartbeat has been detected." Ohio Rev. Code §2919.195(A). Ohio enacted that legislation (one of the most restrictive abortion regulations in the country at the time) in 2019, long before

*Dobbs* overruled 50 years of federal precedent. S*ee Preterm-Cleveland v. Yost*, No. 1:19-cv-00360 (S.D. Ohio May 15, 2019) (Verified Complaint). And though plaintiffs say that they provide surgical abortion (which must be performed at an ASF or hospital) up to the current legal limit of approximately six weeks of pregnancy, they have characterized the Act as an abortion ban in two other cases challenging the law. *See Preterm-Cleveland v. Yost*, No. 1:19-cv-00360 (S.D. Ohio May 15, 2019) (Verified Complaint); *State ex. rel Preterm-Cleveland v. Yost*, No. 2022-0803 (Ohio June 29, 2022) (Original Action in Mandamus).

Plaintiffs rely on *Women's Med. Professional Corp. v. Baird*, 438 F.3d 595, 613 (6th Cir.2006)*,* and the Preliminary Injunction Order in this case, DE 28, to show that they have a liberty and property interest in their businesses and licenses, but this again neglects the implications of the *Dobbs* decision. *See* Pls.' MSJ, DE 184-1 at PageID 3360. *Dobbs* dispensed with the undue burden test and a long line of federal precedent that held that the right to a pre-viability abortion eclipsed any legitimate interest of the State. *Dobbs* also made plain that Ohio has legitimate interests in the "preservation of prenatal life at all stages of development; the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, and disability." *Dobbs,* 142 S. Ct. at 2284 (internal citations omitted).

A property interest can exist only when "a person has a 'legitimate claim of entitlement.'" *Proctor v. Krzanowski*, 820 F.App'x 436, 439-440 (6th Cir.2020) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). *Baird* expressly held that an abortion clinic does not have any property interest in an ASF "license or a waiver." 438 F.3d at 611. And under Ohio law, a license to operate

a business does not create a property right subject to traditional due process. *WCI, Inc. v. Ohio Liquor Control Comm'n*, 116 Ohio St.3d 547, 2008-Ohio-88, ¶ 24, (citing *State ex rel. Zugravu v. O'Brien*, 130 Ohio St. 23, 27 (1935) ("The holdings are uniformly to the effect that such a license does not create a property right within the constitutional meaning of that term, nor even a contract, and that it constitutes a mere permission to engage in the [] business, which may be revoked in the prescribed legislative manner")). Even if plaintiffs could show that they have a property interest in their licenses, sufficient process is conferred by Ohio Revised Code section 119.12 in the event that the Ohio Department of Health ("ODH") would propose to revoke either clinic's license, therefore no constitutional deprivation can occur. *Jefferson v. Jefferson Cnty. Pub. Sch. Sys.*, 360 F.3d 583, 588 (6th Cir. 2004) (citing *Hudson v. PaFlmer*, 468 U.S. 517, 533 (1984) ("If satisfactory state procedures are provided in a procedural due process case, then no constitutional deprivation has occurred despite the injury.")).

But even if they did have a property interest in their licenses, Plaintiffs have absolutely no property interest in a variance. In fact, Plaintiffs have no right to a variance at all because it is a "discretionary, optional, elective, and permissive decision" entrusted to Director Bruce Vanderhoff ("Director"). *Women's Med Ctr. of Dayton v. State Dept. of Health*, 2019-Ohio-1146, 133 N.E.3d 1047, ¶ 54 (2d Dist.).

While *Baird* did find a protected property interest in the continued operation of an existing abortion ASF, that operation was required and protected by federal, not Ohio, law. If anything, Ohio has routinely enacted legislation to protect the health and safety of Ohioans and to limit abortion to the extent possible under the federal mandate. *See, e.g.*, Ohio Rev. Code §2919.123(A); Ohio Rev. Code §2919.121(B)(1); Ohio Rev. Code §2919.192; Ohio Rev. Code §2317.56; Ohio Rev.

Code §2919.10; Ohio Rev. Code §3727.60. And over time, the trend has been toward the imposition of greater restrictions. *Compare, e.g.*, Ohio Rev. Code §1919.195, *with* Ohio Rev. Code §2919.201 and Ohio Rev. Code §2919.17.

Ohio has enacted a regulatory scheme to ensure for the safety of all Ohioans having surgical procedures outside of a hospital at an ASF—including surgical abortion. As part of that scheme, all Ohio ASFs must obtain a written transfer agreement ("WTA") "with a local hospital that specifies an effective procedure for the safe and immediate transfer of patients from the facility to the hospital when medical care beyond the care that can be provided at the ambulatory surgical facility is necessary, including when emergency situations occur or medical complications arise." Ohio Rev. Code §3702.303 ("WTA Requirement"). Plaintiffs freely admit that every other Ohio ASF has obtained a WTA for its licensure. 3d Am. Compl., DE 177 ¶ 37, PageID 3278. And it is only because an ASF is unable to obtain a WTA but may still prove that it can provide for the safety of its patients (through compliance with the statutory scheme which also includes any additional conditions the Director may impose pursuant to Ohio Rev. Code §3702.3011) that the General Assembly enacted legislation providing for a variance from the WTA Requirement. *See* Ohio Rev. Code §3702.304.

Moreover, Ohio Revised Code section 3727.60(B) ("Public Hospital Limitation") accomplishes what the United States Supreme Court also held to be perfectly lawful: it prevents the use of public funds to subsidize abortion in any way. *Maher v. Roe*, 432 U.S. 464, 474 (1977). There is nothing under the current federal law that suggests any "limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds." *Id.* And the Sixth Circuit very recently reiterated that Ohio

"may refuse to subsidize abortion services." *Planned Parenthood of Greater Ohio v. Hodges,* 917 F.3d 908, 912 (6th Cir.2019), (citing *Rust v. Sullivan*, 500 U.S. 173, 192 (1991)); *see also Harris v. McRae*, 448 U.S. 297, 315-17, (1980); *Maher,* 432 U.S. at 474.

Ohio's General Assembly enacted the WTA Requirement as part of a larger regulatory scheme to protect the health and safety of patients receiving care at an Ohio ASF. That body also deemed it necessary to ensure that Ohio not subsidize abortion. *See* Ohio Rev. Code §3727.60(B). Neither purpose offends the Constitution.

