*Exhibit B*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **PLANNED PARENTHOOD** | : | |
| **SOUTHWEST OHIO REGION,** *et al.*, | : | |
| | : | |
| Plaintiffs, | : | **Case No. 1:15-CV-568** |
| | : | |
| v. | : | **JUDGE MICHAEL R. BARRETT** |
| | : | |
| **BRUCE T. VANDERHOFF,**[1] | : | |
| *In his official capacity as* | : | |
| *the Director of the Ohio* | : | |
| *Department of Health,* | : | |
| | : | |
| Defendant. | : | |

EXPERT REPORT OF RUSSELL R. SUDA, M.D.

1.  I am Russell R. Suda.  I am the Medical Director for the Cabarrus County Health Department of

    North Carolina.  I have expertise in microscopic and gross tissue analysis of disease with a

    specialization in Obstetric and Gynecologic tissue analysis. I also have expertise in the clinical

    care of women's health in both Obstetrics and Gynecology, including surgical care.  My business

    address is 300 Mooresville Road, Kannapolis, North Carolina 28081.

**Assignment**

2.  I have been retained by the Ohio Department of Health principally to provide expert testimony

    regarding the benefits of written transfer agreements in emergency medical situations.

---

[1] Bruce T. Vanderhoff has been named the Director of the Ohio Department of Health and
automatically substitutes as a defendant in this case.  Fed. R. Civ. P. 25(d).

**Summary of Opinions**

3.  My overall opinion in this matter is that written transfer agreements coordinate care between clinical care entities, which positively impacts the quality and timeliness of care when emergency response is required in the form of patient transfer.  In addition, a written transfer agreement worked through in advance by the referral and recipient institutions contributes significantly to the well-being of patients transferred for acute care due to a complication in a surgical pregnancy termination procedure.  I will explain how written transfer agreements address: (1) potential complications of surgical abortion, (2) why transfer agreements are necessary, and (3) what can happen when there is no agreement to communicate via a written transfer agreement.  I explain the bases of these opinions in the sections below.

**Qualifications**

4.  I am Board Certified in the medical fields of Anatomic Pathology and Obstetrics and Gynecology, and I have more than 40 years of clinical experience working in private and public health, academia, and military medicine.  After graduating from St. Louis University Medical School in 1978, I completed my first residency, which was in the field of Anatomic Pathology, at the University of Missouri.  Following my Pathology residency, I completed a residency in Obstetrics and Gynecology at Johns Hopkins University.

5.  Upon completing my residencies, I had dual appointments in the Obstetrics and Gynecology and Pathology Departments at the New York Medical College (1985-1986) and then at the University of Oklahoma Medical Center (1986-1990).  While at the University of Oklahoma and the New York Medical College, I was a consulting physician for Obstetrics and Gynecology to the Emergency Department.  I also was the Medical Director of medical student education in Obstetrics and Gynecology at the New York Medical College.  Following my work with the

University of Oklahoma, I went into private practice for 12 years and then worked as a physician at the Fort Stewart Hospital in Hinesville, Georgia.  In 2004, I became the Medical Director for the Cabarrus Health Alliance in North Carolina, which serves as the local health department for Cabarrus County.  In 2007, in addition to being the Medical Director, I became the Assistant Public Health Director for Cabarrus County.

6.  Part of my responsibilities at the New York Medical College and the University of Oklahoma Medical Center was to teach Obstetrics and Gynecology and Anatomic Pathology to resident physicians and medical students.  My areas of teaching included the integration of microscopic tissue analysis into the practice of Obstetrics and Gynecology.

7.  In addition to teaching, I also have extensive clinical experience.  My work has included examining early pregnancy tissues removed from the uterus and clinical experience performing the Dilatation and Curettage[2] surgical procedure (D&C).  I have performed hundreds of early pregnancy surgical D&Cs.  These procedures involve the surgical removal of tissue from the uterus after a miscarriage (death of the fetus in the first half of pregnancy).  A D&C for a miscarriage typically occurs in pregnancies up to the 13th week of pregnancy.  The dilatation part of the D&C involves a mechanical dilatation of the cervix with several metal dilator rods of increasing diameter.  The curettage part of the D&C involves inserting a metal loop into the uterine cavity and withdrawing it from the top of the uterine cavity through the dilated cervix where the tissue is deposited in the vagina and collected in a specimen container to be sent to the Pathology Department for microscopic analysis.  The interior wall of the uterine cavity is scraped sequentially around its full circumference in order to remove all the tissue of the expired

---

[2] See the glossary at the end of this report for definitions of these terms.

pregnancy.  It is very common for the surgeon to also insert a plastic catheter attached to a

suction machine to augment the tissue removal process.  A D&C can also be performed on a

living pregnancy and typically is limited to 13 weeks.  This type of D&C is called a first trimester

surgical abortion.  Finally, a D&C can also be performed on a nonpregnant patient when the

lining tissue of the uterus has tissue changes suggestive of precancer or cancer; these entities are

called Endometrial Hyperplasia or Endometrial Cancer, respectively.  As a surgeon, I have

personally seen and managed cases with uterine hemorrhage and/or perforation occurring as

complications with the D&C surgical procedure.