Without a property interest, Plaintiffs cannot succeed on their due process claims. But even if Plaintiffs could establish a property interest subject to deprivation without a pre-deprivation hearing, Ohio law provides for sufficient post-deprivation procedures. *See infra* II.C. Therefore, Plaintiffs claims fail, and this Court should grant Defendant's Motion for Summary Judgment.

## STATUTORY FRAMEWORK

### I.    The WTA Requirement

Ohio's WTA Requirement is contained in Ohio Revised Code section 3702.303. That section provides that, generally, an ASF "shall have a written transfer agreement with a local hospital." Ohio Rev. Code §3702.303(A). This WTA must "specif[y] an effective procedure for the safe and immediate transfer of patients from the facility to the hospital when medical care beyond the care that can be provided at the ambulatory surgical facility is necessary, including when emergency situations occur or medical complications arise." *Id.*

However, a WTA is not required if "[t]he director of health has, pursuant to the procedure specified in section 3702.304 of the Revised Code, granted the facility a variance from the requirement." *Id.* §3702.303(C)(2).

### II.    The Variance Provision

6

Ohio Revised Code section 3702.304 sets forth the process for obtaining a variance from the WTA Requirement. Whether to grant a variance lies solely in the discretion of the Director of ODH. The director "may" grant a variance if the ASF submits a "complete variance application, prescribed by the director," and "the director determines after reviewing the application that the facility is capable of achieving the purpose of a written transfer agreement in the absence of one." Ohio Rev. Code §3702.304(A)(1). The Director's determination is final. *Id.* To be complete, a variance application must include a number of listed items, as well as "[a]ny other information the director considers necessary." *Id.* §3702.304(B)(5). Part of a complete variance application is documentation showing that an ASF has back-up physicians with admitting privileges at one or more local hospitals in case of an emergency. *Id.* §3702.304(B)(2).

The Director "may impose conditions on any variance the director has granted." *Id.* §3702.304.3011. Moreover, "[t]he director may, at any time, rescind the variance for any reason, including a determination by the director that the facility is failing to meet one or more of the conditions or no longer adequately protects public health and safety." *Id.*

### III.  The Public Hospital Limitation

Ohio Revised Code section 3727.60(B) contains the Public Hospital Limitation. This section provides that "[n]o public hospital" shall either (1) enter into a WTA with an ASF in which nontherapeutic abortions are performed or (2) "[a]uthorize a physician who has been granted staff membership or professional privileges at the public hospital to use that membership or those privileges as a substitution for, or alternative to, a written transfer agreement for purposes of a variance application[.]" Ohio Rev. Code §3727.60(B).

### IV.  The License Suspension Provision

Ohio Revised Code section 3702.309 contains the license suspension provision. This section provides that "[i]f a variance application is denied under section 3702.304 of the Revised Code, the license of such an ambulatory surgical facility is automatically suspended." Ohio Rev. Code §3702.309(A). However, the Director "shall" reinstate the license if any of the following occurs: (1) the ASF files a copy of a proper WTA; (2) the director grants the ASF a variance; or (3) the license must be reinstated pursuant to an order arising from an administrative appeal of the license suspension. *Id.*

## RELEVANT FACTS AND PROCEDURAL HISTORY

I. **Almost seven years ago, Plaintiffs obtain a preliminary injunction of the License Suspension Provision, leaving Ohio's WTA, Variance, and Public Hospital Limitation provisions intact.**

Plaintiffs first filed their complaint in September 2015, almost seven years ago. *See* Compl., DE 1. The complaint targeted a set of health-and-safety laws governing ambulatory surgical facilities (ASFs), including the requirement that such facilities have WTAs with hospitals, the prohibition on public hospitals entering into such agreements with abortion clinics, and the provision suspending the license of any facility failing to obtain either a WTA or a variance (License Suspension Provision). *See* Compl. ¶¶ 86-97, DE 1 at PageID 23-25.

Almost immediately, Plaintiffs obtained a preliminary injunction of the License Suspension Provision—but not of the WTA Requirement, Variance, or Public Hospital Limitation provisions. *See* Preliminary-Injunction Order, DE 28 at PageID 343. This Court relied heavily on the Sixth Circuit's decision in *Baird*, noting that "the Sixth Circuit upheld the constitutionality of the WTA requirement," but determined that "the director did not afford the clinic procedural due process when he ordered the clinic closed before a hearing could be held on the proposed denial of the license application." *Id.* at PageID 326-27 (citing *Baird*, 438 F.3d at 602-11). Like the Sixth Circuit

8

in *Baird*, this Court relied on *Roe* and *Planned Parenthood of Southeastern PA v. Casey,* 505 U.S. 883 (1992) in reaching its conclusion, holding that "[t]he public interest in preserving the status quo and in ensuring access to the constitutionally protected health care services while this case proceeds is strong." *Id.* at PageID at 343 (citing *Doe v. Barron*, 92 F. Supp. 2d 694, 697 (S.D. Ohio 1999) ("A woman's right to choose to terminate her pregnancy was decided more than twenty-five years ago in *Roe v. Wade*. It is in the public's interest to uphold that right when it is being arbitrarily [or unconstitutionally] denied.")); *see also Baird*, 438 F.3d at 603 ("*Casey* and other relevant case law regarding state restrictions on abortion apply.").

In the pre-*Dobbs* legal landscape, this Court reasoned that "[o]n its face, the Director's strongest argument against a pre-deprivation hearing concerns the health and safety of the patients," but that "[t]he denial of a variance, standing alone, . . . does not plainly implicate the same obvious, direct, and compelling health and safety concerns as are present with respect to drugs, guns, and crimes." *Id.* at PageID 338, 340. Even pre-*Dobbs*, this Court's decision to enjoin the License Suspension Provision was carefully limited. The Court "recognize[d] the Director's position that the issuance of an injunction would present health and safety risks to the patients where it is not clear that the clinics have satisfied the State-identified standards for emergency care . . . ." *Id.* at PageID 342. But the Court stated that "at this time, the connection between the denial of the variance and the health and safety concerns is tenuous." *Id.* Thus, "*[g]iven the temporary nature of the relief*," the Court found that "the harm to women seeking abortion services outweighs the more theoretical harm to the patients' health and safety *at this time*." *Id.* (emphases added).