8.  I have also examined many spontaneous abortion tissue specimens microscopically as a

Pathologist.  This work has provided me with an understanding of the microscopic and gross

tissue changes that occur in the uterus during the early stages of pregnancy.  By observing and

understanding these tissue changes, I have an in-depth understanding of the risks of hemorrhage

and organ injury, respectively, which can and do occur during a surgical abortion.

9.  I am presently working on written transfer agreements with a network of caregivers involved in

the care of substance-using pregnant patients.  I have recruited specialists in Psychiatry,

Addiction Medicine, Neonatology, Pain Management, Family Medicine and Emergency

Medicine into a collaborative care network for pregnant substance-use disorder patients over the

past five and a half years.  In my experience, specialists in behavioral health, pain management,

and addiction medicine are often understandably concerned about managing a patient with a

substance-use problem because of concerns about adversely affecting the fetus in utero during

the pregnancy through medications they may prescribe.  As the Obstetrician heading up this

project, I have had to work to create consultative care arrangements so that the specialists would

participate.  Memorandums of Understanding have been written and signed by the participating

care institutions because cooperation in the past was not achieved by simply sending a patient

for a consultation to the physician's institution.  We achieved successful consultation only after having an advanced discussion and agreement that collaboration of care would be entered into by both parties when the patient is sent to the consultative site.  Consultant specialists' fears about treating pregnant women had to be allayed by the assurance that I, as the Obstetrician, would lead the care as the primary provider of care and take responsibility for the outcome of the pregnancy.

10. These advanced written agreements created a collaborative care network where there was little to no cooperation before the agreements.  The Release of Information and Memoranda of Agreement were worked out in conjunction with the University of North Carolina's School of Government and conform with the Federal Regulations of HIPPA and Confidentiality for Substance Use patient care embodied in 42 C.F.R. Part 2.  The work on this collaborative document began in January 2019 and extended into the spring of 2020.  The Substance Use Network Project presently has 10 institutions signed on for cooperative sharing of medical records on these patients, and a monthly care coordination meeting takes place for sharing information to enhance the quality of care for these complex pregnant patients.

11. Substance-use pregnant patients require collaborative care from the specialties listed above.  We have all found that meeting to agree upon the strategy to move patients from physician to physician ahead of time is effective in achieving an integrated network of care.  Written transfer agreements between ambulatory surgical facilities and local hospitals is even more critical than in substance-use scenarios due to the acute problems of hemorrhage and surgical abortion injury.

**Bases of My Opinions**

12. I provide the following opinions as an expert in Obstetrics and Gynecology who has practiced in this specialty for 40 years and who has seven years of teaching Obstetrics and Gynecology at

5

two university hospital residency programs in Obstetrics and Gynecology. As a teacher, I had the opportunity to assist resident Obstetricians in training on surgical procedures, and in this setting, I had the opportunity to manage complications, which are more common in training programs with new physicians. The opinions herein are based on my education; training in two related fields with board certification in both Obstetrics and Gynecology and Anatomic Pathology; and decades of clinical experience, including coverage of several Emergency Rooms as an Obstetric and Gynecologic consultant and role as the Emergency Medicine caregiver at a Veterans Hospital where I worked part time during my residency training.

13. I am being compensated for my services in this matter at the rate of $150.00 per hour for a maximum of 133.33 hours, plus expenses incurred.

14. I have not testified as an expert at trial or by deposition in any cases other than this one within the previous four years.

15. My education, training, experience, and publications are set forth in my curriculum vitae, a copy of which is attached as Appendix A to this report.

16. I continue to review materials and documents related to this case and reserve the right to supplement this expert report based on any additional work that I may be asked to do.

**Documents Reviewed**

17. As part of my assignment, I have reviewed the most recent complaint filed by Plaintiffs in this case, Planned Parenthood Southwest Ohio Region and Women's Med Group Professional Corporation, as well as Defendant's Response in Opposition to Plaintiff's Motion for a Temporary Restraining Order and/or Preliminary Injunction, filed in October 2019. Additionally, I have reviewed Ohio Revised Code sections 3702.303 and 3702.304, the expert declarations of Dr. Paula J. Hillard and Dr. Norman Schneiderman, Women's Med Center

Dayton's August 30, 2017 request for a variance, and Planned Parenthood Southwest Ohio

Region's March 30, 2018 request for a variance. I have also reviewed Obstetrics and Pathology

medical articles along with an Embryology text on early pregnancy anatomy and physiology.

**Background**

18. I understand that the Plaintiffs are suing the Director of the Ohio Department of Health

regarding Ohio's written transfer agreement requirements for ambulatory surgical facilities.