9

As a result, beginning in 2015, the License Suspension Provision was enjoined, but the WTA Requirement, Variance, and Public Hospital Limitation provisions remained in effect.

## II. For years, Plaintiffs continue to operate with the WTA Requirement, Variance, and Public Hospital Limitation provisions in effect.

With, at most, minor interruptions, Plaintiffs have continued to operate since this Court's 2015 decision enjoining the License Suspension Provision. *See* Pls.' MSJ, DE 184-1 at PageID 3471 ("Since being informed by ODH that its provision of abortion services qualified it as an ASF, PPSWO has operated with an ASF license and has sought to comply with the WTA Requirement."); *id.* at PageID 3473 (stating that "PPSWO continued to submit timely variance requests in compliance with Ohio law."); *id.* at PageID 3473-74 (noting that a 2022 state-court injunction "allow[s] Plaintiffs to continue providing procedural abortion"); *id.* at PageID 3475 (stating that "WMGPC is currently operating under the license issued in 2019"); *id.* at PageID 3477 (stating that "WMGPC continues to provide procedural abortions").

## III. In February 2022, Plaintiffs challenge the Director's denial of a variance in state court and obtain a preliminary injunction.

In February 2022, Plaintiffs filed a new lawsuit in the Hamilton County Court of Common Pleas, challenging the Director's denial of one of the plaintiffs' variance requests. *See* State-Court Injunction, DE 186-4 at PageID 3500. On June 17, 2022, the state court preliminarily enjoined the Director from "revoking or refusing to renew Plaintiffs' [ASF] license or otherwise preventing [one of the plaintiffs] from providing procedural abortion services for reasons related to non-compliance with SB 157 until final judgment is entered in this case." *Id.* at PageID 3503.

## IV. The U.S. Supreme Court holds there is no federal right to an abortion, and Ohio's Heartbeat Act again takes effect, prohibiting abortion starting around six weeks.

10

On June 24, 2022, the U.S. Supreme Court held that "the Constitution does not confer a right to abortion"; thus, "*Roe* and *Casey* must be overruled, and the authority to regulate abortion must be returned to the people and their elected representatives." *Dobbs*, 142 S. Ct. at 2279. That same day, this Court dissolved the injunction of Ohio's Heartbeat Act, which generally prohibits abortion once a fetal heartbeat has been detected. Ohio Rev. Code §2919.195; *Preterm-Cleveland v. Yost*, No. 1:19-cv-360 (S.D. Ohio June 24, 2022), DE 100. Thus, abortion in Ohio is currently prohibited beginning at approximately six weeks in pregnancy. *See* Pls.' MSJ, DE 184-1 at PageID 3470 (stating that the "the current legal limit," is "approximately six weeks in pregnancy").

A few days after this Court dissolved the injunction of the Heartbeat Act, Plaintiffs, along with other Ohio abortion clinics, then challenged the Act in a mandamus action in the Ohio Supreme Court. *State ex. rel Preterm-Cleveland v. Yost*, No. 2022-0803 (Ohio June 29, 2022) (Original Action in Mandamus). The Ohio Supreme Court denied the plaintiffs' request for an emergency stay of the Heartbeat Act, and litigation of the mandamus action continues. *Id.*, 07/01/2022 Case Announcements #2, 2022-Ohio-2317.

## RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS

### I. The Director strongly disputes Plaintiffs' claims regarding abortion safety.

Inexplicably, Plaintiffs include a section entitled "Abortion Safety" in their "Statement of Undisputed Facts," citing only to their own previously submitted declarations. Pls.' MSJ, DE 184-1 at PageID 3477-78. Plaintiffs did not submit updated declarations with their motion for summary judgment, but instead merely rely on old declarations—some of which were submitted almost seven years ago, others almost three years ago. *See* Pls.' MSJ at PageID 3470, 3477 (citing 2d Haskell Decl., DE 137-3); *id.* at PageID 3477 (citing Hillard Decl., DE 137-5); *id.* at 3469, 3477 (citing Lawson Decl., DE 3-1).

The Director strongly disputes Plaintiffs' assertions. In fact, the Director submitted two expert reports in this litigation that contradict Plaintiffs' blithe assertions that abortion is "very safe," "so safe," etc. *Id.* at PageID 3477; *see* Exs. A, B; *see infra.*

## II. Uncontroverted expert testimony demonstrates that WTAs are vital for patient safety in light of severe abortion-related complications that can and do occur.

As set forth in the Director's opposition to Plaintiffs' motion for leave to file a third amended complaint, the Director timely submitted two expert reports on December 1, 2021 per the Court's applicable calendar order. *See* Def. Opp., DE 174 at PageID 3214-15. The first expert report, by Dr. Richard J. Hamilton, concerns the importance of WTAs in significantly reducing the risk of patient harm. Ex. A, Hamilton Expert Report ¶ 13. The second report, by Dr. Russell R. Suda, concerns the benefits of WTAs in emergency medical situations. Ex. B, Suda Expert Report ¶ 2.

Plaintiffs produced no expert reports by the December 1, 2021 deadline. *See* Def. Opp., DE 174 at PageID 3214. Nor did they produce any expert rebuttal reports, or seek to depose Dr. Hamilton or Dr. Suda. Thus, the expert testimony submitted by the Director remains uncontroverted.

### A. Dr. Hamilton's expert report

Dr. Hamilton is the Chair of Emergency Medicine for the Drexel University College of Medicine and Emergency Medicine System Chair for the Crozer Health System. Hamilton Expert Report ¶ 1. His expert testimony is based on 25 years of experience as a practicing emergency physician who has both transferred patients from facilities and received patients in transfer as an emergency physician. *Id.* ¶ 11. Dr. Hamilton has testified to the standard of care regarding the care

of emergency patients, the Emergency Medical Treatment and Labor Act ("EMTALA"), and the interfacility transfer of patients. *Id.*

Dr. Hamilton's expert report demonstrates that "interfacility transfer agreements are both necessary and effective in significantly reducing the risk of harm to patients undergoing office-based procedures and surgery at ambulatory surgery centers." *Id.* ¶ 13. This is because "[patients who are transferred according to a written transfer agreement with adherence to a transfer protocol have more complete information, smoother transitions of care, and better outcomes than when there is not an agreed-upon protocol or when the transfer is not in compliance with the agreed-upon protocol." *Id.* Thus, "[i]t is in the best interest of the patient, the sending facility, and the receiving facility to have a written interfacility transfer agreement . . . ." *Id.* Dr. Hamilton notes that "a failed hand-off communication is one of the major contributing factors to sentinel events and adverse outcomes in health care[.]" *Id.* ¶ 14.