19. It is my understanding that under Ohio law, an ambulatory surgical center must generally have a

written transfer agreement with a local hospital detailing the steps to be taken by the referral

institution (ambulatory surgical centers) in transferring a patient to the Emergency Room of the

recipient hospital. I understand that this is to assure the facilitation of an efficient transfer

process for the protection of the health and well-being of the transferred patient.

20. I also understand that in circumstances precluding a written transfer agreement, an ambulatory

surgical facility can apply for a variance that compensates for the lack of a transfer agreement by

providing a list of physicians in good standing with the state medical board who sign on as

consultant physicians capable of being called in to manage a transferred patient from said

ambulatory surgical facility on a 24/7 basis, and that back-up physicians are signed on for this

consultative 24/7 call coverage to a total depth of four consultant physicians.

21. It is my understanding that the Plaintiffs have entered into both written transfer agreements and

variance agreements in the past with various hospitals.

**I. The Complications of Surgical Abortion**

22. There are two types of surgical abortion complications that are most relevant in causing the

transfer of a surgical abortion patient: uterine hemorrhage, which manifests as heavy vaginal

bleeding, and uterine perforation with a surgical instrument during the abortion procedure. A

7

hemorrhage refers to a large amount of bleeding during a short period of time. A uterine perforation occurs when the surgeon applies excessive pressure to the instrument inserted into the uterine cavity and thereby forces the instrument through the wall of the uterus. Each will be addressed in turn.

**A. Uterine Hemorrhage**

23. Pregnancy causes a rapid increase in blood flow to the uterus to support the nutritional and waste elimination needs of the baby. During pregnancy, the total blood volume in the mother's body increases by 60-70%. This increase begins when the embryo embeds into the uterine lining, which occurs roughly five to seven days after the sperm fertilizes the egg (i.e., conception) in the Fallopian Tube. Attachment of the embryo and the cells destined to become the placenta to the uterine lining tissue results in the release of signal molecules by the early placental cells, which in turn causes the production of mucus by the uterine lining tissue glands and the ingrowth of blood vessels at the base of the embedding pregnancy. In effect, the uterine lining tissue thickens and produces glandular nutrients to support the growth of the pregnancy while the rapid and elaborate growth of blood vessels into the pregnancy embedding site bring more and more blood to the pregnancy. Over the course of weeks, the cells of the placenta actually grow into these blood vessels and make them wider in diameter, which in time develop into sinuses of maternal blood. Sinuses are best likened to pools of blood that with each passing week hold more and more blood. This is referred to as the uterine blood congestion of pregnancy. The placenta grows as fronds of cell clusters floating in the sinuses of maternal blood.

24. Because of this large increase in blood flow to the uterus during pregnancy and the formation of pools of maternal blood, a surgical procedure to remove (abort) an early pregnancy will result in

a larger loss of blood than the same surgical procedure done on a non-pregnant uterus. Thus, any surgery done after a woman's body begins to create more blood because of pregnancy puts the woman at risk for serious, and even life-threatening, hemorrhaging.

25. To understand the risks associated with surgical abortions, it is helpful to compare the body's response to a miscarriage with the body's response to a surgical abortion (pregnancy termination abortion) of a healthy, intact pregnancy. During a miscarriage, the uterine tissue undergoes microscopic changes during pregnancy deterioration and after fetal death that help prevent life-threatening hemorrhaging. I have examined specimens of surgical tissue from women who have suffered a miscarriage. These examinations revealed that pregnancy tissue passed after an intrauterine fetal death had microscopic tissue changes. These changes include fibrinoid degeneration, villous fibrosis, and decreased villous vascularity, to name the more common microscopic tissue changes. These changes take place where the placenta has attached to the uterine lining. The changes occur as the fetus is dying and continue after fetal death to prepare the body's expulsion of the expired fetus and placenta from the uterus.

26. These microscopic changes in the uterine lining tissue are a tissue response process meant to separate the pregnancy from the uterine lining tissue. The changes may be described as a gradual reduction in blood flow to the pregnancy attachment site with the formation of a blood clot layer between the placenta and the uterine lining. The end result is a degenerated pregnancy being "walled off" from the surrounding uterine lining, which then can be expelled from the uterus with less risk for hemorrhage. These changes in the uterine tissue can easily be seen by microscopic examination of the tissue sent to the Pathology Department for tissue examination under the microscope.

27. As an Obstetrician, I have learned to take advantage of this tissue separation process, such that when a patient comes to me with a miscarriage and is not yet bleeding, I purposely do not schedule a D&C on the day of presentation of the miscarriage. Instead, I allow a short time for the separation process to proceed, which is typically two to three days, and this results in a D&C with less blood loss. Even with allowing these microscopic tissue changes to proceed, very heavy uterine bleeding can still occur during the surgical removal of the expired pregnancy from the uterus (the D&C). In some cases, blood needs to be transfused into the woman because of the extent of the blood loss.