In their motion for summary judgment, Plaintiffs, without citing any expert declaration, point to EMTALA as though it solved the problem of abortion-related complications. Pls.' MSJ, DE 184-1 at PageID 3477-78. But Dr. Hamilton specifically rebutted this idea, explaining that "EMTALA obligations do not nullify the need for written transfer agreements" because "compliance with EMTALA is not the objective of a written transfer agreement." Hamilton Expert Report ¶ 26. "EMTALA stipulates that an emergency department must treat and stabilize any patient it receives," whereas "[w]ritten transfer agreements establish an agreed-upon protocol for patient transfer." *Id.* ¶¶ 25-26. Thus, Dr. Hamilton concluded that "[a]n interfacility written transfer agreement . . . is a key component of enhanced patient safety." *Id.* ¶ 29.

13

### B.  Dr. Suda's expert report

Dr. Suda is the Medical Director for the Cabarrus County Health Department of North Carolina. Suda Expert Report ¶ 1. Among many other qualifications, he has expertise in the clinical care of women's health in both Obstetrics and Gynecology, including surgical care, based on 40 years of practice. *Id.* ¶¶ 1, 12. Dr. Suda has performed hundreds of early pregnancy surgical Dilatation and Curettage ("D&C") procedures, which involve the surgical removal of tissue from the uterus after a miscarriage. *Id.* ¶ 7. In addition, he has examined many spontaneous abortion tissue specimens microscopically as a Pathologist, and thus has "an in-depth understanding of the risks of hemorrhage and organ injury, respectively, which can and do occur during a surgical abortion." *Id.* ¶ 8.

In Dr. Suda's expert opinion, "a written transfer agreement . . . contributes significantly to the well-being of patients transferred for acute care due to a complication in a surgical pregnancy termination procedure." *Id.* ¶ 3. His expert report details potential complications of surgical abortion, why transfer agreements are necessary, and what can happen when there is no agreement to communicate via a written transfer agreement. *Id.*

Dr. Suda's expert report focuses on two key types of complications in surgical abortion: (1) uterine hemorrhage and (2) uterine perforation. *Id.* ¶¶ 22-33. Regarding uterine hemorrhage, Dr. Suda states that "any surgery done after a woman's body begins to create more blood because of pregnancy puts the woman at risk for serious, and even life-threatening, hemorrhaging." *Id.* ¶ 24. "Unlike a miscarriage, a surgical pregnancy termination abortion allows the woman's uterus no time to develop a natural tissue defense against serious hemorrhage," and this "absence of significant protective separation changes makes surgical abortions more likely to be complicated

14

by brisk bleeding that is more difficult to control." *Id.* ¶¶ 28, 29. "Heavy and sustained bleeding will be life-threatening, requiring immediate transfer of the patient to a local hospital for acute care, which may include additional surgery, blood transfusions, and intravenous fluids to sustain blood pressure." *Id.* ¶ 29.

Uterine perforation, the second serious complication that can transpire during a surgical abortion, occurs "when the surgeon applies excessive pressure to the instrument inserted into the uterine cavity and in so doing forces the instrument through the wall of the uterus." *Id.* ¶ 31. "This can lead to hemorrhage and/or injury to the bowel or other organs contacted by the instrument while it protrudes through the wall of the uterus and into the cavities of the abdomen and pelvis." *Id.* Perforation of other organs "can lead to permanent injuries or death if not treated in a timely manner." *Id.* In Section III of his expert report, Dr. Suda discusses one example of an abortion-related complication involving perforation, where a 16-year-old patient nearly died due in part to poor communication during an abortion-related emergency transfer. *See id.* ¶¶ 42-45.

Regarding the importance of WTAs, Dr. Suda states that "[t]he more acute the care, the more important is the timeliness and quality of the communication." *Id.* ¶ 34. "Excessive blood loss, which is the most common problem requiring transfer to a local hospital following an abortion, can cause hypotension (low blood pressure that must be corrected to avoid shock) or even shock (severely low blood pressure that will lead to death unless corrected)." *Id.* "Having an advanced written transfer agreement in place increases the likelihood that such communications will occur in a timely fashion and that the referring physician at the ambulatory surgical facility will address the concerns of a consulting Obstetrician at the receiving hospital." *Id.* ¶ 38. In Dr. Suda's expert opinion, "[w]ith advanced planning through written transfer agreements and subsequent

communication in emergency situations, both the ambulatory surgical facility and the hospital will know what to do in the transfer situation . . . ." *Id.* ¶ 40. Thus, Dr. Suda concludes that "written transfer agreements help ensure a higher quality of care for a patient in need of transfer to a local hospital following complications with a surgical pregnancy termination procedure." *Id.* ¶ 46.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Smith v. Doe*, No. 1:14-cv-948, 2017 U.S. Dist. LEXIS 28321, at *6-7 (S.D. Ohio Feb. 28, 2017).

To succeed on a procedural due process claim, plaintiffs must establish that "(1) [they have] a life, liberty, or property interest protected by the Due Process Clause; (2) [they were] deprived of that protected interest; and (3) the State did not afford [them] adequate procedural rights prior to depriving [them] of the property interest. *Planned Parenthood Southwest Ohio Region v. Hodges*, 138 F. Supp. 3d 948, 954 (S.D. Ohio 2015). But "in situations where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake, or where the State is truly unable to anticipate and prevent a random deprivation of a liberty interest, postdeprivation remedies might satisfy due process." *Baird*, 438 F.3d at 613 (6th Cir. 2006) (quoting *Zinermon v. Burch,* 494 U.S. 113, 132 (1990)). "Determining what process is due in a given case requires consideration of a number of factors: the nature of the property interest involved (particularly its importance to the individual possessing it); the risk of an erroneous deprivation caused by inadequate procedures designed to safeguard the interest; the value, if any, that additional

16

procedures might provide; and the state's burden in having to provide additional procedures." *Hodges*, 138 F. Supp. 3d at 957 (quoting *Ramsey v. Board of Educ.,* 844 F.2d 1268, 1272 (6th Cir. 1988) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976)).