28. Unlike a miscarriage, a surgical pregnancy termination abortion allows the woman's uterus no time to develop a natural tissue defense against serious hemorrhage. A surgical pregnancy termination abortion separates a fully functional placenta from the uterine lining tissue, and this entails dissection of the tissue plane receiving pregnancy-heightened uterine and fetal blood flow without any of the significant protective separation changes described above. While the tissue removed from the uterus at the time of a surgical pregnancy termination abortion may have some localized tissue changes like fibrinoid degeneration, it is more than three times less common than in the tissue removed from the uterus of a woman who needed a D&C for a miscarriage.[3] Fibrinoid degeneration acts as a barrier between the viable uterine lining tissue and the degenerated placental tissue.

29. The absence of significant protective separation changes makes surgical abortions more likely to be complicated by brisk bleeding that is more difficult to control. Therefore, uterine contraction, which can occlude bleeding vessels by "squeezing" bleeding vessels closed at the

---

[3] *See* Anwar Ul Haque et al., *Pathology of Chorionic Villi in Spontaneous Abortions*, Int'l J. Pathology 2(1): 5-9 (2004).

10

site of the surgical separation is very important to stop the bleeding.  If uterine contracture cannot squeeze the bleeding vessels to near closure, then maternal clotting factors will be unable to plug the bleeding uterine vessels of the uterine wound at the separation site.  Heavy and sustained bleeding will be life-threatening, requiring immediate transfer of the patient to a local hospital for acute care, which may include additional surgery, blood transfusions, and intravenous fluids to sustain blood pressure.  And in cases of hemorrhagic shock, ventilator support may be needed for adequate lung function and oxygen uptake (i.e., oxygen binding to red blood cells).

30. The closest surgical procedure to the surgical pregnancy termination procedure is the gynecologic D&C, and both these procedures are performed either in the operating room of a hospital or in ambulatory surgical facilities that have an affiliation with a transfer hospital.  In my experience with the D&C procedure for first trimester miscarriage, surgical pregnancy termination creates a significantly greater risk of hemorrhagic complications than a gynecologic D&C.  The outpatient procedure substitute for a gynecologic D&C is an Endometrial Biopsy, which does not need to be performed at an ambulatory surgery site because it involves the removal of a piece of tissue the size of a matchhead.  The purpose of an Endometrial Biopsy and the Gynecologic D&C is to extract tissue from the uterine cavity in order to make a diagnosis of precancer or cancer of the lining tissue of the uterus.  The gynecologic D&C and the surgical pregnancy termination D&C involve the removal of most of the intrauterine lining tissue and, in the case of the pregnancy termination D&C, all of the pregnancy tissue.

**B.  Perforation**

31. Another serious complication of a surgical abortion, and any type of D&C, is uterine perforation.  This complication occurs when the surgeon applies excessive pressure to the

11

instrument inserted into the uterine cavity and in so doing forces the instrument through the wall of the uterus.  This can lead to hemorrhage and/or injury to the bowel or other organs contacted by the instrument while it protrudes through the wall of the uterus and into the cavities of the abdomen and pelvis.  This unintended protrusion can necessitate a laparotomy, which is opening the abdominal wall to explore and repair any injury to the intraabdominal and/or intrapelvic organs.  This injury can require removal of the uterus (i.e., hysterectomy) if the damage to the uterus is extensive and obviates repair of the uterus.  A laparoscopy may be needed to determine if there is injury and bleeding from other organs, such as the small or large bowel, spleen, liver, kidney, or ovary.  Perforation of any of these organs can lead to permanent injuries or death if not treated in a timely manner.  Perforation of the uterus is a serious complication of any D&C, and it becomes most serious when it results in surgical injury to the organs outside the uterus.

32.  Importantly, the risk of uterine perforation during a D&C is increased by pregnancy.  Pregnancy changes the consistency of the uterine wall from firm to soft.  This change is primarily the result of the uterine congestion with increased blood flow to the uterus that the pregnancy causes in the uterus.  The surgeon performing a D&C pregnancy termination abortion has to be careful to measure the depth of the uterine cavity with an instrument called a Uterine Sound so that he or she does not insert the aspirator or the curette more deeply into the cavity than it measures (which would significantly increase the likelihood of perforating the uterine wall with the instrument).  However, perforation of the uterine wall may still occur if the depth determination is followed, and this is because the uterus is not necessarily straight in its anatomical lie in the pelvis.  It frequently is deviated anteriorly or posteriorly in the first trimester of pregnancy and in such angulated lies can be perforated by an inserted instrument just above the cervix as it enters the uterine cavity.  The softer composition of the uterine walls in pregnancy coupled with the

angulated lies (which are very possible) is the reason uterine perforation is so much more common in the pregnant state.

33. In Section III of my report, I discuss one example of an abortion-related complication involving perforation.

**II. The Need for a Written Transfer Agreement**

34. Preparation through communication is the reason to require written transfer agreements. Clear communication is never a handicap. In fact, according to national data on medical mistakes in hospitals, failure to communicate diagnostic information in the delivery of medical care is a major contributor to medical mishaps.[4] The more acute the care, the more important is the timeliness and quality of the communication. Any time a woman is transferred from a surgical abortion facility to a hospital she needs acute care. Excessive blood loss, which is the most common problem requiring transfer to a local hospital following an abortion, can cause hypotension (low blood pressure that must be corrected to avoid shock) or even shock (severely low blood pressure that will lead to death unless corrected). The time a patient spends in a hypotensive state, or especially in shock, the more likely she is going to suffer organ damage or even death.