## ARGUMENT

The Director is entitled to judgment as a matter of law on each of Plaintiffs' three claims—their challenge to the WTA Requirement, the Public Hospital Limitation, and the License Suspension Provision. Plaintiffs cannot show that they have a property interest protected by the Due Process Clause. Nor can they establish that they suffered a constitutional deprivation without receiving due process. For the same reasons, Plaintiffs are not entitled to judgment as a matter of law.

## I. Plaintiffs Do Not Have A Property Interest in Their ASF Licenses or Their Surgical Abortion ASFs.

In order to succeed on their motion, Plaintiffs must show that they have a protected property interest which Ohio deprived them of without an adequate opportunity to be heard. But if plaintiffs cannot show that they have a protected property interest, plaintiffs can suffer no deprivation, and the inquiry ends there.

It is axiomatic that "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "Consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Cafeteria & Restaurant Workers Union* v. *McElroy*, 367 U.S. 886, 895 (1961).

When considering procedural due process claims, courts must consider:

17

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Eldridge*, 424 U.S. at 335. "Protected property interests are not created by the Constitution; instead 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Durham v. Martin*, No. 21-5099, 2021 U.S. App. LEXIS 34870, at *14-15 (6th Cir. Nov. 23, 2021) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). "A property interest exists when a person has a 'legitimate claim of entitlement' created by substantive limits on the state discretion to deny a right or privilege enshrined in state law." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

Plaintiffs have no property interest here for two reasons. First, consistent with *Baird,* Plaintiffs do not have a property interest in their ASF license or a variance. 438 F.3d at 611. Second, because Plaintiffs' ability to perform abortions was created and required by federal, and not Ohio, law, Plaintiffs do not have a property interest in the continued operation of their surgical abortion businesses.

After nearly 50 years of federal protection of abortion under a "inherently standardless" standard,[1] it is difficult to know just how much the substantive right of abortion (and its fervent

---

[1] The *Dobbs* majority took note of the late Justice Scalia's apt description of the difficulties in applying the undue burden standard in *Casey.* 142 S. Ct at 2272. "The inherently standardless nature of this inquiry invites the district judge to give effect to his personal preferences about abortion. By finding and relying upon the right facts, he can invalidate, it would seem, almost any abortion restriction that strikes him as 'undue' -- subject, of course, to the

protection) informed the procedural due process analysis in cases such as *Baird*. What is plain, however, is that Ohio did not create a right to obtain or perform an abortion within its borders. So no property right to the continued operation of a surgical abortion ASF can exist because that right was never "enshrined in state law." Rather, Ohio, like every other state that outlawed abortion when *Roe* was decided,[2] did the only thing it was permitted to do: it regulated and limited abortion to the extent permissible under Supreme Court precedent.

Merely because Ohio endeavored to provide health and safety protections (like those challenged here) for abortion procedures that it was compelled to allow cannot vest property interests in Plaintiffs' licenses or their businesses. The "independent source" that gave rise to those licenses and businesses was *Roe*, and now that source has run dry. Ohio law did not create these interests—it permitted them out of a necessary deference to U.S. Supreme Court jurisprudence.

It was because of *Roe* and its arrogation of Ohio's authority to regulate or prohibit abortion that plaintiff surgical abortion providers have been able to obtain ASF licenses or maintain a surgical abortion business in Ohio at all. To wit, Ohio law still reflects legislative efforts to curtail abortion even under the now aborted *Roe* regime. *See, e.g.*, Ohio Rev. Code §2919.123(A); Ohio Rev. Code §2919.121(B)(1); Ohio Rev. Code §2919.192; Ohio Rev. Code §2317.56; Ohio Rev.

---

possibility of being reversed by a court of appeals or Supreme Court that is as unconstrained in reviewing his decision as he was in making it." *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) (Scalia, J., dissenting).

[2] "By the end of the 1950s, according to the *Roe* Court's own count, statutes in all but four States and the District of Columbia prohibited abortion 'however and whenever performed, unless done to save or preserve the life of the mother.' This overwhelming consensus endured until the day *Roe* was decided. At that time, also by the *Roe* Court's own count, a substantial majority—30 States—still prohibited abortion at all stages except to save the life of the mother. And though *Roe* discerned a 'trend toward liberalization' in about 'one-third of the States,' those States still criminalized some abortions and regulated them more stringently than *Roe* would allow. In short, the 'Court's opinion in *Roe* itself convincingly refutes the notion that the abortion liberty is deeply rooted in the history or tradition of our people.'" *Dobbs*, 142 S. Ct. at 2253.

Code §2919.10; Ohio Rev. Code §3727.60. With each subsequent law, the General Assembly imposed even greater restrictions on abortion. *Compare, e.g.*, Ohio Rev. Code §1919.195 with Ohio Rev. Code §2919.201 and Ohio Rev. Code §2919.17.

Regardless, *Baird* itself was quite limited. First, as noted above, the Sixth Circuit's 2006 decision in *Baird* necessarily relied on now discarded abortion jurisprudence. *See, e.g.*, *Baird*, 438 F.3d at 603 ("Accordingly, we evaluate the written transfer agreement requirement as applied to the Dayton clinic under the undue burden framework enunciated in *Casey*."). Second, the court's discussion of property interests in licenses and business operations was also narrowly cabined. The court pointed out that "first-time applicants for liquor or entertainment licenses do not have a protected property interest." *Id.* at 611. Based on that precedent, the court held that the abortion clinic "has no property or liberty interest in a license for its operation[.]" *Id.* And while the court noted that the Constitution generally "protects a person's choice of careers and occupations," *id.* at 612, the Sixth Circuit has since clarified that there is no "freestanding right to perform abortions." *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 912 (6th Cir. 2019).