35. Communication between the abortion provider and the emergency room physician preparing to take care of a bleeding patient first centers on the patient's estimated blood loss and her state of consciousness. The greater the estimated blood loss—especially if the patient has lost consciousness from the blood loss—the greater is the need to have O negative blood ready for

---

[4] Hardeep Singh et al., *Reducing Diagnostic Errors through Effective Communication*, J. Gen. Internal Med. 23(4): 489-94 (2007); Kathleen M. Sutcliffe et al., *Communication Failures: An Insidious Contributor to Medical Mishaps*, Acad. Med. 79(2): 186-94 (Feb. 2004); Joseph G. Murphy et al, *Medical Errors and Poor Communication*, Am. Coll. Chest Physicians 138(6): 1292-93 (Dec. 2010).

13

transfusion into the patient on arrival at the hospital.  Emergency Room physicians can be ready for transfusing patients on arrival by virtue of a patient evaluation and assessment communicated during the transfer process by the surgeon at the ambulatory surgical facility referring the patient.  Time is critical to avoid life-threatening complications from a hemorrhage. Blood banks need time to select and warm the blood and then send it to the Emergency Room. Saving this time can be important when a patient is in shock from blood loss and when every second counts to restore adequate blood volume in the patient.  This is necessary for re-establishing adequate blood pressure and the delivery of oxygen for organ recovery from oxygen deprivation that occurred while the patient was in shock.

36. Describing the nature and extent of the patient's injury complication is another important communication between the ambulatory surgical abortion facility and the receiving hospital. With regard to a surgical pregnancy termination abortion, if the surgeon who performed the abortion believes that a perforation has occurred, then the Obstetrician being so informed and responding to the Emergency Room consultation request can determine if the patient requires both a vaginal and abdominal approach simultaneously in the Operating Room.  The Obstetrician can call for assistance to accomplish this while on the way to the Operating Room. The provider at the ambulatory surgical center should inform the hospital whether a perforation is suspected.  As noted above, a laparoscopy may be necessary when there has been a perforation in order to determine what injury, if any, has occurred to the patient's organs outside the uterine cavity in the abdominal or pelvic cavities.

37. Identifying and treating these organ injuries is time sensitive, as these injuries can lead to oxygen deprivation organ injury or death.  Communication from the provider at the ambulatory surgical center that a perforation is likely greatly helps in preparing for a prompt surgical evaluation of the abdomen as well as the uterus.  If there is no communication regarding a potential

14

perforation, it is very possible that the hospital physicians will focus on treating the vaginal bleeding and will become aware of an injury in the abdomen or pelvis later as the patient fails to recover as expected from the treatment for the uterine hemorrhage. This can cause significant delay in examining the abdominal-pelvic cavity, which can lead to organ damage from oxygen deprivation and a second trip to the Operating Room that may have been avoided with a timelier surgical exam of the abdomen and pelvis. I have been involved in emergency cases where two Obstetricians worked on the patient simultaneously because of two problems: uterine hemorrhage and intraabdominal/pelvic damage with bleeding into the abdominopelvic cavity.

38. Having an advanced written transfer agreement in place increases the likelihood that such communications will occur in a timely fashion and that the referring physician at the ambulatory surgical facility will address the concerns of a consulting Obstetrician at the receiving hospital. It is very important that the possibility of uterine perforation be communicated during the transfer process. A case in point is the emergency situation I describe later in this report. As discussed below, when I arrived at the Emergency Room for the consultation, I witnessed something protruding from the patient's vagina and I needed time to make the diagnosis of extruded Colon. I then had to page General Surgery for assistance. Response times are not always instantaneous because of physicians being involved with other cases. If I would have known about this perforation injury ahead of patient arrival, I could have called and explained the acute, emergency need for General Surgery assistance and time to surgery would have been reduced. A written transfer agreement would address this issue of describing the nature and extent of any injury complication before the patient arrives at the Emergency Room.

39. National guidelines for the prevention and treatment of obstetric hemorrhage have been developed to make the response to obstetric hemorrhage timely and effective. Both the World Health Organization and the International Federation of Gynecology and Obstetrics support the

15

use of protocols in the management of postpartum hemorrhage.[5]  Having an established care protocol with specific steps occurring in response to clinical indicators (low blood pressure, severe anemia) yields improved outcomes.  Having an advanced written transfer agreement between facilities helps coordinate the facilities' protocols and helps ensure that the communication will occur.  Preparing in advance with a structured approach to Obstetric hemorrhage is the correct approach to expedient care and one of the reasons why ambulatory surgical abortion facilities need to have a written transfer agreement in place.  The importance of communicating before the patient's arrival to facilitate the timely application of transfused blood and control of hemorrhaging cannot be overemphasized.