In any event, a business must be sanctioned by state law to have any chance at entitlement to protected property interests. *Id.* at 612 n.11 (citing *United States v. Tropiano*, 418 F.2d 1069, 1076 (2d Cir. 1969) ("The right to pursue a *lawful* business . . . has long been recognized as a property right within the protection of the Fifth and Fourteenth Amendments of the Constitution."); *Small v. United States*, 333 F.2d 702, 704 (3d Cir. 1964) ("The right to pursue a *lawful* business or occupation is a right of property which the law protects against intentional and unjustifiable interference.") (emphases added). Now that *Dobbs* has made clear that Ohio has legitimate

interests in protecting "prenatal life at all stages of development," plaintiffs' attempt to rely on language in *Baird* that was limited to the Dayton clinic at issue in that case is unavailing. *Dobbs*, 142 S. Ct. at 2284.

Because Plaintiffs do not have any property interests to support their due process claims, their motion should be denied. But, as detailed below, they also cannot show that Ohio's scheme fails to afford them notice and an opportunity to be heard, so the Director is entitled to judgment as a matter of law.

II.  **Plaintiffs Cannot Establish That They Have Been Deprived of a Protected Property Interest Without Due Process, so the Director Is Entitled to Judgment as a Matter of Law.**

  A.  **Plaintiffs Have Failed to Establish That They Have Been Denied Fair Notice Regarding a Protected Property Interest.**

Again, to succeed here, Plaintiffs must establish that "(1) [they have] a life, liberty, or property interest protected by the Due Process Clause; (2) [they were] deprived of that protected interest; and (3) the State did not afford [them] adequate procedural rights prior to depriving [them] of the property interest." *Hodges*, 138 F. Supp. 3d at 954. But because they lack a protected property interest, they cannot suffer a deprivation requiring fair notice.

  i.  ***Plaintiffs do not have a protected property interest in receiving a variance from the WTA Requirement.***

Plaintiff's attack on the WTA Requirement (Pls.' MSJ, DE 184-1 at PageID 3361-64) is sleight of hand. Plaintiffs assert (*id.* at 21) that they "meet all three elements of a procedural due process claim," but they never explain how they have a protected property interest in a variance—which is Step 1. Instead, Plaintiffs move straight to Step 2 (deprivation), contending that the Director has "deprive[d] Plaintiffs of fair notice of what is required to obtain a variance." *Id.* at 21.

The Court need not even reach this question because the Sixth Circuit's decision in *Baird* already established that Plaintiffs do not have a protected property interest in a waiver or variance from the WTA Requirement.

In *Baird*, the Sixth Circuit considered a regulation nearly identical to the WTA Requirement at issue here. Ohio Administrative Code section 3701-83-14, challenged in *Baird*, gave ODH's Director full discretion to grant a variance or waiver of the WTA Requirement. *See* 438 F.3d at 599 (citing Ohio Admin. Code §3701-83-14(D)). The Sixth Circuit held that the plaintiff clinic "had no property interest in the waiver" and thus "no right to due process before the waiver was denied." *Id.* at 615. The court's reasoning was simple: "Ohio law grants [the Director] absolute discretion when he is deciding whether to approve a waiver request." *Id.* Under well-settled precedent, "a party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." *Id.* (quoting *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002)).

The same is true here. Ohio law gives ODH's Director full discretion when it comes to granting or rescinding variances. *See* Ohio Rev. Code §3702.304(A)(1) ("The director of health *may* grant a variance from the written transfer agreement requirement . . . if . . . the director determines after reviewing the application that the facility is capable of achieving the purpose of a written transfer agreement in the absence of one." (emphasis added)). Section 3702.3011 makes this complete discretion even clearer:

> The director of health may impose conditions on any variance the director has granted under section 3702.304 of the Revised Code. The director may, *at any time*, rescind the variance *for any reason* . . . . The director's decision to rescind a variance is final.

22

Ohio Rev. Code §3702.3011 (emphases added). Thus, Plaintiffs' challenge to the WTA Requirement and the Director's alleged "arbitrary" enforcement of it in granting or denying variances fails as a matter of law. Plaintiffs "ha[ve] no property interest" in the variance and thus "no right to due process before the [variance] [is] denied." *Baird*, 438 F.3d at 615. As with the WTA Requirement at issue in *Baird*, Plaintiffs here can "establish no more than a 'unilateral expectation'"—not a protected property interest. *Id.* (quoting *Med Corp.*, 296 F.3d at 409-10).

### ii. Regardless, the Director has not deprived Plaintiffs of any protected property interest without due process.

Even if Plaintiffs had a protected property interest in a variance—they do not—The Director has not deprived them of any required fair notice. Plaintiffs' statement of facts makes clear that The Director appropriately notified Plaintiffs when it either denied or accepted variance requests. *See, e.g.*, Pls.' MSJ, DE 184-1 at PageID 3349 ("ODH informed PPSWO that it did not comply with the ASF licensing requirements[.]" (citing Lawson Decl.); *id.* at PageID 3351 ("ODH granted PPSWO's variance request listing four backup physicians on November 27, 2015." (citing Compl. ¶ 85; Answer ¶ 85)); *id.* ("On August 30, 2021, ODH granted PPSWO's variance request." (citing Letter from Def. Vanderhoff to Pl. PPSWO)).

Plaintiffs' cited cases (at PageID 3363-64) are inapt. Plaintiffs cannot credibly claim they have received "no time to adapt to [a] shortened period" of statutory compliance. *See Campbell v. Bennett*, 212 F. Supp. 2d 1339, 1344 (M.D. Ala. 2002) (ballot-access case where defendants had enforced a new deadline for independent candidate registration only a week after the statute was precleared). Nor does Plaintiffs' case involve an "impossibility of compliance with the statute," as Plaintiffs have been obtaining waivers or variances from the WTA Requirement for years. *See* Pls.' MSJ, DE 184-1 at PageID 3349-51. *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d

786, 789 (7th Cir. 2013); *see also United States v. Dumas*, 94 F.3d 286, 291 n.3 (7th Cir. 1996). Plaintiffs seek to rely on non-binding cases that do not even involve variances from written-transfer-agreement requirements.[3] Indeed, Plaintiffs offer only one binding case in their attempt to establish a fair-notice violation regarding variances: *Baird*. *See* Pls. MSJ at PageID 3360-61. But as discussed above, *Baird* undercuts Plaintiffs' entire argument. Plaintiffs cite *Baird* (at PageID 3360-61) regarding the "immediate shut-down of [an] abortion provider's practice" but fail to note *Baird*'s holding that ODH's director did *not* violate procedural due process by denying a request for a waiver of the WTA Requirement. *See Baird*, 438 F.3d at 611 ("[W]e agree that [plaintiff clinic] did not have a property interest in the license or the waiver . . . ."). Thus, Plaintiffs cannot establish that they are entitled to summary judgment on their fair-notice claim. Indeed, Plaintiffs' contentions here fail as a matter of law.