40. When every moment counts, there really is no limit to the types of communication that would be helpful when transferring a patient from an ambulatory surgical abortion facility to a local hospital.  Any information the surgeon at the ambulatory surgery facility can provide to prepare the receiving Emergency Room and consulting physician(s)—such as important medical facts like obesity and comorbid illnesses—can be invaluable.  More pertinent questions than "why communicate" are "why *not* communicate" and "why *not* plan for this communication."  I do not know of a genuine reason to avoid communication or to avoid planning for this patient transfer communication.  With advanced planning through written transfer agreements and subsequent communication in emergency situations, both the ambulatory surgical facility and the hospital will know what to do in the transfer situation and what to expect from the others involved.  There is no reason not to plan.

---

[5] André Lalonde, *Prevention and Treatment of Postpartum Hemorrhage in Low-Resource Settings*, Int'l J. Gynecology & Obstetrics 117: 108-18 (2012); WORLD HEALTH ORGANIZATION, *WHO Recommendations for the Prevention and Treatment of Postpartum Hemorrhage* (2012).

41. In addition, it is my medical opinion that a variance to the written transfer agreement as outlined in Ohio Revised Code § 3702.304 achieves the goal of having a physician of relevant training (an Obstetrician-Gynecologist or at a minimum a General Surgeon) available whenever a transfer is necessary so that valuable time for assessment and treatment of the incoming, high-acuity patient is not lost attempting to locate such a consultative specialist—which in the absence of a variance may not even be attainable in a smaller hospital institution—at a time of acute surgical need.

**III. What Can Happen When There Is No Agreement To Communicate**

42. In my professional experience, I have dealt first-hand with poor communication during an abortion-related emergency transfer. While I was on the faculty with the University of Oklahoma Medical Center, I received a transfer patient from a pregnancy termination clinic. The patient was a 16-year-old who had suffered a uterine perforation and a tearing of the descending colon from the fixed position at the spleen. The colon was pulled down through the uterine perforation and out through the vagina to be exteriorized onto the exam table between the patient's legs. As the consulting Obstetrician for the emergency department, I was paged to the emergency room. At no point in time did I receive any communication from the surgeon or anyone else at the surgical pregnancy termination clinic. The emergency room staff hurriedly gave fluids and called for blood, as the patient was in shock and comatose on arrival. It took time to determine what had happened and what I was looking at. When I finished examining the patient's pelvis and vaginal area, I knew I needed a general surgeon to assist me in the abdominal surgery. The page then went out to recruit the general surgeon on call.

43. Had we received a phone call from the surgeon who performed the abortion, the emergency room physician could have had both necessary consultative physicians called and even possibly

in the emergency room to expedite care when the patient arrived.  Said another way, the lack of communication delayed emergency care.

44. I never received any transfer information from this ambulatory surgical center when I addressed other patients transferred in for post-abortal hemorrhage.  Nor can I remember an instance when I was given the opportunity to review any medical records sent along with the patient.  In essence, both verbal and written communications were nonexistent.  This makes for delay in care because the receiving service providers cannot access information which would take them to the present moment in time to begin care.  Instead, the receiving service providers must expend critical time on evaluative measures in an effort to understand why the patient is in the present condition so that the most appropriate next step in care is taken.

45. This 16-year-old patient nearly died and had multiple follow-up surgeries to manage her colostomy and reconnect her colon.  She had her left tube and ovary unintentionally torn off and removed by the surgical instrument which perforated her uterus during the abortion but did manage to maintain her uterus.  Time counts in these kinds of cases, and advance communication, facilitated by a transfer agreement that was already in place, would have greatly shortened the time it took for the patient to get to the operating room.

## IV. Conclusion

46. A written transfer agreement between an ambulatory surgical facility (and specifically in this case with a surgical pregnancy termination facility) is a measure to ensure that communication occurs regarding the nature of the transfer patient's medical complication.  Communication is evidence-based in its positive contribution to the quality of medical care delivered to patients, especially at times of high acuity.  Thus, written transfer agreements help ensure a higher quality of care for a

patient in need of transfer to a local hospital following complications with a surgical pregnancy termination procedure.

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness I would testify competently thereto.

Dated: November 29, 2021

_____

RUSSELL R. SUDA, M.D.