For all these reasons, the Director move for summary judgment on Count III of Plaintiffs' Third Amended Complaint, "Procedural Due Process – Plaintiffs – Fair Notice," which challenges "[t]he WTA Requirement" and the Director's alleged "arbitrary enforcement thereof." 3d Am. Compl. ¶ 143, DE 177 at PageID 3301.

---

[3] Unlike in *Hallmark Clinic v. N.C. Dep't of Human Res.*, 380 F. Supp. 1153 (E.D.N.C. 1974), Plaintiffs have the option of obtaining a variance from the WTA Requirement. As for *Planned Parenthood of Kan. & Mid-Missouri Inc. v. Drummond*, No. 07-4164-CV-C-ODS, 2007 U.S. Dist. LEXIS 70808 (W.D. Mo. Sep. 24, 2007), the court there directed plaintiffs, going forward, to "seek specific deviations and/or waivers from specific requirements" relating to the construction of new abortion facilities. *Id.* at *28. Here, Plaintiffs have had the opportunity to seek variances, have sometimes received those variances, but are unhappy that at times the Director has denied particular variance requests when they have failed to meet the requirements. *See* Pls.' MSJ at PageID 3349-51. And in *Hodes & Nauser, MDs, P.A. v. Moser,* the court ultimately found that "because this shortened [three day] time frame did not allow for the serious examination contemplated by the Tenth Circuit's standard and because the preliminary injunction does not represent an unambiguous indication of probable success on the merits, the court determines that plaintiffs are not prevailing parties.") No. 2:11-cv-02365-CM-KMH, 2012 U.S. Dist. LEXIS 69406, at *2 (D. Kan. May 18, 2012).

### B. Ohio's Public Hospital Limitation is not an unconstitutional delegation of licensing authority.

Plaintiffs assert that the WTA Requirement and the Public Hospital Limitation operate in tandem to unconstitutionally delegate licensing decisions to private parties. But as detailed above, that claim fails for want of a cognizable property interest.

Independently, both the WTA Requirement and the Public Hospital Limitation's prohibition on the use of public funds for abortion-related services were perfectly constitutional even under *Roe's* undue burden standard. *See EMWomen's Surgical Ctr., P.S.C. v. Friedlander*, 978 F.3d 418, 439 (6th Cir.2020) (holding that Kentucky's written transfer agreement and transport laws were rationally related to a legitimate interest and did not impose an undue burden on a woman's ability to obtain an abortion); *Baird*, 438 F.3d at 607 (holding that Ohio's written transfer requirement was lawful as it served the purpose of ensuring that abortion clinics "meets certain minimum standards."); *see also Maher* , 432 U.S. at 474 (a state welfare regulation was valid even though it funded childbirth services but not abortion because there is no constitutional "limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds."); *Rust v. Sullivan*, 500 U.S. 173 (1991) (Congress' refusal to fund programs that advocated abortion as a method of family planning did not offend the Constitution); *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 911 (6th Cir.2019) (affirming prior precedent that a government may refuse to subsidize abortion services). That is beyond question now that *Dobbs* discarded the undue burden standard in favor of rational basis review. These regulations, even together, do not then transform from constitutionally valid to improper delegations merely because plaintiffs cannot meet the legal requirements of Ohio's licensing scheme.

Plaintiffs further claim that the alternative available under law—a variance—is also an unlawful delegation. But Plaintiffs cannot challenge the Variance Provision here because, just a month after they filed their third amended complaint in this case, plaintiffs chose to challenge Ohio's variance process in Ohio state court rather than in the instant case. *See Women's Medical Group Professional Corp., v. Vanderhoff,* Hamilton Cnty. C.P. No. 2200704 (2022). Just as in *Baird*, then, this Court need only consider whether there is an alternative to the WTA Requirement provided under law, and there is: the Variance Provision. Ohio Rev. Code §3701.304.

The Sixth Circuit said in *Baird* that because *Reizen* or *Hallmark* were distinguishable, the Court need not consider whether those cases were correctly decided. *Baird*, 438 F.3d at 610 ("We need not decide today whether *Hallmark Clinic* and *Reizen* were correctly decided..."). Nor must this Court. Even if the WTA Requirement were an unlawful delegation—it is not—all this Court need consider now is if there is an alternative to that requirement. Plaintiffs chose not to challenge the variance procedure in this case, so the legality of that scheme will be decided where plaintiffs chose to challenge it.

In addition, plaintiffs concede that the Director has total discretion to approve a variance under the law, regardless of the requirements. Pls.' MSJ, DE 184-1 at PageID 3345. Because the Director alone has the ultimate authority to approve and issue variances, there can be no unconstitutional delegation here.

Ohio's General Assembly enacted the WTA Requirement and Public Hospital Limitation as part of a larger regulatory scheme to protect the health and safety of patients receiving care at an Ohio ASF. That body also deemed it necessary to ensure that Ohio not subsidize abortion. Neither purpose offends the Constitution.

26

For these reasons, this Court should grant the Director judgment as a matter of law.

**C. The License Suspension Provision does not violate due process.**

Ohio Revised Code §3702.309 provides that, if the Director denies a variance or does not rule on a variance within 60 days, an ASF without a written transfer agreement is prohibited from performing surgical procedures while its licensure status is adjudicated. The ASF's license can be reinstated if one of the following occurs: (1) the facility files a written transfer agreement as is generally required, (2) the Director subsequently grants a variance, or (3) reinstatement is ordered pursuant to administrative proceedings. Ohio Rev. Code §3702.309. Thus, once an ASF's license is suspended, it may remedy its shortcomings as set forth in Ohio Rev. Code §3702.309, or it will be subject to license revocation proceedings. *See* Ohio Rev. Code §3702.32(D)(2).