19

**Glossary of Medical Terms**

- **D&C/dilatation and curettage**—refers to the necessary dilatation of the cervix with progressively larger metal rod-like instruments; the dilatation makes it possible to then insert an instrument into the cavity of the uterus for removal of tissue therein; the removal instrument can be metal and generally shaped in a loop for retraction of lining tissue down through the cervix; a plastic suction instrument can also be inserted for aspirating tissue out of the uterine cavity

- **Decreased villous vascularity**—refers to the early placental tissue that is normally grape-like in shape and filled with fetal blood vessels, but with fetal death at miscarriage these blood vessels quickly deteriorate and decrease in number, which is visible under a microscope

- **Fibrinoid degeneration**—refers to blood components such as proteins and red blood cells deposited around and into the embedded pregnancy tissue that forms a membrane like sheet around the chorionic villous (placental tissue); much more common in miscarriage tissues than medical abortion tissues

- **Hemorrhagic shock**—low blood volume shock resulting from acute hemorrhage, characterized by low blood pressure, rapid heart rate, pale, cold and clammy skin, and little to no urine production

- **Villous fibrosis**—refers to the deterioration and degeneration of blood vessels into fibrous scar with few or no remaining blood vessels inside the villous (placental) tissue

# APPENDIX A

# CURRICULUM VITAE

### *PERSONAL DATA*

Name:                        Russell R. Suda, Sr., M.D.

Email                        russell.suda@cabarrushealth.org


Work Address:                Cabarrus Health Alliance
                             300 Mooresville Road
                             Kannapolis, NC. 28081

Work Telephone:              (704) 920-1278

# CURRICULUM VITAE

## *EDUCATION*

| | |
|---|---|
| Undergraduate:<br>Premed/Biology<br>1970-1974 | Washington University<br>St. Louis, Missouri<br>A. B. Biology |
| Doctor of Medicine:<br>1974-1978 | St. Louis University Medical School<br>St. Louis, Missouri |
| First Residency:<br>1978 -1981 | Anatomic Pathology<br>University of Missouri<br>Columbia, Missouri |
| Second Residency:<br>1981 -1985 | Obstetrics and Gynecology<br>The Johns Hopkins Hospital<br>Johns Hopkins University<br>Baltimore, Md. |
| Certification:<br>September 1978 | FLEX Examination |
| November 1983 | American Board of Pathology<br>Anatomic Pathology |
| December 1987 | American Board of Obstetrics and Gynecology<br>Oral and Written Board Exams |
| Recertification: | Permanently Board Certified Anatomic Pathology<br>("Grandfathered")<br><br>Passed all recertification exams in Obstetrics and<br>Gynecology and am certified presently through Dec 2021 |

# CURRICULUM VITAE

### *PROFESSIONAL EXPERIENCE*

Military Service:        None

Licensure:        North Carolina – 2003 to present
                Lic # 200301416  Cert # 118692
                DEA #
        Washington – 1990 to 2003 (#MD00028107 025209)
        California – 2003 (#C042643)
        Oklahoma – 1986 (#15942)
        New York – 1985
        Maryland – 1983
        Missouri – 1979

Professional History:        Graduated from Medical School 1978
            St. Louis University Medical School
        Anatomic Pathologist, Residency Training 1978-1981
            University of Missouri
        Obstetrics / Gynecology, Residency Training 1981-1985
            The Johns Hopkins Hospital
        Obstetrics / Gynecology and Pathology Departments
            Faculty New York Medical College, 1985-1986
        Obstetrics / Gynecology and Pathology Departments
            Faculty University of Oklahoma, 1986-1990
        Private Practice, Obstetrics / Gynecology,
            Cascade Valley Hospital, 1/1/1991-7/17/02
        Locums Physician at Fort Stewart, Georgia
            Winn Army Hospital, 10/6/2002-8/31/03
        Temporary Employment at Winston-Salem Health Care
            Winston-Salem, NC 11/01/2003- 3/31/04
        Locums Physician at Fort Bragg, North Carolina
            Womack Army Hospital, 5/18/04 – 9/30/04
        Medical Director of Cabarrus Health Alliance
             Kannapolis, NC, 2004- present
        Assistant Public Health Director of Cabarrus County
            2007- present
        Medical Director of Cabarrus Community Health Clinic
            8/2009 -  12/2010
        Obstetric Network Director for Pregnancy Medical Home
            Initiative     2/2011 – 6/30/2021
        Program Director of Substance Use Network Project of
        Southern Piedmont Region of North Carolina    5/2015 –
            present

# CURRICULUM VITAE

University Appointments:     Assistant Professor
University of Oklahoma College of Medicine
Department of Obstetrics and Gynecology
Division of Pathology and Gynecology
Oklahoma City, Oklahoma, 1986-1990

Adjunct Assistant Professor
University of Oklahoma College of Medicine
Department of Pathology
Oklahoma City, Oklahoma, 1988-1990

Assistant Professor
Department of Obstetrics and Gynecology
New York Medical College
Valhalla, New York, 1985-1986

Director of Medical Student Education in
Obstetrics and Gynecology
New York Medical College
Valhalla, New York, 1985-1986

Director of Cytology / Pathology
Department of Obstetrics and Gynecology
New York Medical College
Valhalla, New York, 1985-1986

Adjunct Assistant Professor
Department of Pathology
New York Medical College
Valhalla, New York, 1985-1986

Professional Organizations:     American Medical Student Association, 1974-1978
Class Representative, 1975
Participant in Medical Student Abroad Program
Oulu, Finland, Summer, 1975