Plaintiffs allege that the licensing structure in Ohio Revised Code §3702.309 violates their right to due process. Again, to establish a procedural due process claim, Plaintiffs must show that (1) they had a life, liberty, or property interest protected by the Due Process Clause; (2) they were deprived of this protected interest; and (3) the State did not afford them adequate procedural rights prior to depriving them of the property interest. *See Baird*, 438 F.3d at 611 (6th Cir. 2006) (citing *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999)). Applying this standard here, even if Plaintiffs have a protected property interest in their license (they do not) and the license-suspension process deprives Plaintiffs of this interest, Ohio's licensing structure provides adequate procedural rights before a final revocation.

Plaintiffs' arguments to the contrary fail. Plaintiffs incorrectly claim that they have no post-suspension hearing. Pls.' MSJ, DE 184-1 at PageID 3480. This claim completely ignores the existence of full administrative rights, including a hearing, after the suspension of a license and

27

prior to any final revocation. The statute itself makes clear that the suspension does not constitute an ASF's last opportunity to be heard on the issue of its entitlement to continue to operate. Specifically, the statute provides that a license can be reinstated in one of three ways: (1) the ASF can try again to obtain a WTA from a local hospital, (2) it can renew its request for a variance with the Director, or (3) it can seek to have the license reinstated by an order through the administrative adjudication procedures under Chapter 119 of the Ohio Revised Code. Ohio Rev. Code §3702.309. Ohio Revised Code §119.06 also expressly provides for post-deprivation administrative review of a license suspension: "[w]hen a statute permits the suspension of a license without a prior hearing, any agency issuing an order pursuant to such statute shall afford the person to whom the order is issued a hearing upon request."

If an ASF is unable or unwilling to correct the deficiencies in its license, the Director will issue a notice of intent to revoke the license, which gives the facility an additional opportunity to request a full administrative hearing. *Id.* §§119.06, 119.07. At that time, the ASF can present, if available, testimony and evidence as to why its license should not be revoked. *Id.* Thereafter, an ASF may appeal an adverse decision to the appropriate court of common pleas, and the decision by that court is itself appealable. *Id.* Thus, as the statutes expressly contemplate, if any error in the suspension is identified through this process, the license will be reinstated. Plaintiffs wholly disregard the substantial and sufficient post-suspension and post-revocation due process that is afforded to them. The administrative proceedings set forth in Ohio Revised Code section 119.06 are more than sufficient to satisfy due process.

Moreover, this Court, and the court in *Baird*, recognized that post-deprivation procedures can be sufficient to satisfy due process: "'[n]ot every deprivation of liberty or property requires a

predeprivation hearing or a federal remedy' and, in some instances, due process may be satisfied by adequate post-deprivation remedies alone." Preliminary Injunction Order, DE 28 at PageID 335 (citing *Ramsey v. Board of Educ.*, 844 F.2d 1268, 1272 (6th Cir 1988)); *see also Baird*, 438 F.3d at 614 (citing *Leary v. Daeschner*, 228 F.3d 729, 743 (6th Cir. 2000) ("In some cases, postdeprivation review may possibly be sufficient, and no predeprivation process is required."). "Determining what process is due in a given case requires consideration of a number of factors: the nature of the property interest involved (particularly its importance to the individual possessing it); the risk of an erroneous deprivation caused by inadequate procedures designed to safeguard the interest; the value, if any, that additional procedures might provide; and the state's burden in having to provide additional procedures." *Ramsey*, 844 F.2d at 1272 (citing *Eldridge*, 424 U.S. at 334-35).

Considering these factors here, and in light of Ohio's legitimate interest in protecting "prenatal life at all stages of development," *Dobbs*, 142 S. Ct. at 2284, the post-suspension process alone provides sufficient due process to Plaintiffs. The U.S. Supreme Court recently recognized that states may regulate abortion for legitimate reasons, including the state's interest in "protecting the life of the unborn." *Dobbs* , 142 S. Ct. at 2239. Ohio has clearly expressed its legitimate interest in protecting life through various abortion-related regulations, including the "Human Rights and Heartbeat Protection Act." *See* Ohio Rev. Code §2919, et seq.

Moreover, Ohio has expressed its interests in regulating ASFs to protect patient safety through its ASF licensing scheme. As discussed at length above, Dr. Hamilton and Dr. Suda's uncontroverted expert reports establish that WTAs serve as a vital protection of the health and safety of patients in light of the severe complications that can and do result from surgical abortion. When an ASF lacks a written transfer agreement, it fails to comply with a requirement the State

has deemed necessary to safeguard patients' safety. That means that the facility is performing surgical procedures on patients without the State's chosen mechanism for ensuring that a hospital is prepared and willing to admit and treat those patients in the event they have complications requiring hospital care. It is thus reasonable for the State to believe that allowing the facility to continue to operate beyond 60 days without a determination that the facility can achieve the objective of the WTA or, worse, after the Director has already determined in his expert discretion that the facility cannot achieve those objectives, puts patients' health at risk. Here, there is no dispute that an ASF does not meet the quality standards as set forth in Ohio Revised Code section 3702.30, unless it maintains either a WTA or a variance. And the license-suspension process is directly related to the lack of a variance or WTA. Ohio Rev. Code §3702.309.

Ohio's licensing scheme and post-suspension process affords Plaintiffs ample procedural rights and withstands constitutional scrutiny. Plaintiffs' contentions fail as a matter of law; therefore, this Court should grant judgment in favor of the Director.

## CONCLUSION

For the forgoing reasons, this Court should deny Plaintiffs' Motion for Summary Judgment and grant the Director's Motion for Summary Judgment.

<div style="margin-left:40%">

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Amanda L. Narog*
AMANDA L. NAROG (0093954)*
ANDREW D. MCCARTNEY (0099853)
HEATHER L. BUCHANAN (0083032)
*Lead and Trial Counsel*
Assistant Attorneys General

</div>

*Counsel for Defendant Bruce Vanderhoff*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 19, 2022, the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing has been served by e-mail or facsimile upon all parties for whom counsel has not yet entered an appearance.

*/s/ Amanda L. Narog*

AMANDA L. NAROG (0093954)
Assistant Attorney General