American Society of Clinical Pathology
Junior Fellow, 1979-1985
Fellow, 1985– 1988

American College of Obstetrics and Gynecologists

# CURRICULUM VITAE

Junior Fellow, 1982-1987
Fellow, 1987 – Present

Oklahoma City Obstetrics and Gynecological Society
1986-1990

Oklahoma County Medical Society
1986-1990

Central (US) Association of Obstetrics and Gynecology
1988-1990

Committees:                       Chairman
                                  Credentials Committee
                                  Cascade Valley Hospital
                                  2001-2002

                                  President of Medical Staff
                                  Cascade Valley Hospital
                                  January 1999 – December 2000

                                  Chairman
                                  Pharmacy and Therapeutics Committee
                                  University of Oklahoma College of Medicine
                                  Oklahoma City, Oklahoma
                                  1989-1990

                                  Member, Patient Care Committee
                                  University of Oklahoma College of Medicine
                                  Oklahoma City, Oklahoma
                                  1989-1990

                                  Member, Dean's Task Force on Student/Resident Health
                                  University of Oklahoma College of Medicine
                                  Oklahoma City, Oklahoma
                                  1990

                                  Member, University of Oklahoma College of Medicine
                                  Admissions Board
                                  1989-1990

                                  Member, P & T Committee
                                  University of Oklahoma College of Medicine
                                  Oklahoma City, Oklahoma

# CURRICULUM VITAE

1986-1988

Credentials Committee of CMC Northeast Hospital
Concord, NC
July 2009 - 2015

Medical Director,
Crisis Pregnancy Center of Snohomish County
State of Washington, 1998-2002

| | |
|---|---|
| Awards: | OB/GYN Chairman's ThreeYear Excellent Teaching Award 1989, University of Oklahoma Health Sciences Center |
| | Excellent Teaching Award by Medical Student Selection 1986-1987, UOHSC |
| | Excellent Teaching Award by Medical Student Selection 1987-1988, UOHSC |
| | Excellent Teaching Award by Medical Student Selection 1988-1989, UOHSC |
| | Excellent Teaching Award by Medical Student Selection 1989-1990, UOHSC |

### GRANTS

Award - $25,000
University of Oklahoma College of Medicine
Subj:  DNA in situ Hybridization Diagnoses of Human
Papilloma Virus of Cervix

| | |
|---|---|
| Board Memberships: | Hispanic Learning Center Concord, NC 2005-2007 Vice President 2006-2007 Ex officio 2007 – 2010 |
| | Healthy Cabarrus of Concord 2007 – 2008 |
| | North Carolina Research Center Kannapolis, NC March 2009 – 2012 |
| | Crisis Pregnancy Ctr of Concord Member of Board August 2012 through 2013 Medical Director |

# CURRICULUM VITAE

August 2012 - present

## *PUBLICATIONS*

### SCIENTIFIC REPORTS

Suda, RRsr, Repke JR, Steer R, et. al, Metastatic Adenocarcinoma of the Lung Complicating Pregnancy.  A Case Report.  J Reprod Med, 1986; 31:11

Morgan M, Moutos D, Pippitt CHjr, Suda RRsr, Smith J, Thurnau G: Vaginal and Bladder Angiosarcoma After Therapeutic Irradiation.  South Med J, 1989; 82 (11): 1434-36

### JOURNAL ARTICLES AND BOOK CHAPTERS

Suda, RRsr, Case Presentation. Pathology in Perspective: In, Thurnau GR, Fishburne Jljr: Proceedings of the Obstetrics and Gynecology Journal Club, Oklahoma City, OK, Quarterly Publication, Department of Obstetrics and Gynecology, 1987; Vol 3 (1):23

Suda, RRsr, Case Presentation. Pathology in Perspective: In, Thurnau GR, Fishburne Jljr: Proceedings of the Obstetrics and Gynecology Journal Club, Oklahoma City, OK, Quarterly Publication, Department of Obstetrics and Gynecology, 1987; Vol 3 (2):48

Suda, RRsr, Case Presentation. Pathology in Perspective: In, Thurnau GR, Fishburne Jljr: Proceedings of the Obstetrics and Gynecology Journal Club, Oklahoma City, OK, Quarterly Publication, Department of Obstetrics and Gynecology, 1987; Vol 3 (2):127

## *LECTURES*

| | |
|---|---|
| 1994- 2001 | Sexual Health and Reproduction; Archbishop Murphy High School<br>State of Washington |
| 1994, 1995, 2001 | Sexual Health and Reproduction; Arlington High School<br>State of Washington |

Lectures in Private Practice (Pharmacia-Upjohn Corp)

# CURRICULUM VITAE

March 31, 2001        The Use of Tolteridine as a Diagnostic and Therapeutic Agent for Mixed Uropathy; Seattle Physician and Nurse Practitioner Group

June 22, 2001        The Use of Tolteridine as a Diagnostic and Therapeutic Agent for Mixed Uropathy; Arlington Physician and Nurse Practitioner Group